IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FUHU, INC., *et al.,*[1] | ) | Case No. 15-12465 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' OPERATING ASSETS, (B) SCHEDULING AN AUCTION AND SALE HEARING, (C) APPROVING BID PROTECTIONS, AND (D) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Debtors Fuhu, Inc. and Fuhu Holdings, Inc., the above-captioned debtors and

debtors in possession herein (the "Debtors"), file this motion (this "Bidding Procedures Motion")

for entry of an order:  (a) approving bidding procedures for the sale of substantially all of the

Debtors' operating assets, including approval of bid protections; (b) scheduling an auction and

hearing to consider the sale of the assets; (c) approving procedures for the assumption and

assignment of certain executory contracts and unexpired leases; and (d) granting related relief,

including but not limited to approving the form and manner of notices related to the foregoing.

Concurrently herewith, the Debtors are filing the *Motion of Debtors for Order*

*(A) Approving Asset Purchase Agreement and Authorizing the Sale of Substantially All of the*

*Debtors' Operating Assets; (B) Authorizing the Sale of Assets Free and Clear of All Liens,*

*Claims, Rights, Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 105,*

*363(b), 363(f) And 363(m); (C) Assuming and Assigning Certain Executory Contracts and*

---

[1]   The Debtors, together with the last four digits of each Debtor's tax identification number, are:  Fuhu, Inc. (7896);and Fuhu Holdings, Inc. (9761).  The location of the Debtors' headquarters and service address is 909 N. Sepulveda Blvd., Suite 540, El Segundo, CA  90245.

*Unexpired Leases; and (D) Granting Related Relief* (the "Sale Motion"), which seeks

authorization of the sale of substantially all of the operating assets of the Debtors to (i) Mattel,

Inc. (the "Stalking Horse" or the "Purchaser"), pursuant to the terms of an asset purchase

agreement (the "Agreement") to be finalized consistent with the terms of that certain *Term Sheet*

*for the Acquisition of the Assets of the Fuhu Entities* dated December 6, 2015, a copy of which is

attached to the Sale Motion as Exhibit A (the "Term Sheet"), and acceptable to the Debtors and

the Purchaser,[2] or alternatively, (ii) the highest or otherwise best bidder for such assets

determined in accordance with the proposed bid procedures.  As discussed below and in the Sale

Motion, the proposed sale is in the best interests of the Debtors, their estates, and creditors.

      In support of this Bidding Procedures Motion, the Debtors respectfully state as

follows:

### Jurisdiction and Venue

      1.    The United States Bankruptcy Court for the District of Delaware (the

"Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference from the United States District Court for the District of*

*Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28

U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection

with this Motion to the extent that it is later determined that the Court, absent consent of the

---

[2] The Agreement will be filed as a supplement to the Sale Motion prior to hearing on the Bidding Procedures Motion.

parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are sections 105, 363, 365, 507, 1107, and 1108 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b) and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

### Background

4.      On the date hereof (the "Petition Date"), the Debtors each filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No request has been made for the appointment of a trustee or an examiner in these cases, and no official committee has yet been appointed by the Office of the United States Trustee.

6.      The factual background regarding the Debtors, including their current and historical business operations and the events precipitating the chapter 11 filing, is set forth in

detail in the *Declaration of James Mitchell in Support of First Day Motions* (the "First Day Declaration") filed concurrently herewith and fully incorporated herein by reference.[3]

**The Assets to Be Sold**

7.      Pursuant to the Sale Motion, the Debtor seeks approval of the sale (the "Sale") of substantially all of its assets necessary to the operation of its business, and certain claims and liabilities to be assumed by the Stalking Horse, all as more fully set forth in the Agreement (collectively, the "Assets").  Under the Agreement, the total consideration to be paid by Purchaser to Debtor for the Assets will be the sum of $9,500,000, subject to certain adjustments,  in cash, paid by a combination of a credit bid of the Pre-Filing Loan (as defined below) and cash, plus the assumption of the Assumed Liabilities (as defined in the Agreement).

8.      In light of the marketing process already undertaken (as described below) and the additional efforts that will be made post-petition during the proposed sale process, the timing of the sale proposed herein is reasonable under the circumstances to effectuate a sale to either the Stalking Horse under the terms of the Agreement or, alternatively, to a higher and better bidder for the Assets.  Furthermore, the Debtors believe that the proposed timetable for the sale is reasonable by minimizing exposure of the Debtors' business to the uncertainties associated with bankruptcy, while at the same time providing an adequate opportunity for competing bids to be solicited.  The Purchaser has also imposed certain deadlines on the Debtors under the Agreement in order to accomplish the sale.

---

[3] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Day Declaration except, as provided in footnote no. 2, those capitalized terms otherwise undefined herein that reference the Agreement shall have the meaning ascribed to them in the Agreement.

9.      The principal deadlines set forth in the Agreement are summarized below:

- Entry of an order approving this Motion (the "Bidding Procedures Order") by no later than **December 21, 2015**;

- Deadline to (a) submit competing bids, (b) object to the sale, (c) object to assumption/assignment and cure claims (no deadline in Agreement; the Debtor proposes **January 21, 2016**);

- Auction no later than **January 25, 2016**;

- Entry of the Sale Order no later than **January 29, 2016**; and

- Closing of the Sale to occur no later than **February 15, 2016**.

10.     In light of the pre-petition marketing efforts and the Debtors' current financial condition, the Debtors believe that the sale process provides sufficient time to fully expose the Assets for sale in the hope of achieving a competitive bidding process.

**Marketing Process**

11.     The Debtors commenced the process of evaluating restructuring and sale options in September 2015. The Debtors' senior management planned and implemented a trip to Asia, during which they attempted to negotiate a sale with certain of the Debtors' shareholders and major creditors. While in Asia, the Debtors' senior management also met with and discussed the sale opportunity with numerous other potential buyers. These negotiations and discussions were conducted with chief executive officers, chief acquisitions officers, and other senior representatives of the companies involved, but they were ultimately unsuccessful.

