IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FUHU, INC., *et al.,*[1] | ) | Case No. 15-12465_ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR ORDER
(A) APPROVING ASSET PURCHASE AGREEMENT AND
AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' OPERATING ASSETS; (B) AUTHORIZING THE SALE OF ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, RIGHTS, ENCUMBRANCES AND
OTHER INTERESTS PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363(b),
363(f) AND 363(m); (C) ASSUMING AND ASSIGNING CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (D) GRANTING RELATED RELIEF**

Debtors Fuhu, Inc. and Fuhu Holdings, Inc., the above-captioned debtors and

debtors in possession herein (the "Debtors"), file this motion (the "Sale Motion") for the entry of

an order:  (a) approving the sale (the "Sale") of substantially all of the operating assets of the

Debtors (the Assets") pursuant to the terms of an asset purchase agreement (the "Agreement") to

be finalized consistent with the terms of that certain *Term Sheet for the Acquisition of the Assets

of the Fuhu Entities* dated December 6, 2015, a copy of which is attached hereto as **Exhibit A**

(the "Term Sheet"), and acceptable to the Debtors and Mattel, Inc. (the "Purchaser");

(b) authorizing the sale of the Assets free and clear of all liens, claims, rights, encumbrances, and

other interests pursuant to sections 105, 363(b), 363(f), and 363(m) of the Bankruptcy Code;

(c) assuming and assigning certain executory contracts and unexpired leases, and (d) granting

related relief.

---

[1]  The Debtors, together with the last four digits of each Debtor's tax identification number, are:  Fuhu, Inc. (7896);
and Fuhu Holdings, Inc. (9761).  The location of the Debtors' headquarters and service address is 909 N. Sepulveda
Blvd., Suite 540, El Segundo, CA  90245.

Concurrently herewith, the Debtors are filing the *Motion of Debtors for Order: (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Operating Assets; (B) Scheduling an Auction and Sale Hearing; (C) Approving Bid Protections; and (D) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (the "Bidding Procedures Motion"), which seeks approval of certain sale and bidding procedures for the Sale, as more particularly set forth therein (the "Bidding Procedures").

In support of this Sale Motion, the Debtors respectfully state as follows:

### Preliminary Statement

1.      By this Sale Motion, the Debtors seek approval of the Sale of the substantially all of the operating assets of the Debtors to the Purchaser pursuant to the Agreement, or to the highest and best bidder for such assets at the auction provided for in the Bidding Procedures Motion (the "Auction"), to take place in accordance with the order to be entered by the Court on the Bidding Procedures Motion (the "Bidding Procedures Order"). The proposed Agreement contemplates that the assets will be sold free and clear of liens, claims, encumbrances, rights, and other interests other than those liens and interests expressly permitted under the Agreement.

2.      As discussed below, the Debtors' sale process is in the best interests of the Debtors and their estates and creditors. The Sale will provide for the payment of the sum of $9,500,000 in cash, subject to certain adjustments, plus the assumption of the Assumed Liabilities. The Debtors submit that the Sale is in the best interests of these estates.

**Jurisdiction and Venue**

3.      The United States Bankruptcy Court for the District of Delaware (the

"Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference from the United States District Court for the District of*

*Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28

U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection

with this Motion to the extent that it is later determined that the Court, absent consent of the

parties, cannot enter final orders or judgments in connection herewith consistent with Article III

of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief sought herein are sections 105, 362,

363, 365, 1107, and 1108 of Title 11 of the United States Code (the "Bankruptcy Code"),

Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rules 2002-1(b) and 6004-1 of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules").

**General Background**

6.      On the date hereof (the "Petition Date"), the Debtors each filed with this

Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are

operating their businesses and managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      No request has been made for the appointment of a trustee or an examiner in these cases, and no official committee has yet been appointed by the Office of the United States Trustee.

8.      The factual background regarding the Debtors, including their current and historical business operations and the events precipitating the chapter 11 filing, is set forth in detail in the *Declaration of James Mitchell in Support of First Day Motions* (the "First Day Declaration") filed concurrently herewith and fully incorporated herein by reference.[2]

## Pre-Petition Marketing and Sale Efforts

9.      The Debtors commenced the process of evaluating restructuring and sale options in September 2015.  The Debtors' senior management planned and implemented a trip to Asia, during which they attempted to negotiate a sale with certain of the Debtors' shareholders and major creditors.  While in Asia, the Debtors' senior management also met with and discussed the sale opportunity with numerous other potential buyers.  These negotiations and discussions were conducted with chief executive officers, chief acquisitions officers, and other senior representatives of the companies involved, but they were ultimately unsuccessful.

