IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FUHU, INC., *et al.*,[1] | ) | Case No. 15-12465 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**DECLARATION OF JAMES MITCHELL**
**FILED IN SUPPORT OF FIRST-DAY MOTIONS**

I, James Mitchell, declare as follows:

1.      On the date hereof, Fuhu, Inc. and Fuhu Holdings, Inc. ("Fuhu" or the "Debtors")

each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code

(the "Bankruptcy Code").

2.      The Debtors continue to operate their businesses and manage their financial

affairs as debtors-in-possession under Sections 1107 and 1108 of the Bankruptcy Code. No

request has been made for the appointment of a trustee or examiner, and no official committee

has been appointed in this case

3.      Since 2008, I have been the Chief Executive Officer of the Debtors.  In that

capacity, I oversee Sales, Finance, Partnerships, Investments and Retail Relationships.

4.      I have access to the books and records of the Debtors, including records pertaining

to the Debtors' financials, shareholders, employees, insurance, customer programs and pending

litigation.  I make this Declaration, in part, based upon the information contained in the business

---

[1] The Debtors, together with the last four digits of each Debtor's tax identification number, are:  Fuhu, Inc. (7896); and Fuhu Holdings, Inc. (9761).  The location of the Debtors' headquarters and service address is 909 N. Sepulveda Blvd., Suite 540, El Segundo, CA 90245.

records of the Debtors.  The books, records and other documents in the files of Debtors constitute

writings made in the regular and ordinary course of business, by individuals with personal

knowledge of the event or events being recorded and who are under a business duty to record

accurately such event (or events), and were made at or near the time of the event or act of which

they are a record.  The facts contained in this Declaration are true based on my personal

knowledge or my review of the pertinent business records, and if called as a witness, I could and

would testify competently to the truth of said facts.

5.      Previous to Fuhu, as a Partner as Accenture, I have over eighteen years of

experience working with global market makers in the media, high tech and electronics industries.

I have worked with leading brands, including Google, Qualcomm, HP, Western Digital, Toshiba,

and Intel, with a focus on increasing shareholder value by opening new channels, launching new

products and businesses, improving supply chain and global operations and enhancing customer

care.  I defined and lead Accenture's strategy with regard to eCommerce and hold 11 Patents in

that area.

### The Debtors' Business

6.      Fuhu is the maker of the nabi tablets, the number one tablet made just for

children.  Fuhu was founded in 2008 by John Hui, Steve Hui, and Robb Fujioka ("Fujioka").  I

currently co-manage the Debtors with Robb Fujioka, the company's president.

7.      Fuhu is headquartered in El Segundo, California, and employs approximately 115

employees and retains 1 independent contractor who work in various areas including marketing,

sales, operations, creative, technology, development and management.

8.      Between 2010 and 2013, Fuhu's revenue grew by more than 159,956% to more than $195 million in 2013. Fuhu was named the fastest growing company by Inc. Magazine in both 2013 and 2014. Fuhu has sold more than 4 million tablets, with more than 1.5 million sold in fiscal year 2014. Fuhu's array of nabi tablets are sold in more than 10,000 retail outlets, including Target, Best Buy, Costco Wholesale, Toys R' Us and Walmart stores.

9.      Fuhu Holdings was established in 2012 as a wholly owned subsidiary of Fuhu, and the entities share common management. Fuhu Holdings owns significant intellectual property assets of the Debtors , including trademarks and copyrights.

**The Debtors' Secured Credit Facilities**

10.      Obsidian Agency Services, Inc., as Agent for Tennenbaum Special Situations Fund IX, LLC and Tennenbaum Special Situations IX-O, L.P. (collectively, "Tennenbaum"), holds a first-priority security interest in substantially all of the assets of the Debtors other than accounts receivable, as well as a second-priority security interest in the Debtors' accounts receivable, under a Credit Agreement dated May 27, 2015, as amended, and a Guaranty and Collateral Agreement of the same date. As of November 25, 2015, Tennenbaum asserted that it was owed approximately $6.5 million by the Debtors, which includes principal of approximately $5.4 million, accrued interest of approximately $65,000, a yield-enhancement fee of $400,000 and an early-termination fee of $700,000. Since that date, Tennenbaum has swept approximately $300,000 in cash from the Debtors for application to its debt.

