# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FUHU, INC., *et al.*,[1] | Case No. 15-12465 (CSS) |
| Debtors. | Joint Administration Requested |

## OBJECTION OF OBSIDIAN AGENCY SERVICES, INC. TO DEBTORS' MOTION TO USE CASH COLLATERAL

Obsidian Agency Services, Inc., in its capacity as Administrative Agent and Collateral Agent ("Agent") for the senior secured lenders of the Debtors, by and through its undersigned counsel, hereby objects to the Debtors' motion to use cash collateral (D.I. No. 3, "Cash Collateral Motion") and demands adequate protection of its interests in the Debtors' property.

Every dollar the Debtors propose to spend under the Cash Collateral Motion will erode the Agent's collateral position, and the Debtors have nothing to offer as adequate protection. The Debtors will not use cash collateral to buy new inventory or generate any other property for these estates. Instead, they seek to fund ongoing losses and administrative costs through the fire sale of the Lenders' collateral while hoping to finalize sale documents and consummate a going-concern sale that *might* do better than an orderly liquidation. If the Debtors fail in this regard, the Lenders will bear the full expense of these cases and lose more than half of their working capital collateral.

---

[1] The above-captioned Debtors' request for joint administration of this case with the case of Fuhu Holdings, Inc. (Case No. 15-12466 (CSS)) is pending. In an abundance of caution, this objection has been filed in both cases.

The Debtors point to a non-binding letter of intent with a stalking horse purchaser (the "LOI") to suggest there is an equity cushion sufficient to cure their fundamental adequate protection problem. However, any sale under that LOI is speculative, while the millions to be permanently lost trying to achieve it are certain.[2] Moreover, that LOI is full of contingencies, deductions and potential offsets that reduce the purchase price in absolute terms.[3] If the Debtors fall only 10% short of their projected net cash flow in these cases, a sale under this LOI will leave the estates administratively insolvent even under the best-case scenario.[4] That is a far cry from an equity cushion sufficient to justify the large, permanent deterioration of the value of the Lenders' interests that the Cash Collateral Motion seeks. *See The Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 567 (3d Cir. 1994)("Congress did not contemplate that a creditor could find its priority position

---

[2] Under the Debtors' budget, the Debtors' accounts receivable will have been reduced by approximately $2.6 million and inventory by more than $10 million by the projected sale date. None of this collateral is being applied to the Lenders' secured debt nor is it being replaced by new collateral.

[3] As a few examples of the problems with the non-binding LOI: (a) there shall be a cash deduction from the purchase price of approximately $1 million based on the Debtors' projected budget, *see* LOI attached as Exhibit A to the Debtors' Sale Motion (D.I. 9) at p. 2; (b) a dollar-for-dollar deduct of any cure costs greater than $500,000, *see id.*; (c) the stalking horse purchaser's ability to credit bid junior debtor-in-possession financing and deduct the full amount from the purchase price, *see id.*; (d) undefined required representations and warranties; (e) an undefined material adverse change provisions, *Id.* at p. 6-7; and (e) numerous conditions to close, many of which depend on third parties (including, without limitation, consents from third parties for assigned contracts, such as IP licenses and related rights), *Id.* at p.7.

[4] The Debtors net cash flow goes to $0 in Week 10, concurrent with their proposed sale closing. That represents approximately $12.5 million in disbursements against the same amount of cash on-hand plus collections. Ten percent of that is $1.25MM, which is approximately the result of a $9.5 million purchase price, minus an approximately $6.5 million claim of the Agent, minus $1.25 million owed to the Debtors' factor, minus the $300,000 secured claim of the putative stalking horse, minus any alleged secured claim of the Debtors' prepetition bailee.

eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects.").