12.     In October 2015, the Debtors increased their restructuring and sale efforts and hired KRyS Global USA ("KRyS") as their exclusive investment banker. Under the terms of its agreement, KRyS was tasked with pursuing a sale or capital placement transaction for the

5

Debtors. On October 30, 2015, as directed by the Board of Directors of the Debtors, KRyS began a full-sale effort to contact parties to determine their interest in the acquisition of or investment in the Debtors. Interested parties were asked to participate in an initial discussion with KRyS to hear about the opportunity and ask questions about the Debtors' assets. To date, KRyS has contacted more than 500 potential bidders, representing both financial and strategic potential buyers. The Debtors' management and KRyS have had in-depth discussions with high-ranking executives at approximately 15 potential strategic or financial buyers. Many of these discussions have included multiple follow-up sessions and are still ongoing. As of the Petition Date, nine of the potential bidders have executed confidentiality agreements and have been provided a Confidential Information Memorandum and data-room access. KRyS continues to contact additional potential interested parties and to work with parties to conduct due diligence.

13.    The Debtors concluded that the Purchaser was the party that offered the greatest value for the Debtors' assets, as well as the only party that was in a position to move quickly enough to a transaction in light of the Debtors' difficult financial circumstances. On December 6, 2015, the Debtors entered into the Term Sheet with the Purchaser regarding a sale of substantially all of the Debtors' operating assets, plus the assumption of certain liabilities.

14.    The Term Sheet is subject to definitive documentation in the form of the Agreement. The Debtors and the Purchaser contemplate entering into the Agreement shortly after the Petition Date and filing it with the Court. The Agreement will be subject to higher and better bids and, ultimately, the approval of the Court.

## Secured Debt Obligations of the Debtor

15.     LSQ Funding Group, L.C. ("LSQ") factored certain of the Debtors' accounts receivable under a Factoring and Security Agreement dated April 21, 2015. Although LSQ factored only a limited subset of the receivables, it holds a first-priority security interest in all of the Debtors' receivables. As of the Petition Date, the outstanding amount owed to LSQ on account of factored receivables was approximately $1.3 million. There are disputes between the Debtors and LSQ regarding the collection of the factored receivables.

16.     Obsidian Agency Services, Inc., as Agent for Tennenbaum Special Situations Fund IX, LLC and Tennenbaum Special Situations IX-O, L.P. (collectively, "Tennenbaum"), holds a first-priority security interest in substantially all of the assets of the Debtors other than accounts receivable, as well as a second-priority security interest in the Debtors' accounts receivable, under a Credit Agreement dated May 27, 2015, as amended, and a Guaranty and Collateral Agreement of the same date. As of November 25, 2015, Tennenbaum asserted that it was owed approximately $6.5 million by the Debtors, which includes principal of approximately $5.4 million, accrued interest of approximately $65,000, a yield-enhancement fee of $400,000 and an early-termination fee of $700,000. Since that date, Tennenbaum has swept approximately $300,000 in cash from the Debtors for application to its debt.

17.     The Debtors granted two related suppliers, Fusing International, Inc. and Hon Hai Precision Industry Co., Ltd. (collectively, "Foxconn"), purchase-money security interests in approximately 35,000 tablets sold by Foxconn to the Debtors in October 2015. The outstanding balance owed to Foxconn from that transaction is approximately $2 million. The

7

Debtors are uncertain whether Foxconn provided the notice to Tennenbaum that would have permitted Foxconn to obtain priority over Tennenbaum's security interest in the tablets sold by Foxconn. The Debtors promptly resold the tablets at issue to retailers in advance of the holiday season, generating accounts receivable. Under Section 9-324(b) of the Uniform Commercial Code, even if Foxconn's security interest in its inventory collateral had priority over Tennenbaum's, Foxconn's security interest in proceeds does not. Accordingly, Foxconn has a third-priority security interest in the accounts receivable generated by the sale of the inventory at issue. Foxconn also claims to be owed approximately $61 million on an unsecured basis arising from unrelated transactions. The Debtors have significant disputes with Foxconn arising out of Foxconn's mishandling of products intended for sale during the 2014 Christmas season and other events.

18.     The Stalking Horse made a loan of $300,000 to the Debtors on or about December 4, 2015 (the "Pre-Filing Loan") to provide funding necessary to permit the Debtors to complete their preparations for the commencement of these cases, including the documentation of the Sale. The Pre-Filing Loan is secured by substantially all of the Debtors' assets and was perfected by the filing of financing statements in applicable Delaware and California filing offices on or about December 4, 2015.

### Continued Sale Process

19.     While the pre-petition marketing and sale process was thorough, as discussed above, the Debtors will send notice of the Sale Motion and Bidding Procedures to all parties that the Debtors believe may be potentially interested in acquiring the Assets promptly

8

after the Court's consideration of this Bidding Procedures Motion.  The Debtors will also

maintain their electronic data room with key documents and company-specific information in

order to streamline the due diligence process going forward.  The data room has been, and will

be, available to interested parties who have, or will, execute confidentiality agreements

acceptable to the Debtors.  The Debtors and their advisors will continue to respond to inquiries

from prospective buyers through the bid deadline approved by the Court for alternative bidders

to bid on the Assets and will continue to engage KRyS as their investment banker.

> 20.      In light of the pre-petition marketing efforts, the Debtors believe that the

sale process provides sufficient time to fully expose the Assets for sale in the hope of achieving a

competitive bidding process.  The Debtors believe that the consummation of the Sale to the

Purchaser, or other Successful Bidder, will provide their creditors and other stakeholders with

the best opportunity possible for maximizing the value of the Assets.  Except as otherwise

provided in definitive documentation with respect to the Sale, all of the Debtors' rights, title and

interest in and to the Assets shall be sold free and clear of all pledges, liens, security interests,

encumbrances, claims, charges, options and interests thereon.