10.      In October 2015, the Debtors increased their restructuring and sale efforts and hired KRyS Global USA ("KRyS") as their exclusive investment banker.  Under the terms of its agreement, KRyS was tasked with pursuing a sale or capital placement transaction for the

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Day Declaration.

4

Debtors.  On October 30, 2015, as directed by the Board of Directors of the Debtors, KRyS began a full-sale effort to contact parties to determine their interest in the acquisition of or investment in the Debtors.  Interested parties were asked to participate in an initial discussion with KRyS to hear about the opportunity and ask questions about the Debtors' assets.  To date, KRyS has contacted more than 500  potential bidders, representing both financial and strategic potential buyers.  The Debtors' management and KRyS have had in-depth discussions with high-ranking executives at approximately 15 potential strategic or financial buyers.  Many of these discussions have included multiple follow-up sessions and are still ongoing.  As of the Petition Date, nine of the potential bidders have executed confidentiality agreements and have been provided a Confidential Information Memorandum and data-room access.  KRyS continues to contact additional potential interested parties and to work with parties to conduct due diligence.

11.    The Debtors concluded that the Purchaser was the party that offered the greatest value for the Debtors' assets, as well as the only party that was in a position to move quickly enough to a transaction in light of the Debtors' difficult financial circumstances.  On December 6, 2015, the Debtors entered into the Term Sheet with the Purchaser regarding a sale of substantially all of the Debtors' operating assets, plus the assumption of certain liabilities.

12.    The Term Sheet is subject to definitive documentation in the form of the Agreement.  The Debtors and the Purchaser contemplate entering into the Agreement shortly after the Petition Date and filing it with the Court. The Agreement will be subject to higher and better bids and, ultimately, the approval of the Court.

**Secured Debt Obligations of the Debtor**

13.     LSQ Funding Group, L.C. ("LSQ") factored certain of the Debtors'
accounts receivable under a Factoring and Security Agreement dated April 21, 2015.  Although
LSQ factored only a limited subset of the receivables, it holds a first-priority security interest in
all of the Debtors' receivables.  As of the Petition Date, the outstanding amount owed to LSQ on
account of factored receivables was approximately $1.3 million.  There are disputes between the
Debtors and LSQ regarding the collection of the factored receivables.

14.     Obsidian Agency Services, Inc., as Agent for Tennenbaum Special
Situations Fund IX, LLC and Tennenbaum Special Situations IX-O, L.P. (collectively,
"Tennenbaum"), holds a first-priority security interest in substantially all of the assets of the
Debtors other than accounts receivable, as well as a second-priority security interest in the
Debtors' accounts receivable, under a Credit Agreement dated May 27, 2015, as amended, and a
Guaranty and Collateral Agreement of the same date.  As of November 25, 2015, Tennenbaum
asserted that it was owed approximately $6.5 million by the Debtors, which includes principal of
approximately $5.4 million, accrued interest of approximately $65,000, a yield-enhancement fee
of $400,000 and an early-termination fee of $700,000.  Since that date, Tennenbaum has swept
approximately $300,000 in cash from the Debtors for application to its debt.

15.     The Debtors granted two related suppliers, Fusing International, Inc. and
Hon Hai Precision Industry Co., Ltd. (collectively, "Foxconn"), purchase-money security
interests in approximately 35,000 tablets sold by Foxconn to the Debtors in October 2015.  The
outstanding balance owed to Foxconn from that transaction is approximately $2 million.  The

6

Debtors are uncertain whether Foxconn provided the notice to Tennenbaum that would have permitted Foxconn to obtain priority over Tennenbaum's security interest in the tablets sold by Foxconn. The Debtors promptly resold the tablets at issue to retailers in advance of the holiday season, generating accounts receivable. Under Section 9-324(b) of the Uniform Commercial Code, even if Foxconn's security interest in its inventory collateral had priority over Tennenbaum's, Foxconn's security interest in proceeds does not. Accordingly, Foxconn has a third-priority security interest in the accounts receivable generated by the sale of the inventory at issue. Foxconn also claims to be owed approximately $61 million on an unsecured basis arising from unrelated transactions. The Debtors have significant disputes with Foxconn arising out of Foxconn's mishandling of products intended for sale during the 2014 Christmas season and other events.