11.      LSQ Funding Group, L.C. ("LSQ") factored certain of the Debtors' accounts receivable under a Factoring and Security Agreement dated April 21, 2015. Although LSQ factored only a limited subset of the receivables, it holds a first-priority security interest in all of

the Debtors' receivables. As of the Petition Date, the outstanding amount owed to LSQ on account of factored receivables was approximately $1.3 million. There are disputes between the Debtors and LSQ regarding the collection of the factored receivables.

## Events Leading to the Chapter 11 Cases

12.     In or about 2013, Fuhu agreed to move the engineering, development and manufacturing of the nabi tablets exclusively to Hon Hai Precision Industry Co., Ltd ("Hon Hai") and Fusing International, Inc. ("Fusing," and collectively with Hon Hai, "Foxconn").

13.     However, in late 2014, Foxconn failed to timely deliver the nabi tablets for the 2014 holiday season, resulting in a significant loss of sales during the company's historically most profitable season. This late delivery and missed holiday season resulted in a significant oversupply of product in the first calendar quarter of 2015 (the end of Fuhu's fiscal year).

14.     Thereafter, Fuhu returned approximately $90 million worth of inventory to Foxconn, and agreed to purchase the inventory back as necessary to meet supply. Foxconn has since ceased manufacturing of the nabi tablets.

15.     The Debtors have significant disputes with Foxconn arising out of these and other events.

16.     In late September 2015, Foxconn began to aggressively pursue repayment of its outstanding accounts payable. Foxconn refused to supply any further product to Fuhu, despite the fact that Foxconn was Fuhu's sole supplier and that such action would cause Fuhu to fail to fulfill purchase orders from various big box retailers during the critical 2015 holiday season.

17.     During this period, Fuhu retained experienced financial consultants, restructuring counsel and an investment banker to begin to market the company for sale.

18.    Despite efforts by Fuhu to reach a resolution which would allow the company to fulfill the pending purchase orders for their retailers and online stores, Foxconn suddenly ceased all negotiations and communications with Fuhu's management and counsel after releasing only limited product.   Foxconn's actions during this period caused significant damage to the company and significantly limited Fuhu's revenue.

19.    Initially, the Debtors agreed to grant Foxconn purchase-money security interests in approximately 35,000 tablets sold by Foxconn to the Debtors for approximately $4 million (the "Forbearance Agreement").  Although Foxconn ceased communications and failed to execute the Forbearance Agreement for more than a month, Foxconn recorded its UCC financing statements and sold the tablets to the Debtors.

20.    The Debtors are uncertain whether Foxconn provided the notice to Tennenbaum that would have permitted Foxconn to obtain priority over Tennenbaum's security interest in the tablets sold by Foxconn.

21.    The Debtors promptly resold the tablets at issue to retailers in advance of the holiday season, generating accounts receivable.

22.    In late October, after negotiations with Foxconn ultimately ceased, Fuhu informed its secured lender, Tennenbaum, of its critical situation.  Although seemingly willing to work with Fuhu, Tennenbaum almost immediately issued a Notice of Default and exercised its rights under a Deposit Account Control Agreement ("DACA"), sweeping more than $4.5 million from Fuhu's bank accounts and leaving Fuhu will little funds and no inventory to continue to operate its business.

23.    Thereafter, Tennenbaum issue several other default notices dated November 16 and November 24.

### The Mattel Loan and Sale Transaction

24.    Mattel, Inc. ("Mattel" or "Purchaser") made a loan of $300,000 to the Debtors on or about December 4, 2015 (the "Pre-Filing Loan") to provide funding necessary to permit the Debtors to complete their preparations for the commencement of these cases, including the documentation of the sale of the Debtors' assets.  The Purchaser's pre-petition loan is secured by substantially all of the Debtors' assets and was perfected by the filing of financing statements in applicable Delaware and California filing offices on or about December 4, 2015.