As of the filing of this objection, the Agent has been aware of the Debtors' bankruptcy filing for barely twenty-four hours. Since that time, it has focused on attempting to understand the Debtors' immediate spending and sales requests and, thereby, make the best use of the Court's time at the emergency hearing later today. Some of their requested disbursements may classify as emergencies, but most do not. Just the first two weeks of the Debtors' proposed budget alone contain over $1.25 million of clearly non-emergency disbursements, including:

> (i) $550,000 of the Lenders' collateral for estate professionals not yet retained. Upon information and belief, these disbursements consist almost entirely of requests for evergreen retainers for Debtors' professionals. This clearly does not qualify as an emergency expense that must be paid out of the Lenders' collateral on the first day of these cases;
>
> (ii) the Debtors' "Cost of Sales" includes approximately $480,000 of payments on an alleged *prepetition* claim to a bailee that has limited its potential lien by a prepetition Bailee Agreement among Agent, the Debtors and such bailee, such that the bailee clearly enjoys an equity cushion on any such interest; and
>
> (iii) $250,000 for miscellaneous contingencies (e.g., "other").

These expenditures should not be approved on an interim basis. *See* Fed. R. Bankr. P. 4001(b)(2)("[T]he court may conduct a preliminary hearing before such 14 day period expires, but the court may authorize the use of *only that amount of cash collateral as is necessary to avoid immediate and irreparable harm* to the estate pending a final hearing.")(emphasis added); Local Rule 4001-2(b) (Cash Collateral and Financing Orders) ("Such immediate relief shall be *only what is necessary to avoid immediate and irreparable harm* to the estate pending a final hearing.")(emphasis added).

When stripped of the more than $1.2 million in items that clearly do not qualify as emergency expenditures, the Debtors have sufficient cash collateral in their possession to fund their operating expenses without further impairing the Lenders' collateral by selling significant inventory (much of it at below cost prices) pending an evidentiary hearing.[5]

If the Court nevertheless permits the Debtors to spend or ship any product today, its permission should only extend to truly emergency disbursements and clearly beneficial sales for a limited time. Anything beyond that would constitute premature approval of the large risks that the Debtors are willing to take with the Agent's collateral in these cases. The Agent formally requests adequate protection of its interests affected by the Cash Collateral Motion and otherwise, including segregation and accounting of all cash collections, all other first-day orders should be subject to the limited relief granted by the cash collateral order, and most importantly an evidentiary hearing on the Cash Collateral Motion at the earliest reasonable opportunity. The Agent is prepared to move quickly in this regard, but the Debtors bear the burden of proof on the issues of immediate and irreparable harm and adequate protection. The Agent should have the opportunity to depose the Debtors' fact and expert witnesses and review the Debtors' records, in addition to presenting its own witnesses. The Agent believes the costs of such litigation would be an unfortunate waste of time and expense to prove the obvious lack of adequate protection, but the Debtors are forcing this result by asking to consume – all according to their Budget –$12.5 million in cash, $10 million in inventory, and $2.5 million in accounts receivable to get to a speculative sale with a gross (not net) $9.5 million purchase price. Since the Debtors will generate nothing to replace the cash and

---

[5] Under these circumstances, the Debtors' logic of shipping over $4 million worth of inventory (on a net book basis) in two weeks is limited at best.

inventory the Court may permit them to consume, a prompt evidentiary hearing may be the Lenders' only adequate protection if the Court does not deny the Cash Collateral Motion.

Accordingly, the Agent (a) requests that the Court deny the Cash Collateral Motion in its entirety, (b) formally requests adequate protection of its interests affected by the Cash Collateral Motion and otherwise, and (c) if the Court overrules this objection, requests that the Court set a pre-trial schedule to conduct an expedited but full evidentiary hearing regarding adequate protection of the Agent's interests within the next ten (10) days.

Dated: December 8, 2015

*/s/ Curtis S. Miller*
Robert J. Dehney (No.3578)
Curtis S. Miller (No. 4583)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200

and

GOLDBERG KOHN LTD.
Jeremy M. Downs
Zachary J. Garrett
55 East Monroe Street, Suite 3300
Chicago, Illinois  60603
(312) 201-4000

Counsel for Obsidian Agency Services, LLC