### Relief Requested

> 21.      Pursuant to this Bidding Procedures Motion, the Debtors request that the

Court, among other things:

> (a)      approve the Purchaser's status as the Stalking Horse, including, pursuant
>
>           to the terms of the Agreement, the requested break-up fee equal to
>
>           $300,000 (the "Break-Up Fee"), an expense reimbursement not to exceed

9

$200,000 (the "Expense Reimbursement"), and reimbursement of the

$300,000 Pre-Filing Loan (the "Pre-Filing Loan Reimbursement," and

collectively, the "Bid Protections"), which Bid Protections will have

administrative claim status in the Debtors' cases pursuant to section

503(b) of the Bankruptcy Code;

(b)   approve the Bidding Procedures attached as Annex 1 to the proposed

Bidding Procedures Order;

(c)   approve the form and sufficiency of the Auction and Hearing Notice

attached as Annex 2 to the proposed Bidding Procedures Order;

(d)   approve the Assignment Procedures attached as Annex 3 to the proposed

Bidding Procedures Order;

(e)   approve the form and sufficiency of the Assignment Notice attached as

Annex 4 to the proposed Bidding Procedures Order;

(f)   approve the form and sufficiency of the Auction Results Notice attached

as Annex 5 to the proposed Bidding Procedures Order;

(g)   approve the form and sufficiency of the Creditor Notice attached as Annex

6 to the proposed Bidding Procedures Order;

(h)   approve the form and sufficiency of the Further Assignments Notice

attached as Annex 7 to the proposed Bidding Procedures Order; and

(i)   schedule a hearing to consider approval of the Sale on or before

January 28, 2016.

DOCS_DE:203684.1 29396/001

22.    A proposed form of Bidding Procedures Order is attached hereto as

**Exhibit A**.

**Proposed Bidding Procedures**

23.    The proposed Bidding Procedures are attached to the proposed order as

Annex 1. The Bidding Procedures are summarized as follows:[4]

(a)    Qualified Bid. To participate in the bidding process and to have a bid considered by the Debtors, each Potential Bidder must deliver a written offer or offers satisfying the below criteria. A "**Qualified Bidder**" is a Potential Bidder that delivers a binding bid that in the Debtors' discretion (after consultation with any official committee of creditors appointed in these cases (the "**Committee**")) satisfies the following criteria (a "**Qualified Bid**"). The Stalking Horse (i) shall be deemed a Qualified Bidder, and the bid reflected in the Agreement shall be deemed a Qualified Bid without compliance with the requirements below, and (ii) for the avoidance of doubt, shall not be required to serve as the Backup Bidder and shall not be required to post a Deposit.

(b)    Bid Deadline. Each bid package must be delivered in written and electronic form (where available) to: (a) (i) Debtors' counsel, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067 (Attn: Jeffrey N. Pomerantz, jpomerantz@pszjlaw.com and Michael R. Seidl, mseidl@pszjlaw.com), and Bryan Cave LLP, Two North Central Ave., Suite 2200, Phoenix, AZ 85004 (Attn: Robert J. Miller, rjmiller@bryancave.com and Brian C. Walsh, brian.walsh@bryancave.com), (ii) KRyS Global USA 57 W. 57th St., 4th Floor, New York, NY 10019 (Attn: Grant Lyon, glyon@krysglobalusa.com, (b) counsel to the Committee, if any, and (c) counsel to any secured creditor that has entered an appearance in these cases so as to **actually be received no later than January 21, 2016, at 4:00 p.m. (prevailing Eastern Time) (the "Bid Deadline")**. Complete versions of such bids, excluding confidential financial information, shall be forwarded by the Debtors to the Stalking Horse no later than 8:00 p.m. (prevailing Eastern Time) on the Bid Deadline.

---

[4]  To the extent that there are any inconsistencies between the summary description of the Bidding Procedures contained herein and the Bidding Procedures, the terms of the Bidding Procedures control.

11

(c)    Bid Package.    Each bid must include (collectively, the "**Bid Package**"): (i) a written and signed irrevocable and binding offer letter stating that (w) the bidder offers to consummate a transaction on terms and conditions no less favorable than those found in the Agreement and in an amount at least equal to the Minimum Bid (as defined below), (x) confirming that the bid will remain irrevocable and binding until five business days following the entry of the Sale Order, (y) that the Bidder has had the opportunity to conduct due diligence prior to its offer and does not require further due diligence, has relied solely upon its own independent review and investigation and did not rely on any written or oral representations except as expressly set forth in the Modified Agreement (defined below), and (z) the Bidder shall, if designated as such in accordance with these procedures, serve as the Backup Bidder (defined below) until the consummation of the transaction pursuant to the Successful Bid; (ii) an executed copy of the Agreement as modified by the Potential Bidder in accordance with its bid ("**Modified Agreement**"); (iii) an electronic markup of the Agreement showing the revisions in the Modified Agreement, along with a clean copy of the Modified Agreement (formatted as a Microsoft Word document).    The Debtors, in consultation with the Committee, shall determine whether any Modified Agreement that modifies the Agreement in any respect beyond the identity of the purchaser and the purchase price under the Agreement is a Qualified Bid.

(d)    Minimum Bid.    The amount of the purchase price in any bids for the Assets must provide for consideration in cash, and/or a valid credit-bid by a secured creditor of the Debtors, that is at least $100,000, in the aggregate, more than the purchase price contained in the Agreement ($9,500,000), plus the amount required to satisfy the Bid Protections ($800,000) (the "**Minimum Bid**").

(e)    Financial Information.    The Bid Package must contain such financial and other information that will allow the Debtors, in consultation with the Committee, to make a determination as to the bidder's financial wherewithal and its ability to consummate the transactions contemplated by the Modified Agreement, including evidence of adequate financing, any proposed conditions to closing and adequate assurance of such bidder's ability to perform under any of the Assumed Contracts and Leases.    Any counterparty to an unexpired lease or executory contract that is scheduled to be assumed and assigned to the buyer may request adequate assurance information from the Debtors' counsel, and the Debtors' counsel may provide such information to contract counterparties, provided that any party receiving adequate assurance information from the

Purchaser or any other Qualified Bidder is required to maintain the confidentiality of such information.

(f)    <u>Regulatory Approvals</u>.    The Bid Package must describe all regulatory approvals the bidder will need and provide evidence of the bidder's ability to obtain all necessary regulatory approvals in a timely manner, if applicable.

(g)    <u>Executory Contracts and Unexpired Leases</u>.    The Modified Agreement must identify with particularity each and every proposed Assumed Contract and Lease.

(h)    <u>Additional Bid Protections</u>.  The bid must not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment, or propose to modify any of the Bidding Procedures.

(i)    <u>Identity of Bidders</u>.  Each Potential Bidder must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such bid, including the names and addresses of any members or individuals with an interest in the entity, and the complete terms of any such participation, as well as disclose the organization form and the business conducted by each entity.  Any Potential Bidder shall be required to provide such additional information as the Debtors may require regarding a Potential Bidder's ability to satisfy the requirements of the applicable regulatory authorities.