16.     The Purchaser made a loan of $300,000 to the Debtors on or about December 4, 2015 (the "Pre-Filing Loan") to provide funding necessary to permit the Debtors to complete their preparations for the commencement of these cases, including the documentation of the Sale. The Pre-Filing Loan is secured by substantially all of the Debtors' assets and was perfected by the filing of financing statements in applicable Delaware and California filing offices on or about December 4, 2015.

## Sale of the Assets

17.     The Debtors seek approval of the sale of substantially all of the assets necessary to their operations, including, *inter alia*, unexpired leases and executory contracts, personal property, intellectual property, intangible property, inventory, vendor items, and certain

claims and liabilities to be assumed by the Purchaser, all as more fully set forth in the Agreement

(collectively, the "Assets").

18.    As required by Local Rule 6004-1(b), the principal deadlines set forth in

the Agreement are summarized below:

- Entry of an order approving the Bidding Procedures Motion (the "Bidding Procedures Order") by no later than **December 21, 2015**;

- Deadline to (a) submit competing bids, (b) object to the sale, (c) object to assumption/assignment and cure claims (no deadline in Agreement; the Debtor proposes **January 21, 2016**);

- Auction no later than **January 25, 2016**;

- Entry of the Sale Order no later than **January 29, 2016**; and

- Closing of the Sale to occur no later than **February 15, 2016**.

19.    In light of the pre-petition marketing efforts and the Debtors' current

financial condition, the Debtors believe that the sale process provides sufficient time to fully

expose the Assets for sale in the hope of achieving a competitive bidding process.

**Continued Sale Process**

20.    While the pre-petition marketing and sale process was thorough, as

discussed above, the Debtors will send, or will have sent, notice of the Sale Motion and Bidding

Procedures to all parties that the Debtors believe may be potentially interested in acquiring the

Assets.  The Debtors will also maintain their electronic data room with key documents and

company-specific information in order to streamline the due diligence process going forward.

The data room has been, and will be, available to interested parties who have, or will, execute

confidentiality agreements acceptable to the Debtors.  The Debtors will continue to respond to

inquiries from prospective buyers through the bid deadline approved by the Court for alternative

bidders to bid on the Assets. The Debtors will also continue to use KRyS, subject to Court

approval, as their investment banker to solicit any further offers for the Assets.

### Agreement With Purchaser

21.     The Debtors believe that the consummation of the Sale to the Purchaser or

other successful bidder will provide creditors and other stakeholders with the best opportunity

possible for maximizing the value of the Assets.

22.     As required by Local Rule 6004-1(b)(4), the key terms of the Agreement

and the proposed Sale Order, which will be provided as a supplement to this Motion, are

summarized below. The description below only summarizes certain provisions of the Agreement

and the Sale Order as a convenience to the Court and parties in interest, and the terms of the

Agreement control in the event of any inconsistency.

a.      **Purchase Price**. The total consideration to be paid by the Purchaser to the Debtors for the Assets shall be:  (a) $9,500,000, subject to certain adjustments, paid by a combination of a credit bid of the Pre-Filing Loan, and any other amounts that may be advanced by the Purchaser, and cash, and (b) the assumption of the Assumed Liabilities, including the assumption of Assumed Contracts and Assumed Leases (together, the "Assigned Contracts") subject to the agreed amount of related cure costs. *See* Term Sheet at 2.

b.      **Purchased Assets**. The Assets (inclusive of the Assigned Contracts) are substantially all of the Debtors' assets, including those assets necessary to operate the Debtors' business, including, but not limited to, (a) all real and personal property; (b) all tangible or intangible assets; (c) all accounts receivable; (d) all inter-company receivables; (e) all cash (excluding, for avoidance of doubt, the Purchase Price), cash equivalents and readily-marketable securities and other investments; (f) all deposits and prepaid expenses relating to Acquired Assets or Assigned Contracts; (g) all inventory; (h) all rights in patents, trademarks, copyrights and all other intellectual property, including all licenses of intellectual property; (i) all computer software or systems; (j) all rights to payment from the licensees