25.    As of the Petition Date, the Debtors entered into a *Term Sheet for the Acquisition of the Assets of the Fuhu Entities*, with Mattel for the sale of substantially all of the Debtors' assets for $9,500,000, subject to certain adjustments and the assumption of certain liabilities. The Term Sheet is subject to definitive documentation in the form of an asset purchase agreement. The Debtors and the Purchaser contemplate entering into that agreement shortly after the Petition Date and filing it with the Court.  That agreement will be subject to higher and better bids and, ultimately, the approval of the Court.  The Debtors expect to continue their current operations in the ordinary course pending the outcome of their sale process.

### The Debtors' Request for Use of Cash Collateral

26.    The Debtors have an urgent and immediate need to use Cash Collateral.  The Debtors have approximately $2.0 million in cash on hand, but they have not had unrestricted use of their cash since October 29, 2015, when Tennenbaum directed the Debtors' depository bank not to release funds and subsequently swept approximately $4.5 million of the Debtors' cash.  As

of the Petition Date, approximately $1.8 million of the Debtors' cash on hand was in a PayPal account that is not subject to a control agreement with Tennenbaum, but these funds are derived from orders of tablets by consumers, primarily ordered since the beginning of the holiday shopping season. The Debtors cannot presently fulfill these orders, because Tennenbaum directed the Debtors' warehouse and logistics providers not to release inventory without Tennenbaum's express consent on or about November 6, 2015.

27.    The Debtors' cash on hand is urgently needed for the Debtors' operations, including payroll obligations that must be funded on Wednesday, December 9 and paid on Friday, December 11. The Debtors also must satisfy obligations to Amazon Web Services, which hosts the servers that provide functionality and content to all of the Debtors' consumer products. Despite multiple requests, Tennenbaum has refused to consent to the release of funds for these critical business purposes.

28.    If the Debtors are not permitted to use cash collateral to operate the business and administer this case, it is a virtual certainty that the Debtors' estate will be liquidated. Specifically, without use of cash collateral and the ability to operate, employees will not be paid, the Debtors will be unable to order and deliver additional goods during the busy holiday period, and the Debtors will not be able to honor warranties or address other concerns of its customers and retailers. Even if the Debtors are deprived use of cash collateral for a short time, the harm to the Debtors' reputation will severely damage its business, thereby reducing the value of the estate and potential recovery to creditors.

29.    If the Debtors' business ceases to exist, the digital server platform that supports and operates all nabi tablets will no longer be active and supported. This will cause all 4 million

nabi tablets currently in market and all nabi tablets in inventory as creditor collateral to cease functioning as promoted and specified in marketing and in user manuals. Because the nabi tablets are built for kids, the Debtors' software is built into the tablets and integrated at the firmware level. This software controls the startup of the tablet as well as over 400 features, including all parental control. If the company ceases to exist and thus this software is no longer available and supported, all of the current customers will not be able to use the product in the manner for which they purchased it. Unsold tablets would most likely all be returned, causing retailers, customers and the estates significant financial harm.

### The Debtors' Cash-Management System

30.     Prior to the Petition Date, the Debtors, in the ordinary course of their business, employed an integrated, centralized cash-management system (the "Cash-Management System") with Wells Fargo Bank, N.A. ("Wells Fargo") and other institutions for the purpose of, among other things, collecting and disbursing funds, centralizing cash forecasting and reporting, and integrating bank accounts across the United States through which the Debtors manage cash receipts, disbursements, and transfers for the Debtors' business operations.

31.     The Cash-Management System: (a) collects funds generated by the Debtors' operations, (b) transfers funds available under the Pre-Petition Secured Credit Facility established with the Lender, and (c) accurately records all such transactions as they are made.

32.     The Cash-Management System is highly automated and computerized and includes the necessary accounting controls to enable the Debtors, as well as creditors and the Court, if necessary, to trace funds through the Cash-Management System and to ensure that all

transactions are adequately documented and readily ascertainable. The Debtors will continue to maintain detailed records reflecting all transfers of funds.