(j)    <u>Due Diligence</u>.  The bid must not contain any due diligence or financing contingencies of any kind, and must affirmatively acknowledge that the bidder (i) had an opportunity to conduct due diligence regarding the prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith.

(k)    <u>Consents</u>. Each Potential Bidder must represent that it obtained all necessary organizational approvals to make its competing bid and to enter into and perform the Modified Agreement and include evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Agreement.

DOCS_DE:203684.1 29396/001

(l)     Deposit. A Potential Bidder for the Assets must deposit **10% of the purchase price** under the Modified Agreement (the "**Deposit**") with the Debtors' counsel (the "**Deposit Agent**") in the form of a certified check or wire transfer at least three business days before the Auction. The Potential Bidder shall forfeit the Deposit if (i) the Potential Bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein, (ii) the bidder is the Backup Bidder and withdraws the bid prior to the consummation of the Sale contemplated by the Successful Bid, or (iii) the bidder is the Successful Bidder and (x) withdraws the bid before the consummation of the sale contemplated by the Successful Bid, or (y) breaches the Agreement (or Modified Agreement, as applicable) associated with such bid. The Deposit shall be returned to the Potential Bidder (unless such Potential Bidder has forfeited its Deposit) (i) as soon as practicable if the Potential Bidder is not determined to be a Qualified Bidder; (ii) if the Potential Bidder is determined to not be the Successful Bidder or the Backup Bidder at the Auction, no later than five (5) business days following conclusion of the Auction; or (iii) if the Potential Bidder is determined to be the Backup Bidder, no later than five (5) business days after consummation of the Sale to the Successful Bidder. The Deposit will not be required to be maintained in an interest-bearing account, but any interest earned on any Deposit will be remitted to the appropriate Qualified Bidder if the Deposit is returned to the Qualified Bidder pursuant to the above.

24.     The Debtors shall have the right, after consultation with the Committee, to determine whether a bid meeting the requirements set forth in the Bidding Procedures is a Qualified Bid and shall notify Potential Bidders whether their bids have been determined to be Qualified Bids, as soon as possible, and prior to the Auction. For the avoidance of doubt, the Purchaser is a Qualified Bidder, and the Agreement constitutes a Qualified Bid. After the Debtors determine which bids are Qualified Bids, the Debtors shall so notify the Purchaser.

25.     In the event that the Debtors timely receive more than one Qualified Bid (other than the Purchaser's Agreement), the Debtors shall conduct the Auction with respect to the Assets. The Auction will take place at the Delaware offices of Pachulski Stang Ziehl &

Jones, LLP located at 919 North Market Street, 17th Floor, Wilmington, DE 19801, starting at

10:00 a.m. (prevailing Eastern Time) on January 25, 2016, or at such other place, date and time

as may be designated by the Debtors, in consultation with the Committee, at or prior to the

Auction. The Auction shall be governed by the following procedures:

(a)   Participation. Qualified Bidders shall be entitled to participate in the Auction, and each Qualified Bidder shall appear in person at the Auction, or through a duly authorized representative. At least one day prior to the commencement of the Auction, each Qualified Bidder must confirm in writing that it will participate in this Auction; provided, however, that in the event a Qualified Bidder does not attend the Auction, the relevant Qualified Bid shall nonetheless remain fully enforceable against that Qualified Bidder in accordance herewith. Representatives of, and counsel for, the Committee and any other party in interest shall be permitted to attend the Auction.

(b)   Anti-Collusion. At the commencement of the Auction, each Qualified Bidder shall be required to confirm that it has not engaged and will not engage in any collusion with any other Qualified Bidder with respect to the bidding or the Sale.

(c)   Conduct of Auction. The Auction will be conducted openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid.

(d)   Bidding. Bidding at the Auction shall commence at the amount of the highest or otherwise best Qualified Bid submitted prior to the Auction; Qualified Bidders for all of the Assets may then submit successive bids in increments of $100,000 (the "**Bid Increment**"). Any bid submitted after the conclusion of the Auction shall not be considered for any purpose.

(e)   Successful Bid. If an Auction is conducted, it shall continue until the Debtors determine, in consultation with the Committee, which offer is the highest or otherwise best offer from among the Qualified Bids submitted at the Auction (such bid or bids, as applicable, the "**Successful Bid**"); provided, however, that when evaluating any bid submitted by the Purchaser, such bid shall be deemed to include the full amount of the Bid Protections; provided further that in the event the Purchaser's last bid is higher or otherwise better than any bid submitted by a Qualified Bidder, the Purchaser's bid (as per the Purchaser's Agreement (as existing or modified at the Auction) shall be deemed to

15

be the Successful Bid.  The Qualified Bidder submitting such Successful Bid shall become the "**Successful Bidder**," and shall have such rights and responsibilities of the purchaser, as set forth in the applicable Modified Agreement, as applicable, together with any changes made thereto by the Successful Bidder at the Auction.  Within one business day after the conclusion of the Auction, but in any event prior to the commencement of the Sale Hearing (as defined below), the Successful Bidder shall  complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

(f)    Backup Bid.  At the conclusion of the Auction, the Debtors will also announce the second highest or otherwise best bid from among the Qualified Bids submitted at the Auction (the "**Backup Bid**"); provided, however, that the Stalking Horse shall not be the Backup Bid unless the Stalking Horse expressly agrees.  The Qualified Bidder submitting such Backup Bid shall become the "**Backup Bidder**," and shall have such rights and responsibilities of the purchaser, as set forth in the applicable Modified Agreement, together with any changes made thereto by the Backup Bidder at the Auction. *The Backup Bid shall remain open and irrevocable until the consummation of the Sale of the Assets pursuant to the Successful Bid,* provided that if the Purchaser is the Back-Up Bidder, its bid shall only remain open until the Outside Date (as defined below).  In the event the Backup Bidder fails to comply with the requirements of this paragraph, it will be deemed to have forfeited its Deposit. The Backup Bidder's Deposit will be returned by the Debtors upon the earlier of the following: (i) the Outside Date, or (ii) immediately  following  consummation  of  the  Successful  Bid. Notwithstanding any other provision contained herein, the Purchaser or any other bidder shall remain as Backup Bidder only through February 15, 2016 (the "**Outside Date**").