9

of intellectual property; (k) all business records relating to Acquired Assets or Assigned Contracts; (l) all claims and causes of action relating to Acquired Assets or Assigned Contracts; (m) all assets used in the operation of the business including assets under lease; (n) all rights under Assigned Contracts; (o) any and all avoidance actions arising under chapter 5 of the Bankruptcy Code relating to Acquired Assets or Assigned Contracts; (p) the stock or other equity interests in the Debtors' foreign subsidiaries, unless the Purchaser elects to acquire the assets of those subsidiaries instead; and (q) all other assets which are not Excluded Assets. *See* Term Sheet at 3. The Purchased Assets do not include the Excluded Assets. The Excluded Assets will be set forth in the Agreement.

c.    **Closing.** Subject to the terms and conditions of the Agreement and the Sale Order, the sale and purchase of the Assets and the assumption of the Assigned Contracts contemplated by the Agreement shall take place at a closing (the "Closing") to be held no later than February 15, 2016, or at such other place, at such other time, on such other date or in such other manner as the Debtors and the Purchaser may mutually agree upon in writing.

e.    **Identity of Purchaser.** The Purchaser is Mattel, Inc.

f.    **Assumption of Executory Contracts and Unexpired Leases.** Within 10 days of execution of the Agreement, the Debtors will provide the Purchaser a list of all executory contracts and unexpired leases necessary or useful to the conduct of the Debtors' business, along with estimated cure amounts, and will provide proper notice of the potential assumption and assignment of such agreements to the Purchaser or other successful bidder on the Closing Date. If any such agreements are later identified, the Debtors will similarly provide proper notice, and such agreements shall be added to the schedule. Prior to the hearing to approve the Sale, the Purchaser will determine which executory contracts and unexpired leases from the schedule will be assumed by the Debtors and assigned to the Purchaser. *See* Term Sheet at 4.

g.    **Bid Protections.** The Agreement will provide for a break-up fee equal to $300,000, an expense reimbursement not to exceed $200,000, and reimbursement of the $300,000 Pre-Filing Loan (collectively, the "Bid Protections"), which Bid Protections will have administrative claim status in the Debtors' cases pursuant to section 503(b) of the Bankruptcy Code. *See* Term Sheet at 4-5.

h.    **Representations, Warranties and Covenants.** The Agreement will include various representations by the Debtors and the Purchaser that are customary for a transaction of this kind. The Debtors also will agree to various affirmative and negative covenants.

i.  **Conditions.**  The Closing is conditioned upon the occurrence of certain events customary for transactions of this kind, which will be set forth more fully in the Agreement but will include those identified on pages 5-7 of the Term Sheet.

j.  **Rule 6004/6006 Waiver.**  The proposed Sale Order will provide that, upon entry, the Sale Order will be immediately enforceable, notwithstanding Bankruptcy Rules 6004 and 6006.  As discussed herein, the sale and prompt consummation thereof are in the best interest of the Debtors and their estates in order to maintain and otherwise maximize the going concern value of the Debtors' assets for the benefit of the estates and their stakeholders and to comply with certain timing deadlines as discussed above.

k.  **Successor Liability and Good Faith Findings.**  The proposed Sale Order will provide that the Purchaser and its employees, officers, directors, advisors, lenders, affiliates, owners and successors and assigns shall not have any successor or vicarious liabilities and that the Purchaser is a good faith purchaser within the meaning of, and it entitled to all of the benefits of, section 363(m) of the Bankruptcy Code.

m.  **Record Access.**  The Agreement will provide for the Debtors to have reasonable access to the books and records relating to the Assets and the conduct of the Debtors' business.  *See* Term Sheet at 8.

n.  **Good Faith Deposit.**  The Agreement will not require the Purchaser to submit a good faith deposit.

23.  The Debtors believe that the sale of the Assets as a going concern to the Purchaser or other successful bidder is in the best interests of the Debtors' estates and their creditors.  The Debtors further believe that obtaining the stalking horse bid, marketing the Assets with the assistance of KRyS, and holding the Auction on the date specified by the Court will result in the highest or otherwise best consideration for the Assets.

24.  The Debtors have examined the alternatives to a sale of the Assets and has determined that a more viable alternative to sale of the Assets does not exist.  The Debtors believe that the sale of the Assets optimizes value for their estates and creditors.

11

25.    For the reasons stated above, and in light of the obvious benefits to the estate, the Debtors have determined, in the exercise of their business judgment, to consummate the proposal submitted under the Agreement with the Purchaser or, if applicable, another bidder in the event that the Debtors receive a higher or otherwise better bid to the transaction set forth in the Agreement.