33.     The Cash-Management System is comprised of:  (a) a Fuhu checking account with Wells Fargo into which cash and other receipts from the Debtors' sales are initially deposited (the "Primary Account"); (b) a Fuhu business account with PayPal, Inc., into which cash and other receipts from the Debtors' eCommerce store sales are initially deposited and from which application developers were historically paid quarterly royalties (the "PayPal Account"); (c) a Fuhu checking account with Wells Fargo (the "Secondary Account"), through which Debtors' manual checks are processed; (d) a Fuhu savings account with Wells Fargo (the "Restricted Account"), in which the Debtors holds restricted cash reserves for the company credit card account and letters of credit with various landlords and a significant licensor; and (e) a Fuhu (previously) zero balance account with Wells Fargo (the "Payroll Account"), through which Fuhu's payroll is processed. The accounts described here are referred to collectively as the "Bank Accounts," and the institutions where they are maintained are referred to collectively as the "Banks."

34.     In addition, Fuhu Holdings maintains two checking accounts at Wells Fargo and a checking account at HSBC Bank which were essentially inactive on the Petition Date (collectively, "Inactive Accounts").

35.     On a daily basis, accounts receivable are deposited into the Primary Account and the PayPal Account. On a periodic basis, a portion of the funds in the PayPal Account are swept to the Primary Account, while the remaining funds are kept in the PayPal Account as a reserve for potential customer returns. Accounts payable are made primarily through electronic transfers

from the Primary Account. Only manual checks are processed through the Secondary Account, which generally is limited to payment of final wages and expenses upon employee termination.

36.     The Debtors' payroll is processed through a third party payroll company, CBIZ, Inc. ("CBIZ"). For each payroll period, CBIZ makes various withdrawals from the Payroll Account corresponding to the net wages, taxes, and any applicable garnishments or expense reimbursements. The following day, because the Payroll Account is intended as a zero balance account, the total amount of the payroll withdrawal is then transferred from the Primary Account to the Payroll Account. Thereafter, the employee 401(k) contributions are then funded from the Primary Account. All insurance premiums are advanced monthly from the Primary Account.

37.     Additionally, the Debtors fund operations of their Taipei, Taiwan subsidiary, Fuhu Taiwan, Inc. ("Fuhu Taiwan"), which employees approximately 113 employees focused on software development. Debtors fund Fuhu Taiwan in the approximate amount of $400,000 per month, which covers both operations of the company and its payroll.[2] All of the intellectual property developed by Fuhu Taiwan is owned by Fuhu.

38.     Since Tennenbaum's exercise of its DACA rights as described above, the Debtors have had to use the Payroll Account for other purposes, but intend to resume use of the Primary and Secondary Account once the DACA restrictions are lifted.

---

[2] Fuhu Taiwan historically pays its employees an additional month's salary at the Chinese new year. As part of the cash collateral motion, FuHu seeks authority to fund this payment in addition to FuHu Taiwan's regular monthly operating and payroll costs.

## The Debtors' Employees and Their Compensation

39.     As of the Petition Date, Fuhu employs approximately 115 employees and retains

1 independent contractor (collectively, the "Employees"[3]).[4]  Generally, these Employees work in

the areas of marketing, sales, operations, creative, technology, development and management.

The Employees are broken down into three categories: employees based in the two El Segundo,

California offices ("El Segundo"); employees based in the San Jose, California office ("San

Jose"); and an independent contractor located in El Segundo ("Contractors").  All of the El

Segundo Employees are employees at will and are paid bi-weekly.  The San Jose Employees are

paid on a monthly basis, while Contractors are paid monthly.

40.     Fuhu's payroll is managed by CBIZ, which also handles all garnishment,

withholding, W-2 preparation, and other payroll-related functions. Payments to CBIZ are paid

from Fuhu's Payroll Account with Wells Fargo Bank.  In the ordinary course of Fuhu's business,

Fuhu incurs payroll obligations to the Employees for the performance of services rendered by

such employees.  The average gross payroll for the Employees is approximately:

     a.   El Segundo:              $400,000 (biweekly)

     b.   San Jose:               $85,000 (monthly)

     c.   Contractors:            $10,000 (monthly)

41.     Fuhu estimates that, as of the Petition Date, approximately $392,730 in

prepetition wages and compensation earned by its Employees prior to the Petition Date was

---

[3] The term "Employees" is used to refer collectively to the debtor's employees and independent contractors solely for ease of reference and because the requested relief is appropriate as to all employees and independent contractors, regardless of the legal relationship between Fuhu and the individuals.  The use of the term is not intended to imply that the independent contracts are currently, or were at any time, legally employees of the Debtor.