26.    In the event that the Debtors choose a Successful Bidder or Backup Bidder other than the Purchaser at the Auction or the terms of the proposed Sale are modified at the time of the Auction, the Objection Deadline solely with respect to (i) the Debtors' choice of such alternative Successful Bidder or Backup Bidder, or the modifications to the terms of the Sale to the Successful Bidder and (ii) cure amounts under the Assumed Leases and Contracts, to the extent such party did not receive notice of such cure amounts prior to the Auction, must be filed with the Court at 4:00 p.m. Eastern time on the first business day prior to the Sale Hearing.

16

### Auction and Hearing Notice

27.     On a date no later than two business days following entry of the Bidding

Procedures Order, the Debtors shall mail the notice of the proposed sale of the Assets (the

"Auction and Hearing Notice") in the form approved in the Bidding Procedures Order by first

class mail, postage prepaid, to (a) any party requesting service in this case, (b) all counterparties

to the Assumed Contracts and Leases, (c) all potential purchasers identified by the Debtors or

their agents, and (d) any other party known to the Debtors to have or assert an interest in any of

the Assets.

### Notice of Sale Hearing

28.     As noted above, the Debtors propose that the Auction occur on **January

25, 2016**, and that the Sale Hearing occur on **January 28, 2016**.  The Debtors propose that

objections, if any, to the Sale Motion be filed on or before 4:00 p.m. on **January 21, 2016**

(prevailing Eastern Time).

29.     The Debtors requests that the Court approve the manner of notice of the

Sale Motion, the Bidding Procedures, the Auction, and the Sale Hearing, substantially in the

form attached to the Bidding Procedures Order as Annex 2, Annex 4, Annex 5, Annex 6, and

Annex 7 (the "Sale and Bid Procedures Notices"), which the Debtors will serve on the following

parties:

        (a)      the U.S. Trustee;

        (b)      any official appointed committee of unsecured creditors (if any);

        (c)      the twenty largest unsecured creditors of each of the Debtors;

DOCS_DE:203684.1 29396/001

(d)     all parties known by the Debtors to assert a lien on any of the Assets;

(e)     all entities who executed NDAs with the Debtors in connection with a potential acquisition of any or all of the Assets or whom the Debtors believe may have an interest in bidding;

(f)     all counterparts to executory contracts and leases with the Debtors;

(g)     the Purchaser and its counsel; and

(h)     all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure as of the date of entry of the Bidding Procedures Order (collectively, the "Sale and Bid Procedures Notice Parties").

30.     Additionally, the Debtors propose to serve the Creditor Notice (Annex 6) on all known creditors of the Debtors.

31.     The Debtors propose to serve the Sale and Bid Procedures Notices and the Creditor Notice within three (3) Business Days from the date of entry of the Bidding Procedures Order, by first-class mail, postage prepaid, on the appropriate parties.  Both the Sale and Bid Procedures Notice and the Creditor Notice will provide that any party that has not received a copy of the Sale Motion or the Bidding Procedures Order that wishes to obtain a copy of such documents may make such a request, in writing, to the Debtors' counsel.

## Sale Hearing

32.     The Successful Bid and the Backup Bid (or the Purchaser's Agreement in the event the Auction is not held) will be subject to approval by the Court at the Sale Hearing, with the Assets being sold free and clear of all liens, claims, interest, and encumbrances pursuant to section 363(f) of the Bankruptcy Code (other than the liens and interests permitted under the Agreement) with all such liens, claims, interests, and encumbrances to attach to the proceeds of

the Sale of the Assets, except as otherwise provided with the same validity and in the same order

of priority as they attached to the Assets prior to the Sale.  Upon approval of the Backup Bid by

the Court, the Backup Bid shall remain open and irrevocable until the earlier of

(i) consummation of the Sale pursuant to the Successful Bid or (ii) the Outside Date.

33.    The Debtors request that the Court schedule the Sale Hearing on **January

28, 2016**.  Further, the Debtors request that objections, if any, to the Sale Motion be filed no later

than 4:00 p.m. prevailing Eastern Time on **January 21, 2016**.

### Closing

34.    The closing shall take place in accordance with terms of the Agreement, or

in accordance with the terms of such other agreement approved by the Court at the Sale Hearing.

### Procedures for the Assumption and Assignment of Assigned Contracts

35.    Pursuant to the Agreement, the Debtors may assume and assign to the

Purchaser or other Successful Bidder certain executory contracts (the "Assumed Contracts") and

unexpired leases (the "Assumed Leases," together with the Assumed Contracts, the "Assumed

Contracts and Leases") designated to be assumed by the Debtors and assigned to the Purchaser.

In order to ensure the orderly assignment of the Assumed Contracts and Leases and the timely

resolution of objections thereto, the Debtors seek approval of the Assignment Procedures.  The

following is a summary of certain provisions of the Assignment Procedures: [5]

(a)    Notice of Assumed Contracts and Leases.  Within two business days
after entry of the Bidding Procedures Order, the Debtors will serve by
first-class mail an omnibus notice (the "**Assignment Notice**") on each
Counterparty to the Assumed Contracts and Assumed Leases,

---

[5] To the extent that there are any inconsistencies between the summary description of the Assignment Procedures
contained herein and the Assignment Procedures, the terms of the Assignment Procedures control.

substantially in the form attached as Annex 4 to the Bidding Procedures Order (and such party's attorney, if such attorney has filed a notice of appearance in the Debtors' chapter 11 proceedings) at the last known address available to the Debtors. The Assignment Notice shall include an exhibit that identifies (i) the name and address of the Counterparty, (ii) the specific Assumed Contract or Assumed Lease being specified, (iii), for each Assumed Lease, the premises relating to the Assumed Lease, and (iv) the cure amount asserted by the Debtors that is necessary to cure any default under the relevant Assumed Contract or Assumed Lease pursuant to section 365 of the Bankruptcy Code (the "**Cure Amount**").

The Assignment Notice shall also include (i) a description of the Purchaser and a statement as to the Purchaser's ability to perform the Debtors' obligations under the Assumed Contracts and/or Assumed Leases ("**Purchaser's Adequate Assurance**"), (ii) the date of the Objection Deadline (defined below), (iii) the date of the Auction, and (iv) the date of the Sale Hearing.