### Personally Identifiable Information

26.    The Sale will include the transfer of "personally identifiable information," as that term is defined in section 101(41A) of the Bankruptcy Code, to the Purchaser.  The Debtors' privacy policy in effect on the Petition Date provides as follows:

> As we continue to develop our business, we may sell, buy, merge or partner with other companies or businesses.  If Fuhu or substantially all of its assets are acquired, customer information will be one of the transferred assets, including your Personally Identifiable Information.  In all such transactions, user information will remain subject to the promises made in any pre-existing Privacy Notice (unless, of course, the customer consents otherwise).  You will be notified via email and/or prominent notice on our Web site of any change in ownership or uses of your personal information, as well as any choices you may have regarding your personal information.

The transfer of personally identifiable information to the Purchaser in the Sale will be consistent with this privacy policy.  Accordingly, the Debtors submit that a consumer privacy ombudsman need not be appointed in these cases.

12

### Relief Requested

27.    The Debtors are requesting that this Court, *inter alia*, (a) authorize the sale

of the Assets to the Purchaser pursuant to the Agreement, or alternatively, to another successful

bidder pursuant to such competing agreement(s) with such other successful bidder entered into in

accordance with the Bidding Procedures Order, (b) authorize such sale of the Assets to be free

and clear of all liens, claims, rights, encumbrances, or other interests pursuant to sections 105,

363(b), 363(f), 363(m), and 365 of the Bankruptcy Code, with such liens, claims, rights,

encumbrances and interests (collectively, the "Liens, Claims, and Encumbrances") attaching to

the sale proceeds of the Assets (the "Sale Proceeds") with the same validity (or invalidity),

priority and perfection as existed immediately prior to such sale; and (c) grant such other relief as

may be necessary or appropriate.

### Basis for Relief

28.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after

notice and a hearing, may use, sell or lease, other than in the ordinary course of business,

property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) provides in relevant part that

"[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry

out the provisions of this title." 11 U.S.C. § 105(a).

29.    A sale of a debtor's assets should be authorized pursuant to section 363 of

the Bankruptcy Code if a sound business purpose exists for doing so. *See, e.g.*, *In re Martin*, 91

F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d

513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir.

1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*,

722 F.2d 1063 (2d Cir. 1983); *In re Titusville Country Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re*

*Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991). The *Delaware & Hudson*

*Railway* court rejected the pre-Code "emergency" or "compelling circumstances" standard,

finding the "sound business purpose" standard applicable and, discussing the requirements of

that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining
> if there is a sound business purpose for the sale include:
> the proportionate value of the asset to the estate as a whole;
> the amount of elapsed time since the filing; the likelihood
> that a plan of reorganization will be proposed and
> confirmed in the near future; the effect of the proposed
> disposition of the future plan of reorganization; the amount
> of proceeds to be obtained from the sale versus appraised
> values of the Property; and whether the asset is decreasing
> or increasing in value.

*Delaware & Hudson Railway*, 124 B.R. at 176.

30.    The *Delaware & Hudson Railway* court further held that "[o]nce a court is

satisfied that there is a sound business reason or an emergency justifying the pre-confirmation

sale, the court must also determine that the trustee has provided the interested parties with

adequate and reasonable notice, that the sale price is fair and reasonable and that the Buyer is

proceeding in good faith." *Id.*

31.    The Debtors have proposed the sale of the Assets after thorough

consideration of all viable alternatives and has concluded that the sale is supported by many

sound business reasons. The Debtors have marketed the Assets as described above and have

proposed Bidding Procedures designed to maximize the purchase price realized from the sale of

14

the Assets. Furthermore, the pre-petition and post-petition marketing of the Assets up to the

proposed deadline for competing bids will provide a sufficient opportunity to generate any

potential overbids and maximize recovery for the Debtors' creditors.

32.    The Debtors believe that the proposed timetable for the sale is reasonable

because it minimizes exposure of the Debtors' business to the uncertainties associated with

bankruptcy, while at the same time providing an adequate opportunity for competing bids to be

solicited. The Purchaser has also imposed certain deadlines on the Debtors under the Agreement

in order to accomplish the sale.

33.    Based on the foregoing, the Debtors have articulated sound business

reasons for a sale of the Assets on the proposed schedule. *See, e.g.*, *In re Tempo Tech.*, 202 B.R.