[4] Debtor Fuhu Holdings, Inc. does not have any employees or retain any independent contractors.

unpaid (the "Unpaid Compensation"). Items of Unpaid Compensation were due and owing on the Petition Date because, inter alia:

    a.    Employees are paid in arrears in the ordinary course of Fuhu's business;

    b.    Fuhu's chapter 11 petition was filed in the middle of Fuhu's regular and customary payroll periods; and

    c.    Some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date.

42.    The request to pay Unpaid Compensation relates solely to Employees who are employed or retained as of the Petition Date. Any employees who were terminated prior to the Petition Date were paid all wages due upon departure.

43.    The majority of Employees would each have a priority claim of up to $12,475 with respect to all of their earned but unpaid prepetition wages or salaries. Accordingly, such amounts would ultimately be paid to Employees in full prior to payment of other unsecured claims under a plan of reorganization. None of the Employees are owed prepetition wages in excess of the $12,475 cap imposed by section 507(a)(4) of the Bankruptcy Code. Paying the amounts due to the Employees is justified by these Employees' critical importance to the Fuhu's business operations and the need to avoid any negative effect on their morale should such payments not be made.

44.    In addition, Fuhu is required by law to withhold from Employees' payroll certain federal, state, and local income taxes, and Social Security and Medicare taxes and remit the same

to the appropriate taxing authorities (collectively, the "Payroll Tax Obligations").    Fuhu

estimates that the average amount of Payroll Tax Obligations is approximately 26% and 20% of

total gross payroll, or $104,000 and $17,000, for El Segundo and San Jose, respectively.

45.    In the ordinary course of its business, Fuhu also provides its Employees

(excluding the Contractors) with certain benefits, including, but not limited to, medical, dental,

and vision insurance; basic life and accidental death and dismemberment insurance; workers'

compensation; sick leave and paid time off; and a 401(k) retirement savings plan (the "Benefit

Plans").    The 401(k) plan offered by Fuhu meets the requirements of section 401(k) of the

Internal Revenue Code of 1986 and is a qualified defined contribution plan under the Internal

Revenue Code, pursuant to which Employees can elect to make before-tax contributions through

payroll deductions.

46.    As a convenience and accommodation for Employees, Fuhu makes deductions

from Employees' payroll checks and subsequently pays those funds to various third parties.

These payroll deductions are for such items as health, dental, and vision insurance, and 401(k)

plan contributions.    These funds are not property of the estate under 11 U.S.C. § 541, and

accordingly, Fuhu requests authority to pay over all such funds to the designated payees.[5]

47.    With continued post-petition operations, Fuhu expects to have sufficient funds

available to pay all requested amounts as and when due, and all payments made on account of

---

[5] In the ordinary course of its business, FuHu provides paid holidays and discretionary paid vacation time.  Like employee wages, such amounts are entitled to priority treatment under 11 U.S.C. § 507(a)(4).  Although the exact amount of such pay and entitlements cannot be determined with precision at this time, the Debtors request authority to maintain its current holiday leave and discretionary paid time off policies in the ordinary course of its operations.

Compensation Obligations will be made in accordance with any budgeted use of cash collateral approved by the Court.

48.     Fuhu pays approximately $129,000 on a monthly basis to administer the Employee Benefit Plans. Fuhu requests permission to pay the prepetition allocation of such amount (approximately $22,435) and to continue paying amounts postpetition.

49.     Fuhu seeks to pay only those prepetition wages and benefits for those Employees who are still employed by or under contract with the Debtor.

50.     Payment of wages and benefits for its Employees is essential to Fuhu's continued operations as a debtor-in-possession. Fuhu believes that any delay in paying the Compensation Obligations will adversely impact its relationship with the Employees and will irreparably impair the Employees' morale, dedication, confidence, and cooperation. Moreover, unless Fuhu is permitted to honor these obligations, the Employees will suffer undue hardship and serious financial difficulties, as the amounts in question enable certain of the Employees to meet their own personal financial obligations.

51.     Fuhu believes the compensation structure and benefits policies are competitive within the industry, and are necessary to attract and retain essential employees. Moreover, continuing to compensate Employees and honor the benefits currently in effect is essential to maintaining positive relationships and employee morale.