The Assignment Notice shall also be served upon (a) Counterparties, (b) counsel to the Purchaser, Latham & Watkins LLP, 355 S. Grand Ave., Los Angeles, CA 90071 (Attn: Peter M. Gilhuly, peter.gilhuly@lw.com and Ted A. Dillman, ted.dillman@lw.com); and (c) any other parties requesting notice in this case (collectively, the "**Notice Parties**").

(b)     Initial Objections. To the extent that any interested party wishes to object to any matter pertaining to the sale of the Assets or the assumption and assignment of an Assumed Contract or Assumed Lease, including, without limitation, Purchaser's Adequate Assurance or the Cure Amount designated in the Initial Assignment Notice, then such interested party must file a written objection (the "**Contract/Lease Objection**") with the Court no later than **January 21, 2016, at 4:00 p.m. (prevailing Eastern Time)** (the "**Objection Deadline**"), and simultaneously serve such Contract/Lease Objection on the following parties (the "Objection Parties"): (a) Debtors' counsel, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067 (Attn: Jeffrey N. Pomerantz, jpomerantz@pszjlaw.com and Michael R. Seidl, mseidl@pszjlaw.com), and Bryan Cave LLP, Two North Central Ave., Suite 2200, Phoenix, AZ 85004 (Attn: Robert J. Miller, rjmiller@bryancave.com and Brian C. Walsh, brian.walsh@bryancave.com), (b) counsel to the Committee, if any, (c) counsel to any secured creditor that has entered an appearance in these cases, (d) counsel to the Purchaser, Latham & Watkins LLP, 355 S. Grand Ave., Los Angeles, CA 90071 (Attn: Peter M. Gilhuly, peter.gilhuly@lw.com); (e) any other party requesting notice in this case, so that it is **actually received** by each of the foregoing parties by the Objection Deadline.

To the extent that any party-in-interest does not timely serve an Contract/Lease Objection as set forth above, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Assumed Contract or Assumed Lease; (ii) agreed that the Purchaser has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) consented to the relevant Cure Amount, if any; (iv) agreed to the terms of the Sale Order; and (v) waived any and all objections in connection with items (i) through (iv) hereof.

(c)     Supplemental Notice of Assumed Contracts and Leases. If and only if the bid submitted by the Successful Bidder (the "**Successful Bid**") or the bid submitted by the Backup Bidder (the "**Backup Bid**") includes (i) additional executory contracts (each an "**Additional Assumed Contract**") or additional unexpired leases (each an "**Additional Assumed Lease**") to be assumed and assigned by the Debtors to either the Successful Bidder or the Backup Bidder (as the case may be), or (ii) a different Cure Amount than the one listed in the Initial Assignment Notice (such Cure Amount, an "**Amended Cure Amount**"), then the Auction Results Notice shall include an exhibit that (a) identifies the name and address of the Counterparty, (b) identifies the specific Additional Assumed Contract and/or Additional Assumed Lease being assumed and assigned, (c) identifies, for each Additional Assumed Lease, the premises relating to the Additional Assumed Lease, and (d) the cure amount asserted by the Debtors that is necessary to cure any default under the relevant Additional Assumed Contract or Additional Assumed Leases pursuant to section 365 of the Bankruptcy Code (the "**Additional Cure Amount**"). For each Amended Cure Amount, the Auction Results Notice shall include an exhibit that identifies (w) the name and address of the Counterparty, (x) the relevant Assumed Contract or Assumed Lease, (y) for each Assumed Lease, the premises relating to the relevant Assumed Lease, and (z) the Amended Cure Amount.

The Auction Results Notice shall include, to the extent the Successful Bidder or Backup Bidder is not the Purchaser, a description of the Successful Bidder and the Back-Up Bidder and, upon request, the Debtors will provide a statement as to the ability of the Successful Bidder or the Backup Bidder to perform the Debtors' obligations under the Assumed Contracts and Assumed Leases (and, to the extent applicable, the Additional Assumed Contracts and the Additional Assumed Leases) (the "**Successful Bidder's Adequate Assurance**" or the "**Backup Bidder's Adequate Assurance**") and such statement shall be kept confidential to the extent required by the Successful Bidder or the Backup Bidder.

21

(d)     <u>Supplemental Objections</u>.  To the extent that any interested party wishes to object to (i) the assumption of an Additional Assumed Contract or Additional Assumed Lease; (ii) the Successful Bidder's or the Backup Bidder's Adequate Assurance designated in the Auction Results Notice, if the Successful Bidder or Backup Bidder is not the Purchaser; or (iii) to the selection of an alternative purchaser as a result of the Auction, such party shall file a written objection (the "**<u>Supplemental Sale Objection</u>**") with the Court no later than **January 28, 2016 at 4:00 p.m. (prevailing Eastern Time)** (the "**<u>Supplemental Objection Deadline</u>**"), and serve such an objection on the Objection Parties so that it is **<u>actually received</u>** by the Supplemental Objection Deadline.

To the extent that any interested party wishes to object to an Amended Cure Amount or Additional Cure Amount, such party shall file a written objection (the "**<u>Supplemental Cure Objection</u>**") with the Court no later than the Supplemental Objection Deadline, and serve such an objection on the Objection Parties so that it is actually received by the Supplemental Objection Deadline.

To the extent that any interested party does not timely serve (x) a Supplemental Sale Objection as set forth above, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Additional Assumed Contract or Additional Assumed Lease; (ii) agreed that the Successful Bidder and the Backup Bidder have provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) agreed to the terms of the Sale Order; and (iv) waived any and all objections in connection with items (i) through (iii) hereof, or (y) a Supplemental Cure Objection as set forth above, such party will be deemed, as applicable, to have (i) consented to the relevant Additional Cure Amount or Amended Cure Amount, if any; (ii) agreed to the terms of the Sale Order; and (iii) waived any and all objections in connection with items (i) through (ii) hereof.