363, 369-70 (D. Del. 1996) (approving a sale of all of the debtor's assets, within a month after

the petition date, where the debtor faced a cash shortfall, operated in an industry where there

were few potential buyers, and anticipated continuing losses and a decline in value of the

bankruptcy estates); *Delaware & Hudson Railway*, 124 B.R. at 177 (affirming the bankruptcy

court's approval of a sale of substantially all of the debtor's assets where the debtor would have

been "in liquidation mode if required to delay a sale until after filing a disclosure statement and

obtaining approval for a reorganization plan"); *Titusville Country Club*, 128 B.R. at 400

(granting an expedited hearing on a motion to approve a sale as a result of "deterioration" of the

debtor's assets); *Coastal Indus., Inc. v. Internal Revenue Service (In re Coastal Indus., Inc.)*, 63

B.R. 361, 366-69 (Bankr. N.D. Ohio 1986) (approving an expedited sale pursuant to section

363(b) five weeks after the petition date where the debtor was suffering operating losses).

34.    The Debtors believe that, as a result of the marketing efforts that have been undertaken and that they will continue to undertake, the highest or otherwise best offer obtained through the proposed Bidding Procedures and Auction will provide maximum value to the Debtors under the current circumstances.  Other potential buyers and parties that have expressed interest in the acquisition of the Assets will be served with this Sale Motion and/or notice thereof.  The fairness and reasonableness of the consideration to be paid by the successful bidder is demonstrated by the marketing efforts that the Debtors have undertaken, and will continue to undertake, followed by a fair and reasonable sale process including a potential auction, and culminating in the sale of the Assets.  As noted herein, notice of this Sale Motion, as well as of the Bidding Procedures Motion, will be served by the Debtors on or shortly after the Petition Date on potential bidders, as well as known putative lienholders and other parties in interest.

35.    The sale of the Assets is supported by sound business reasons and is in the best interests of the Debtors and their estates.  Accordingly, the Debtors request approval under section 363(b) of the Bankruptcy Code of the Sale to the Purchaser or other Successful Bidder, as set forth herein.

### The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Liens, Claims, and Encumbrances

36.    Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such Property of an entity other than the estate, only if –

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

16

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

37.     Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests." The term "any interest," as used in section 363(f), is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000). In *Folger Adam*, the Third Circuit specifically addressed the scope of the term "any interest." 209 F.3d at 258. The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in Property," the trend in modern cases is toward "a broader interpretation which includes other obligations that may flow from ownership of the Property." *Id. at 258* (citing 3 *Collier on Bankruptcy* ¶ 363.06[1]). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger Adam* made clear that debtors "could sell their assets under §363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

38.     Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Assets free and clear of all of the applicable Liens, Claims and Encumbrances, except with respect to any Liens,

17

Claims and Encumbrances permitted under the Agreement. *See Citicorp Homeowners Services,*

*Inc. v. Elliot,* 94 B.R. 343, 345 (E.D. Pa. 1988). The Debtors submit that each Lien, Claim, and

Encumbrance that is not an assumed liability satisfies at least one of the five conditions of

section 363(f) of the Bankruptcy Code, and that any such Lien, Claim, or Encumbrance will be

adequately protected by either being paid in full at the time of closing, or by having it attach to

the Sale Proceeds, subject to any claims and defenses the Debtors may possess with respect

thereto. The Debtors accordingly request authority to convey the Assets to the Purchaser or

other Successful Bidder, free and clear of all Liens, Claims, and Encumbrances except for the

Liens, Claims, and Encumbrances that expressly permitted under the terms of the Agreement,

with such Liens, Claims, and Encumbrances to attach to the Sale Proceeds, with the same

validity, priority, and perfection as existed immediately prior to the Sale, subject to the terms of

the Agreement and the Sale Order.

      39.    The Debtors have conducted a UCC search and other lien searches of

purported lienholders in conjunction with the proposed sale of the Assets. The Debtors will

serve such purported lienholders with notice of this Sale Motion. To the extent there are any

secured creditors that do not consent to the Sale, (a) applicable nonbankruptcy law permits sale

of the Assets free and clear of such creditors' claims, (b) their interests are disputed, or (c) such

creditors could be compelled, in a legal or equitable proceeding, to accept a money satisfaction

of their claims.

      40.    Accordingly, this Court should approve the sale of the Assets to the

Purchaser or other Successful Bidder free and clear of Liens, Claims, and Encumbrances under

Bankruptcy Code section 363(f), and any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims.

### Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not In Violation of Section 363(n) of the Bankruptcy Code

41.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of Property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such Property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(n) of the Bankruptcy Code, among other things, provides, in turn, that a trustee may avoid a sale under such section if the sale price was controlled by an agreement among potential bidders as the sale.  *See* 11 U.S.C. § 363(n).  Although the Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), held that:

> [t]he requirement that a Buyer act in good faith . .  speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a Buyer's good faith status at a judicial sale involves fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

42.     The Agreement was negotiated at arm's length, and the Purchaser has acted in good faith, without collusion or fraud of any kind, and in compliance with the *Abbotts Dairies* standards.  The Purchaser is not an insider of the Debtors.  Neither the Debtors nor the Purchaser (to the best of the Debtors' knowledge) has engaged in any conduct that would prevent

19

the application of section 363(m) of the Bankruptcy Code or otherwise implicate section 363(n) of the Bankruptcy Code with respect to the consummation of the Sale or the transfer of the Assets to the Purchaser.  In addition, if a party other than the Purchaser is the Successful Bidder, the Debtors intend to make an appropriate showing at the Sale Hearing that the purchase agreement with the other Successful Bidder is a negotiated, arm's-length transaction, in which the Successful Bidder at all times has acted in good faith under and otherwise in accordance with such standards.

43.     The Debtors thus request that the Court find that the Purchaser or the Successful Bidder has purchased the Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code.

## Authorization of Assumption and Assignment of Assigned Contracts

44.     As required by the Agreement, and in order to enhance the value to the Debtors' estate, the Debtors request approval of the potential assumption and assignment of the Assigned Contracts to Purchaser or the other successful bidder upon the closing of the transactions contemplated under the Agreement.

45.     Pursuant to the Agreement, the Purchaser (or other successful bidder) will be responsible for payment of all cure amounts, up to a cap of $500,000, required to be paid to the counterparties to the Assigned Contracts (each a "Counterparty" and collectively, the "Counterparties") under section 365(b)(1) of the Bankruptcy Code.

20

46.     The Assigned Contracts are those contracts or leases that are to be assumed by the Debtors and assigned to the Purchaser or the other successful bidder as part of the sale transaction under the Agreement. The Debtors further request that the Sale Order provide that the Assigned Contracts will be assigned to, and remain in full force and effect for the benefit of, the Purchaser or the other successful bidder, notwithstanding any provisions in the Assigned Contracts, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

47.     Pursuant to the Bidding Procedures Motion, the Debtors propose that an initial list (or lists) of Assigned Contracts be served on all counterparties to such contracts and leases no later than two (2) business days after entry of the Bidding Procedures Order.

48.     Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2). Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such

21

contract or lease unless, at the time of assumption of such contract or lease, the trustee --

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

49.    Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an executory contract, courts have consistently applied a "business judgment" test when reviewing such a decision. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *Matter of Talco, Inc.*, 558 F.2d 1369, 1173 (10th Cir. 1977). A debtor satisfies the "business judgment" test when it determines, in good faith, that assumption of an executory contract will benefit the estate and the unsecured creditors. *In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D.N.Y. 1986). The potential assumption and assignment of the Assigned Contracts, or any of them, set forth in the Agreement, will be a necessary part of the deal that Debtors have struck with the Purchaser or other successful bidder and, as stated above, will benefit the estate of the Debtors.

50.    As set forth above, with respect to Assigned Contracts to be potentially assumed and assigned pursuant to the Sale Hearing, the Debtors have sent or will send the Cure Notices to all Counterparties in connection with the Court's approval of the Bid Procedures,

22

thereby notifying such Counterparties of the potential assumption by the Debtors and assignment to the Purchaser or the successful bidder of the Assigned Contracts at the Sale Hearing. The Cure Notices will set forth the "cure" amounts owing on each of the Assigned Contracts, according to the Debtors' books and records and, in accordance with the provisions set forth in the Bid Procedures, shall be  the amounts required to be paid pursuant to section 365(b)(1) of the Bankruptcy Code ("Cure Amounts"). The Bidding Procedures Motion proposes that objections, if any, to either the Cure Amounts or the assumption or assignment of Assigned Contracts to Purchaser or adequate assurance of future performance be filed on or before the objection deadline to the proposed Sale. Objections to the adequate assurance of future performance of a successful bidder (other than the Purchaser) may be raised at the Sale Hearing.