52.     Fuhu is required to (a) match the Social Security and Medicare taxes; (b) based on a percentage of gross payroll, pay additional amounts for state and federal unemployment insurance; and (c) remit these payroll taxes to various taxing authorities. The Debtor estimates

that the average amount of Social Security and Medicare taxes paid by the Debtor is approximately $21,500 biweekly for El Segundo and $5,000 monthly for San Jose.

53.    In the ordinary course of processing payroll checks for Employees, Fuhu withholds certain amounts on account of garnishments, such as tax levies, child support, and other court-ordered garnishments.  Fuhu is aware of $257 of accrued and unpaid amounts on account of garnishments from the prepetition period, but seeks authorization to collect and pay such garnishments.

54.    Each of these checks or transfers is or will be drawn on the Debtors' payroll and general disbursements accounts, and can be identified as relating directly to payment of the Prepetition Compensation Obligations.

### The Debtors' Insurance Coverage

55.    The Debtors maintain various insurance policies (the "Insurance Policies") in amounts and types of coverage in accordance with laws governing the jurisdictions in which the Debtors do business, as well as in accordance with their contractual obligations.  The Insurance Policies include coverage for, *inter alia*, general liability, excess liability, directors and officers liability, ocean cargo, and workers compensation.

56.    Certain of the Policies run from December 18, 2014, to December 18, 2015; other Policies run into 2016.  Most of the Debtors' insurance premiums are paid annually; others are due quarterly.  For the current policy periods, the total premiums for all of the Insurance Policies equal approximately $306,914.00.  The policy types, policy periods, amounts of coverage, and insurance companies are set forth on Exhibit B attached to Debtors' Motion for Authority to Perform Obligations Necessary to Maintain Insurance Coverage.

57.    The coverage types, levels, and premiums for these Insurance Policies are not unusual in amount nor in number in relation to the extent of the business operations conducted by the Debtors, and the Debtors believe that they are similar to insurance coverages typically carried by businesses of a comparable size and type to those of the Debtors.    The Debtors believe that Insurance Obligations attributable to the pre-petition period (including prorated amounts for the current month) aggregate approximately $9,645 (plus any unforeseen deductible payment amounts for pre-petition claims).

58.    The Debtors finance the cost of their Directors and Officers Policy through AFCO Acceptance Corporation ("AFCO") pursuant to a Premium Finance Agreement – Promissory Note (the "PFA").    In the PFA, the Debtors, among other things, grant a security interest to AFCO in the Debtors' unearned premiums, dividend payments, and loss payments under the policy, as well as any interest in any state guarantee fund relating to any financed policy.    The form of PFA is attached as Exhibit C to the Debtors' Motion for Authority to Perform Obligations Necessary to Maintain Insurance Coverage.

59.    Pursuant to the PFA, AFCO agreed to pay in full the amount of the policy premium to the insurance carriers.    In return, the Debtors agreed to pay AFCO a down payment and nine (9) monthly installments of $8,768.34. The interest rate under the PFA is 7.99%.    The Debtors last made a payment on or about November 3, 2015.    The following payment was due on December 3, 2015.

60.    The Insurance Policies maintained by the Debtors will eventually expire under their terms, beginning with policies due to expire on December 18, 2015.    Maintenance of insurance coverage is required under the certain laws of the jurisdictions in which the Debtors

operate, other contractual agreements, and prudent business practices. Therefore, the Debtors request entry of an order authorizing them to revise, extend, supplement, renew, change, or enter into new insurance coverage, as needed, in their business judgment.

61.    To the extent that any Insurance Policy premiums may be attributed to pre-petition insurance coverage, the Debtors believe that payment of such Insurance Policy premiums is necessary and appropriate to ensure continued coverage. Similarly, the continued payment of Insurance Policy premiums as such premiums come due is necessary to ensure continued coverage.

62.    The Debtors have been represented in negotiations with the various insurance carriers by Bolton & Company (the "Insurance Consultant"). The employment of the Insurance Consultant has allowed the Debtors to obtain the insurance coverage necessary to operate their businesses in a reasonable and prudent manner, and to realize considerable savings in the procurement of such policies. The Debtors believe that it is in the best interests of their creditors, stakeholders, and estates to continue their business relationships with the Insurance Consultant. Accordingly, the Debtors seek the entry of an order authorizing them to continue their pre-petition practice of paying fees to the Insurance Consultant in connection with their representation of the Debtors in various ongoing negotiations with the Debtors' insurance carriers.