(e)     <u>Resolution and Adjudication of Objections</u>.  Upon filing of an objection by a Counterparty, the Debtors and/or the Purchaser will contact the objecting Counterparty to attempt to consensually resolve any timely served objection.   If the Debtors and/or the Purchaser are unable to resolve an objection in response to the Initial Assignment Notice or the Auction Results Notice, (i) to the extent such objections relate to the adequate assurance of future performance by the Purchaser or Successful Bidder (each an "**<u>Adequate Assurance Objection</u>**"), such objections will be heard at the Sale Hearing (except in the case of an Adequate Assurance Objection to a Further Assignment, with a hearing on such an objection to be scheduled by the Bankruptcy Court) or (ii) to the extent such objections relate to a Cure Amount, Additional Cure Amount, or Amended Cure Amount, such objections will be heard at a

hearing (the "**Cure Objection Hearing**") to be scheduled by the Court at the Sale Hearing (except in the case of an Adequate Assurance Objection to a Further Assignment, with a hearing on such an objection to be scheduled by the Bankruptcy Court).

In the event an objection relates solely as to a Cure Amount, Additional Cure Amount, or Amended Cure Amount, (each a "**Cure Objection**"), then such objecting party will be deemed to consent to the assumption of the related executory contract or unexpired lease and its assignment to the Purchaser, notwithstanding such objection. In the event that the Debtors and/or the Purchaser are unable to resolve the Cure Objection prior to the Cure Objection Hearing, the Purchaser may elect not to request assumption and assignment of the related executory contract or unexpired lease as part of the Sale.

On or as promptly after the Closing as practical, the Cure Amounts, Amended Cure Amounts, or Additional Cure Amounts to which no objections have been filed, or to which the Purchaser and applicable Counterparties have agreed shall be paid by pursuant to the Agreement.

Payment of the undisputed cure amounts shall be deemed to discharge the obligation of the Debtors and the Purchaser to: (i) cure any defaults under the Assumed Contracts and Leases; and (ii) compensate, or provide adequate assurance that the Debtors will promptly compensate, any non-Debtor party to the Assumed Contracts and Leases for any actual pecuniary loss resulting from any default thereunder.

(f)    Further Assignments. Without limiting any rights of the Purchaser set forth in the Agreement, during the period between the Auction and the Bid Deadline, the Purchaser may designate additional executory contracts or unexpired leases for assumption by the Debtors and assignment to the Purchaser (the "**Further Assignments**"). The Debtors shall serve by first-class mail an omnibus notice (the "**Further Assignments Notice**") on each Counterparty to the Further Assignments, substantially in the form attached as Annex 7 to the Bidding Procedures Order. To the extent that any interested party wishes to object to any matter pertaining to the Further Assignments, then such interested party must file a written objection (a "**Further Assignment Objection**") with the Court no later than at **4:00 p.m. (prevailing Eastern Time) on the fifteenth day after service of the Further Assignments Notice**. In the event that a Further Assignment Objection is filed, such objections will be heard at a hearing to be scheduled by the Bankruptcy Court.

36.    Without limiting any rights of the Purchaser set forth in the Agreement,

the Purchaser may add to the list of Assigned Contracts for assumption and assignment up until

23

five business days before the Sale Hearing, and the Purchaser may remove agreements from the list of Assigned Contracts at any time prior to the Closing. The non-debtor party or parties to any such deleted Assigned Contract will be notified of such deletion by written notice mailed within two (2) business days of such determination.

37.     The Debtors and the Purchaser or Successful Bidder shall be responsible for payment of all Cure Amounts per the terms of the Agreement. The Purchaser or the Successful Bidder shall be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assigned Contract. Objections to the adequate assurance of future performance of a Successful Bidder may be raised and considered at the Sale Hearing.

38.     Except to the extent otherwise provided in the Agreement or the agreement entered into with the Successful Bidder, subject to the payment of any Cure Amounts, the assignee of the Assigned Contracts will not be subject to any liability to the assigned contract Counterparty that accrued or arose before the closing date of the sale of the Assets, and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to 11 U.S.C. § 365(k).

### Approval of Bid Protections, the Bidding Procedures, and the Assignment Procedures is Appropriate

39.     As indicated above, the Debtors request that the Court approve the Bid Protections in their entirety. To compensate the Purchaser whose bid will be subject to higher or

24

better offers, the Debtors seek approval of the Bid Protections in accordance with the terms of the Agreement.

40.     The Debtors and the Purchaser believe that the amount of the Bid Protections is reasonable, given the benefits to the Debtors' estates of having a "stalking horse" bidder by virtue of the definitive asset purchase agreement with the Purchaser, the funding extended to the Debtors by the Purchaser shortly before the commencement of these cases, and the risk to the Purchaser that a third-party offer may ultimately be accepted, and that approval of the Bid Protections under the terms of the Agreement (including the administrative claim status thereof) is necessary to preserve and enhance the value of the Debtors' estates.  The Debtors believe that the agreement to pay the Bid Protections on the terms of the Agreement is necessary to induce the Purchaser to enter into the transactions encompassed by the Agreement and thus to enable the Debtors to obtain the highest and best possible price for the Assets.  Furthermore, the Debtors believe that the Bid Protections are fair and reasonable provision under all the circumstances.

41.     The Bidding Procedures are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values.  The Bid Protections will encourage competitive bidding and will potentially lead to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.

42.     The Assignment Procedures provide fair and adequate notice to the counterparties of the Assumed Contracts and Leases and provide for a fair resolution of any

25

objection related to the Cure Amount or demonstration of adequate assurance of future

performance by the Purchaser.

43.    Bidding incentives encourage a potential purchaser to invest the requisite

time, money and effort to negotiate with the Debtors and perform the necessary due diligence

attendant to the acquisition of the Debtors' assets, despite the inherent risks and uncertainties of

the chapter 11 process.  Historically, bankruptcy courts have approved bidding incentives similar

to the Bid Protections, under the "business judgment rule," which proscribes judicial second-

guessing of the actions of a corporation's board of directors taken in good faith and in the

exercise of honest judgment.  *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr.

S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to

enter the bidding by providing some form of compensation for the risks it is undertaking")

(internal quotation marks and citation omitted).

44.    The Third Circuit has established standards for determining the

appropriateness of bidding incentives in the bankruptcy context.  *In Calpine Corp. v. O'Brien

Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the court held that even though bidding

incentives are measured against a business judgment standard in nonbankruptcy transactions, the

administrative expense provisions of Bankruptcy Code § 503(b) govern in the bankruptcy

context.  Accordingly, to be approved, bidding incentives must provide some benefit to the

Debtors' estates.  *See id.* at 533.