      51.    Counterparties to the Assigned Contracts will have a sufficient opportunity to file an objection to the proposed Cure Amounts set forth in the Cure Notices. To the extent no objection is filed with regard to a particular Cure Amount, such Cure Amount shall be binding on the applicable contract or lease Counterparty. The payment of the Cure Amounts specified in the Cure Notices (or a different amount either agreed to by the Purchaser, or the successful bidder, or resolved by the Court as a result of a timely-filed objection filed by a contract or lease counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtors determine (with the consent of the Purchaser or Successful Bidder) that a particular lease or contract is not truly

executory, and does not need to be cured to transfer the lease or contract to the Successful Bidder or Purchaser.

52.     Cure Amounts disputed by any Counterparty will be considered by the Court either at the Sale Hearing or at some later date as may be scheduled by the Court to determine contested objections regarding Cure Amounts that have not been resolved in advance or at the Sale Hearing.  With respect to payment of Cure Amounts, the Purchaser or other Successful Bidder shall bear and pay the entire amount of such cure costs, subject to a cap of $500,000.

53.     The Purchaser or other Successful Bidder is responsible for providing evidence of "adequate assurance of future performance" to the extent required in connection with the assumption and assignment of any Purchased Contract.  The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  See *Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989).  *See also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).  If necessary, the Purchaser or the other Successful Bidder shall provide evidence of its ability to provide adequate assurances to Counterparties to the Assigned Contracts at the Sale Hearing.  Moreover, any Successful Bidder will be required to provide evidence that the bidder can provide adequate

24

assurance of future performance with respect to the Assigned Contracts at the time it submits its bid.

### Notice

54.     A copy of this Motion will be provided to (a) the Office of the United States Trustee; (b) the twenty (20) largest unsecured creditors of the Debtors; (c) all parties who are known by the Debtors to assert liens with respect to the Assets, if any; (d) all entities who executed non-disclosure agreements with the Debtors in connection with a potential acquisition of any or all of the Assets or whom the Debtors believe may have an interest in bidding; (e) all counterparties to the Assigned Contracts; (f) the Purchaser and its counsel; and (g) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure.  The Debtors respectfully submit that such notice is sufficient, and request that the Court find that no further notice of the relief requested herein is required.

55.     The Debtors request, pursuant to Bankruptcy Rules 6004(h) and 6006(d), that the order approving this Sale Motion become effective immediately upon its entry.

### No Prior Request

56.     No prior request for the relief sought in this Sale Motion has been made to this or any other court.

### Conclusion

57.     The Debtors' proposed sale of the Assets as described in this Sale Motion is supported by sound business reasons, as set forth herein.  The proposed sale is proper, necessary and serves the best interests of the Debtors, their estates and creditors, and all parties

25

in interest.  The Debtors thus request that the Court approve the proposed Sale of the Assets free and clear of all interests, liens, claims, and encumbrances, as requested, to the Purchaser or other Successful Bidder.

*[remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Sale Motion and authorize the sale of the Assets to the Purchaser or other Successful Bidder and approve the Agreement, pursuant to the attached proposed order; (ii) approve the form and manner of notice of this Sale Motion, and of the proposed sale and assumptions and assignments of the Assigned Contracts; and (iii) grant such other and further relief as is just and proper.

Dated: December 7, 2015

PACHULSKI STANG ZIEHL & JONES LLP

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira Kharasch (CA Bar No. 109084)
Michael R. Seidl (DE Bar No. 3889)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
Telephone: 302-652-4100
Facsimile:  302-652-4400
E-mail:jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        mseidl@pszjlaw.com
        crobinson@pszjlaw.com

-and-

**BRYAN CAVE LLP**
Robert J. Miller (AZ#013334) (*pro hac vice pending*)
Two N. Central Ave., Suite 2200
Phoenix, Arizona  85004
T: 602-364-7000
F: 602-364-7070
Email: rjmiller@bryancave.com

-and-

Kerry A. Moynihan (SBN 25057) *(pro hac vice pending)*
3161 Michelson Drive, Suite 1500
Irvine, California 92612
T: 949-223-7000
F: 949-223-7100
Email: kerry.moynihan@bryancave.com

-and-

Brian C. Walsh (MO#58091) *(pro hac vice pending)*
Laura Uberti Hughes (MO#60732) *(pro hac vice pending)*
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
T: 314-259-2000
F: 314-259-2020
Email:      brian.walsh@bryancave.com
            laura.hughes@bryancave.com

*Proposed Counsel for the Debtors and Debtors in Possession*

DOCS_DE:203683.1 29396/001