## The Debtors' Customer Programs

63.    The Debtors sell nabi tablets and related accessories through retailers, such as Walmart, and the Debtors' website, www.nabishop.com ("nabi Shop"). On nabi Shop, the Debtors sometimes offer promotions and discounts, such as bundling of accessories or

seasonal discounts. To the extent that a customer purchases hardware directly from the Debtors' website, the Debtors fulfill such orders with the assistance of a third-party fulfillment agent.

64.    When customers purchase tablets through nabi Shop, the Debtors offer customary customer-service features, such as returns and exchanges, as well as repairs. When a customer purchases a tablet through a retailer, subsequent requests to repair that tablet are made directly to the Debtors.

65.    Regardless of a customer's point of purchase, customers contact the Debtors for warranty and repair issues. The Debtors refer to the program they use to allow their customers to submit hardware for repairs as "nabi Cares." In determining whether to repair or replace a defective tablet, the Debtors sometimes elect to exchange a non-functioning tablet for a refurbished one.

66.    In administering nabi Cares, the Debtors contract with a third-party to accomplish the repairs and refurbishing. The Debtors do not charge customers for assistance through nabi Cares. Honoring the nabi Cares program would not require the Debtors to make a cash outlay, other than ordinary course post-petition expenses associated with payments to the Debtors' third-party vendor for its repairs to nabi Cares hardware.

67.    Prior to commencement of these Chapter 11 cases, in the ordinary course of its business, the Debtors maintained numerous programs to allow their products to be constantly updated and tailored by their end-users. When customers purchase a nabi tablet, they may receive the benefit of their bargain only if both the hardware and software components function. Similar to other consumer electronic products companies, the Debtors operate software

on the tablets they sell to customers, allowing the customers to access content provided by the Debtors.

68.    The Debtors operate a content subscription service allowing customers to customize their tablets. Each customer creates an account, which allows the personalization of content, including saving preferences and purchasing certain content. Under the nabi Pass program, customers may access all of nabi's content, including movies, music, "apps," television shows, e-books, games, and videos for $4.99 per month, which is charged to the customer's account on a monthly basis. Under the nabi Pass Tab program, the Debtors provide customers with both hardware and software under a subscription agreement of one or two years. During the subscription period, the customer makes monthly payments that allow access to the Debtors' online content, and that also serve as an installment payment on the tablet. At the end of the subscription period, the customer may keep the tablet for a small fee.

69.    The Debtors also maintain a virtual currency, called nabi Coins, which allows their customers to purchase credits for later downloads and access to certain content. Some of the content Debtors offer, including their music service, nabi Radio, and their e-books service, Speakaboos, is delivered by a third-party provider. The Debtors process the customer's payment for the third-party provider's content and then remit payment to the third-party.

The Debtors believe that the total potential cash outlay associated with honoring nabi Coins is approximately $10,000.  The Debtors believe that honoring the nabi Coins is an essential goodwill gesture to its customers.

**The Debtors' Critical Vendors**

70.    The Debtors undertook a process to identify the Critical Vendors using the following criteria: (i) whether a vendor is a sole-source provider of materials; (ii) whether certain customizations, specifications, or volume requirements prevent Fuhu from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe; and (iii) if a vendor is not a sole-source provider, whether Fuhu can continue to operate in the ordinary course while a replacement vendor is secured.  As a result of its critical review and evaluation, Fuhu has identified a narrow subset of vendors as Critical Vendors, as set forth below.

71.    Fuhu relies on Amazon Web Services, Inc. ("Amazon") to deliver essential online content to its customers.  When customers purchase a nabi tablet, they may receive the benefit of their bargain only if both the hardware and software components function.  Similar to other consumer electronic products companies, the Debtors operate software on the tablets they sell to customers, allowing the customers to access content provided by the Debtors.  Prior to commencement of these Chapter 11 cases, in the ordinary course of its business, the Debtors provided online content for the users of its tablets through website servers maintained by Amazon.