45.    The *O'Brien* court identified at least two instances in which bidding

incentives may provide benefit to an estate.  First, benefit may be found if "assurance of a break-

26

up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not

have been made and without which bidding would have been limited." *Id.* at 537. Second,

where the availability of bidding incentives induces a bidder to research the value a debtor's

assets and submit a bid that serves as a minimum or floor bid on which other bidders can rely,

"the bidder may have provided a benefit to the estate by increasing the likelihood that the price at

which the debtor is sold will reflect its true worth." *Id.*

46.    Whether evaluated under the "business judgment rule" or the Third

Circuit's "administrative expense" standard, the Bid Protections are appropriate. The Agreement

and the Debtors' agreement to pay the Bid Protections pursuant to the terms thereunder is the

product of good faith, arm's-length negotiations between the Debtors and the Purchaser. The

Bid Protections are fair and reasonable in amount, and are reasonably intended to compensate for

the risk to the Purchaser of being used as a stalking-horse bidder. Similarly, the Agreement

provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that

the price at which the [Property will be] sold will reflect [its] true worth." *Id.*

47.    Finally, the Bidding Procedures are fair and reasonable procedures

reasonably intended to encourage competitive bidding, and the Bid Protections will permit the

Debtors to insist that competing bids for the Assets, made in accordance with the Bidding

Procedures, be materially higher or otherwise better than the Agreement (or competing

agreement), which is a clear benefit to the Debtors' estate.

48.    Furthermore, the Break-Up Fee, in the amount of $300,000, is

approximately 3.1% of the Purchase Price, not including the Purchaser's assumption of the

27

Assumed Liabilities, and is within the spectrum of termination fees approved by bankruptcy courts in chapter 11 cases. *See, e.g., In re Global Motorsport Group, Inc., et al.,* (Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) (Court approved a break-up fee of approximately 4%, or $500,000 in connection with sale); *In re Global Home Products,* Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (Court approved a break-up fee of 3.3%, or $700,000, in connection with sale); *In re Ameriserve,* Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (Court approved a break-up fee of 3.64%, or $4,000,000, in connection with $110,000,000 sale); *In re Montgomery Ward Holding Corp., et al.,* Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (Court approved termination fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets); *In re Medlab, Inc.,* Case No, 97-1893 (PJW) (Bankr. D. Del. April 28, 1998) (Court approved termination fee of 3.12%, or $250,000, in connection with $8,000,000 sale transaction); *In re FoxMeyer Corp. et al.,* Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (Court approved termination fee of 7.47%, or $6,500,000, in connection with $87,000,000 sale of substantially all of debtors' assets); *In re Edison Bros. Stores. Inc., et al.,* Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (Court approved termination fee of 3.5%, or $600,000, in connection with $17,000,000 sale of debtors' entertainment division); *In re NetEffect, Inc.,* Case No. 08-12008 (KJC) (Bankr. D. Del., Sept. 11, 2008) (Court approved break-up fee of 3%, or $240,000.00 in connection with sale of debtor's assets for purchase price of $8,000,000); *In re Champion Enterprises, et al.,* Case No. 09-14019 (KG) (Bankr. D. Del., Feb. 8, 2010) (Court approved break-up fee of less than credit bid or $3,000,000.00 in connection with sale of debtor's assets for purchase price of

28

approximately $80,000,000); *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW)

(Bankr. D. Del., May 15, 2009) (Court approved break-up fee and expense reimbursement of

3.68%, or $810,000 in connection with sale of debtor's assets for purchase price of

$22,000,000); *In re Western Nonwovens, Inc., et al.*, Case No. 08-11435 (PJW) (Bankr. D. Del.,

July 28, 2009) (Court approved break-up fee and expense reimbursement of $250,000 in

connection with sale of debtor's assets for purchase price of $4,000,000 to $6,500,000 purchase

price); and *In re Point Blank Solutions, Inc., et al.*, Case No. 10-11255 (PJW) (Bankr. D. Del,

Oct. 5, 2011) (Court approved break-up and expense reimbursement of 3.75% or $750,000 in

connection with sale of debtor's assets for purchase price of $20,000,000).

### No Prior Request

49.     No prior request for the relief sought in this Bidding Procedures Motion

has been made to this or any other court.

### Notice

50.     A copy of this Motion will be provided to (a) the Office of the United

States Trustee; (b) the twenty (20) largest unsecured creditors of the Debtors; (c) all parties who

are known by the Debtors to assert liens with respect to the Assets, if any; (d) all entities who

executed non-disclosure agreements with the Debtors in connection with a potential acquisition

of any or all of the Assets or whom the Debtors believe may have an interest in bidding; (e) all

counterparties to the Assigned Contracts; (f) the Purchaser and its counsel; and (g) all parties

who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy

Procedure.  Upon approval of this Motion, the Debtors will serve notice of the Sale Hearing, the

Bidding Procedures, and related matters on all of the foregoing service parties and all other

known creditors of the Debtors (as proposed herein, subject to Court approval). The Debtors

respectfully submit that such notice is sufficient and request that the Court find that no further

notice of the relief requested herein is required.

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form attached hereto, granting the relief requested herein and such other and

further relief as this Court deems appropriate.

Dated: December 7, 2015          PACHULSKI STANG ZIEHL & JONES LLP

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira Kharasch (CA Bar No. 109084)
Michael R. Seidl (DE Bar No. 3889)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
Telephone: 302-652-4100
Facsimile:  302-652-4400
E-mail:jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        mseidl@pszjlaw.com
        crobinson@pszjlaw.com

        -and-

        **BRYAN CAVE LLP**
        Robert J. Miller (AZ#013334) (*pro hac vice pending*)
        Two N. Central Ave., Suite 2200
        Phoenix, Arizona  85004
        T: 602-364-7000
        F: 602-364-7070
        Email: rjmiller@bryancave.com

        -and-

Kerry A. Moynihan (SBN 25057) *(pro hac vice pending)*
3161 Michelson Drive, Suite 1500
Irvine, California  92612
T: 949-223-7000
F: 949-223-7100
Email: kerry.moynihan@bryancave.com

-and-

Brian C. Walsh (MO#58091) *(pro hac vice pending)*
Laura Uberti Hughes (MO#60732) *(pro hac vice pending)*
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri  63102
T: 314-259-2000
F: 314-259-2020
Email:        brian.walsh@bryancave.com
              laura.hughes@bryancave.com

*Proposed Counsel for the Debtors and Debtors in
Possession*