72.    In addition, the Debtors contract with R&L Global Logistics ("R&L"), a warehouse that stores its tablets and other hardware for orders to be fulfilled.  The uninterrupted supply of tablets to customers is essential to the Debtors' business and is especially important at

20

this time of year, as the Debtors fulfill orders in connection with the holiday season. R&L currently holds approximately 631,337 units of inventory, and the Debtors have no other source for their inventory to fill customer orders. By virtue of R&L's possession of the inventory, R&L may have a statutory lien.

73.    The Critical Vendors do not operate under formal contracts with Fuhu. Instead, the Critical Vendors rely on prompt and full payment. Absent assurance of immediate payment either in part or in whole, the Critical Vendors could refuse to continue to service the Debtor. In particular, Amazon could cut off Fuhu's servers, terminating all of Fuhu's customers' access to online content and immediately and irreparably harming Fuhu's relationship with its customers, as well as its goodwill. R&L's refusal to allow access to inventory would prevent orders from being fulfilled, which would prevent the Debtors' operations as a going concern.

74.    Fuhu believes that it would be extremely difficult, if not impossible, to replace the Critical Vendors within a reasonable time without severe disruption to Fuhu's business. As discussed above, providing continuing online content to customers and fulfilling ongoing orders is paramount to the Debtors' business. At this critical time of the year, uninterrupted access to the Critical Vendors' supplies are paramount and any interruption would severely impact, if not destroy, Fuhu's business. Such harm would far outweigh the cost of payment of the Critical Vendor Claims.

75.    As of the Petition Date, Fuhu has not paid recent monthly invoices from the Critical Vendors, and will owe amounts that have accrued immediately prior to the Petition Date for which it has not yet been invoiced or payment is not yet due. Fuhu anticipates the total Critical Vendor Claims will be between $862,000 and $1 million.

**The Proposed Sale**

76.    Prior to the Petition Date, Fuhu has made substantial efforts to locate potential buyers for the Debtors' assets.

77.    The Debtors commenced the process of evaluating restructuring and sale options in September 2015. The Debtors' senior management planned and implemented a trip to Asia, during which they attempted to negotiate a sale with certain of the Debtors' shareholders and major creditors. While in Asia, the Debtors' senior management also met with and discussed the sale opportunity with numerous other potential buyers. These negotiations and discussions were conducted with chief executive officers, chief acquisitions officers, and other senior representatives of the companies involved, but they were ultimately unsuccessful.

78.    In October 2015, the Debtors increased their restructuring and sale efforts and hired KRyS Global USA ("KRyS") as their exclusive investment banker. Under the terms of its agreement, KRyS was tasked with pursuing a sale or capital placement transaction for the Debtors. On October 30, 2015, as directed by the Board of Directors of the Debtors, KRyS began a full-sale effort to contact parties to determine their interest in the acquisition of or investment in the Debtors.

79.    The Debtors concluded that the Purchaser was the party that offered the greatest value for the Debtors' assets, as well as the only party that was in a position to move quickly enough to a transaction in light of the Debtors' difficult financial circumstances. On December 6, 2015, the Debtors entered into the Term Sheet with the Purchaser regarding a sale of substantially all of the Debtors' operating assets, plus the assumption of certain liabilities.

80.    The Term Sheet is subject to definitive documentation in the form of the Agreement. The Debtors and the Purchaser contemplate entering into the Agreement shortly after the Petition Date and filing it with the Court. The Agreement will be subject to higher and better bids and, ultimately, the approval of the Court.

### Motion for Consolidated Matrix

81.    Local Rule 2002-1(f)(v) requires each debtor, or its duly retained agent, in jointly administered cases to maintain a separate creditor mailing matrix. Local Rule 1001-1(c) permits modification of the Local Rules by the Court "in the interest of justice." The Debtors submit that permitting them to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, is warranted. Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings.

82.    Given the number of creditors to be noticed in these cases, I respectfully request that the Court authorize the Debtors to submit and maintain a single consolidated list of creditors in lieu of filing a separate creditor matrix for each Debtor.


[Remainder of page intentionally left blank]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on this 7th day of December, 2015, at El Segundo, California.

JAMES MITCHELL