# **Exhibit 1**

ASSET PURCHASE AGREEMENT

BY AND AMONG

FUHU, INC.,

EACH OF THE SUBSIDIARIES OF FUHU, INC.
LISTED ON THE SIGNATURE PAGES HERETO,

AND

MATTEL, INC.

DATED AS OF DECEMBER 15, 2015

## TABLE OF CONTENTS

Article I. DEFINITIONS .................................................................................................1

    Section 1.1    Definitions..................................................................................1
    Section 1.2    Construction .............................................................................15

Article II. PURCHASE AND SALE .............................................................................15

    Section 2.1    Purchase and Sale of Assets....................................................15
    Section 2.2    Excluded Assets .......................................................................18
    Section 2.3    Assumed Liabilities..................................................................20
    Section 2.4    Excluded Liabilities .................................................................20
    Section 2.5    Assumption and Assignment of Contracts................................23
    Section 2.6    Additional and Eliminated Assumed Contracts........................23
    Section 2.7    Allocation.................................................................................24

Article III. PURCHASE PRICE ..................................................................................24

    Section 3.1    Purchase Price..........................................................................24
    Section 3.2    Withholding .............................................................................25

Article IV. THE CLOSING ........................................................................................25

    Section 4.1    Time and Place of the Closing.................................................25
    Section 4.2    Deliveries by the Seller............................................................25
    Section 4.3    Deliveries by the Buyer ...........................................................26

Article V. REPRESENTATIONS AND WARRANTIES OF THE SELLING ENTITIES .........27

    Section 5.1    Organization, Standing and Corporate Power ...........................27
    Section 5.2    Subsidiaries..............................................................................27
    Section 5.3    Authority Relative to this Agreement .......................................28
    Section 5.4    No Violation; Consents.............................................................28
    Section 5.5    Legal Proceedings and Orders .................................................29
    Section 5.6    Compliance with Law ..............................................................29
    Section 5.7    Financial Statements; Liabilities; Accuracy .............................29
    Section 5.8    Benefit Plans; Employees and Employment Practices ..............30
    Section 5.9    Labor Matters...........................................................................32
    Section 5.10    Contracts..................................................................................34
    Section 5.11    Intellectual Property.................................................................34
    Section 5.12    Taxes........................................................................................37
    Section 5.13    Insurance..................................................................................39
    Section 5.14    Assets; Real Property...............................................................40
    Section 5.15    Environmental Matters.............................................................40
    Section 5.16    Permits.....................................................................................41
    Section 5.17    Inventory .................................................................................41
    Section 5.18    Accounts and Notes Receivable and Payable ...........................41

Section 5.19   Products...........................................................................................41
Section 5.20   Foreign Corrupt Practices Act .........................................................42
Section 5.21   Banks................................................................................................42
Section 5.22   Brokers.............................................................................................42
Section 5.23   No Other Agreements to Sell the Purchased Assets .......................42
Section 5.24   No Other Representations and Warranties.......................................42

Article VI. REPRESENTATIONS AND WARRANTIES OF BUYER.........................43

Section 6.1    Organization and Good Standing......................................................43
Section 6.2    Authority Relative to this Agreement ..............................................43
Section 6.3    No Violation; Consents....................................................................44
Section 6.4    Legal Proceedings and Orders .........................................................44
Section 6.5    Brokers.............................................................................................44
Section 6.6    No Other Representations and Warranties.......................................44

Article VII. COVENANTS OF THE PARTIES.............................................................45

Section 7.1    Conduct of Business of the Selling Entities.....................................45
Section 7.2    Access to and Delivery of Information; Maintenance of Records.............47
Section 7.3    Expenses ..........................................................................................49
Section 7.4    Further Assurances...........................................................................49
Section 7.5    Public Statements.............................................................................50
Section 7.6    Governmental Authority Approvals and Cooperation .....................50
Section 7.7    Employee Matters. ...........................................................................51
Section 7.8    Tax Matters. .....................................................................................54
Section 7.9    Submission for Bankruptcy Court Approval ....................................56
Section 7.10   Overbid Procedures; Adequate Assurance........................................57
Section 7.11   Termination Fee and Pre-Filing Loans Reimbursement ...................57
Section 7.12   Transfer of Purchased Assets............................................................58
Section 7.13   Post-Closing Operation of the Seller; Name Changes......................58
Section 7.14   Non-Competition; Non-Solicitation..................................................59
Section 7.15   Intercompany Arrangements.............................................................59
Section 7.16   Damage or Destruction ....................................................................60
Section 7.17   Permits .............................................................................................60
Section 7.18   Suppliers and Distributors; Certain Avoidance Actions; Insurance
              Policies.............................................................................................60
Section 7.19   Notification of Certain Matters.........................................................61
Section 7.20   Collection of Accounts Receivable...................................................61
Section 7.21   Cure Payments; Cure of Defaults .....................................................62
Section 7.22   Post-Closing Assignment of Contracts .............................................63
Section 7.23   Notification of Competing Bids........................................................63

Article VIII. CONDITIONS TO CLOSING ..................................................................63

Section 8.1    Conditions to Each Party's Obligations to Effect the Closing..................63
Section 8.2    Conditions to Obligations of the Buyer ...........................................64

LA\4340501.10

| | | |
|---|---|---|
| Section 8.3 | Conditions to Obligations of the Selling Entities | 65 |
| Section 8.4 | Frustration of Closing Conditions | 66 |

**Article IX. TERMINATION; WAIVER** ............................................................66

| | | |
|---|---|---|
| Section 9.1 | Termination | 66 |
| Section 9.2 | Procedure and Effect of Termination | 68 |
| Section 9.3 | Extension; Waiver | 69 |
| Section 9.4 | Liabilities Upon Termination; Return of Deposit | 69 |

**Article X. MISCELLANEOUS PROVISIONS** ...............................................69

| | | |
|---|---|---|
| Section 10.1 | Amendment and Modification | 69 |
| Section 10.2 | Survival | 70 |
| Section 10.3 | Notices | 70 |
| Section 10.4 | Assignment | 71 |
| Section 10.5 | Severability | 71 |
| Section 10.6 | Governing Law | 71 |
| Section 10.7 | SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL | 72 |
| Section 10.8 | Counterparts | 72 |
| Section 10.9 | Incorporation of Schedules and Exhibits | 73 |
| Section 10.10 | Entire Agreement | 73 |
| Section 10.11 | Remedies | 73 |
| Section 10.12 | Mutual Drafting; Headings; Information Made Available | 73 |
| Section 10.13 | Seller Disclosure Schedule | 73 |
| Section 10.14 | No Third Party Beneficiaries | 74 |
| Section 10.15 | Bulk Sales Law | 74 |

LA\4340501.10

SCHEDULES

| | |
|---|---|
| 1.1(a) | Excluded Insurance Policies |
| 2.2 | Other Excluded Assets |
| 2.5(a) | Assumed Agreements and Assumed Real Property Leases |
| 7.1 | Conduct of Business |
| 7.21(c) | Non-Assigned Contracts |
| 8.2(h) | Required Consents |
| 8.2(i) | Acquired Subsidiary Liabilities |

Seller Disclosure Schedule

| | |
|---|---|
| 5.2(a) | Subsidiaries |
| 5.2(d) | Permanent Establishments |
| 5.2(e) | Assets and Liabilities of Acquired Subsidiaries |
| 5.4(a)(iii) | Consents and Conflicts – Material Contracts |
| 5.4(b)(i) | Governmental Authority Consents |
| 5.4(b)(iii) | Governmental Authority Consents – Permits |
| 5.7(c) | Indebtedness of Selling Entities |
| 5.8 | Seller Benefit Plans |
| 5.8(b) | Compliance with Seller Benefit Plans |
| 5.8(f) | Foreign Plans |
| 5.9(a) | Current Employees |
| 5.9(c) | Employment Compliance |
| 5.9(f) | COBRA Liabilities |
| 5.9(h) | Independent Contractors |
| 5.10(a)(i) | Material Contracts |
| 5.10(a)(ii) | Real Property Leases |
| 5.10(c) | Material Contract Consents |
| 5.10(d) | Credit Support |
| 5.11(a) | Intellectual Property |
| 5.11(f) | Technology Licenses |
| 5.11(j) | Intellectual Property Standard Setting Organizations |
| 5.13 | Insurance Policies |
| 5.16 | Permits |
| 5.21 | Banks |
| 5.22 | Brokers |

LA\4340501.10

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made and entered into as of December 15, 2015 by and among Fuhu, Inc., a Delaware corporation (the "Seller"), each of the subsidiaries of the Seller listed on the signature pages hereto (together with the Seller, the "Selling Entities"), and Mattel, Inc., a Delaware corporation or its designee (the "Buyer"). Each of the Selling Entities and the Buyer are referred to herein individually as a "Party" and together as the "Parties."

## RECITALS

WHEREAS, the Selling Entities have filed or are preparing to file Chapter 11 bankruptcy petitions pursuant to the Bankruptcy Code in the Bankruptcy Court; and

WHEREAS, the Buyer desires to purchase from the Selling Entities, directly and/or, in the Buyer's sole discretion, through one or more Buyer Designees, and the Selling Entities desire to sell to the Buyer and/or such Buyer Designees, substantially all of the Selling Entities' assets, and the Buyer desires to assume from the Selling Entities, directly and/or, in the Buyer's sole discretion, through one or more Buyer Designees, certain specified liabilities, in each case pursuant to the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

Section 1.1   Definitions.   A defined term has its defined meaning throughout this Agreement and in each Exhibit and Schedule to this Agreement, regardless of whether it appears before or after the place where it is defined.   As used in this Agreement, the following terms have the meanings specified below:

"Accounts Receivable" means any and all (i) accounts receivable, notes receivable and other amounts receivable owed to the Selling Entities or the Acquired Subsidiaries (whether current or non-current), together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all Actions pertaining to the collection of amounts payable, or that may become payable, to the Selling Entities or Acquired Subsidiaries with respect to products sold or services performed on or prior to the Closing Date, (ii) construction allowances and other amounts due from landlords (including in respect of prior overcharges and insurance recoveries), (iii) license and royalty receivables, (iv) rebate receivables from suppliers, (v) insurance claims receivables (other than claims receivable under the Excluded Insurance Policies), and (vi) other amounts due to the Selling Entities or Acquired Subsidiaries which they have historically classified as accounts receivable in the consolidated balance sheet of the Seller.

"Acquired Subsidiaries" means (i) Fuhu Limited (98-0547384, Hong Kong Company, Hong Kong, PRC); (ii) Fuhu Taiwan, Inc. (formerly OSG Taiwan) (Taiwan Company, Taipei,

Taiwan); (iii) Fuhu Japan, Inc. (Japan Company, Tokyo, Japan); and (iv) Atala Enterprises Ltd. (CRA# 81723 5849, Canada (BC) Corporation, Vancouver, BC); *provided* that at any time prior to Closing Buyer may determine not to acquire and may remove any or all such entities from the Acquired Subsidiaries.

"Action" means any Claim, action, complaint, suit, litigation, arbitration, appeal, petition, inquiry, hearing, Legal Proceeding, investigation or other dispute, whether civil, criminal, administrative or otherwise, at law or in equity.

"Affected Assets" has the meaning given to such term in Section 7.16.

"Affiliate" means, with respect to any specified Person, any other Person that directly or indirectly controls, is controlled by or is under common control with, such specified Person. For purposes of this definition, "control" (and any similar term) means the power of one or more Persons to direct, or cause the direction of, the affairs of another Person by reason of ownership of voting stock or by contract or otherwise.

"Agreement" shall mean this Asset Purchase Agreement, together with the exhibits and schedules, in each case as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"Allocation" has the meaning given to such term in Section 2.7.

"Alternative Transaction" means (i) a Restructuring Transaction or (ii) one or more sales, assignments, leases, transfers, or other dispositions of all or any material portion of the Purchased Assets to any Person (or group of Persons), whether in one transaction or a series of transactions, in each case other than (A) to the Buyer or an Affiliate of the Buyer or (B) sales of Inventory in the Ordinary Course of Business of the Selling Entities.

"Antitrust Laws" has the meaning given to such term in Section 7.6(b).

"Assumed Agreements" has the meaning given to such term in Section 2.1(e).

"Assumed Liabilities" has the meaning given to such term in Section 2.3.

"Assumed Real Property Leases" has the meaning given to such term in Section 2.1(f).

"Assumption Agreement" means one or more Assumption and Assignment Agreements to be executed and delivered by the Buyer or one or more Buyer Designees, and the Selling Entities at the Closing, in form and substance reasonably acceptable to the Buyer.

"Auction" has the meaning given to such term in Section 7.10(a).

"Avoidance Actions" means any and all preference or avoidance claims or actions which a trustee, a debtor-in-possession or other appropriate party in interest may assert on behalf of any Selling Entity or its Estate under applicable Law, including actions arising under Chapter 5 of the Bankruptcy Code.

2

"Bankruptcy Case" means the cases commenced or to be commenced under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court by each Selling Entity.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court having competent jurisdiction over the Bankruptcy Case.

"Base Purchase Price" means $9,500,000.

"Bid Deadline" means the deadline set for submission of bids in the Bidding Procedures Order.

"Bidding Procedures and Sale Motion" means one or more motions and notices filed by the Selling Entities, in each case in form and substance reasonably acceptable to the Buyer, and served on creditors and parties in interest, in accordance with the Bidding Procedures Order, other orders of the Bankruptcy Court, the Federal Rules of Bankruptcy Procedures and local rules of the Bankruptcy Court, which motion(s) seeks, among other things, (i) authority from the Bankruptcy Court for the Selling Entities to enter into this Agreement and to consummate the transactions contemplated by this Agreement and (ii) entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order.

"Bidding Procedures Order" means the order of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer, approving, among other matters, payment of the Buyer Expense Reimbursement, the Termination Fee, and the Pre-Filing Loans Reimbursement in accordance with Sections 7.3 and 7.11.

"Bill of Sale" means one or more Bill of Sale and Assignment Agreements to be executed and delivered by the Selling Entities to the Buyer or one or more Buyer Designees at the Closing, in form and substance reasonably acceptable to the Buyer.

"Business" means the business conducted by the Seller, the Selling Entities and the Acquired Subsidiaries.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by Law to be closed in New York, New York.

"Buyer" has the meaning given to such term in the Preamble hereto.

"Buyer Advance Amount" means any and all (i) the Pre-Filing Loans Amount, and (ii) the Buyer DIP Amount, if any.

"Buyer Cure Amount Cap" means $500,000.

"Buyer Designee" means one or more Person(s) who are Affiliates of the Buyer designated by the Buyer in writing to the Seller prior to the Closing.

"Buyer DIP Amount" means the aggregate amount of Indebtedness outstanding as of the Closing Date (without giving effect to the transactions contemplated hereby) under the Buyer DIP Facility, if any.

"Buyer DIP Facility" means any facility under which the Buyer or its Affiliates provides financing to the Selling Entities or the Acquired Subsidiaries on or after the Petition Date.

"Buyer Expense Reimbursement" means the sum of the aggregate amount of the Buyer's reasonable documented out-of-pocket costs and expenses (including expenses of outside counsel, accountants and financial advisors, which shall be based on summary invoices, redacted to preserve privileged or confidential information, and which shall not be required to comply with applicable United States Trustee guidelines) incurred by the Buyer in connection with or related to the Buyer's evaluation, consideration, analysis, negotiation, and documentation of a possible transaction with the Selling Entities or in connection with or related to the transactions contemplated by this Agreement, up to a maximum amount of $200,000.

"Cash" means cash and cash equivalents and restricted cash on a consolidated basis determined in accordance with the GAAP Accounting Principles.

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning given to such term in Section 4.1.

"Closing Date" has the meaning given to such term in Section 4.1.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"Competing Bid" means any bid contemplating an Alternative Transaction.

"Confidential Information" has the meaning given to such term in Section 7.2(d).

"Consent" means any approval, consent, ratification, permission, waiver or authorization of any Person, or a Final Order of the Bankruptcy Court that deems, or renders unnecessary, the same.

"Contract" means any lease, contract, deed, mortgage, license or other legally enforceable agreement or instrument.

"Copyrights" means copyrights and all other rights with respect to Works of Authorship and all registrations thereof and applications therefor (including moral and economic rights, however denominated).

"Cure Payments" means the amount required to be paid with respect to each Non-Real Property Contract and Real Property Lease to cure all defaults under such Non-Real Property Contract or Real Property Lease to the extent required by Section 365 of the Bankruptcy Code and to otherwise satisfy all requirements imposed by Section 365 of the Bankruptcy Code in

order to effectuate, pursuant to the Bankruptcy Code, the assumption by the Selling Entities and assignment to Buyer of each such Non-Real Property Contract and Real Property Lease.

"Current Employees" means all employees of the Selling Entities or Acquired Subsidiaries employed as of the Closing Date, whether active or not (including those on short-term disability or leave of absence, paid or unpaid), excluding any employees of the Selling Entities on long-term disability as of the Closing Date.

"Damage or Destruction Loss" has the meaning given to such term in Section 7.16.

"Databases" means databases and other compilations and collections of data or information.

"Debts" has the meaning set forth in Section 101(12) of the Bankruptcy Code.

"Deposit" has the meaning set forth in Section 3.1(b).

"Designation Deadline" has the meaning given to such term in Section 2.6.

"Documentary Materials" has the meaning given to such term in Section 2.1(j).

"Domain Names" means domain names and uniform resource locators.

"Encumbrances" means all mortgages, pledges, charges, liens (as defined in Section 101(37) of the Bankruptcy Code), Debts, interests, debentures, trust deeds, Claims, encumbrances, licenses, assignments by way of security or otherwise, security interests, conditional sales contracts or other title retention agreements, rights of first refusal or similar interests or instruments charging, or creating a security interest in the Purchased Assets or any part thereof or interest therein, and any agreements, leases, licenses, occupancy agreements, options, easements, rights of way, restrictions, executions or other encumbrances (including notices or other registrations in respect of any of the foregoing) affecting any right or title to the Purchased Assets or any part thereof or interest therein, in each case of any type, nature or kind whatsoever (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, Law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability).

"Environmental Laws" has the meaning given to such term in Section 5.15.

"Equity Interests" has the meaning given to such term in Section 2.1(k).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to any Person, any other Person (whether or not incorporated) that, together with such Person, would be treated as a single employer under Section 414 of the IRC or Section 4001 of ERISA.

"Estate" means, with respect to any Selling Entity, the estate created pursuant to Section 541 of the Bankruptcy Code.

"Excluded Assets" has the meaning given to such term in Section 2.2.

"Excluded Employees" has the meaning given to such term in Section 7.7(b).

"Excluded Insurance Policies" means all director and officer, fiduciary, employment practices and similar insurance policies maintained by or on behalf of any Selling Entity, including those listed on Schedule 1.1(a).

"Excluded Liabilities" has the meaning given to such term in Section 2.4.

"Existing Facility" means the prepetition senior secured term loan facility provided by Obsidian Agency Services, Inc., as Administrative Agent and Collateral Agent, and the Lenders party thereto from time to time under that certain Credit Agreement, dated May 27, 2015, and the other "Loan Documents" (as defined therein), all as amended or otherwise modified from time to time).

"Existing Facility Reduction Amount" means the amount, if any, by which the obligations arising under the Existing Facility (including principal, interest, and fees) are reduced as a result of payments or setoffs on or after the Petition Date and prior to Closing.

"FCPA" has the meaning given to such term in Section 5.20.

"Final Order" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (ii) if an appeal, writ of certiorari new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

"Foreign Plan" has the meaning given to such term in Section 5.8(f).

"Former Employees" means all individuals who have been employed by the Selling Entities (or any of their predecessors) who are not Current Employees.

"GAAP" means generally accepted accounting principles in the United States.

"Governmental Authority" means any federal, municipal, state, provincial, local or foreign governmental, administrative or regulatory authority, department, agency, commission or body (including any court or similar tribunal).

"Indebtedness" of any Person means, without duplication, any of the following (whether or not contingent and including any and all principal, accrued and unpaid interest, prepayment premiums or penalties, related expenses, commitment and other fees, sale or liquidity participation amounts, reimbursements, indemnities and other amounts which are or would be payable in connection therewith): (a) all obligations of such Person for borrowed money or advances; (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or similar instruments; (c) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person (even though the rights and remedies of the seller or lenders under such agreement in the event of default are limited to repossession or sale of such property); (d) all obligations of such Person issued or assumed as part of the deferred purchase price of property or services; (e) any obligations with respect to bank guarantees, deferred compensation arrangements, workers' compensation liabilities, employee medical liabilities, bonuses and any required statutory payments to employees; (f) all obligations of such Person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions; (g) all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any lien on, or security interest in, any property or asset of such Person (whether or not such obligation is assumed or guaranteed by such Person); and (h) all contingent obligations of such Person in respect of Indebtedness or obligations of other Persons of the kinds referred to in clauses (a) through (f) above.

"Intellectual Property Rights" means any and all of the following rights (anywhere in the world, whether statutory, common law or otherwise and whether now known or hereafter existing under the Laws of any jurisdiction) and including, where applicable, all registrations and applications therefor: (i) Patents, including all members of the Patent Families of such Patents; (ii) Copyrights; (iii) mask work rights; (iv) Trademarks; (v) rights with respect to Domain Names; (vi) Trade Secrets, including rights to limit the use or disclosure thereof by any Person; (vii) rights with respect to Databases; (viii) publicity and privacy rights, including all rights with respect to use of a Person's name, signature, likeness, image, photograph, voice, identity, personality, and biographical and personal information and materials; (ix) Software; (x) Works of Authorship; (xi) all claims and causes of action arising out of or related to any past, current or future infringement, misappropriation, interference or violation of any of the foregoing; and (xii) any rights equivalent or similar to any of the foregoing.

"Inventory" means all inventory (including raw materials, component parts, products in-process and finished products) owned by any of the Selling Entities, whether in transit to or from the Selling Entities and whether in the Selling Entities' warehouses, distribution facilities, held by any third parties or otherwise.

7

"IP Assignment Agreement" means one or more Intellectual Property Assignment Agreements to be executed and delivered by the Selling Entities to the Buyer or one or more Buyer Designees at the Closing, in form and substance reasonably acceptable to the Buyer.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the United States Internal Revenue Service.

"Knowledge of Seller" means, as to a particular matter, the knowledge, after reasonable inquiry, of Jim Mitchell (CEO), Robb Fujioka (President and Founder), Doug Woo (COO), Ming Cheung (Director of Finance), and Chris Lipp (General Counsel).

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, ordinance, code, edict, decree, proclamation, treaty, rule, regulation, ruling, directive, pronouncement or requirement of any Governmental Authority.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits or legal proceedings (public or private) by or before a Governmental Authority.

"Liability" means any Claim, Debt, Indebtedness, obligation, duty or liability of any nature, including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability, regardless of whether such claim, debt, obligation, duty or liability would be required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether such claim, debt, obligation, duty or liability is immediately due and payable.

"Licensed Intellectual Property" means all Intellectual Property Rights and Technology licensed to the Selling Entities by third parties pursuant to the Assumed Agreements.

"Malicious Code" has the meaning given to such term in Section 5.11(g).

"Material Adverse Effect" means any event, condition, circumstance, development, or change or effect that, when taken individually or in the aggregate with all other events, changes, conditions, circumstances, developments and effects, (a) has had or would reasonably be expected to have or result in a material adverse effect on the results of operations or financial condition of the Business or on the Purchased Assets or the Assumed Liabilities, or (b) would reasonably be expected to prevent the Selling Entities or Acquired Subsidiaries from consummating the transactions contemplated by this Agreement except, in each case, for any such events, changes, conditions, circumstances, developments or effects resulting from or attributable to: (i) the announcement of the signing of this Agreement or the pendency of the transactions contemplated hereby, (ii) changes in Law or interpretations thereof by any Governmental Authority, (iii) changes in generally accepted accounting principles in the United States or elsewhere, (iv) changes in general or industry-wide economic conditions, currency exchange rates or United States or international debt or equity markets, (v) national or international political or social conditions or any national or international hostilities, acts of terror or acts of war, or (vi) the filing and prosecution of the Bankruptcy Case; *provided* that, in the case of clauses (iv) through (v), such events, changes, conditions, circumstances,

developments or effects shall be taken into account in determining whether any such material adverse effect has occurred to the extent that any such events, changes, conditions, circumstances, developments or effects have a disproportionate adverse effect on the Business, or the Purchased Assets and the Assumed Liabilities, taken as a whole, as compared to other similarly situated businesses.

"Material Contract" means each of the following Contracts to which any Selling Entity or Acquired Subsidiary is a party or is bound or which is binding on the Purchased Assets or used in connection with the Business:

(i)     that (x) limits in any material respect the freedom of a Selling Entity or of an Acquired Subsidiary to engage in any line of business or to compete with any other Person, or limits in any material respect the freedom of any Affiliate of a Selling Entity or of an Acquired Subsidiary to engage in any line of business or to compete with any other Person; or (y) restrains, restricts, limits or impedes in any material respect the ability of any Selling Entity or of any Acquired Subsidiary to compete with or conduct any business or line of business in any geographic area, or restrains, restricts, limits or impedes in any respect the ability of any Affiliate of a Selling Entity or of an Acquired Subsidiary to compete with or conduct any business or line of business in any geographic area;

(ii)     that contains minimum purchase or mandatory supply requirements, or that requires any Selling Entity or Acquired Subsidiary to deal exclusively with any Person with respect to any matter, or that provides "most favored nation" pricing or terms to the other party to such Contract or any third Person;

(iii)     any Contract relating to Indebtedness;

(iv)     any Contract relating to the sale or disposition of Purchased Assets (other than a sale or disposition of Inventory in the Ordinary Course of Business);

(v)     any Contract to which any employee, officer or director of any Selling Entity or Acquired Subsidiary is bound which in any manner purports to restrict such employee's, officer's or director's freedom to engage in any line of business or to compete with any other Person;

(vi)     providing for the development of any material Software, other material Works of Authorship or Technology, and any Intellectual Property Rights thereto;

(vii)     that grants any ownership interest, any license, sublicense or other option or right to any Seller IP or by which the Selling Entities or Acquired Subsidiaries are required to grant to any Person any right or license, any covenant not to assert/sue, release or other immunity from suit under or any other rights, to any Seller IP;

(viii)     pursuant to which a Selling Entity or Acquired Subsidiary is granted any license, covenant not to assert/sue or other immunity from suit under any rights to Intellectual Property Rights or Technology, with or without the right to sublicense the

same, and which Intellectual Property Rights or Technology are used in, held for use in, or necessary for the conduct of the Business;

(ix)    any joint venture Contract, partnership agreement, limited liability company or other Contract (however named) involving a sharing of profits, losses, costs, or liabilities by any Selling Entity or Acquired Subsidiary with any other Person;

(x)    any Contract providing for payments to or by any Person or in excess of $100,000 in any 12 month period following the date hereof; or

(xi)    any other Contracts that is material to the Business or the Purchased Assets and the Assumed Liabilities, taken as a whole.

"Minimum Cash Deficiency" means the amount, if any, by which the Cash transferred to the Buyer at Closing is *less* than $1,500,000.

"Non-Real Property Contracts" means the Contracts to which any Selling Entity is a party, other than the Real Property Leases.

"Non-US Transferred Employee" has the meaning given to such term in Section 7.7(a).

"Offeree" has the meaning given to such term in Section 7.7(a).

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, directive, determination or award made, issued or entered by or with any Governmental Authority, whether preliminary, interlocutory or final, including any Order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

"Ordinary Course of Business" means, with respect to any Selling Entity or Acquired Subsidiary, any action taken by such Person (a) consistent in nature, scope, and magnitude with the past custom and practices of such Person (including with respect to quantity and frequency) as of immediately prior to the filing of such Person's Bankruptcy Case and (b) not caused by any breach of Contract or violation of Law.

"Party" or "Parties" has the meaning given to such term in the Preamble hereto.

"Patent Family" means (i) all Patents in the same priority chain (i.e., all Patents that claim priority to the same non-provisional application or applications, and all Patents from which priority is claimed by the identified Patent), (ii) all corresponding foreign Patents; and (iii) all Patents that are subject to a terminal disclaimer that disclaims the term of any such Patent beyond the term of any member of the family.

"Patents" means all patents worldwide, including utility models, industrial designs and design patents, and applications therefor (and any patents that issue as a result of those patent applications), and includes all divisionals, substitutions, continuations, continuations-in-part, continuing prosecution applications, reissues, re-examinations, renewals, restorations, and extensions, and any counterparts worldwide claiming priority therefrom, and all rights in and to any of the foregoing.

10

"Permits" means all franchises, permits, certificates, clearances, approvals and authorizations of or with any Governmental Authority held, used by, or made by, any of the Selling Entities or Acquired Subsidiaries in connection with the operation of the Business.

"Permitted Encumbrances" means: (a) liens for Taxes for the Post-Closing Tax Period that are not yet due and payable (but excluding any liens for Taxes arising on account of or relating to the Pre-Closing Tax Period), (b) immaterial statutory liens and rights of set-off of landlords, banks, carriers, warehousemen, mechanics, repairmen, workmen, customs brokers or agencies, suppliers and materialmen, and other Encumbrances imposed by Law, in each case, incurred in the Ordinary Course of Business, (c) deposits and pledges securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits (other than valid obligations incurred in respect of any defined benefit pension plan) or (ii) obligations on performance, surety or appeal bonds, (d) non-exclusive licenses of, or other non-exclusive grants of, rights or permissions to use Seller IP granted to customers in the Ordinary Course of Business, (e) Laws now or hereafter in effect relating to real property, easements and similar Encumbrances which do not interfere with the current use of such real property subject thereto by the Selling Entities or the Acquired Subsidiaries in any material respect, (f) statutory liens creating a security interest in favor of landlords with respect to property of the Selling Entities or the Acquired Subsidiaries which do not interfere with the current use of such leased real property by the Selling Entities or the Acquired Subsidiaries in any material respect, (g) Encumbrances set forth in the Assumed Agreements or the Assumed Real Property Leases, and (h) any Encumbrances effecting the landlords or ground lessors underlying interest in any of the Real Property Leases and/or the underlying interests in land from time to time, provided that such Encumbrances do not interfere with the current use of such real property subject thereto by the Selling Entities or the Acquired Subsidiaries in any material respect.

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, syndicate, group, trust, association or other organization or entity or Governmental Authority. References to any Person include such Person's successors and permitted assigns.

"Petition" means the voluntary petition or petitions under Chapter 11 of the Bankruptcy Code filed by the Selling Entities with the Bankruptcy Court.

"Petition Date" means the date on which any of the Selling Entities first files the Petition.

"Post-Closing Tax Period" means any Tax period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and that portion of any Straddle Period ending on (and including) the Closing Date.

"Pre-Filing Loans" means certain secured loans to the Selling Entities made at the Seller's request to meet the Selling Entities' working capital needs and other expenses prior to the filing of the Bankruptcy Case in a principal amount of $300,000.

11

"Pre-Filing Loans Amount" means the aggregate amount of Indebtedness outstanding as of the Closing Date (without giving effect to the transactions contemplated hereby) on account of the Pre-Filing Loans.

"Pre-Filing Loans Reimbursement" means the repayment of any outstanding Pre-Filing Loans Amount as of the date of determination.

"Professional Services" has the meaning given to such term in Section 2.4(e).

"Property Taxes" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"Purchase Price" has the meaning given to such term in Section 3.1(a).

"Purchased Assets" has the meaning given to such term in Section 2.1.

"Real Property Leases" means all leases, subleases and other occupancy Contracts with respect to real property to which any Selling Entity is a party.

"Registered IP" means all Seller IP that, as of the date of this Agreement, is registered, filed or issued under the authority of, with or by any Governmental Authority, including all Patents, registered Copyrights, registered mask works, registered Trademarks, registered Domain Names, and all applications for any of the foregoing.

"Representatives" means, with respect to a particular Person, any director, officer, manager, employee or other authorized representative of such Person or its Subsidiaries, including such Person's attorneys, accountants, financial advisors and restructuring advisors.

"Restricted Business" has the meaning given to such term in Section 7.14(a).

"Restructuring Transaction" means (i) any recapitalization transaction, plan of reorganization, liquidating plan, structured dismissal, or sale, including any such transaction by way of a credit bid or by any creditor of any of the Selling Entities, involving, whether in whole or in part, any of the Selling Entities or all or any material portion of the Purchased Assets, or (ii) any merger, consolidation, share exchange, business combination or similar transaction involving, whether in whole or in part, any of the Selling Entities or all or any material portion of the Purchased Assets, in each case whether in one transaction or a series of transactions.

"Sale Hearing" means the hearing at which the Bankruptcy Court considers approval of the Sale Order pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.

"Sale Order" means the order of the Bankruptcy Court, in form and substance acceptable to the Buyer in its sole discretion, which, among other things, (i) approves, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Selling Entities of this Agreement, (B) the sale of the Purchased Assets to Buyer free and clear of all Encumbrances on the terms set forth herein, and (C) the performance by Selling Entities of their respective obligations under this Agreement; (ii) authorizes the Selling Entities to assume and assign to Buyer the Assumed Agreements and the Assumed Real Property Leases;

(iii) finds that Buyer is not a successor to the Selling Entities, and (iv) finds that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and grants Buyer the full protection provided thereby.

"Seller" has the meaning given to the Preamble hereto.

"Seller Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA) and each other employee benefit or compensation plan, policy, program practice, agreement, understanding or arrangement (whether written or oral) entered into, sponsored, maintained or administered by or contributed to or required to be contributed to by any Selling Entity, or any Subsidiary of any Selling Entity, or with respect to which any Selling Entity, or any Subsidiary of any Selling Entity, has or may have any obligation or Liability, whether actual or contingent, director or indirect, including, without limitation, all incentive, bonus, employment, consulting, severance, change in control, retirement, deferred compensation, vacation, sick leave, holiday, cafeteria, fringe benefit, medical, disability, life insurance, stock option, stock purchase, stock appreciation, phantom stock, restricted stock or other stock-based compensation plans, policies, programs, practices or arrangements).

"Seller Cure Amount Cap" means $500,000.

"Seller Disclosure Schedule" means the disclosure schedule delivered by the Seller to the Buyer concurrently with the execution and delivery of this Agreement.

"Seller Financial Statements" has the meaning given to such term in Section 5.7(a).

"Seller IP" means all rights, title and interest in and to any and all Intellectual Property Rights and Technology owned by, or claimed or purported by the Selling Entities to be owned by, the Selling Entities or Acquired Subsidiaries as of the Closing.

"Seller Properties" has the meaning given to such term in Section 5.14(b).

"Selling Entities" has the meaning given to the Preamble hereto.

"Software" means any and all computer programs, operating systems, applications systems, firmware or software code of any nature, whether operational or under development, including all object code, source code, RTL code, Gerber files, GDSII files, executable code, data files, rules, definitions or methodology derived from the foregoing, and any derivations, updates, enhancements and customizations of any of the foregoing, and any related processes, know-how, APIs, user interfaces, command structures, menus, buttons and icons, flow-charts, and related documentation, operating procedures, methods, tools, developers' kits, utilities, developers' notes, technical manuals, user manuals and other documentation thereof, including comments and annotations related thereto, whether in machine-readable form, programming language or any other language or symbols and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature.

"Straddle Period" means any Tax period beginning before or on the Closing Date and ending after the Closing Date.

13

"Subsidiary" means, with respect to any Person, (a) any corporation or similar entity of which at least 50% of the securities or interests having, by their terms, ordinary voting power to elect members of the board of directors, or other persons performing similar functions with respect to such corporation or similar entity, is held, directly or indirectly by such Person and (b) any partnership, limited liability company or similar entity of which (i) such Person is a general partner or managing member or (ii) such Person possesses a 50% or greater interest in the total capitalization or total income of such partnership, limited liability company or similar entity.

"Tax" means all federal, state, provincial, local or foreign taxes (including any income tax, franchise tax, service tax, capital gains tax, capital tax, gross receipts tax, value-added tax, surtax, excise tax, ad valorem tax, transfer tax, stamp tax, sales tax, use tax, property tax, business tax, profits tax, inventory tax, capital stock tax, license tax, withholding tax, payroll tax, employment tax, social security tax, unemployment tax, employer health tax, severance tax, or occupation tax), escheat and abandoned property tax, levies, assessments, tariffs, duties (including any customs duties), deficiencies or fees (including any fine, addition, penalty or interest), imposed, assessed or collected by or under the authority of any Governmental Authority, including any interest, penalty or addition thereto, whether disputed or not, and including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person by Law, by Contract or otherwise.

"Tax Return" means any return, report, information return or other document (including any related or supporting information and including any amendment thereof) supplied or required to be supplied to any Governmental Authority with respect to Taxes.

"Technology" means, collectively, all algorithms, APIs, designs, net lists, data, databases, data collections, diagrams, inventions (whether or not patentable), know-how, methods, processes, proprietary information, protocols, schematics, specifications, tools, systems, servers, hardware, computers, point of sale equipment, inventory management equipment, Software, subroutines, techniques, user interfaces, web sites, Works of Authorship and other similar materials, including all documentation related to any of the foregoing, including instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries, whether or not embodied in any tangible form and whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used in connection with the foregoing.

"Termination Fee" means an amount in cash equal to $300,000.

"Trade Secrets" means information and materials not generally known to the public and qualifying as a trade secret under applicable Law, including (i) any technical, engineering, manufacturing, product, marketing, servicing, financial, supplier, and other information and materials; and (ii) any customer, vendor, and distributor lists, contact and registration information, and correspondence.

"Trademarks" means trademarks, trade names, service marks, service names, logos and design marks, trade dress, fictitious and other business names and identifiers, brand names, collective membership marks, certification marks, slogans, 800 numbers, social media pages or

14

designations, hash tags and other forms of indicia of origin, whether or not registrable as a trademark in any given jurisdiction, together with all goodwill associated with any of the foregoing.

"Transaction Documents" means this Agreement, the Assumption Agreement, the Bill of Sale, the IP Assignment Agreement, the Buyer DIP Facility (if any), and any other Contract or document to be entered into by the Parties and/or one or more Buyer Designees, as applicable, at or in furtherance of the Closing.

"Transfer Taxes" has the meaning given to such term in Section 7.8(a).

"Transferred Employees" has the meaning given to such term in Section 7.7(a).

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (1988) and any similar Laws, including Laws of any state, country or other locality that is applicable to a termination of employees, including the Cal-WARN Act, Cal. Labor Code §§ 1400-1408.

"Works of Authorship" means Software (whether in source code or object code form), websites, content, images, graphics, text, photographs, artwork, audiovisual works, sound recordings, graphs, drawings, reports, analyses, writings, and other works of authorship and copyrightable subject matter, and any modifications, improvements and derivative works of any of the foregoing.

Section 1.2    Construction.    The terms "hereby," "hereto," "hereunder" and any similar terms as used in this Agreement refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used.  The terms "including," "includes" or similar terms when used herein shall mean "including, without limitation." The meaning of defined terms shall be equally applicable to the singular and plural forms of the defined terms, and the masculine gender shall include the feminine and neuter genders, and vice versa, unless expressly indicated otherwise.  Any reference to any federal, state, provincial, local or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  Any reference herein to "days" shall mean calendar days, unless Business Days are expressly specified.   Unless otherwise indicated, references to (a) Articles, Sections, Schedules and Exhibits refer to Articles, Sections, Schedules and Exhibits of and to this Agreement and (b) references to $ (dollars) are to United States Dollars.  The word "or" when used in this Agreement is not meant to be exclusive unless expressly indicated otherwise.

## ARTICLE II.
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets.    Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, the Selling Entities shall sell, assign, convey, transfer and deliver to the Buyer and/or one or more Buyer Designees, and the Buyer and/or such Buyer Designees shall, by the Buyer's and/or such Buyer Designees' payment of the Purchase Price, purchase and acquire from the Selling Entities, all of the Selling Entities' right, title and interest, free and clear of all Encumbrances (other than Permitted

15

Encumbrances), in and to all of the properties, rights, interests and other tangible and intangible assets of the Selling Entities (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP) (collectively, the "Purchased Assets"), including any assets acquired by the Selling Entities after the date hereof but prior to the Closing; *provided, however*, that the Purchased Assets shall not include any Excluded Assets. Without limiting the generality of the foregoing, the Purchased Assets shall include the following (except to the extent listed or otherwise included as an Excluded Asset):

(a)     all Cash of the Selling Entities as of the Closing;

(b)     all Accounts Receivable of the Selling Entities as of the Closing;

(c)     all Inventory, supplies, materials and spare parts of the Selling Entities as of the Closing (including all rights of the Selling Entities to receive such Inventory, supplies, materials and spare parts that are on order) and all open purchase orders with suppliers;

(d)     without duplication of the above, all royalties, advances, prepaid assets (excluding prepaid Taxes of the Selling Entities), security and other deposits, prepayments and other current assets relating to the Business or the Purchased Assets, the Assumed Agreements and the Assumed Real Property Leases, in each case of the Selling Entities as of the Closing (but excluding all interests in the Excluded Insurance Policies and all prepaid assets relating to Contracts that are not Assumed Agreements or Assumed Real Property Leases as of the Closing);

(e)     all Non-Real Property Contracts, including Contracts related to Seller IP and Licensed Intellectual Property, that have been, or are intended to be, assumed by and assigned to the Buyer and/or one or more Buyer Designees pursuant to Section 2.5 or Section 2.6 (the "Assumed Agreements");

(f)     all Real Property Leases that have been, or are intended to be, assumed by and assigned to the Buyer and/or one or more Buyer Designees pursuant to Section 2.5 or Section 2.6 (the "Assumed Real Property Leases");

(g)     all Seller IP;

(h)     all open purchase orders with customers (to the extent there is sufficient Inventory as of the Closing Date to satisfy such orders or that are consented to by Buyer in writing and in its sole discretion);

(i)     all items of machinery, equipment, supplies, furniture, fixtures, leasehold improvements (to the extent of the Selling Entities' rights to any leasehold improvements under the Assumed Real Property Leases) and other tangible personal property and fixed assets owned by the Selling Entities as of the Closing;

(j)     all books, records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items of the Selling Entities as of the Closing (except as otherwise described in Section 2.2), including customer and supplier lists, mailing lists, sales and promotional literature, other sales related

materials related to the Business or the Purchased Assets, and, to the extent not prohibited under applicable Law, all files and data related to the Transferred Employees (collectively, the "Documentary Materials");

(k)     all of the stock or other equity interests owned by the Selling Entities in the Acquired Subsidiaries (the "Equity Interests"); *provided* that prior to Closing the Buyer may, in its sole discretion, determine not to acquire the Equity Interests of any Acquired Subsidiary, in which case the Buyer may elect (i) to exclude such Acquired Subsidiary and its assets from the Purchased Assets, or (ii) may acquire the assets of such Acquired Subsidiary and, if so elected, the Selling Entities will facilitate such asset acquisition on terms reasonably acceptable to the Buyer free and clear of Encumbrances (other than Permitted Encumbrances), in which case such assets shall constitute Purchased Assets; *provided, further,* that, with the consent of the Buyer, which may be withheld in its sole discretion, such transactions may be effectuated after the Closing Date;

(l)     all claims (including claims for past infringement or misappropriation of Seller IP) and causes of action (other than, in each case, to the extent related to Excluded Assets or Excluded Liabilities) of the Selling Entities as of the Closing against Persons (including the Acquired Subsidiaries) other than the Selling Entities (regardless of whether or not such claims and causes of action have been asserted by the Selling Entities) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, possessed by the Selling Entities and Acquired Subsidiaries as of the Closing (regardless of whether such rights are currently exercisable) to the extent related to the Purchased Assets;

(m)     all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Seller IP and all rights under any confidentiality agreements executed by any third party for the benefit of any of the Selling Entities to the extent relating to the Business or the Purchased Assets;

(n)     all rights of the Selling Entities under non-disclosure or confidentiality, non-compete, non-solicitation agreements or other agreements with Current Employees, Former Employees or current or former directors, consultants, independent contractors and agents of any of the Selling Entities or any of their Affiliates or with third parties to the extent primarily relating to the Business or the Purchased Assets (or any portion thereof), including agreements related to work for hire and intellectual property assignments, except to the extent arising under a Contract that is executory and is not an Assumed Agreement;

(o)     all of the rights and benefits accruing under all Permits, all deposits and prepaid expenses (excluding prepaid Taxes of the Selling Entities) held by third parties and/or, to the extent transferable, any Governmental Authority and, to the extent transferable, all bank and deposit accounts;

(p)     the amount of, and all rights to any, insurance proceeds received by any of the Selling Entities (other than any amounts or rights to any insurance proceeds received under any Excluded Insurance Policy) after the date hereof in respect of (i) the loss, destruction or

LA\4340501.10

condemnation of any Purchased Assets occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(q)     any rights, demands, claims, credits, allowances, rebates (including any vendor or supplier rebates), or rights of setoff (other than against the Selling Entities) arising out of or relating to any of the Purchased Assets as of the Closing (but excluding all interests in the Excluded Insurance Policies);

(r)     all prepaid and deferred items (including prepaid real property tax but excluding prepaid Taxes of the Selling Entities) that relate to the Business or the Purchased Assets as of the Closing, including all prepaid rentals and unbilled charges, fees and deposits (but excluding all interests in the Excluded Insurance Policies);

(s)     to the extent transferable, all current and prior insurance policies of any of the Selling Entities that relate to the Purchased Assets or Assumed Liabilities, and all rights and benefits of any of the Selling Entities of any nature (except for any rights to insurance recoveries thereunder required to be paid to other Persons under any Order of the Bankruptcy Court relating to any debtor-in-possession financing obtained by the Selling Entities) with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, but excluding all interests in the Excluded Insurance Policies;

(t)     any rights, claims or causes of action as of the Closing of any Selling Entity relating to or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses, and counterparties to any Assumed Agreement or Assumed Real Property Lease (including in each case the Acquired Subsidiaries) in respect of the assets, properties, conduct of business or operations of such Selling Entity arising out of events occurring on or prior to the Closing Date, including any Avoidance Actions that relate to any Purchased Assets or Assumed Liabilities;

(u)     any rights, claims or causes of action as of the Closing of any Selling Entity relating to or arising against the Buyer, any Buyer Designee, or any of their respective Affiliates, Subsidiaries, or Representatives, including any Avoidance Actions against any such Persons;

(v)     all rights, claims and causes of action of the Selling Entities against any director or officer of any Selling Entity; and

(w)     all other assets that are related to or used in connection with the Business and that are owned or leased by any Selling Entity as of the Closing, *provided* that as to any such leased asset, the lease with respect thereto constitutes an Assumed Agreement or Assumed Real Property Lease.

Section 2.2    Excluded Assets. Notwithstanding any provision herein to the contrary, the Purchased Assets shall not include any of the following (collectively, the "Excluded Assets"):

(a)     any records, documents or other information relating to Excluded Employees, and any materials containing information about any Transferred Employee, disclosure of which would violate applicable Law;

(b)     the Selling Entities' (i) minute books and other corporate books and records relating to their organization and existence and the Selling Entities' books and records relating to Taxes of the Selling Entities, including Tax Returns filed by or with respect to the Selling Entities; and (ii) books, records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items relating to any Excluded Assets or Excluded Liabilities;

(c)     the Selling Entities' rights under this Agreement and the other Transaction Documents, and all consideration payable or deliverable to the Selling Entities pursuant to the terms and provisions hereof;

(d)     any Contracts of any Selling Entities relating to Indebtedness; and any Contracts between any Selling Entity, on the one hand, and any equity holder of Seller (including any Person who has the right to acquire equity of Seller, whether as the result of an exchange, conversion, exercise, or otherwise) in such Person's capacity as an equity holder of Seller, on the other hand (including any stock purchase, shareholders', registration rights or similar agreements);

(e)     any Contracts, together with all prepaid assets relating to such Contracts, of any Selling Entities (including employment Contracts), other than the Assumed Agreements and the Assumed Real Property Leases;

(f)     all rights, claims and causes of action of the Selling Entities against Persons other than the Acquired Subsidiaries and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, of the Selling Entities (regardless of whether such rights are currently exercisable), in each case to the extent solely related to any Excluded Assets or Excluded Liabilities;

(g)     all Excluded Insurance Policies and interests in the Excluded Insurance Policies;

(h)     any shares of capital stock or other equity interests of any of the Selling Entities, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of any of the Selling Entities;

(i)     Accounts Receivable, intercompany obligations and other amounts receivable, in each case of any Selling Entity owed to it by any other Selling Entity;

(j)     any prepaid Tax, Tax receivable or Tax refund of a Selling Entity with respect to any period ending on or prior to the Closing;

19

(k)　　any Seller Benefit Plan or any right, title or interest in any assets of or relating thereto, or any assets relating to Excluded Liabilities described in <u>Section 2.4(f)</u> through <u>(h)</u>, except as otherwise specifically provided in <u>Section 7.7</u>;

(l)　　any Avoidance Actions that relate solely to any Excluded Assets or Excluded Liabilities, excluding, for avoidance of doubt, any Avoidance Actions against any counter-party to an Assumed Agreement or Assumed Real Property Lease, in each case subject to <u>Section 7.18(b)</u>; ; and

(m)　　the Selling Entities' right, title and interest to the other assets, if any, set forth in <u>Schedule 2.2</u>.

Notwithstanding anything in this Agreement to the contrary, the Buyer may, in its sole and absolute discretion (without any adjustment to the Purchase Price), at any time on or prior to the Closing, elect not to acquire any of the assets, properties and rights of the Selling Entities (including any Equity Interests or the assets of any Acquired Subsidiary), and any asset so designated by the Buyer on <u>Schedule 2.2</u> (which the Buyer may update from time to time by delivering the updated <u>Schedule 2.2</u> to the Seller) shall be an Excluded Asset for all purposes hereunder; *provided, however,* that with respect to Assumed Agreements and Assumed Real Property Leases, such designation shall be made in accordance with <u>Section 2.5</u>.

Section 2.3　　<u>Assumed Liabilities</u>.  On the Closing Date, the Buyer and/or one or more Buyer Designees shall execute and deliver to the Selling Entities the Assumption Agreement pursuant to which the Buyer and/or such Buyer Designees shall assume and agree to pay, perform and discharge when due the Assumed Liabilities.  For purposes of this Agreement, "<u>Assumed Liabilities</u>" means only the following Liabilities (to the extent not paid or discharged prior to the Closing) and no others:

(a)　　the Liabilities of the Selling Entities arising under the Assumed Agreements and the Assumed Real Property Leases; *provided, however,* that, except for the payment of Buyer's share of Cure Payments pursuant to <u>Section 7.21</u>, the Buyer and Buyer Designees shall not assume or agree to pay, discharge or perform any Liabilities of any Selling Entities under or with respect to any Assumed Agreements and Assumed Real Property Leases, including Liabilities arising out of any breach, misfeasance or under any other theory, to the extent relating to Selling Entities' conduct prior to the Closing;

(b)　　the Liabilities of the Selling Entities arising in the Ordinary Course of Business under purchase orders with suppliers that are Purchased Assets open as of the Closing Date;

(c)　　Taxes to the extent expressly payable by the Buyer pursuant to <u>Section 7.8(a)</u> or <u>Section 7.8(b)</u>; and

(d)　　the payment of Buyer's share of Cure Payments pursuant to <u>Section 7.21</u>.

Section 2.4　　<u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary in this Agreement, the Parties expressly acknowledge and agree that neither the Buyer nor any Buyer Designee shall assume, be obligated to pay, perform or otherwise discharge or in any other

manner be liable or responsible for any Liabilities whatsoever of the Selling Entities, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that neither the Buyer nor any Buyer Designee is expressly assuming being referred to collectively as the "Excluded Liabilities"). Without limiting the foregoing, the Buyer shall not be obligated to assume, and does not assume, and hereby disclaims all the Excluded Liabilities, including the following Liabilities of any of the Selling Entities or of any predecessor of any of the Selling Entities, whether incurred or accrued before or after the Petition Date or the Closing:

(a)     any Liability arising out of facts or circumstances in existence prior to the Closing Date and from or related to any breach, default under, failure to perform, torts related to the performance of, violations of Law, infringements or indemnities under, guaranties pursuant to and overcharges, underpayments or penalties on the part of the Seller or any of its Affiliates under any Contract, agreement, arrangement or understanding to which the Seller or any of its Affiliates is a party prior to the Closing Date;

(b)     any Liability arising from or related to the operation or condition of the Purchased Assets prior to the Closing or facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing;

(c)     any Liability arising from or related to the operation of the Business or the Seller's products prior to the Closing Date, including any Liability relating to design or manufacturing defects and any warranty, product liability, safety and other Liability relating to any product sold or manufactured by the Seller prior to the Closing;

(d)     all Taxes of the Selling Entities (or Taxes of any branch offices of any Selling Entity), including Taxes imposed on the Selling Entities under Treasury Regulations Section 1.1502-6 and similar provisions of state, local or foreign Tax law, other than Taxes expressly payable by the Buyer pursuant to Section 7.8(a) or Section 7.8(b);

(e)     all Liabilities of the Selling Entities relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services ("Professional Services") performed in connection with this Agreement and any of the transactions contemplated hereby or otherwise on behalf of the Selling Entities, and any pre-Petition or post-Petition Claims for such Professional Services, including any brokerage fees, commissions, finders or similar fees incurred by any Selling Entity in connection with the transactions contemplated by this Agreement;

(f)     all Liabilities arising out of, relating to, or with respect to any Seller Benefit Plan;

(g)     all Liabilities or claims arising out of, relating to or with respect to the employment or performance of services for, or termination of employment or services for, or potential employment or engagement for the performance of services for, any of the Selling Entities (or any predecessor) of any individual Person (including the Transferred Employees) or any Person acting as a professional employer organization, employee leasing company or providing similar services on or prior to the Closing (including as a result of the transactions contemplated by this Agreement), including Liabilities or claims for wages, remuneration,

compensation, stock options or other equity-based awards, vacation, paid time off, benefits, workers' compensation, severance (including statutory severance), separation, termination, unfair labor practice, discrimination, classification, or notice pay or benefits (including under COBRA, except to the extent required by applicable Treasury Regulations issued under COBRA), claims under the WARN Act, or any other form of accrued or contingent compensation (including leave entitlements), irrespective of whether such Liabilities or claims are paid or made, as applicable, on, before or after Closing;

(h)     all Liabilities with respect to any Excluded Employee or Former Employee with respect to any period;

(i)     all Liabilities relating to Excluded Assets;

(j)     all accounts payable and other amounts payable of any Selling Entity owed by it to any other Selling Entity or any Acquired Subsidiary and all Liabilities arising as a result of effecting the matters set forth in <u>Section 7.15</u>;

(k)     all Liabilities of the Selling Entities arising under or pursuant to Environmental Laws, including with respect to any real property owned, operated, leased or otherwise used by any Selling Entity, whether or not used in the Business, including any Liabilities for noncompliance with Environmental Laws or the release of hazardous materials by any Selling Entity on or prior to the Closing, whether known or unknown as of the Closing;

(l)     all Liabilities arising from or related to any claim, action, arbitration, audit, hearing, investigation, suit, litigation or other proceeding (whether civil, criminal, administrative, investigative, or informal and whether pending or threatened or having any other status) against any Selling Entity or any of their respective Affiliates, or related to the Purchased Assets or the Assumed Liabilities, pending or threatened or with respect to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing Date;

(m)     all Liabilities of the Selling Entities in respect of Indebtedness;

(n)     all Liabilities arising in connection with any violation of any applicable Law or Order relating to the period prior to the Closing;

(o)     all Liabilities for fraud, breach of fiduciary duty, misfeasance or under any other theory relating to conduct, performance or non-performance of the Seller or any of its Subsidiaries, or any of their respective directors, officers, or employees;

(p)     all Liabilities to any equity holder of any Selling Entity;

(q)     all Liabilities arising from state or bankruptcy law theories of recovery, including fraudulent transfer;

(r)     all costs and expenses payable in connection with obtaining any Consents; and

22

(s)     any other Liability of the Selling Entities that arises in relation to the period prior to the Closing and is not expressly included among the Assumed Liabilities.

Section 2.5     Assumption and Assignment of Contracts.

(a)     (i)     Promptly, but in any event, prior to the earlier of (X) the date upon which the Selling Entities are required to serve notice of the assignment and assumption pursuant to the Bidding Procedures Order or (Y) December 31, 2015, Seller shall deliver Schedule 2.5(a) to the Buyer, which Schedule shall list each Non-Real Property Contract and Real Property Lease of the Selling Entities, and shall contain the Seller's good-faith best estimate of the amount of Cure Payments with respect to each such Non-Real Property Contract and Real Property Lease. Prior to the Sale Hearing, the Seller shall commence appropriate proceedings before the Bankruptcy Court and otherwise take all reasonably necessary actions in order to determine Cure Payments with respect to any Assumed Agreement or Assumed Real Property Lease entered into prior to the Petition Date. Notwithstanding the foregoing, at any time and from time to time prior to the Closing, the Buyer may identify any Assumed Agreement or Assumed Real Property Lease as one that the Buyer no longer desires to have assigned to it or its designee in accordance with Section 2.6. Cure Payments shall be apportioned between Buyer and Seller as set forth in Section 7.21.

(ii)     At the Closing, the Selling Entities shall assume and assign to the Buyer and/or, as applicable, one or more Buyer Designees the Assumed Agreements and Assumed Real Property Leases, in each case pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to provision by the Buyer of adequate assurance as may be required under Section 365 of the Bankruptcy Code and payment of the Cure Payments in respect of Assumed Agreements and Assumed Real Property Leases as contemplated hereby. The Seller shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assumed Agreements and Assumed Real Property Leases arising or otherwise payable on or prior to the Closing Date (other than Cure Payments paid by the Buyer pursuant to Section 7.21), and such Liabilities shall not be the obligation, liability or responsibility of Buyer or any Buyer Designee.

(b)     If, following the Closing, any Selling Entity receives or becomes aware that it holds any asset, property or right which constitutes a Purchased Asset, then such Selling Entity shall transfer such asset, property or right to the Buyer and/or, as applicable, one or more Buyer Designees as promptly as practicable for no additional consideration.

(c)     If, following the Closing, the Buyer receives or becomes aware that it holds any asset, property or right which constitutes an Excluded Asset, then the Buyer shall transfer such asset, property or right to the Seller as promptly as practicable for no additional consideration.

Section 2.6     Additional and Eliminated Assumed Contracts. Notwithstanding anything in this Agreement to the contrary, the Buyer may, from time to time and in its sole and absolute discretion, amend or revise Schedule 2.5(a) in order to (a) add any Non-Real Property Contract

23

or Real Property Lease to such Schedule prior to the Bid Deadline or (b) eliminate any Non-Real Property Contract or Real Property Lease from such Schedule prior to the Closing Date (the "Designation Deadline") and, for any particular Assumed Agreement or Assumed Real Property Lease that will be assumed in whole or in part by a Buyer Designee, to identify such Buyer Designee. Automatically upon the addition of any Non-Real Property Contract or Real Property Lease to Schedule 2.5(a) by the Buyer in accordance with the previous sentence, it shall be an Assumed Agreement or Assumed Real Property Lease, as applicable, for all purposes of this Agreement. Automatically upon the deletion of any Non-Real Property Contract or Real Property Lease from Schedule 2.5(a) by the Buyer in accordance with the first sentence of this Section 2.6, it shall be an Excluded Asset for all purposes of this Agreement, and no Liabilities arising thereunder or relating thereto shall be assumed by the Buyer or any Buyer Designee or be the obligation, liability or responsibility of Buyer or any Buyer Designee. If any Contract is added to the list of Assumed Agreements or Assumed Real Property Leases, then the Selling Entities shall take such steps as are reasonably necessary to cause such Contract to be assumed and assigned to Buyer as promptly as possible at or following the Closing.

Section 2.7    Allocation. The Buyer shall, within ninety (90) days following the Closing Date, deliver to the Seller an allocation of the Purchase Price (and the Assumed Liabilities, to the extent properly taken into account under the IRC) among the Purchased Assets and the covenants contained in Section 7.14 (the "Allocation") in accordance with Section 1060 of the IRC and the Treasury regulations promulgated thereunder. Within thirty (30) days following the Seller's receipt of the Allocation, the Seller may notify and provide the Buyer with any comments to the Allocation. The Buyer shall consider in good faith any reasonable comments to the Allocation so provided by the Seller. The Parties agree to file all Tax Returns (including the filing of Form 8594 with their United States federal income Tax Return for the taxable year that includes the date of the Closing) consistent with the Allocation unless otherwise required by applicable Law.

### ARTICLE III.
### PURCHASE PRICE

Section 3.1    Purchase Price.

(a)    In consideration for the Purchased Assets, and subject to the terms and conditions of this Agreement, at the Closing, the Buyer and/or one or more Buyer Designees shall assume the Assumed Liabilities by executing the Assumption Agreement and the Buyer shall pay in accordance with Section 3.1(b) an aggregate amount equal to (i) the Base Purchase Price, *minus* (ii) the Buyer Advance Amount (which amount shall be deemed repaid), *minus* (iii) the Minimum Cash Deficiency or the Existing Facility Reduction Amount, whichever leads to a greater deduction, *minus* (v) any amounts reducing the Purchase Price pursuant to Section 7.8 and/or Section 7.21 (such amount, the "Purchase Price").

(b)    Within three (3) Business Days following the Bankruptcy Court's entry of (i) orders authorizing use cash collateral on terms reasonably acceptable to the Buyer through and including the Closing Date, and (ii) the Bidding Procedures Order, in form and substance reasonably acceptable to the Buyer, Buyer shall make a deposit in an amount equal to $500,000 (the "Deposit"). The Deposit shall be held in trust in a segregated account by the Seller's

professionals, or another account mutually acceptable to the Buyer and Seller. The Deposit and any accrued interest thereon shall be applied to the Closing Payment as a credit to the Purchase Price. Within one (1) Business Day of the termination of this Agreement, the Deposit and any accrued interest thereon shall be paid to the Buyer or the Seller in accordance with Section 9.4. On the Closing Date, the Buyer shall pay or caused to be paid to the Seller, by wire transfer of immediately available funds to an account designated by the Seller prior to the Closing, an amount in cash equal to the Purchase Price, *less* the Deposit, and the Deposit shall be released to the Seller (such amount, the "Closing Payment").

(c)     On the Closing Date, or as soon thereafter as reasonably practicable, the Buyer shall pay or caused to be paid the Cure Payments payable by Buyer pursuant to Section 7.21.

Section 3.2     Withholding.  The Buyer shall be entitled to withhold from any amount otherwise payable to any of the Selling Entities or any other Person under this Agreement any withholding Taxes required by applicable Law to be withheld from the amounts so payable. Any amount so withheld and paid over to the appropriate Governmental Authority pursuant to this Section 3.2 shall be deemed to have been paid over to the applicable Selling Entities or other Persons for all purposes of this Agreement.

## ARTICLE IV.
## THE CLOSING

Section 4.1     Time and Place of the Closing.  Upon the terms and subject to the satisfaction of the conditions contained in ARTICLE VIII of this Agreement, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated by this Agreement (the "Closing") shall take place at the offices of the Buyer's counsel, Los Angeles, California at 10:00 a.m. (Pacific time) no later than the second (2nd) Business Day following the date on which the conditions set forth in ARTICLE VIII have been satisfied or, to the extent permitted, waived by the applicable Party in writing (other than conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permitted, waiver of such conditions at or prior to the Closing), or at such other place and time as the Buyer and the Seller may mutually agree.  The date on which the Closing actually occurs is herein referred to as the "Closing Date."  For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 a.m. (Pacific time) on the Closing Date.

Section 4.2     Deliveries by the Seller.  At or prior to the Closing, the Seller shall deliver the following to the Buyer:

(a)     the Bill of Sale, duly executed by the Selling Entities;

(b)     the Assumption Agreement, duly executed by the Selling Entities;

(c)     the IP Assignment Agreement, duly executed by the applicable Selling Entities;

(d)     such other instruments of assignment or conveyance duly executed by the applicable Selling Entities as shall be reasonably requested or reasonably necessary to transfer the Purchased Assets to the Buyer in accordance with this Agreement;

(e)     a copy of the Sale Order as entered by the Bankruptcy Court;

(f)     the certificate contemplated by Section 8.2(c);

(g)     a properly executed certificate of non-foreign status prepared in accordance with Treasury Regulations Section 1.1445-2(b) from each Selling Entity organized within the United States;

(h)     certificates representing all of the Equity Interests, duly endorsed (or accompanied by duly executed stock or similar powers) by the Selling Entity owning such Equity Interests in blank or for transfer to the Buyer or a Buyer Designee, if such Equity Interests are certificated, and all other appropriate instruments, resolutions, filings, certificates and confirmations necessary to transfer such Equity Interests to the Buyer and any applicable Buyer Designees;

(i)     copies of the certificate of incorporation and bylaws (or equivalent governance documents) of the Acquired Subsidiaries;

(j)     to the extent necessary pursuant to applicable Law, certified copies of the resolutions duly adopted by the Acquired Subsidiaries authorizing the sale of all of the equity interests of such entity and the other transactions contemplated hereby;

(k)     evidence, reasonably acceptable to the Buyer, that the insurance policies that constitute Purchased Assets, to the extent transferable, have been assigned to the Buyer or a Buyer Designee;; and

(l)     to the extent requested by the Buyer, written resignations from each director and officer of the Acquired Subsidiaries, effective as of the Closing.

Section 4.3     Deliveries by the Buyer.  At or prior to the Closing, the Buyer shall deliver the following to the Seller:

(a)     the Closing Payment;

(b)     the Assumption Agreement and the IP Assignment Agreement, duly executed by the Buyer or, to the extent applicable, one or more Buyer Designees; and

(c)     such other instruments of assumption duly executed by the Buyer and/or any applicable Buyer Designees as shall be reasonably requested or reasonably necessary for the Buyer and/or any applicable Buyer Designees to assume the Assumed Liabilities in accordance with this Agreement;

26

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF THE SELLING ENTITIES

Subject to (a) such exceptions as are disclosed (subject to <u>Section 10.13</u>) in the Seller Disclosure Schedule delivered by the Seller to the Buyer concurrently with the execution and delivery of this Agreement, and (b) such exceptions as result directly from the filing and commencement of the Bankruptcy Case, the Selling Entities jointly and severally represent and warrant to the Buyer as of the date hereof and as of the Closing Date as follows:

Section 5.1    <u>Organization, Standing and Corporate Power</u>.  Each Selling Entity and each Acquired Subsidiary is a corporation or other entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, formation or organization. Each Selling Entity and each Acquired Subsidiary is duly qualified or licensed to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, except to the extent that any such failure to be qualified or licensed would not be material to the Business, the Purchased Assets or the Assumed Liabilities.

Section 5.2    <u>Subsidiaries</u>.

(a)    <u>Section 5.2(a)</u> of the Seller Disclosure Schedule identifies (i) each direct and indirect Subsidiary of the Seller, its jurisdiction of formation, and all owners of equity interests of each such Subsidiary and the number or percentage of equity interests owned by each such owner and (ii) all equity interests that are owned directly or indirectly by the Seller of Persons who are not direct or indirect Subsidiaries of the Seller.  Except as set forth in <u>Section 5.2(a)</u> of the Seller Disclosure Schedule, all of the outstanding capital stock of, or other ownership interests in, each Selling Entity (other than the Seller) and all of the Equity Interests are owned beneficially and of record by the Seller, directly or indirectly.  Except as set forth in <u>Section 5.2</u>(a) of the Seller Disclosure Schedule, the Selling Entities own no other equity interests in any other Person.

(b)    All of the Equity Interests have been duly authorized and are validly issued, fully paid and nonassessable and will be free and clear of any Encumbrances (other than Permitted Encumbrances and except to the extent that such Encumbrances will not be enforceable against the Equity Interests following the Closing in accordance with the Sale Order) and were not issued in violation of any preemptive or similar rights.

(c)    There are no currently outstanding or authorized options, warrants, rights, contracts, rights of first refusal or first offer, calls, preemptive rights, puts, rights to subscribe, conversion rights, or other agreements or commitments to which any Selling Entity or Acquired Subsidiary is a party or which are binding upon any Selling Entity or Acquired Subsidiary providing for the issuance, disposition, or acquisition of the capital stock of any of the Acquired Subsidiaries or securities convertible into or exchangeable for the capital stock of any Acquired Subsidiary.  There are no (i) outstanding obligations of any Acquired Subsidiary to repurchase, redeem or otherwise acquire any of its capital stock or (ii) voting trusts, proxies or other agreements among the stockholders of any Acquired Subsidiary with respect to the voting or

transfer of its capital stock. There are no outstanding or authorized equity appreciation, phantom equity, or similar rights with respect to any Acquired Subsidiary.

(d)     Section 5.2(d) of the Seller Disclosure Schedule sets forth a true and complete list of each permanent establishment of any Selling Entity or any Acquired Subsidiary recognized under applicable Law in any non-U.S. jurisdiction.

(e)     Section 5.2(e) of the Seller Disclosure Schedule sets forth a true and complete list of (i) all assets and (ii) all Liabilities of each Acquired Subsidiary.

Section 5.3     Authority Relative to this Agreement.     Each Selling Entity has the requisite corporate or company power and authority to execute and deliver the Transaction Documents to be executed and delivered by such Selling Entity on or after to the Petition Date pursuant to this Agreement and, subject to the entry by the Bankruptcy Court of the Bidding Procedures Order (in the case of Section 7.3 and Section 7.11 hereof and other provisions authorized pursuant thereto) and the Sale Order (in the case of all other provisions, but solely with respect to actions to be taken following the Petition Date that require approval pursuant to the Sale Order to be effective), to carry out the transactions contemplated hereby and thereby. The execution, delivery and performance by each Selling Entity of the Transaction Documents to which such Selling Entity is a party have been duly authorized by all necessary action of such Selling Entity and subject to the entry by the Bankruptcy Court of the Bidding Procedures Order (in the case of Section 7.3 and Section 7.11 hereof and other provisions authorized pursuant thereto) and the Sale Order (in the case of all other provisions but solely with respect to actions to be taken following the Petition Date that require approval pursuant to the Sale Order to be effective), no other action on the part of such Selling Entity is required in connection therewith. The Transaction Documents to which a Selling Entity is a party, assuming due authorization, execution and delivery by the other parties hereto and thereto, constitute, or when executed and delivered by such Selling Entity will constitute subject to the entry by the Bankruptcy Court of the Bidding Procedures Order (in the case of Section 7.3 and Section 7.11 hereof and other provisions authorized pursuant thereto) and the Sale Order (in the case of all other provisions but solely with respect to actions to be taken following the Petition Date that require approval pursuant to the Sale Order to be effective), valid and binding obligations of such Selling Entity enforceable against such Selling Entity in accordance with their terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws of general application affecting enforcement of creditors' rights and (ii) general principles of equity.

Section 5.4     No Violation; Consents.

(a)     Except to the extent excused by or rendered unenforceable against the Selling Entities as a result of the Bankruptcy Case or the Sale Order, neither the execution and delivery of this Agreement nor the sale by any Selling Entity of any Purchased Assets pursuant to this Agreement or the other Transaction Documents will (with or without notice or lapse of time) (i) conflict with or result in any breach of any provision of any Selling Entity's or Acquired Subsidiary's certificate of incorporation or bylaws (or similar organizational documents), (ii) subject to the matters referred to in Section 5.4(b), violate, conflict with or result in any breach of any Law applicable to any Selling Entity, the Business, the Purchased Assets or any Acquired Subsidiary, or (iii) except as set forth on Section 5.4(a)(iii) of the Seller Disclosure Schedule,

violate, conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any Consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Material Contract, agreement, lease, sublease, license, Permit, franchise or other instrument or arrangement to which any of the Selling Entities or any Acquired Subsidiary is a party as of the Closing and which constitutes a Purchased Asset or Assumed Liability, or result in the creation of any Encumbrance (other than a Permitted Encumbrance) as of the Closing on any of the Purchased Assets, except to the extent that any such rights of termination, amendment, acceleration, suspension, revocation or cancellation as a result of such Encumbrance will not be enforceable against such Purchased Asset or Assumed Liability following the Closing in accordance with the Sale Order.

(b)     No Consent of any Governmental Authority is required to be obtained by or with respect to any Selling Entity or any Acquired Subsidiary, in connection with the execution, delivery and performance of this Agreement or any Transaction Document to which any Selling Entity is a party, or the consummation by the Selling Entities of the transactions contemplated hereby or thereby, except for (i) the Consents set forth in Section 5.4(b)(i) of the Seller Disclosure Schedule, compliance with any applicable requirements of Antitrust Laws and compliance with any applicable requirements of applicable securities Laws, (ii) the entry of the Sale Order by the Bankruptcy Court, and (iii) Consents to the transfer or assignment of Permits that constitute Purchased Assets set forth in Section 5.4(b)(iii) of the Seller Disclosure Schedule.

Section 5.5     Legal Proceedings and Orders.     Other than in connection with the Bankruptcy Case, there is no Legal Proceeding pending before any Governmental Authority, and no Person has threatened in writing to commence any such Legal Proceeding, (a)(i) that relates to any of the Purchased Assets or (ii) is against or involving any Acquired Subsidiary, or (b) that would reasonably be expected to have the effect of preventing or making illegal any of the transactions contemplated by this Agreement.  As of the date of this Agreement, there is no outstanding Order to which any of the Selling Entities, any of the Purchased Assets, or any Acquired Subsidiary are subject.

Section 5.6     Compliance with Law.     Each of the Selling Entities and the Acquired Subsidiaries (i) has been since January 1, 2012, and is in material compliance with all Laws and Orders relating to the Purchased Assets (including the use thereof), the Assumed Liabilities and the conduct of the Business, and (ii) has not received any written notice from any Governmental Authority, that has not been dismissed or otherwise finally resolved, that any violation of any such Law or Order exists.

Section 5.7     Financial Statements; Liabilities; Accuracy.

(a)     Each of the financial statements of the Selling Entities and Acquired Subsidiaries for the fiscal year ended March 31, 2014 and quarterly reports for the quarterly periods ended March 31, 2015, June 30, 2015 and September 30, 2015 (collectively, the "Seller Financial Statements") was prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto) and presents fairly, in all material respects, the consolidated financial position of the Selling Entities and Acquired Subsidiaries as of the respective dates thereof and the consolidated statements of

29

operations, stockholder's equity and cash flows of the Seller for the respective periods indicated therein (subject, in the case of unaudited financial statements, to normal period end adjustments).

(b)     No Material Adverse Effect has occurred.

(c)     The Selling Entities and the Acquired Subsidiaries do not have any Indebtedness or other Liabilities (of the type required to be reflected on a balance sheet or other financial statements prepared in accordance with GAAP) that were not disclosed or reserved against in the Seller Financial Statements (including the notes thereto), except for indebtedness or other Liabilities that (i) were incurred after September 30, 2015 in the Ordinary Course of Business, (ii) were incurred under this Agreement or in connection with the transactions contemplated hereby, or (iii) will constitute Excluded Liabilities. All Indebtedness of the Selling Entities is set forth in Section 5.7(c) of the Seller Disclosure Schedule.

(d)     None of the information supplied or to be supplied by or on behalf of the Selling Entities (i) to any Person for inclusion in any document or application filed with any Governmental Authority having jurisdiction over, or in connection with, the transactions contemplated by this Agreement and the Transaction Documents or (ii) to the Buyer or its Representatives in connection with, pursuant to, or contained in, this Agreement, the negotiations leading up to this Agreement, any Transaction Document, the Seller Disclosure Schedule or the exhibits, schedules, certificates, documents, written information or lists attached hereto or specifically referred to herein or otherwise in connection with the transactions contemplated by this Agreement or by such Transaction Documents, contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact required to be stated herein or therein or that is necessary to make the statements contained herein or therein, in light of the circumstances under which they were made, not misleading. To the Knowledge of Seller, there are no material facts pertaining to the Selling Entities, any Acquired Subsidiaries or the Business which have not been disclosed in this Agreement, the Seller Disclosure Schedule, or the Seller Financial Statements or otherwise disclosed to the Buyer by the Seller in writing. All documents required to be filed by the Selling Entities with any Governmental Authority in connection with this Agreement or the transactions contemplated by this Agreement comply (or will comply) in all material respects with the provisions of applicable Law.

Section 5.8     Benefit Plans; Employees and Employment Practices.

(a)     Section 5.8 of the Seller Disclosure Schedule sets forth a complete and correct list of each Seller Benefit Plan and true, correct and complete copies of each Seller Benefit Plan have been made available to the Buyer.

(b)     Except as set forth in Section 5.8(b) of the Seller Disclosure Schedule, (i) each Seller Benefit Plan, has been maintained and administered in accordance with its terms and with all applicable provisions of ERISA, the IRC and other applicable Laws, (ii) there are no audits, inquiries or proceedings pending or, to the Knowledge of Seller, threatened by the IRS or any other Governmental Authority with respect to any Seller Benefit Plan (other than routine claims for benefits in the Ordinary Course of Business), (iii) no event has occurred and, to the Knowledge of Seller, there exists no condition or set of circumstances in connection with which Buyer could be subject to any Liability under the terms of, or with respect to, such Seller Benefit

30

Plan, or under ERISA, the IRC or any other applicable Law with respect to such Seller Benefit Plan, and (iv) all contributions, premiums and payments (including all employer contributions, employee contributions and salary deferral contributions elected by Current Employees and Former Employees) with respect to any Seller Benefit Plans that are due and owing or required to be made pursuant to such plans have been made by the due date thereof (including any valid extension), and all contributions, premiums and payments with respect to periods ending on or before the Closing Date (including periods from the first day of the current plan year or policy year to the Closing Date) which are not yet due have been, or as of the Closing will be paid by the Selling Entities at Closing. None of the Purchased Assets is, or could reasonably be expected to become, the subject of any Lien arising under ERISA or the IRC, whether arising with respect to the operation, termination, restoration or funding of any Seller Benefit Plan, in connection with any excise Tax or penalty Tax with respect to any Seller Benefit Plan or otherwise.

(c)     No Seller Benefit Plan is, and neither the Selling Entities nor any of their respective ERISA Affiliates sponsors, maintains, contributes to, has ever sponsored, maintained or contributed to or has any Liability with respect to any (A) "multiemployer plan" (within the meaning of Section 3(37) of ERISA), (B) "multiple employer plan" (within the meaning of Section 413(c) of the IRC), (C) "pension plan" within the meaning of Section 3(2) of ERISA that is subject to Title IV or Section 302 of ERISA or Section 412 of the IRC, or (D) multiple employer welfare arrangement (within the meaning of Section 3(40) of ERISA), or (E) any Plan that provides retiree or post-employment medical, disability, life insurance or other welfare benefits to any Person, other than (1) to the extent required by Section 4980B of the IRC or any similar applicable Legal Requirement or (2) non-retiree life insurance benefits or disability benefits under a Seller Benefit Plan that is an welfare plan within the meaning of Section 3(1) of ERISA.

(d)     Each Seller Benefit Plan that is intended to be qualified under Section 401(a) of the IRC has timely received a favorable determination letter or is entitled to rely on a favorable opinion letter from the IRS, in either case, that has not been revoked and, to the Knowledge of Seller, no event or circumstance exists that has adversely affected or would reasonably be expected to adversely affect such qualification or exemption.

(e)     Except as required under Section 7.7(d), neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated by this Agreement, either alone or in combination with another event (whether contingent or otherwise) will (i) entitle any Current Employee or other service provider of the Selling Entities to any payment or benefit; (ii) increase the amount or value of any payment, compensation or benefits due to any such Current Employee or other service provider; or (iii) accelerate the vesting, funding or time of payment or delivery of any compensation, equity award or other payment or benefit; (iv) result in any liability or obligation to or obligation or commitment by the Buyer or any of its Affiliates under or with respect to any Seller Benefit Plan to any Current Employee or Former Employee; or (v) result in any "parachute payment" within the meaning of Section 280G of the IRC or any similar foreign, state or local Legal Requirements.

(f)     Each Seller Benefit Plan maintained or contributed to by any Selling Entity or Acquired Subsidiary under the law or applicable custom or rule of the relevant jurisdiction outside of the United States (each such plan, a "Foreign Plan") is listed on Section

31

5.8(f) of the Seller Disclosure Schedule. As regards each Foreign Plan, (i) such Foreign Plan is, and has been operated, in material compliance with its terms and the provisions of the Laws of each jurisdiction in which such Foreign Plan is maintained, to the extent those Laws are applicable to such Foreign Plan, (ii) all contributions to, and material payments from, such Foreign Plan which may have been required to be made in accordance with the terms of such Foreign Plan, and, when applicable, the Laws of the jurisdiction in which such Foreign Plan is maintained, have been timely made or shall be made by the Closing Date, (iii) each Selling Entity or Acquired Subsidiary and each ERISA Affiliate thereof have materially complied with all applicable reporting and notice requirements, and such Foreign Plan has obtained from the Governmental Authority having jurisdiction with respect to such Foreign Plan any required determinations, if any, that such Foreign Plan is in compliance with the Laws of the relevant jurisdiction if such determinations are required in order to give effect to such Foreign Plan, (iv) to the Knowledge of Seller, there are no pending investigations by any Governmental Authority involving such Foreign Plan, and no pending claims (except for claims for benefits payable in the normal operation of such Foreign Plan), suits or proceedings against such Foreign Plan or asserting any rights or claims to benefits under such Foreign Plan, and (v) the consummation of the transactions contemplated by this Agreement will not by themselves create or otherwise result in any Liability with respect to such Foreign Plan. No Foreign Plan has unfunded Liabilities that will not be offset by insurance.

Section 5.9    Labor Matters.

(a)    Section 5.9(a) of the Seller Disclosure Schedule contains a true, correct and complete list of the names and current annual salary rates or current hourly wages (as applicable), bonus opportunity, hire date, accrued vacation and paid-time-off, principal work location, employer and leave status of all Current Employees and each such Current Employee's status as being exempt or nonexempt from the application of state and federal wage and hour laws applicable to employees who do not occupy a managerial, administrative, or professional position. No Current Employee and no group of Current Employees or other service providers of any of the Selling Entities has informed any of the Selling Entities or Acquired Subsidiaries (whether orally or in writing) of any present intention to terminate employment with or services for any Selling Entities or Acquired Subsidiaries and, to the Knowledge of Seller, no such Person or Persons has any plans to terminate employment with or services for Seller or any Subsidiary.

(b)    None of the Selling Entities or the Acquired Subsidiaries is a party to, or otherwise bound by or subject to, any collective bargaining or other labor union contracts and no Current Employees are represented by any labor organization, trade union, works council, employee representative, employee congress or other form of employee association or representative. No labor organization (or representative thereof) or Current Employee or group of Current Employees has made a pending demand for recognition, and there are no representation proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of Seller, threatened to be brought or filed, with the National Labor Relations Board or other labor relations tribunal, or provincial or foreign or other Governmental Authority. To the Knowledge of Seller, there is no organizing activity involving the Selling Entities, the Acquired Subsidiaries, or any of their Affiliates pending or threatened by any labor organization (or representative thereof) or employee or group of employees to organize Current Employees. There are no lockouts, slowdowns, work stoppages, strikes or other organized work interruptions

32

pending, or threatened between the Selling Entities, the Acquired Subsidiaries, or any of their Affiliates, on the one hand, and their respective Current Employees, on the other hand, and there have been no such lockouts, slowdowns, work stoppages, strikes or other organized work interruptions for the past three (3) years.

(c)     As of the date of this Agreement and except as set forth in <u>Section 5.9(c)</u> of the Seller Disclosure Schedule, each of the Selling Entities, the Acquired Subsidiaries, and their Affiliates is in material compliance with all agreements, Contracts and Laws regarding (i) the terms and conditions of employment of Current Employees, Former Employees and prospective employees and (ii) other labor-related matters, including all Laws or court orders relating to wages, hours, pay equity, employment equity, conditions of employment, employment standards, human rights, employee privacy, the WARN Act, collective bargaining, discrimination, civil rights, safety and health, workers' compensation and the collection and payment of withholding Taxes and/or social security Taxes and contributions and any similar Tax or contribution. Except as set forth in <u>Section 5.9(c)</u> of the Seller Disclosure Schedule, there has been no "mass layoff" or "plant closing" (as defined by the WARN Act), or "collective redundancy" or similar process (being a process under any foreign Law under which an employer is required by Law to follow a different process for the termination of more than one (1) employee when compared with the process for the termination of one (1) employee), with respect to the Selling Entities, the Acquired Subsidiaries, or any of their Affiliates within the six (6) months prior to Closing.

(d)     Each of the Selling Entities, the Acquired Subsidiaries, and their Affiliates has paid in full to their respective Current Employees, consultants and directors, all wages, salaries, commissions, bonuses, benefits and other compensation due to or on behalf of such Current Employees, consultants or directors; (ii) there is no claim with respect to payment of wages, salary or overtime pay that has been asserted or is now pending or, to the Knowledge of Seller, threatened before any Governmental Authority with respect to any Persons currently or formerly employed by any of the Selling Entities and their Affiliates; and (iii) none of the Selling Entities, the Acquired Subsidiaries, or their Affiliates is a party to, or otherwise bound by, any consent decree with, or citation by, any Governmental Authority relating to their Current Employees or employment practices.

(e)     There are no notices of assessment, provisional assessment, reassessment, supplementary assessment, penalty assessment or increased assessment (collectively, "assessments") or any other communications related thereto which any Selling Entity or Acquired Subsidiary has received from any workers' compensation or workplace safety and insurance board or similar authorities in any jurisdictions where the Business is carried on which are unpaid on the date hereof or which will be unpaid at the Closing Date and there are no facts or circumstances which may result in an increase in liability to any Buyer or any Buyer Designee under any applicable workers' compensation or workplace safety and insurance Law after the Closing Date.

(f)     <u>Section 5.9(f)</u> of the Seller Disclosure Schedule sets forth a true and complete list of the Liabilities of the Selling Entities and Acquired Subsidiaries under COBRA as of the date hereof.

(g)     Each of the Selling Entities and the Acquired Subsidiaries has properly classified all of its service providers as either employees or independent contractors and as exempt or non-exempt for all purposes under applicable Law and Seller Benefit Plans.

(h)     Section 5.9(h) of the Seller Disclosure Schedule contains a true, correct and complete list of all independent contractors, consultants, agents or agency employees currently engaged by the Selling Entities or the Acquired Subsidiaries, along with the position, date of retention and rate of remuneration for each such Person.

Section 5.10     Contracts.

(a)     Section 5.10(a)(i) of the Seller Disclosure Schedule sets forth a complete and accurate list of all Material Contracts. Section 5.10(a)(ii) of the Seller Disclosure Schedule sets forth a complete and accurate list of all Real Property Leases. The Seller has made available to the Buyer true and complete copies of all Material Contracts and Real Property Leases, including any amendments thereto.

(b)     Each Material Contract and each Real Property Lease is a valid and binding obligation of each Selling Entity or Acquired Subsidiary party thereto as applicable, and to the Knowledge of Seller, the other parties thereto, enforceable against each of them in accordance with its terms, except, in each case, as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar Laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

(c)     None of the Selling Entities, Acquired Subsidiaries or, to the Knowledge of Seller, the other parties thereto, is in breach in any material respect of any Material Contract or any Real Property Lease, and none of the Selling Entities or the Acquired Subsidiaries have received any written notice of any such breach, except, in each case, (i) as a result of the Bankruptcy Case, or (ii) as will be cured upon entry of the Sale Order and payment of the Cure Payments. Section 5.10(c) of the Seller Disclosure Schedule lists all Material Contracts for which Consent of a Person (other than the Bankruptcy Court) is required in connection with the assumption and assignment of such Material Contract to the Buyer pursuant to the Sale Order.

(d)     Section 5.10(d) of the Seller Disclosure Schedule sets forth a complete and accurate list of all outstanding letters of credit, banker's acceptances or similar credit support arrangements that secure any Assumed Liabilities of any Selling Entity.

Section 5.11     Intellectual Property.

(a)     Section 5.11(a) of the Seller Disclosure Schedule sets forth a complete and accurate list, as of the date hereof, of (i) each item of Registered IP in which any Selling Entity or Acquired Subsidiary has an ownership interest of any nature (whether exclusively, jointly with another Person or otherwise) and all actions, filings and payment obligations due to be made to any Governmental Authority within one hundred and eighty (180) days following the Closing Date, (ii) the jurisdiction in which each such item of Registered IP has been registered or filed and the applicable registration or serial number, (iii) any other Person that has an ownership interest in each such item of Registered IP, and (iv) all material unregistered Trademarks used in connection with any product of any Selling Entity or Acquired Subsidiary. No Selling Entity or

34

Acquired Subsidiary has transferred ownership of (whether a whole or partial interest), or granted any exclusive right to use, any Seller IP to any Person.

(b)     Except as set forth on <u>Section 5.11(b)</u> of the Seller Disclosure Schedule, to the Knowledge of Seller, all Seller IP is valid, subsisting, and enforceable. The Seller has made all filings and payments and taken all other actions required to be made or taken to maintain each item of Registered IP in full force and effect by the applicable deadline and otherwise in accordance with all applicable Laws. The Seller has provided to the Buyer complete and accurate copies of all applications, material correspondence to or from any Governmental Authority, and other material documents related to each such item of Registered IP. The Seller, and to the Knowledge of Seller its patent counsel, have complied with their duty of candor and disclosure and have made no bad faith or material misrepresentations in the filings submitted to the applicable Governmental Authorities with respect to all Patents included in the Seller IP. No Selling Entity or Acquired Subsidiary has engaged in Patent or Copyright misuse or any fraud or inequitable conduct in connection with any Registered IP.

(c)     Except as set forth on <u>Section 5.11(c)</u> of the Seller Disclosure Schedule, the Selling Entities and the Acquired Subsidiaries own or possess valid rights to use all Seller IP and all Licensed Intellectual Property. There is no restriction or limitation on the right of the Selling Entities to transfer exclusive ownership of any Seller IP to the Buyer or a Buyer Designee pursuant to the Sale Order. No Person who has licensed Intellectual Property Rights or Technology to a Selling Entity or Acquired Subsidiary has ownership rights or license rights to derivative works or improvements made by a Selling Entity or Acquired Subsidiary related to such Intellectual Property Rights or Technology, or has any rights or options to acquire any such improvements or Intellectual Property Rights related thereto. No Current Employee, Former Employee nor any current or former independent contractor of any of the Selling Entities or Acquired Subsidiaries has any rights, title or interest in any Seller IP, other than, in each case, rights that would no longer attach following the entry of the Sale Order. The Seller IP and the Licensed Intellectual Property are all the Intellectual Property Rights and Technology used in, held for use in or necessary for the operation of the Business as it is conducted as of the date of this Agreement.

(d)     Except as set forth on <u>Section 5.11(d)</u> of the Seller Disclosure Schedule, none of the Selling Entities or Acquired Subsidiaries has infringed, misappropriated, used or disclosed without authorization or otherwise violated, or is infringing, misappropriating, using or disclosing without authorization or otherwise violating any Intellectual Property Right of any other Person (including, to the Knowledge of Seller, any Patents). None of the Selling Entities or Acquired Subsidiaries has received any written claim or written notice from any Person alleging infringement, misappropriation, use or disclosure without authorization or any other violation of Intellectual Property Rights or challenging the validity, enforceability, use or ownership of the Selling Entities' or Acquired Subsidiaries' interest in Seller IP. To the Knowledge of Seller, no Person has infringed, misappropriated or otherwise violated, or is infringing, misappropriating or otherwise violating any Seller IP.

(e)     The Selling Entities and Acquired Subsidiaries have taken commercially reasonable steps in accordance with normal industry practice to protect and maintain the confidentiality and secrecy of any Selling Entity's or Acquired Subsidiary's Trade Secrets and

any other confidential and proprietary information and materials, or any other confidential Seller IP.

(f) The information technology systems of the Selling Entities and Acquired Subsidiaries, including material Software, servers, hardware and other Technology, are sufficient to operate the Business as it is currently conducted. All information technology systems of the Selling Entities and Acquired Subsidiaries are owned by, or licensed or leased to, the Selling Entities and Acquired Subsidiaries. Each Contract granting a license or lease to a Selling Entity or Acquired Subsidiary for such information technology systems is listed in Section 5.11(f) of the Seller Disclosure Schedule. The Selling Entities and Acquired Subsidiaries are the legal and beneficial owners of, or have a contractual right to use, the such information technology systems free from Encumbrances, except for Permitted Encumbrances, and have not, in the twelve (12) months prior to the date of this Agreement, received written notice from a third Person alleging that any Selling Entity or Acquired Subsidiary is in default under licenses or leases relating to the information technology systems. The Selling Entities and Acquired Subsidiaries have taken commercially reasonable security measures in accordance with normal industry practice to protect the information technology systems against intrusion. Since January 1, 2012, (i) the information technology systems of the Selling Entities and Acquired Subsidiaries have not suffered any material failure, and (ii) none of the Selling Entities or Acquired Subsidiaries has suffered any security breaches that have resulted in a third Person obtaining access to any material confidential or proprietary information of the Selling Entities or Acquired Subsidiaries or any personal identifiable information of their customers. The Selling Entities and Acquired Subsidiaries are in compliance with any posted privacy policies and any Laws relating to personal data or other information; and no such privacy policy requires the delivery of any notice to or Consent from any Person, or prohibits the transfer of personal data or other information collected and in the possession or control of any Selling Entity or Acquired Subsidiary to the Buyer, in connection with the execution, delivery, or performance of this Agreement or the consummation of any of the transactions contemplated herein.

(g) The Seller Entities and Acquired Subsidiaries implement industry standard measures designed to prevent the introduction of Malicious Code into information technology systems of the Selling Entities and Acquired Subsidiaries and into any product of any Selling Entity or Acquired Subsidiary, including firewall protections and regular virus scans. "Malicious Code" means any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," "worm," "spyware" or "adware" (as such terms are commonly understood in the software industry) or any other code designed or intended to have, or capable of performing or facilitating, any of the following functions: (i) disrupting, disabling, harming, or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed, or (ii) compromising the privacy or data security of a user or damaging or destroying any data or file without the user's Consent.

(h) No source code for any product of any Selling Entity or Acquired Subsidiary has been delivered, licensed, or made available to any escrow agent or other Person who is not, as of the date of this Agreement, a Current Employee or a contractor who is providing or has provided development services to a Selling Entity or Acquired Subsidiary. No Selling Entity or Acquired Subsidiary has any duty or obligation (whether present, contingent, or otherwise) to deliver, license, or make available the source code for any product of any Selling

36

Entity or Acquired Subsidiary to any escrow agent or other Person. No event has occurred, and to the Knowledge of Seller, no circumstance or condition exists, that (with or without notice or lapse of time) will, or could reasonably be expected to, result in the delivery, license, or disclosure of any source code for any product of any Selling Entity or Acquired Subsidiary to any other Person who is not a Current Employee.

(i)     No funding, facilities or personnel of any Government Authority or of any university, college, other educational institution or research center was used, directly or, to the Knowledge of Seller, indirectly, in the development of any Seller IP.

(j)     Section 5.11(j) of the Seller Disclosure Schedule contains a list and description of all standard-setting organizations, industry bodies and other standards-related activities in which any Selling Entity or Acquired Subsidiary has participated in or contributed to.

(k)     No product of any Selling Entity or Acquired Subsidiary is subject to any "copyleft" or other obligation or condition (including any obligation or condition under any "open source" license such as the GNU Public License, Lesser GNU Public License, or Mozilla Public License) that (i) could require, or could condition the use or distribution of such product or portion thereof on, (A) the disclosure, licensing, or distribution of any source code for any portion of such product, or (B) the granting to licensees of the right to make derivative works or other modifications to such products or portions thereof or (ii) could otherwise impose any limitation, restriction, or condition on the right or ability of any Selling Entity or Acquired Subsidiary to use, distribute or charge for any product of any Selling Entity or Acquired Subsidiary.

Section 5.12    Taxes.

(a)     All income Tax Returns and other material Tax Returns (and, with respect to any Acquired Subsidiary, all Tax Returns) required to be filed by or with respect to any Selling Entity with respect to the Purchased Assets or any Acquired Subsidiary (i) have been timely filed (taking into account any extension of time within which to file) and (ii) all such Tax Returns are true, correct, and complete in all material respects.

(b)     All material Taxes (and, with respect to any Acquired Subsidiary, all Taxes) with respect to (i) the Purchased Assets of the Selling Entities and (ii) the Acquired Subsidiaries have been timely paid.

(c)     No material deficiency (and, with respect to any Acquired Subsidiary, no deficiency) for any amount of Taxes has been proposed, asserted or assessed in writing or, to the Knowledge of Seller, other than in writing, by any Governmental Authority against (i) any Selling Entity with respect to the Purchased Assets or (ii) any Acquired Subsidiary that remains unpaid. There are no audits, examinations or other administrative or judicial Legal Proceedings currently ongoing or pending with respect to any Taxes with respect to (i) the Purchased Assets of any Selling Entity or (ii) any Acquired Subsidiary. There are no waivers or extensions of any statute of limitations currently in effect with respect to Taxes of (i) any Selling Entity with

respect to the Purchased Assets or (ii) any Acquired Subsidiary, other than with respect to any currently open audits.

(d)     All material Taxes required to be withheld or collected by the Selling Entities or the Acquired Subsidiaries have been withheld and collected and, to the extent required by Law, timely paid to the appropriate Governmental Authority.

(e)     There are no Encumbrances for Taxes upon any Purchased Assets or upon any property or assets of the Acquired Subsidiaries, except for Permitted Encumbrances.

(f)     No written claim has been received by any Selling Entity or Acquired Subsidiary from an authority in a jurisdiction where such Selling Entity or Acquired Subsidiary does not file Tax Returns claiming that such Selling Entity or Acquired Subsidiary is or may be subject to taxation in that jurisdiction, which claim, if successfully asserted, could reasonably be expected to result in any material liability for Taxes.

(g)     The Selling Entities have delivered or made available to Buyer complete and accurate copies of all income and other material federal, state, local and foreign Tax Returns of the Acquired Subsidiaries for all taxable years remaining open under the applicable statute of limitations, including, promptly upon their availability, for the most recent taxable year, and complete and accurate copies of all audit or examination reports and statements of deficiencies assessed against or agreed to by the Acquired Subsidiaries since January 1, 2012.

(h)     No Acquired Subsidiary has been a member of an affiliated group filing a consolidated federal income Tax Return or any similar group for federal, state, local or foreign Tax purposes.  No Acquired Subsidiary has any liability for the Taxes of any other Person (i) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law), (ii) as a transferee or successor, (iii) by Contract or (iv) otherwise.

(i)     No Acquired Subsidiary is, or has been, a party to or bound by any Tax indemnity agreement, Tax sharing agreement, Tax allocation agreement or similar Contract.

(j)     No entity classification election pursuant to Treasury Regulations Section 301.7701-3 has been filed with respect to any of the Acquired Subsidiaries.

(k)     No Acquired Subsidiary has been a party to a transaction that is or is substantially similar to a "reportable transaction," as such term is defined in Treasury Regulations Section 1.6011-4(b)(1), or any other transaction requiring disclosure under analogous provisions of state, local or foreign Tax law.

(l)     No Acquired Subsidiary has engaged in a trade or business, had a permanent establishment (within the meaning of an applicable Tax treaty), or otherwise become subject to Tax jurisdiction in a country other than the country of its formation.

(m)     No Acquired Subsidiary (i) is or was a "surrogate foreign corporation" within the meaning of Section 7874(a)(2)(B) of the IRC or is treated as a U.S. corporation under Section 7874(b) of the IRC; or (ii) was created or organized both in the United States and in a

38

foreign jurisdiction such that such entity would be taxable in the United States as a domestic entity pursuant to United States Treasury Regulation Section 301.7701-5(a).

(n)     The prices and terms for the provision of any property or services by or to the Acquired Subsidiaries are arm's length for purposes of the relevant transfer pricing laws, and all related documentation required by such laws has been timely prepared or obtained and, if necessary, retained.

(o)     For the period commencing on the first day of any Straddle Period and ending at the close of business on the Closing Date, no Acquired Subsidiary has any item of income which could constitute subpart F income within the meaning of Section 952 of the IRC. As of the Closing Date, no Acquired Subsidiary will hold assets that constitute U.S. property within the meaning of Section 956 of the IRC.

(p)     The Seller has provided or made available to Buyer all documentation relating to, and the Acquired Subsidiaries are in full compliance with, all material applicable terms and conditions of, any Tax exemption, Tax holiday, Tax incentive or other Tax reduction agreement or order of a territorial or non-U.S. government. The consummation of the transactions contemplated by this Agreement will not have any adverse effect on the continued validity and effectiveness of any such Tax exemption, Tax holiday, Tax incentive or other Tax reduction agreement or order.

(q)     Since January 1, 2012, with respect to each Selling Entity and each Acquired Subsidiary, there has not been any: (i) new, change in or revocation of any Tax election; (ii) settlement or compromise of any claim, notice, audit report or assessment in respect of Taxes; (iii) change in any annual Tax accounting period; (iv) adoption or change in any method of Tax accounting; (v) filing of any amended Tax Return; (vi) entrance into any Tax allocation agreement, Tax sharing agreement, Tax indemnity agreement or closing agreement relating to any Tax; (vii) surrender of any right to claim a material Tax refund; or (viii) consent to any extension or waiver of the statute of limitations period applicable to any Tax claim or assessment.

(r)     The unpaid Taxes of each of the Selling Entities and the Acquired Subsidiaries did not, as of the date of the latest balance sheet in the Seller Financial Statements, exceed the reserve for Tax liability (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of such balance sheet. Since the date of the latest balance sheet in the Seller Financial Statements, none of the Selling Entities or Acquired Subsidiaries has incurred any Liability for Taxes outside the Ordinary Course of Business or otherwise inconsistent with past custom and practice.

Section 5.13    Insurance. Section 5.13 of the Seller Disclosure Schedule sets forth a true and correct list of all insurance policies of the Selling Entities and the Acquired Subsidiaries or covering the Purchased Assets, the Assumed Liabilities, the Business and the Current Employees. All such policies (i) are in full force and effect and all premiums thereon have been paid, and the Selling Entities are otherwise in compliance in all material respects with the terms and provisions of such policies, and (ii) provide insurance in such amounts and against such risks as is sufficient to comply with applicable Law. Neither the Selling Entities nor the Acquired

Subsidiaries are in breach or default, and neither the Selling Entities nor the Acquired Subsidiaries have taken any action or failed to take any action which, with notice, the lapse of time or the happening of any other event or condition, would constitute such a breach or default, or permit termination or modification of, any of such insurance policies. To the Knowledge of Seller, there are no pending notices of cancellation or non-renewal of any insurance policy referred to in this Section 5.13 nor has the termination of any such insurance policy been threatened.

Section 5.14    Assets; Real Property.

(a)    The Selling Entities or the Acquired Subsidiaries, as applicable, have good and valid title to, or, in the case of leased assets have good and valid leasehold interests in, all tangible personal property included in the Purchased Assets, free and clear, as of the Closing, of all Encumbrances (other than Permitted Encumbrances and except to the extent that such Encumbrances will not be enforceable against such tangible personal property following the Closing in accordance with the Sale Order). Except for the assets that the Buyer elects not to acquire pursuant to Section 2.2 and 2.6, the Purchased Assets constitute all of the assets, tangible and intangible, necessary for operation of the Business in the manner presently operated by the Selling Entities and in the manner proposed to be operated immediately following the Closing. Each tangible Purchased Asset has been maintained in accordance with normal industry practice, is in good operating condition and repair (subject to normal wear and tear), and is suitable for the purposes for which it presently is used.

(b)    Neither the Selling Entities nor the Acquired Subsidiaries owns any real property. Each Selling Entity or Acquired Subsidiary, as applicable, has valid leasehold interests in the Real Property Leases and the real property leased by the Acquired Subsidiaries (such leasehold interests, the "Seller Properties"), in each case sufficient to conduct the Business as currently conducted and free and clear, as of the Closing, of all Encumbrances (other than Permitted Encumbrances and except to the extent that such Encumbrances will not be enforceable against the Real Property Leases following the Closing in accordance with the Sale Order), assuming the timely discharge of all obligations owing under or related to the Seller Properties.

Section 5.15    Environmental Matters. (i) Each Selling Entity and Acquired Subsidiary is in compliance with all Laws relating to the protection of the environment, natural resources or to health and safety ("Environmental Laws"), (ii) each Selling Entity and Acquired Subsidiary has obtained and maintained all Permits issued pursuant to Environmental Laws that are required to conduct the Business as it is currently conducted, (iii) there has been no release of any waste, material or substance defined, characterized or otherwise classified as a "hazardous", "pollutant", "contaminant", "toxic" or words of similar meaning or effect, including petroleum and its by-products, asbestos or polychlorinated biphenyls under any applicable Environmental Law into the environment as a result of the operations or activities of any Selling Entity or Acquired Subsidiary, or any other Person, at any of the Seller Properties that would reasonably be expected to result in any liability under any Environmental Law, and (iv) none of the Selling Entities or Acquired Subsidiaries has received any written claim or notice of violation from any Governmental Authority, and to the Knowledge of Seller, no such claim or notice is pending or

threatened, alleging that a Selling Entity or an Acquired Subsidiary is in violation of, or liable under, any Environmental Law that has not been remedied as of the date hereof.

Section 5.16    Permits.  The Selling Entities and the Acquired Subsidiaries have obtained and possess all material Permits required by Law to be held by such Selling Entity or Acquired Subsidiary, as applicable, for the lawful conduct and operation of the Business as presently conducted and operated, or necessary for the lawful ownership of their properties and assets, a true and complete list of which is set forth in Section 5.16 of the Seller Disclosure Schedule. Each such Permit of the Selling Entities and the Acquired Subsidiaries is valid and in full force and effect, and the Selling Entities and the Acquired Subsidiaries are in material compliance with all such Permits.

Section 5.17    Inventory.  The inventories of the Selling Entities and the Acquired Subsidiaries are in good and marketable condition, and are saleable in the Ordinary Course of Business, other than for normal discounts in the Ordinary Course of Business. The consolidated inventory of the Seller set forth in the Seller Financial Statements was stated therein in accordance with GAAP applied on a consistent basis throughout the periods indicated and presents fairly, in all material respects, the consolidated inventory of the Seller as of the respective dates thereof (subject, in the case of unaudited financial statements, to normal period end adjustments). Reserves for markdowns, shortage, salvage, lower of cost or market, obsolete, excess, damaged or otherwise unsaleable and unusable inventory have been reflected in the Seller Financial Statements in accordance with GAAP applied on a consistent basis throughout the periods.

Section 5.18    Accounts and Notes Receivable and Payable.  All Accounts Receivable of the Selling Entities and the Acquired Subsidiaries reflected in the Seller Financial Statements have arisen in the Ordinary Course of Business. The consolidated Accounts Receivable of the Seller, net of any allowances for doubtful accounts, set forth in the Seller Financial Statements were stated therein in accordance with GAAP applied on a consistent basis throughout the periods indicated and presents fairly, in all material respects, the consolidated accounts receivable of the Seller as of the respective dates thereof. All accounts payable of the Selling Entities and the Acquired Subsidiaries reflected in the Seller Financial Statements have arisen in the Ordinary Course of Business.

Section 5.19    Products.  None of the Selling Entities or the Acquired Subsidiaries has, whether voluntarily or as a result of any action by any Governmental Authority or trade or consumer group, generally recalled or withdrawn (or been requested to recall or withdraw) a product, including any product sold by a licensee of any Selling Entity or any Acquired Subsidiary which incorporates any Seller IP (other than products where the applicable licensee has acknowledged that it has an obligation to indemnify any applicable Selling Entities), for any reason, including any manufacturing or labeling defect or any other product safety issue, or issued any press release or public statements advising its customers or consumers of its products to treat such products in any manner other than in the ordinary course. No product of any Selling Entity or Acquired Subsidiary fails to materially comply with any applicable warranty or other contractual commitment relating to the use, functionality, or performance of such product.

41

Section 5.20    Foreign Corrupt Practices Act.  Neither any Selling Entity or any Acquired Subsidiary, nor, to the Knowledge of Seller, any Representative, consultant or agent thereof acting on any Selling Entity's or Acquired Subsidiary's behalf, has made, directly or indirectly, any payment or promise to pay, or gift or promise to give or authorized such a promise or gift, of any money or anything of value, directly or indirectly, to (a) any foreign official (as such term is defined in the Foreign Corrupt Practices Act of 1977, as amended (the "FCPA")) for the purpose of influencing any official act or decision of such official or inducing him or her to use his or her influence to affect any act or decision of a foreign government, or any agency or subdivision thereof, or (b) any foreign political party or official thereof or candidate for foreign political office for the purpose of influencing any official act or decision of such party, official or candidate or inducing such party, official or candidate to use his, her or its influence to affect any act or decision of a foreign government or agency or subdivision thereof, in the case of both (a) and (b) above in order to assist any Selling Entity or Acquired Subsidiary to obtain or retain business for or direct business to any Selling Entity or Acquired Subsidiary and under circumstances which could subject any Selling Entity or Acquired Subsidiary to liability under the FCPA or any corresponding foreign Laws or any anti-corruption Laws in any country in which any Selling Entity or any Acquired Subsidiary operates or conducts business.

Section 5.21    Banks.    Section 5.22 of the Seller Disclosure Schedule contains a complete and correct list of the names and locations of all banks in which any Selling Entity or Acquired Subsidiary has accounts or safe deposit boxes and the names of all persons authorized to draw thereon or to have access thereto.  Except as set forth in Section 5.21 of the Seller Disclosure Schedule, no Person holds a power of attorney to act on behalf of any Selling Entity or Acquired Subsidiary with respect to any such accounts or safe deposit boxes.

Section 5.22    Brokers.  Except as set forth in Section 5.22 of the Seller Disclosure Schedule, no Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by any Selling Entity or Acquired Subsidiary in connection with the transactions contemplated by this Agreement.  Such fees shall be paid in full by the Seller.

Section 5.23    No Other Agreements to Sell the Purchased Assets.  No Selling Entity has any legal obligation, absolute or contingent, to any other Person to sell the Purchased Assets (other than a sale or disposition of Inventory in the Ordinary Course of Business), the Assumed Liabilities or any portion thereof or to sell any portion of the Business or to effect any merger, consolidation or other reorganization relating to the Purchased Assets or the Business or to enter into any agreement with respect thereto, except pursuant to this Agreement.

Section 5.24    No Other Representations and Warranties.  Except for the representations and warranties contained in this Agreement or any other Transaction Document (including the related portions of the Seller Disclosure Schedule), no Selling Entity, Acquired Subsidiary, or any other Person has made or makes, and Seller expressly disclaims, any other express or implied representation or warranty and it is understood and agreed that, except as expressly stated in this Agreement or any other Transaction Document, the Selling Entities are selling to the Buyer, and the Buyer shall accept from the Selling Entities, the Purchased Assets and Assumed Liabilities in their "AS IS, WHERE IS" condition.

## ARTICLE VI.
## REPRESENTATIONS AND WARRANTIES OF BUYER

The Buyer hereby represents and warrants to the Selling Entities as of the date hereof and as of the Closing Date as follows:

Section 6.1    Organization and Good Standing.    The Buyer is a corporation duly organized, validly existing and in good standing under the Laws of Delaware.    Any Buyer Designee that executes and delivers any Transaction Document will be a corporation or other entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization as of the Closing Date.

Section 6.2    Authority Relative to this Agreement.

(a)    The Buyer has all necessary power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is party and to consummate the transactions contemplated hereby and thereby.    The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which the Buyer is party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all corporate action on behalf of the Buyer, and no other corporate proceedings on the part of the Buyer are necessary to authorize the execution, delivery and performance by Buyer of this Agreement or the other Transaction Documents to which it is party or to consummate the transactions contemplated hereby or thereby.    This Agreement has been duly and validly executed and delivered by the Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the other Transaction Documents to which the Buyer is a party will have been duly and validly executed and delivered by the Buyer, and, assuming that this Agreement and such other Transaction Documents constitute valid and binding agreements of the Selling Entities party thereto, constitute valid and binding agreements of the Buyer, enforceable against the Buyer in accordance with their terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Laws of general application affecting enforcement of creditors' rights and (ii) general principles of equity.

(b)    Each Buyer Designee that executes and delivers a Transaction Document shall have, as of the Closing Date, all necessary corporate or other power and authority to execute, deliver and perform the Transaction Documents to which it is party and to consummate the transactions contemplated thereby.    The execution, delivery and performance by each Buyer Designee of each Transaction Documents to which such Buyer Designee is party and the consummation of the transactions contemplated thereby shall have been duly and validly authorized by all corporate or other requisite action on behalf of each Buyer Designee that executes and delivers a Transaction Document prior to such execution and delivery, and no other corporate or other organizational proceedings on the part of such Buyer Designee shall be necessary at the time of such execution and delivery to authorize the execution, delivery and performance by such Buyer Designee of the Transaction Documents to which it is party or to consummate the transactions contemplated thereby.    The Transaction Documents to which a Buyer Designee is party shall have been duly and validly executed and delivered prior to the Closing by each Buyer Designee that executes and delivers a Transaction Document, and,

43

assuming that the Transaction Documents constitute valid and binding agreements of the Selling Entities party thereto, shall constitute valid and binding agreements of such Buyer Designee, enforceable against such Buyer Designee in accordance with their terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Laws of general application affecting enforcement of creditors' rights and (ii) general principles of equity.

Section 6.3    No Violation; Consents.

(a)    Neither the execution and delivery of this Agreement by the Buyer, nor the purchase by the Buyer and/or any applicable Buyer Designees of the Purchased Assets and the assumption by the Buyer and/or such Buyer Designees of the Assumed Liabilities pursuant to this Agreement or the other Transaction Documents will (with or without notice or lapse of time) violate, conflict with or result in any breach of, (i) any provision of the Buyer's or any such Buyer Designee's certificate of incorporation or bylaws (or similar organizational documents) or (ii) subject to the matters referred to in Section 6.3(b), any Law applicable to Buyer or any such Buyer Designee or their respective properties or assets.

(b)    No Consent of any Governmental Authority or any third party is required to be obtained by or with respect to Buyer and/or any applicable Buyer Designee in connection with the execution, delivery and performance of this Agreement or any other Transaction Document to which Buyer or any Buyer Designee is a party, or the consummation by Buyer or such Buyer Designee of the transactions contemplated hereby and thereby, except for (i) compliance with any applicable requirements of Antitrust Laws, (ii) compliance with any applicable requirements of applicable securities Laws, (iii) the entry of the Sale Order by the Bankruptcy Court, and (iv) such other Consents where the failure to obtain such Consents would not prevent or delay the consummation of the transactions contemplated by this Agreement.

Section 6.4    Legal Proceedings and Orders.    There is no material Legal Proceeding pending before any Governmental Authority, and no Person has threatened in writing to commence any such material Legal Proceeding that would reasonably be expected to have the effect of preventing or making illegal any of the transactions contemplated by this Agreement, except for the Bankruptcy Case.    As of the date of this Agreement, there is no material outstanding Order to which the Buyer is subject that would reasonably be expected to have the effect of preventing or making illegal any of the transactions contemplated by this Agreement.

Section 6.5    Brokers.    No Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by the Buyer, any Buyer Designee or any of their respective Affiliates in connection with the transactions contemplated by this Agreement.

Section 6.6    No Other Representations and Warranties.    Except for the representations and warranties contained in this Agreement or any other Transaction Document, none of Buyer, Buyer Designee, nor any other Person has made or makes, and Buyer expressly disclaims, any other express or implied representation or warranty.

**ARTICLE VII.**
**COVENANTS OF THE PARTIES**

Section 7.1    Conduct of Business of the Selling Entities.    Except (i) as set forth on Schedule 7.1, (ii) as required by the terms of this Agreement, or (iii) as otherwise consented to in writing by the Buyer in its sole discretion (which consent shall not be unreasonably withheld or delayed), during the period commencing on the date of this Agreement and continuing through the Closing or the earlier termination of this Agreement in accordance with its terms:

(a)    each of the Selling Entities shall, and shall cause the Acquired Subsidiaries to: (i) operate the Business in the Ordinary Course of Business, including making capital, supply and sales and marketing expenditures, each in the Ordinary Course of Business and in accordance with a cash collateral budget provided by Seller to Buyer and acceptable to the Buyer in its reasonable discretion, (ii) use commercially reasonable efforts to preserve in all material respects the Purchased Assets (excluding sales of Inventory in the Ordinary Course of Business), and (iii) use commercially reasonable efforts to preserve its current relationships with the suppliers, vendors, customers, clients, contractors and others having business dealings with the Business; and

(b)    without limiting the generality of Section 7.1(a), and in addition thereto, the Selling Entities shall not, and shall cause the Acquired Subsidiaries not to:

(i)    take, or agree to or commit to take, any action which would (A) reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) be reasonably likely to result in any of the conditions to the Closing set forth in ARTICLE VIII not being satisfied, or (C) materially impair the ability of any Selling Entity or Buyer to consummate the Closing in accordance with the terms hereof or materially delay such consummation;

(ii)    sell, lease (as lessor), transfer or otherwise dispose of, or permit to become subject to any additional Encumbrance (other than (A) Permitted Encumbrances, (B) Encumbrances arising under any Bankruptcy Court orders relating to the use of cash collateral (as defined in the Bankruptcy Code), (C) Encumbrances arising in connection with the Buyer DIP Facility that will be released at or prior to Closing, and (D) Encumbrances that will not be enforceable against or attach to any Purchased Asset following the Closing in accordance with the Sale Order) any Purchased Assets, other than (x) the sale of Inventory or the disposition of obsolete equipment, in each case in the Ordinary Course of Business, (y) the collection of receivables in the Ordinary Course of Business, and (z) the use of prepaid assets and Documentary Materials in the conduct of the Business in the Ordinary Course of Business;

(iii)    make any payments in respect of Indebtedness other than payments due pursuant to the terms thereof;

(iv)    conduct any liquidation or similar sales;

(v)    hire or terminate any employee, consultant or director, establish or increase, or commit to establish or increase, the compensation payable or benefits

45

provided to any director or consultant of any Selling Entity or any of their Affiliates or to any Current Employee, pay or grant, as applicable, any equity or equity-linked award, cash bonus, performance or other incentive compensation, or make any profit sharing, severance, termination or similar payment to any consultant or director of any Selling Entity or any of their Affiliates or any Current Employee, accelerate the vesting or payment of any compensation or benefits under any Seller Benefit Plan, or establish, adopt, enter into, modify, amend or terminate any Seller Benefit Plan, other than (A) as required by the terms of any Contract or Seller Benefit Plan in effect on the date of this Agreement, (B) as provided in any incentive or retention program or similar arrangement approved by Final Order, (C) any termination of, or reduction in benefits payable under, a Seller Benefit Plan prior to the Closing, or (D) in the case of the termination of any employee or consultant for cause in accordance with the normal practices of the applicable Selling Entity;

(vi)    incur or assume any Indebtedness other than in the Ordinary Course of Business, or that will be repaid or released on or prior to the Closing;

(vii)    make, change or revoke any Tax election; settle or compromise any claim, notice, audit report or assessment in respect of Taxes; change any annual Tax accounting period; adopt or change any method of Tax accounting; file any amended Tax Return; enter into any Tax allocation agreement, Tax sharing agreement, Tax indemnity agreement or closing agreement relating to any Tax; surrender any right to claim a Tax refund; or consent to any extension or waiver of the statute of limitations period applicable to any Tax claim or assessment;

(viii)    acquire any assets or properties outside the Ordinary Course of Business, or make any other investment;

(ix)    enter into or agree to enter into any merger or consolidation with any corporation or other entity;

(x)    except in the Ordinary Course of Business, cancel or compromise any debt or claim or waive or release any right, in each case, that is a debt, claim or right of the Acquired Subsidiaries or that is or relates to a Purchased Asset or Assumed Liability;

(xi)    introduce any material change with respect to the operation of the Business, including any change in the types, nature, composition or quality of products or services sold in the Business, other than, in each case, in the Ordinary Course of Business;

(xii)    enter into any new Material Contract;

(xiii)    abandon or knowingly permit to lapse any Registered IP;

(xiv)    enter into any Contract under which any Selling Entity or Acquired Subsidiary grants or agrees to grant to any third Person any assignment, license, release,

immunity or other right with respect to any Seller IP (other than non-exclusive licenses of Seller IP granted to customers in the Ordinary Course of Business);

(xv)     terminate, amend, restate, supplement, extend, renew or waive any rights under, or create any Encumbrance with respect to, or otherwise modify, any Assumed Agreement, any Assumed Real Property Lease or any Permit, or increase any payments required to be paid thereunder by the Buyer or any Buyer Designee after the Closing;

(xvi)     amend the certificate of incorporation or by-laws or other organizational documents of the Acquired Subsidiaries;

(xvii)     settle, or agree to settle, any claims, actions, or Legal Proceedings of the Acquired Subsidiaries or that is a Purchased Asset or Assumed Liability before any court or other Governmental Authority;

(xviii)     abandon any rights under, request the rejection under Section 365 of the Bankruptcy Code of, or amend, modify or supplement the terms of, any of the Assumed Agreements or Assumed Real Property Leases, or of any other Contracts that may become Assumed Agreements or Assumed Real Property Leases; or

(xix)     authorize any of the foregoing, or commit or agree to do any of the foregoing.

(c)     In furtherance of the foregoing, the Selling Entities agree to use commercially reasonable efforts to ensure that the Inventory (and the works-in-process relating to such Inventory) is manufactured and delivered such that management's current forecasted Inventory levels are achieved (including with respect to timing of deliveries of Inventory and works-in-process).  In furtherance of the foregoing, the Selling Entities shall use commercially reasonable efforts to order, procure and accept Inventory after the date hereof to achieve the projected Inventory levels.

(d)     Seller shall use its reasonable best efforts to deliver to Buyer, at or prior to the Closing, a confirmation of assignment of Intellectual Property Rights from each such holders thereof as Buyer may request.

Section 7.2     Access to and Delivery of Information; Maintenance of Records.

(a)     Between the date of this Agreement and the Closing Date, to the extent permitted by applicable Law, the Selling Entities shall and shall cause the Acquired Subsidiaries to, during ordinary business hours and upon reasonable prior notice (i) give the Buyer and the Buyer's Representatives reasonable access to the Selling Entities and Acquired Subsidiaries' Representatives in their respective principal places of business, all books, records and other documents and data in the locations in which they are normally maintained, and all offices and other facilities of the Selling Entities and the Acquired Subsidiaries, (ii) permit the Buyer and the Buyer's Representatives to make such reasonable inspections and copies of all books, records and other documents of the Selling Entities and the Acquired Subsidiaries to the extent relating to the Purchased Assets as the Buyer may reasonably request, and (iii) furnish the Buyer with

47

such reasonably available financial and operating data and other information in connection with the Purchased Assets as the Buyer and the Buyer's Representatives may from time to time reasonably request.

(b)     On and after the Closing Date, the Buyer and the Buyer's Representatives shall have reasonable access to the Selling Entities' and to the Acquired Subsidiaries' books and records, including all information pertaining to the Assumed Agreements and Assumed Real Property Leases, in the possession of the Selling Entities or the Acquired Subsidiaries to the extent that (i) such books, records and information relate to any period prior to the Closing Date and are not already in the possession of the Buyer or the Buyer's Representatives and (ii) such access is reasonably required by the Buyer in connection with the Assumed Liabilities, the operation of the Business following the Closing or the Purchased Assets. Such access shall be afforded by the Seller upon receipt of reasonable advance notice and during normal business hours. If any of the Selling Entities shall desire to dispose of any books and records constituting Excluded Assets, the Seller shall (x) give the Buyer at least ninety (90) days prior written notice of such disposition and (y) give the Buyer a reasonable opportunity, at the Buyer's expense, to segregate and remove such books and records as the Buyer may select and/or to copy at Buyer's sole cost and expense such books and records as the Buyer may select.

(c)     On and after the Closing Date, the Selling Entities and the Seller's Representatives shall have reasonable access to all of the books and records of the Selling Entities and the Acquired Subsidiaries delivered to the Buyer or any Buyer Designee at Closing or pursuant to Section 7.2(b) above, including all Documentary Materials and all other information pertaining to the Assumed Agreements and Assumed Real Property Leases to the extent that (i) such books, records and information relate to any period prior to the Closing Date and (ii) such access is reasonably required by the Selling Entities in connection with the Bankruptcy Case, the Excluded Liabilities, the Excluded Assets or similar matters relating to or affected by the operation of the Business for periods prior to the Closing or for the limited purposes of concluding involvement in the Business after the Closing Date. Such access shall be afforded by the Buyer upon receipt of reasonable advance notice and during normal business hours, and the Buyer shall permit the Selling Entities and the Seller's Representatives to make such reasonable copies of such books, records and information as they may reasonably request at the Seller's sole cost and expense. In addition, on and after the Closing Date, the Selling Entities and the Seller's Representatives may make reasonable inquiries of the Buyer and the Acquired Subsidiaries and their respective employees and accountants, upon reasonable notice and during normal business hours, regarding questions concerning the winding down and dissolution of the Selling Entities, and the Buyer shall, and shall cause the Acquired Subsidiaries to, use commercially reasonable efforts to cause any such employees and accountants to cooperate with and respond to such inquiries. At the request of the Selling Entities and the Seller's Representatives, the Buyer and the Acquired Subsidiaries shall permit any other knowledgeable persons who are employed by the Buyer or the Acquired Subsidiaries after the Closing Date to respond to such inquiries. Notwithstanding the foregoing, (x) such inquiries shall not interfere with any employee's, accountant's, or other Person's duties and responsibilities to the Buyer, Buyer Designee, or Acquired Subsidiary, as applicable, and (y) all out-of-pocket costs associated with such inquiries and responses shall be paid by Seller.

48

(d)     From and after the Closing and except as required by Law, the Selling Entities shall, and shall cause their Affiliates and Representatives to, (i) treat and hold as confidential any information to the extent concerning the Purchased Assets or the Assumed Liabilities that is not, as of the Closing, generally available to the public (the "Confidential Information") and (ii) refrain from using any of the Confidential Information for commercial purposes; *provided, however*, that "Confidential Information" shall not include (i) any information that becomes publicly available after the Closing Date through no fault of any Selling Entity or any of their respective Affiliates and Representatives, or (ii) any information that after the Closing Date is legitimately received by any Selling Entity or any of its Affiliates or Representatives from a third Person (*provided* that such third Person is not known by any Selling Entity or any of their Affiliates to be bound by an obligation of secrecy with respect to such information). Each Selling Entity agrees that in the event it (or any of its Affiliates or Representatives) is required by Law to use or disclose any Confidential Information, such Selling Entity shall inform the Buyer in advance of any such required disclosure, shall use commercially reasonable efforts to cooperate with the Buyer in obtaining a protective order or other protection in respect of such required disclosure, and shall limit such disclosure to the extent reasonably possible while still complying with such Law.

Section 7.3     Expenses.

(a)     The Seller shall, without the requirement of any notice or demand from Buyer or any application to or order of the Bankruptcy Court, pay the Buyer Expense Reimbursement in cash to the Buyer on the earlier to occur of (i) two Business Days after the date this Agreement is terminated by the Buyer pursuant to Section 9.1 other than pursuant to Section 9.1(a), or (ii) on the date this Agreement is terminated by the Seller pursuant to Section 9.1 other than pursuant to Section 9.1(a) or Section 9.1(c)(i) or Section 9.1(c)(ii).

(b)     Except to the extent otherwise specifically provided herein, whether or not the transactions contemplated hereby are consummated, all fees, costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Party incurring such fees, costs and expenses.

(c)     Pursuant to the Bidding Procedures Order, the Bankruptcy Court shall find and determine that the claim of the Buyer in respect of the Buyer Expense Reimbursement is and constitutes an allowed super-priority administrative expense claim against the Selling Entities on a joint and several basis under Sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case, senior to all other administrative expense claims of the Selling Entities (other than any claims arising under the Buyer DIP Facility).

Section 7.4     Further Assurances.

(a)     Subject to the terms and conditions of this Agreement, at all times prior to the earlier of the Closing and the termination of this Agreement in accordance with its terms, each of the Parties shall use its commercially reasonable efforts, to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement, including executing and delivering such documents and other papers as are

49

reasonably required to carry out the provisions of this Agreement and consummate the transaction contemplated hereby.

(b) On and after the Closing, the Selling Entities and the Buyer shall use their commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated hereby, including in order to more effectively vest in the Buyer all of the Selling Entities' right, title and interest to the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

(c) Nothing in <u>Section 7.4</u> shall, except as otherwise set forth in this Agreement, (i) prohibit any Selling Entity from ceasing operations or winding up its affairs following the Closing, or (ii) prohibit the Selling Entities from taking such actions as are necessary to conduct the Auction, as are required by the Bankruptcy Court, or as would otherwise be permitted under <u>Section 7.1</u>.

Section 7.5    <u>Public Statements</u>.  The text of the initial press release or press releases relating to this Agreement (which may be joint or separate) shall be agreed to by the Buyer, on the one hand, and the Seller, on the other hand.  Unless otherwise required by applicable Law or the rules or regulations of any applicable securities exchange, and except for disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and any filings or notices related thereto, the Buyer, on the one hand, and the Selling Entities, on the other hand, shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other Parties and shall not issue any such release or make any such statement without the prior written consent of the Seller or the Buyer, respectively (such consent not to be unreasonably withheld, conditioned or delayed).

Section 7.6    <u>Governmental Authority Approvals and Cooperation</u>.

(a) As promptly as reasonably practicable after the date of this Agreement each of the Selling Entities and the Buyer shall (and shall cause their respective Affiliates to) make any filings and notifications required to be made by them (which, in any event, shall be made within ten (20) days after the date of this Agreement), and shall use its commercially reasonable efforts to obtain any Consents from Governmental Authorities, required to be made and obtained under applicable Law in connection with the transactions contemplated by this Agreement as promptly as reasonably practicable after the date of this Agreement.

(b) Each of the Buyer and the Seller shall use commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended and any other applicable United States federal or state or foreign Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the

50

"Antitrust Laws"). Each of the Buyer and the Seller shall use commercially reasonable efforts to take such action as may be reasonably required to cause the expiration of any applicable notice periods under the Antitrust Laws with respect to such transactions as promptly as possible after the execution of this Agreement. Notwithstanding anything to the contrary provided herein, none of Buyer nor any of its Affiliates shall be required (i) to hold separate (including by trust or otherwise) or divest any of its businesses, product lines or assets, including any of the Purchased Assets, or to enter into any consent decree or settlement agreement with any Governmental Authority, (ii) to agree to any limitation on the operation or conduct of the Business, or (iii) to waive any of the applicable conditions to this Agreement set forth in ARTICLE VIII.

(c)     Each Party (i) shall cooperate with each other Party in connection with the filings and Consents contemplated by this Section 7.6, (ii) shall promptly inform each other Party of any material communication received by such Party from any Governmental Authority concerning this Agreement, the transactions contemplated hereby and any filing, notification or request for Consent related thereto, and (iii) shall permit each other Party to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto. In addition, none of the Selling Entities or the Buyer shall (and shall ensure that their respective Affiliates do not) agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement, the transactions contemplated hereby or any such filing, notification or request for Consent related thereto unless it consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority and applicable Law, gives the other Parties the opportunity to attend and participate thereat. The Selling Entities and the Buyer shall, and shall cause their respective Affiliates to, furnish the Buyer or the Selling Entities (and the Buyer's Representatives and the Seller's Representatives, as applicable), as the case may be, copies of all material correspondence, filings and communications between it and its Affiliates (and the Buyer's Representatives and the Seller's Representatives, as applicable) on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby or any such filing, notification or request for Consent related thereto. Each of the Selling Entities and the Buyer shall (and shall cause their respective Affiliates to) furnish each other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with its preparation of necessary filings, registrations or submissions of information to any Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for Consent related thereto.

Section 7.7     Employee Matters.

(a)     Prior to the Closing, the Buyer may offer, or cause a Buyer Designee to offer, to employ those Current Employees (other than any employees of the Acquired Subsidiaries who continue to be employed by the Acquired Subsidiaries following the Closing (the "Non-US Transferred Employees")), if any, who Buyer desires to hire with employment commencing as of, and contingent on, the Closing. Any such offer of employment shall be on terms and conditions determined by the Buyer in its sole discretion, and such offers of employment shall be subject to satisfaction of Buyer's standard employment qualifications, including verification of eligibility for employment. For purposes of this Agreement, each Current Employee who receives such an offer of employment shall be referred to as an

51

"Offeree." At least five (5) Business Days prior to the Closing Date, the Buyer will provide the Seller with a schedule setting forth a list of the names of all Offerees. The Selling Entities shall cooperate with and use its best efforts to assist Buyer in its efforts to secure satisfactory employment arrangements with all Offerees. The Selling Entities shall terminate the employment of all Offerees who accept an offer of employment prior to the Closing and commence employment with the Buyer or a Buyer Designee, as well as their active participation in or under any Seller Benefit Plans, effective immediately prior to the Closing. With regard to Non-US Transferred Employees, such employees shall remain employees of the Acquired Subsidiaries. Each Offeree who accepts such offer prior to the Closing and commences employment with the Buyer or a Buyer Designee, collectively with Non-US Transferred Employees, shall be referred to herein as a "Transferred Employee". Seller shall pay all accrued vacation and other amounts due in connection with the Selling Entities' termination of any Current Employee. Notwithstanding the foregoing, prior to the Closing, the Buyer shall, or cause a Buyer Designee to, offer to employ a sufficient number of Current Employees of the Selling Entities, with employment commencing as of, and contingent on, the Closing (which offers of employment shall be on terms and conditions that are substantially similar, in the aggregate, to the terms and conditions of employment with the applicable Selling Entity immediately prior to the Closing Date, excluding any equity-based compensation and severance benefits) such that the number of full time Current Employees of the Selling Entities at any single site *not* receiving offers is less than the greater of (i) fifty (50) or (ii) 1/3 of all full time Current Employees at such site.

(b) Each Current Employee who is not a Transferred Employee shall be referred to herein as an "Excluded Employee."

(c) Following the date of this Agreement:

(i) the Selling Entities shall allow the Buyer or any applicable Buyer Designee reasonable access to meet with and interview the Current Employees who are members of executive management and other employees reasonably requested during normal business hours; *provided, however,* that such access shall not unduly interfere with the operation of the Business prior to the Closing;

(ii) the Selling Entities shall not, nor shall any Selling Entity authorize or direct or give express permission to any Affiliate, officer, director, or employee of any Selling Entity or any Affiliate to (A) interfere with Buyer's or any Buyer Designee's rights under Section 7.7(a) to make offers of employment to any Offeree, or (B) solicit or encourage any Offeree not to accept, or to reject, any such offer of employment;

(iii) the Selling Entities shall provide reasonable cooperation and information to Buyer or the relevant Buyer Designee as reasonably requested by Buyer or such Buyer Designee with respect to its determination of appropriate terms and conditions of employment for any Offeree; and

(iv) the Selling Entities shall cooperate with and use their best efforts to assist Buyer in its efforts to secure satisfactory employment arrangements with the Offerees.

52

(d)    401(k) Plan. To the extent that any Transferred Employees participate in one or more Seller Benefit Plans that are intended to qualify under Section 401(k) of the IRC, Seller and its Subsidiaries shall cause the unvested account balances (if any) of each such Transferred Employee under each such plan to vest in full upon or prior to the Closing to the extent required under applicable Law.

(e)    The Selling Entities shall be solely responsible for complying with the WARN Act and any and all obligations under other applicable Laws requiring notice of plant closings, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to Current Employees as a result of any action by the Selling Entities on or prior to the Closing, or following the Closing with respect to any Current Employee who does not become a Transferred Employee for any reason.

(f)    From and after the date of this Agreement, prior to making any written or formal oral communications to employees, officers or consultants of the Selling Entities and their Affiliates pertaining to compensation or benefit matters that are affected by the transactions contemplated by this Agreement, the Seller shall provide the Buyer with a copy of the intended communication prior to any distribution thereof, the Buyer shall have a reasonable period of time to review and comment on the communication, and the Buyer and the Selling Entities shall have mutually agreed on such communication and shall cooperate in distributing any such mutually agreeable communication to such employees, officers or consultants.

(g)    The Selling Entities shall be solely responsible for satisfying any and all obligations and Liabilities under the continuation health coverage requirements of COBRA, which arise with respect to employees (and their beneficiaries) of the Selling Entities with respect to any "qualifying event" which occurs on or prior to the Closing Date.

(h)    The Selling Entities and their Affiliates shall be solely responsible for all Seller Benefit Plans and all obligations and Liabilities thereunder, and Buyer shall not assume any of the Seller Benefit Plans or any obligation or Liability thereunder. Without limiting the generality of the foregoing, the Selling Entities shall be solely responsible for all severance and similar obligations under any Seller Benefit Plan that become payable as a result of the termination of employment of any Current Employee in connection with the transactions contemplated by this Agreement.

(i)    The provisions of this Section 7.7 are solely for the benefit of the respective parties to this Agreement and nothing in this Section 7.7, express or implied, shall confer upon any employee, consultant, manager or other service provider (or any dependent, successor, legal representative or beneficiary thereof), any rights or remedies, including any right to continuance of employment or any other service relationship with Buyer or any of its Affiliates, or any right to compensation or benefits of any nature or kind whatsoever under this Agreement. Nothing in this Section 7.7, express or implied, shall be: (i) an amendment or deemed amendment of any plan providing benefits to any employee, (ii) construed to interfere with the right of Buyer or its Affiliates to terminate the employment or other service relationship of any Transferred Employee at any time, with or without cause, or restrict any such entity in the exercise of their independent business judgment in modifying any of the terms and conditions of the employment or other service arrangement of any Transferred Employee, or (iii) deemed to

53

obligate Buyer or its Affiliates to adopt, enter into or maintain any employee benefit plan or other compensatory plan, program or arrangement at any time.

Section 7.8    Tax Matters.

(a)    Any sales, use, value added, property transfer (excluding, for the avoidance of doubt, any Taxes based on or measured by reference to income or gain), documentary, stamp, registration, recording or similar Tax payable in connection with the sale or transfer of the Purchased Assets and the assumption of the Assumed Liabilities and not exempted under the Sale Order ("Transfer Taxes") shall be borne by the Buyer. The Selling Entities and Buyer shall use their commercially reasonable efforts and cooperate in good faith to (i) exempt the sale and transfer of the Purchased Assets from any such Transfer Taxes and (ii) relieve Buyer and its Affiliates of any Liability for Transfer Taxes, Taxes of the Selling Entities and Taxes of the Acquired Subsidiaries for any Pre-Closing Tax Period, including by following any procedures with a Governmental Authority that may be legally available in non-U.S. jurisdictions to protect the Buyer from successor or transferee Liability for Taxes. Buyer shall prepare and file (or cause to be prepared and filed) all necessary Tax Returns with respect to all Transfer Taxes. The Selling Entities shall cooperate with the Buyer in the preparation and filing of such Tax Returns, including by executing such documents as may be required to permit Buyer to file such Tax Returns on behalf of the parties or the Selling Entities.

(b)    The Selling Entities shall be responsible for and shall promptly pay when due all Property Taxes levied with respect to the Purchased Assets attributable to the Pre-Closing Tax Period. All Property Taxes levied with respect to the Purchased Assets for the Straddle Period shall be apportioned between Buyer and the Selling Entities based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period. The Selling Entities shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and the Buyer shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period.

(c)    The Seller shall prepare and timely file (or cause to be prepared and timely filed) all Tax Returns in respect of the Acquired Subsidiaries or the Purchased Assets that are required to be filed on or before the Closing Date (without taking into account any extensions of time to file such Tax Returns), and the Seller shall pay, or cause to be paid, all Taxes of the Acquired Subsidiaries due on or before the Closing Date. Such Tax Returns shall be prepared by treating items on such Tax Returns in a manner consistent with the past practices of the Acquired Subsidiaries or the Selling Entities, as applicable, with respect to such items, except as required by applicable law. At least ten (10) Business Days prior to the due date for the filing of any such Tax Return, the Seller shall deliver a copy of such Tax Return to the Buyer for the Buyer's review and consent, not to be unreasonably withheld.

(d)    The Buyer shall prepare and timely file (or cause to be prepared and timely filed) all Tax Returns in respect of the Acquired Subsidiaries or the Purchased Assets that relate to (i) a Pre-Closing Tax Period (other than the Tax Returns described in Section 7.8(c)) or (ii) a Straddle Period. The Seller shall reimburse, or cause to be reimbursed, to the Buyer, according to the procedures set forth in Section 7.8(e), all Taxes of the Acquired Subsidiaries

54

due on such Tax Returns and allocable to a Pre-Closing Tax Period (except to the extent such Taxes were specifically reserved (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) on the latest balance sheet in the Seller Financial Statements). With respect to Taxes of any Acquired Subsidiary relating to a Straddle Period, the amount of such Taxes allocable to the Pre-Closing Tax Period shall be (i) in the case of Property Taxes, deemed to be the amount of such Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of calendar days in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the number of calendar days in the entire Straddle Period, and (ii) in the case of all other Taxes, determined as though the taxable year of the Acquired Subsidiary terminated at the close of business on the Closing Date.

(e)     Upon receipt of any bill for Taxes due hereunder, the Buyer or the Seller, as applicable, shall present a statement to the other setting forth the amount of reimbursement to which each is entitled under this <u>Section 7.8</u> together with such supporting evidence as is reasonably necessary to calculate the proration amount. The proration amount shall be paid by the party owing it to the other within ten (10) Business Days after delivery of such statement. In the event that the Buyer or the Seller makes any payment for which it is entitled to reimbursement under this <u>Section 7.8</u>, the applicable party shall make such reimbursement promptly but in no event later than ten (10) Business Days after the presentation of a statement setting forth the amount of reimbursement to which the presenting party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement. Any Claims of the Buyer against the Selling Entities pursuant to this <u>Section 7.8</u> shall constitute allowed super-priority administrative expense claim against the Selling Entities on a joint and several basis under Sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case, senior to all other administrative expense claims of the Selling Entities (other than any claims arising under the Buyer DIP Facility); *provided* that, without altering any of the Selling Entities' obligations under this <u>Section 7.8</u>, Buyer may elect to offset from the Purchase Price Buyer's reasonable good faith estimate of any Taxes for which any Selling Entity would otherwise be responsible hereunder, in which case such amounts, to the extent offset, shall be paid by Buyer, and Buyer shall refund to the Selling Entities any amount so offset by Buyer in excess of the amounts for which the Selling Entities are responsible under this <u>Section 7.8</u> as soon as reasonably practicable after the relevant Tax Returns are filed. Any disputes with respect to the amount of such offset shall be resolved by the Bankruptcy Court.

(f)     The Buyer and the Seller agree to furnish or cause to be furnished to the other, upon request such information and assistance as is reasonably necessary for the filing of Tax Returns contemplated in this <u>Section 7.8</u>, the making of any election relating to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claim, suit or Legal Proceeding relating to any Tax. Such information and assistance shall include providing reasonable access to all of the books and records of the Selling Entities and the Acquired Subsidiaries delivered to the Buyer at Closing.

(g)     Notwithstanding any other provision in this Agreement, the Buyer or any of its Affiliates shall have the right, but not the obligation, to make an election or fail to make an election under Section 338 of the IRC with respect to any Acquired Subsidiary, in the sole and

55

absolute discretion of the Buyer. The Buyer and its Affiliates shall have no liability to the Seller Entities or their Affiliates with respect to the making of or failure to make such election.

Section 7.9    Submission for Bankruptcy Court Approval.

(a)    The Bidding Procedures and Sale Motion shall have been filed on the Petition Date and shall be in form and substance acceptable to the Buyer in its sole discretion, seeking the entry of the Bidding Procedures Order and of the Sale Order. All of the Parties shall use their respective commercially reasonable efforts to have (i) the Bankruptcy Court enter the Bidding Procedures Order by no later than December 31, 2015, (ii) the Auction (if required by the Bidding Procedures Order) shall commence on or before January 25, 2016, (iii) the Bankruptcy Court enter the Sale Order by no later than January 29, 2015, and (iv) the Closing Date occur by no later than February 15, 2016, *provided* that such date shall be extended to and including February 29, 2016 to the extent reasonably necessary to obtain the Consents from Governmental Authorities pursuant to Section 7.6 or to effectuate any transactions or modifications permitted under Section 10.1. The Selling Entities shall give notice under the Bankruptcy Code of the request for the relief specified in the Bidding Procedures and Sale Motion to all Persons entitled to such notice, including all Persons that have asserted Encumbrances in the Purchased Assets, and all non-debtor parties to the Assumed Agreements and the Assumed Real Property Leases, and other appropriate notice as required by the Federal Rules of Bankruptcy Procedures and the local rules of the Bankruptcy Court, including such additional notice as the Bankruptcy Court shall direct or as the Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other Legal Proceedings in the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby. The Selling Entities shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be in form and substance acceptable to the Buyer in its sole discretion and submitted, to the extent practicable, to the Buyer prior to their filing with the Bankruptcy Court for the Buyer's prior review and comment.

(b)    List(s) of the Non-Real Property Contracts and Real Property Leases that may be Assumed Agreements and Assumed Real Property Leases shall be filed by Seller with the Bankruptcy Court so as to provide adequate notice to the non-debtor parties to such Contracts of the potential assumption and assignment of such Contracts to the Buyer (or other successful bidder). Upon designation by the Buyer of Non-Real Property Contracts or Real Property Leases in accordance with Section 2.6, the Seller shall promptly take such steps as are reasonably necessary to effectuate the assumption and assignment of such Contracts to the Buyer at or as soon as reasonably practicable after the Closing and to establish the Cure Payments required in connection therewith. A final list of all Assumed Agreements and Assumed Real Property Leases shall be filed by the Seller following the Closing.

(c)    Each Selling Entity and the Buyer shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, as applicable, the Bidding Procedures Order or the Sale Order. Each Selling Entity shall promptly provide the Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that such Selling Entity has in its possession (or receives) pertaining to the Bidding Procedures and Sale Motion,

the Bidding Procedures Order, the Sale Order, or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to the Buyer and its counsel.

(d)     If the Bidding Procedures Order, the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, the Sale Order, or other such order), subject to rights otherwise arising from this Agreement, the Selling Entities and the Buyer shall use their commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(e)     The Seller will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, petitions, schedules and supporting papers prepared by any Selling Entity (including forms of orders and notices to interested parties) in connection with transactions contemplated by this Agreement prior to their filing with the Bankruptcy Court.

Section 7.10     Overbid Procedures; Adequate Assurance.

(a)     The Selling Entities and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to higher and better bids and Bankruptcy Court approval. The Buyer and the Selling Entities acknowledge that the Selling Entities must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice thereof to the creditors of the Selling Entities and other interested parties, providing information about the Selling Entities' business to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an auction (the "Auction").

(b)     The bidding procedures to be employed with respect to this Agreement and any Auction shall be those reflected in the Bidding Procedures Order. Buyer acknowledges that the Selling Entities and their Affiliates and the Seller's Representatives are and may continue soliciting inquiries, proposals or offers for the Purchased Assets in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order.

(c)     The Selling Entities and the Buyer agree, and the motion to approve the Bidding Procedures Order shall reflect the fact that, the provisions of this Agreement, including Section 7.3, this Section 7.10 and Section 7.11, are reasonable, were a material inducement to the Buyer, and reasonably relied upon by the Buyer in deciding, to enter into this Agreement, and are designed to achieve the highest or otherwise best price for the Purchased Assets.

Section 7.11     Termination Fee and Pre-Filing Loans Reimbursement.

(a)     If (x) this Agreement is terminated for any reason pursuant to Sections 9.1(d)(i) through (d)(iv) and (y) any Selling Entity consummates an Alternative Transaction at any time, then such Selling Entity shall, without the requirement of any notice or

demand from Buyer or any application to or order of the Bankruptcy Court, immediately pay to the Buyer the Termination Fee and Pre-Filing Loans Reimbursement in cash on the day such Alternative Transaction is consummated.

(b)     The Termination Fee and Pre-Filing Loans Reimbursement shall be made by wire transfer of immediately available funds to an account designated by the Buyer.

(c)     Pursuant to the Bidding Procedures Order, the Bankruptcy Court shall find and determine that the claim of the Buyer in respect of the Termination Fee and Pre-Filing Loans Reimbursement is and constitutes an allowed super-priority administrative expense claim against the Selling Entities on a joint and several basis under Sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case, senior to all other administrative expense claims of the Selling Entities (other than any claims arising under the Buyer DIP Facility).

(d)     Each of the Parties hereto acknowledges and agrees that the agreements contained in <u>Section 7.3</u> and this <u>Section 7.11</u> are an integral part of the transactions contemplated by this Agreement and that the Termination Fee and Pre-Filing Loans Reimbursement are not a penalty, but rather is liquidated damages in a reasonable amount that will reasonably compensate the Buyer in the circumstances in which such Termination Fee is payable for the efforts and resources expended and opportunities foregone by the Buyer while negotiating and pursuing the transactions contemplated by this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

Section 7.12     <u>Transfer of Purchased Assets</u>.     The Buyer will make all necessary arrangements for the Buyer or a Buyer Designee to take possession of the Purchased Assets, and, at the Buyer's expense, to transfer same to a location operated by the Buyer or a Buyer Designee, to the extent necessary, as promptly as practicable following the Closing.

Section 7.13     <u>Post-Closing Operation of the Seller; Name Changes</u>.     The Seller hereby acknowledges and agrees that upon the consummation of the transactions contemplated hereby, the Buyer and/or each Buyer Designee shall have the sole right to the use of the name "Fuhu" or "nabi" or similar names or any service marks, trademarks, trade names, identifying symbols, logos, emblems or signs containing or comprising the foregoing, including any name or mark confusingly similar thereto. After the Closing Date, none of the Selling Entities nor any of their respective Affiliates shall use the name or mark "Fuhu" or "nabi" or any derivatives thereof for commercial purposes and shall only use the same for administrative purposes while subject to the jurisdiction of the Bankruptcy Court. The Sale Order shall provide for the modification of the caption in the proceedings before the Bankruptcy Court to reflect the change in the name of Seller, except that during the pendency of such proceedings, Seller shall be permitted to use the name "Fuhu" in connection with matters relating to the Bankruptcy Case as a former name for legal and noticing purposes, but for no other commercial purpose. After the Closing, the Selling Entities and their Affiliates shall promptly file with the applicable Governmental Authorities all documents reasonably necessary to delete from their names the words "Fuhu" or "nabi" or any derivatives thereof and shall do or cause to be done all other acts, including the payment of any

58

fees required in connection therewith, to cause such documents to become effective as promptly as reasonably practicable.

Section 7.14   Non-Competition; Non-Solicitation.

(a)   For a period from the Closing until the fifth (5th) anniversary of the Closing Date, each Selling Entity shall not directly or indirectly, own, manage, operate, control or participate in the ownership, management, operation or control of any business, whether in corporate, proprietorship or partnership form or otherwise, engaged in the Business or that otherwise competes with the Business (a "Restricted Business"). The parties hereto specifically acknowledge and agree that the remedy at law for any breach of the foregoing will be inadequate and that the Buyer, in addition to any other relief available to it, shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damage or posting any bond whatsoever.

(b)   For a period from the Closing to the fifth (5th) anniversary of the Closing Date, each Selling Entity shall not: (i) cause, solicit, induce or encourage any Current Employees of any Selling Entity or Acquired Subsidiaries who are or become employees of the Buyer or a Buyer Designee to leave such employment or (ii) cause, induce or encourage any material actual or prospective client, customer, supplier, or licensor of the Business (including any existing or former customer of a Selling Entity or Acquired Subsidiaries and any Person that becomes a client or customer of the Business after the Closing) or any other Person who has a material business relationship with the Business, to terminate or modify any such actual or prospective relationship with the Buyer (but taking into account, in each case, the fact that the Bankruptcy Case have commenced and that, following the Closing, the Selling Entities intend to dissolve and liquidate and, as a result thereof, may reject, terminate or cease any remaining relationships with any other Persons to the extent not constituting a Purchased Asset or an Assumed Liability).

(c)   The covenants and undertakings contained in this Section 7.14 relate to matters which are of a special, unique and extraordinary character and a violation of any of the terms of this Section 7.14 will cause irreparable injury to the Buyer, the amount of which will be impossible to estimate or determine and which cannot be adequately compensated. Therefore, the Buyer will be entitled to an injunction, restraining order or other equitable relief from any court of competent jurisdiction in the event of any breach of this Section 7.14 without the necessity of proving actual damage or posting any bond whatsoever. The rights and remedies provided by this Section 7.14 are cumulative and in addition to any other rights and remedies which the Buyer may have hereunder or at law or in equity.

(d)   The parties hereto agree that, if any court of competent jurisdiction in a Final Order determines that a specified time period, a specified geographical area, a specified business limitation or any other relevant feature of this Section 7.14 is unreasonable, arbitrary, unenforceable or against public policy, then a lesser time period, geographical area, business limitation or other relevant feature which is determined to be reasonable, not arbitrary and not against public policy may be enforced against the applicable party.

Section 7.15   Intercompany Arrangements. Prior to the Closing, the Selling Entities and the Acquired Subsidiaries shall satisfy in full all intercompany accounts payable (or other

59

amounts payable) and other intercompany obligations of any Selling Entity owed by it to any Acquired Subsidiary or of any Acquired Subsidiary owed by it to any Selling Entity with effect prior to or on the Closing Date. All costs, expenses and other Liabilities incurred in connection with the termination and satisfaction of such intercompany obligations shall be paid or borne solely by the Selling Entities, and the Buyer (and, from and after the Closing, the Acquired Subsidiaries) shall have no liability, obligation or responsibility therefor. Further, the Selling Entities shall satisfy in full all Liabilities of the Acquired Subsidiaries arising or relating to the period prior to the Closing Date, except for Liabilities set forth on Schedule 8.2(j).

Section 7.16  Damage or Destruction.  Until the Closing, the Purchased Assets shall remain at the risk of the Selling Entities. In the event of any material damage to or destruction of any of the Purchased Assets after the date hereof and prior to the Closing (in any such case, a "Damage or Destruction Loss"), the Seller shall give prompt written notice thereof to the Buyer. If any such Damage or Destruction Loss is covered by policies of insurance and, if such damage or destruction is to a facility, is not repaired or replaced by a similar facility in reasonable proximity to any former facility, all right and claim of the Selling Entities to any proceeds of insurance for such Damage or Destruction Loss shall be assigned and (if previously received by the Selling Entities and not used prior to the Closing Date to repair any damage or destruction) paid to the Buyer and/or a Buyer Designee at Closing in accordance with Section 2.1(p). If any such Damage or Destruction Loss is not covered by policies of insurance (not considering any deductible payable with respect to any policy of insurance), the Buyer shall have the right to reduce the Closing Payment by an amount equal to the lesser of (i) the estimated cost to repair or restore the Purchased Assets affected by such Damage or Destruction Loss (the "Affected Assets") to substantially the same condition that existed immediately prior to the occurrence of such Damage or Destruction Loss, or (ii) if such Affected Assets are destroyed or damaged beyond repair or are not able to be repaired to substantially the same condition that existed prior to such Damage or Destruction Loss at a cost less than their replacement cost, the replacement cost of the Affected Assets. If the Buyer elects to reduce the Closing Payment pursuant to this Section 7.16, the Seller and the Buyer shall negotiate in good faith in an effort to agree upon the amount of such reduction. If the parties are unable to reach agreement within five (5) Business Days after notice of the Damage or Destruction Loss is given by the Selling Entities, then the amount of the reduction shall be determined by an independent, qualified insurance adjuster selected by the Parties (or, if they are unable to agree on such selection, one appointed by the Bankruptcy Court upon application of either Party).

Section 7.17  Permits.  Commencing on the date of this Agreement, the Parties, cooperating in good faith, at the Seller's sole cost and expense, shall use commercially reasonable efforts to take such steps, including the filing of any required applications with Governmental Authorities, as may be necessary (i) to effect the transfer of Permits that are Purchased Assets to the Buyer on or as soon as practicable after the Closing Date, to the extent such transfer is permissible under applicable Law, and (ii) to enable the Buyer to obtain, on or as soon as practicable after the Closing Date, any additional licenses, permits, approvals, consents, certificates, registrations, and authorizations (whether governmental, regulatory, or otherwise) as may be necessary for the lawful operation of the Business from and after the Closing Date.

Section 7.18  Suppliers and Distributors; Certain Avoidance Actions; Insurance Policies.

LA\4340501.10

(a)     The Selling Entities shall, and shall cause the Acquired Subsidiaries to, promptly following the request thereof by the Buyer, seek and use their respective commercially reasonable efforts to arrange such meetings and telephone conferences with material suppliers and distributors of the Selling Entities and the Acquired Subsidiaries as may be reasonably requested by the Buyer and necessary and appropriate for the Buyer to coordinate transition of such suppliers and distributors with the Business following the Closing; *provided* that Representatives of Seller shall be entitled to attend any such meeting or telephone conference.

(b)     The Selling Entities shall not pursue any Avoidance Actions against any current or former employee, supplier, vendor or landlord of the Selling Entities or the Business who is a party to a Contract or a Real Property Lease that is, or is intended to be, an Assumed Agreement or Assumed Real Property Lease, and each of the Selling Entities hereby releases, subject to the occurrence of and effective as of the Closing, any rights it may have with respect to any such Avoidance Actions.

(c)     To the extent that any current or prior insurance policy of any of the Selling Entities relate to the Purchased Assets or Assumed Liabilities (excluding and Excluded Insurance Policies) and such insurance policy is not transferable to Buyer or a Buyer Designee at the Closing in accordance with the terms hereof, the Selling Entities shall hold such insurance policy for the benefit of Buyer or such Buyer Designee, shall reasonably cooperate with Buyer (at the Seller's cost and expense) in pursuing any claims thereunder, and shall pay over to Buyer promptly any insurance proceeds paid or recovered thereunder with respect to the Purchased Assets or the Assumed Liabilities.  In the event Buyer determines to purchase replacement coverage with respect to any such insurance policy, the Selling Entities shall reasonably cooperate with Buyer to terminate such insurance policy and shall, at the option of Buyer, promptly pay over to Buyer any refunded or returned insurance premiums received by any Selling Entities in connection therewith or cause such premiums to be applied by the applicable carrier to the replacement coverage arranged by Buyer.

Section 7.19   Notification of Certain Matters.  Each Party shall give prompt written notice to the other Party of (i) the occurrence or non-occurrence of any event, the occurrence or non-occurrence of which would cause any of its respective representations or warranties in this Agreement to be untrue or inaccurate in any material respect at or prior to the Closing Date or (ii) any failure to comply with or satisfy any of its respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; *provided, however*, (x) the delivery of any notice pursuant to this Section 7.19 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement, and (y) any failure to comply with this Section 7.19 shall not be taken into account in determining whether the conditions to closing set forth in ARTICLE VIII have been or would be satisfied.

Section 7.20   Collection of Accounts Receivable.

(a)     As of the Closing Date, each Selling Entity hereby (i) authorizes the Buyer or any Buyer Designee to open any and all mail addressed to any Selling Entity relating to the Purchased Assets and delivered to the offices of the Business or otherwise to Buyer or any Buyer Designee if received on or after the Closing Date and (ii) appoints the Buyer, any Buyer

Designee or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by the Buyer of any Buyer Designee after the Closing Date with respect to Accounts Receivable that are Purchased Assets or Accounts Receivable relating to work performed by the Buyer after the Closing, as the case may be, made payable or endorsed to any Selling Entity or Selling Entity's order, for the Buyer's or any Buyer Designee's own account.

(b)     As of the Closing Date, each Selling Entity agrees that any monies, checks or negotiable instruments received or identified by any Selling Entity after the Closing Date with respect to Accounts Receivable that are Purchased Assets or Accounts Receivable relating to work performed by the Buyer after the Closing, as the case may be, shall be held in trust by such Selling Entity for the Buyer's or any Buyer Designee's benefits and accounts, not commingled with other funds of such Selling Entity, and promptly upon receipt by a Selling Entity of any such payment, such Selling Entity shall pay over to the Buyer or its designee the amount of such payments without any right of set off or reimbursement. In addition, the Buyer agrees that, after the Closing, it will hold and will promptly transfer and deliver to the Seller, from time to time as and when received or identified by the Buyer or its Affiliates, any cash, checks with appropriate endorsements, payment of an account, trade, note receivable or other payment or property or assets that the Buyer or its Affiliates may receive or identify on or after the Closing which properly belongs to the Selling Entities as an Excluded Asset.

(c)     As of the Closing Date, the Buyer or any Buyer Designee shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and Accounts Receivable relating to work performed by the Buyer after the Closing.

(d)     Notwithstanding anything to the contrary contained hereto, any Buyer Designees who acquire any Accounts Receivable that are Purchased Assets hereunder shall be express third party beneficiaries of this <u>Section 7.20</u>.

Section 7.21     <u>Cure Payments; Cure of Defaults</u>.

(a)     Seller agrees that it will promptly take such actions as are reasonably necessary to obtain a Final Order of the Bankruptcy Court providing for the assumption and assignment of the Assumed Agreements and Assumed Real Property Leases.

(b)     Subject to entry of the Sale Order, at (in the case of Seller) and as soon as reasonably practicable following (in the case of the Buyer) the Closing, the Cure Payments shall be paid as set forth below, and all defaults and breaches under the Assumed Agreements and Assumed Real Property Leases shall be cured, so that such Contracts may be assumed by the Selling Entities and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement:

(i)     *first*, Buyer shall be responsible for payment of Cure Payments up to the Buyer Cure Amount Cap;

(ii)     *second*, Seller shall be responsible for payment of Cure Payments up to the Seller Cure Amount Cap (for avoidance of doubt, after payment by Buyer of Cure Payments up to the Buyer Cure Amount Cap pursuant to Section 7.21(b)(i)); and

LA\4340501.10

(iii)   *third*, Seller shall be responsible for payment of all remaining Cure Payments and all other cure obligations except to the extent Buyer has expressly agreed in writing to pay such additional Cure Payments (subject to Seller's right to terminate this Agreement pursuant to Section 9.1(c)(iii)).

(c)   In no event shall Buyer be responsible for any Cure Payments in excess of the Buyer Cure Amount Cap (or any portion thereof) unless Buyer has expressly so agreed in writing; *provided, however,* that each of the Contracts set forth on Schedule 7.21(c) shall not constitute an Assumed Agreement or Assumed Real Property Lease unless (i) no Cure Payment is required in connection with the assumption and assignment of such Contract, or (ii) Buyer and Seller otherwise agree.

(d)   To the extent Seller is responsible for any Cure Payments pursuant to the terms hereof (for the avoidance of doubt, excluding additional Cure Payments that the Buyer has expressly agreed in writing to pay), the Buyer may, in its sole discretion, (i) agree to pay such amount(s) on behalf of Seller, in which case Seller shall have no further responsibility therefor, and (ii) offset such amount(s) against any amount(s) Buyer may owe the Seller (including by deducting such amounts, at the Closing, from the Purchase Price or, without duplication, recovering such amounts from the Closing Payment).

Section 7.22   Post-Closing Assignment of Contracts.   With respect to any Contract which is not an Assumed Agreement or Assumed Real Property Lease on the Closing Date and provided such Contract has not been rejected by Seller after the Closing Date pursuant to section 365 of the Bankruptcy Code, upon written notice(s) from Buyer to Seller given at any time after the Closing Date, Seller shall promptly take all actions reasonably necessary to assume and assign to Buyer pursuant to section 365 of the Bankruptcy Code any such Contract(s) set forth in Buyer's notice(s); *provided* that any Cure Payment applicable thereto shall be satisfied solely by Buyer; *provided, further,* that such assumption and assignment (and payment by the Buyer of such Cure Payment), shall not affect the amount of the Purchase Price.   Notwithstanding anything in this Agreement to the contrary, on the date any such Contract is assumed and assigned to Buyer pursuant to this Section 7.22, such Contract shall thereafter be deemed a Purchased Asset for all purposes under this Agreement.

Section 7.23   Notification of Competing Bids.   Each Selling Entity shall, and shall cause its Affiliates and Representatives to, promptly notify Buyer of the identity of any Person conducting due diligence or exploring a potential Competing Bid.   Complete versions of all Competing Bids, excluding confidential financial information, submitted to any Selling Entity shall be forwarded by the Selling Entities to the Buyer by no later than 8:00 p.m. (prevailing Eastern Time) on the Bid Deadline.   The Selling Entities shall not, without the prior consent of the Buyer, release any Person from, or waive any provision of, any standstill agreement or confidentiality agreement to which any Selling Entity is a party.

**ARTICLE VIII.**
**CONDITIONS TO CLOSING**

Section 8.1   Conditions to Each Party's Obligations to Effect the Closing.   The respective obligations of each Party to effect the sale and purchase of the Purchased Assets and

LA\4340501.10

to consummate the other transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing of the following conditions:

(a) consummation of the transactions contemplated hereby would not violate any Final Order, decree or judgment of the Bankruptcy Court or any other Governmental Authority having competent jurisdiction in effect, and there shall not be any (i) Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited or (ii) a Legal Proceeding commenced by or before a Governmental Authority having competent jurisdiction that is pending and that, if determined adversely to a Party hereto, would reasonably be expected to make the consummation of the transactions contemplated hereby illegal or otherwise prohibited;

(b) all filing and waiting periods (including any extensions thereof) applicable to the consummation of the transactions contemplated by this Agreement under the Antitrust Laws shall have expired or been terminated, and all consents or approvals required for the consummation of the transactions contemplated by this Agreement under any Antitrust Laws shall have been obtained; and

(c) the Bankruptcy Court shall have entered the Sale Order in form and substance acceptable to Buyer in its sole discretion and such Sale Order shall be a Final Order (unless such Final Order requirement is waived by the Buyer in its sole discretion).

Section 8.2    Conditions to Obligations of the Buyer.  The obligation of the Buyer to effect the purchase of the Purchased Assets and the assumption of the Assumed Liabilities and to consummate the other transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing of the following additional conditions:

(a) the Selling Entities shall have performed and complied with the covenants and agreements contained in this Agreement that are required to be performed and complied with by them on or prior to the Closing Date (i) for covenants and agreements qualified by materiality or Material Adverse Effect, in all respects, and (ii) for all other covenants and agreements, in all material respects;

(b) (i) the representations and warranties of the Selling Entities set forth in ARTICLE V that are qualified by materiality or Material Adverse Effect shall be true and correct in all respects, and (ii) all other representations and warranties of the Selling Entities set forth in ARTICLE V shall be true and correct in all material respects, in each case of clauses (i) and (ii) as of the date of this Agreement, and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date);

(c) the Buyer shall have received a certificate from an officer of the Seller as such to the effect that the conditions set forth in Section 8.2(a) and (b), have been satisfied;

(d) the Buyer shall have received the other items to be delivered to it pursuant to Section 4.2;

(e)     since the date of this Agreement, there shall not have occurred any Material Adverse Effect;

(f)     the Bankruptcy Court shall have entered the Bidding Procedures Order in form and substance reasonably acceptable to Buyer and such Bidding Procedures Order shall be a Final Order (unless such Final Order requirement is waived by the Buyer in its sole discretion);

(g)     the Bankruptcy Court shall have entered one or more orders (which may be the Sale Order), in form and substance acceptable to Buyer in its sole discretion, approving the assumption and assignment of the Assumed Agreements and Assumed Real Property Leases to the Buyer pursuant to Section 365 of the Bankruptcy Code and such order(s) shall be Final Orders (unless such Final Order requirement is waived by the Buyer in its sole discretion);

(h)     all Consents of any third Person required under the Contracts set forth on Schedule 8.2(h) in connection with the consummation of the transactions contemplated by this Agreement shall have been delivered to the Buyer in form and substance reasonably acceptable to the Buyer;

(i)     the Acquired Subsidiaries shall have no Liabilities arising or relating to the period prior to the Closing Date, except for Liabilities set forth on Schedule 8.2(i).

Any condition specified in this Section 8.2 or any condition in Section 8.1 for the benefit of the Buyer, may be waived by the Buyer in its sole discretion; *provided* that no such waiver shall be effective against the Buyer unless it is set forth in a writing executed by the Buyer.

Section 8.3     Conditions to Obligations of the Selling Entities. The obligation of the Selling Entities to effect the sale of the Purchased Assets and to consummate the other transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing of the following additional conditions:

(a)     the Buyer shall have performed and complied in all material respects with the covenants and agreements contained in this Agreement which are required to be performed and complied with by the Buyer on or prior to the Closing Date;

(b)     (i) the representations and warranties of the Buyer set forth in ARTICLE VI that are qualified by materiality shall be true and correct in all respects, and (ii) all other representations and warranties of the Buyer set forth in ARTICLE VI shall be true and correct in all material respects, in each case of clauses (i) and (ii) as of the date of this Agreement, and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date); and

(c)     the Seller shall have received the other items to be delivered to it pursuant to Section 4.3.

Any condition specified in this Section 8.3, or any condition in Section 8.1 for the benefit of the Selling Entities, may be waived by the Seller in its sole discretion; *provided* that no such waiver shall be effective against the Seller unless it is set forth in a writing executed by the Seller.

65

Section 8.4    <u>Frustration of Closing Conditions</u>.  None of the Selling Entities or Buyer may rely on or assert the failure of any condition set forth in <u>ARTICLE VIII</u> to be satisfied if such failure was proximately caused by such Party's failure to comply with this Agreement in all material respects.

**ARTICLE IX.**
**TERMINATION; WAIVER**

Section 9.1    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of the Seller and the Buyer;

(b)    by the Seller or the Buyer, at any time in their respective sole discretion, if:

(i)    there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited; or

(ii)    consummation of the transactions contemplated hereby would violate any non-appealable Final Order, decree or judgment of the Bankruptcy Court or any other Governmental Authority having competent jurisdiction;

*provided* that the actions of the Party seeking to terminate this Agreement pursuant to this <u>Section 9.1(b)</u> shall not have been a principal cause of the entry of such Law, order, decree or judgment;

(c)    by the Seller, at any time in its sole discretion, if:

(i)    any of the representations and warranties of Buyer contained in ARTICLE V shall be inaccurate as of the date of this Agreement, or shall have become inaccurate as of a date subsequent to the date of this Agreement (as if made on and as of such subsequent date) such that the condition set forth in <u>Section 8.3(b)</u> would not then be satisfied;

(ii)    Buyer shall have failed to perform or comply with any of the covenants or agreements contained in this Agreement to be performed and complied with by the Buyer such that the condition set forth in <u>Section 8.3(a)</u> would not then be satisfied;

*provided, however*, that if an inaccuracy in any of the representations and warranties of the Buyer or a failure to perform or comply with a covenant or agreement by the Buyer is curable by the Buyer within ten (10) days after the date of written notice from the Seller to the Buyer of the occurrence of such inaccuracy or failure, then the Seller may not terminate this Agreement under this <u>Section 9.1(c)</u> on account of such inaccuracy or failure (x) prior to delivery of such written notice to the Buyer or during the ten (10) day period commencing on the date of delivery of such notice or (y) following such ten (10) day period, if such inaccuracy or failure shall have been fully cured during such ten (10) day period;

66

(iii)     except to the extent payable by the Buyer (including additional Cure Payments that Buyer has expressly agreed in writing to pay), the Cure Payments necessary to cure defaults under the Assumed Agreements and the Assumed Real Property Leases exceed the Seller Cure Amount Cap; or

(iv)     the Closing Date shall not have occurred on or prior to February 15, 2016, *provided* that such date shall be extended to and including February 29, 2016 to the extent reasonably necessary to obtain the Consents from Governmental Authorities pursuant to Section 7.6 or to effectuate any transactions or modifications permitted under Section 10.1.

(d)     by the Buyer, at any time in its sole discretion, if:

(i)     any of the representations and warranties of the Selling Entities contained in ARTICLE VI shall be inaccurate as of the date of this Agreement, or shall have become inaccurate as of a date subsequent to the date of this Agreement (as if made on and as of such subsequent date) such that the condition set forth in Section 8.2(b) would not then be satisfied;

(ii)     any Selling Entity shall have failed to perform or comply with any of its respective covenants or agreements contained in this Agreement to be performed and complied with by it such that the condition set forth in Section 8.2(a) would not then be satisfied;

*provided, however*, that if an inaccuracy in any of the representations and warranties of the Selling Entities or a failure to perform or comply with a covenant or agreement by any of the Selling Entities is curable by it within ten (10) days after the date of written notice from the Buyer to the Seller of the occurrence of such inaccuracy or failure, then the Buyer may not terminate this Agreement under this Section 9.1(d) on account of such inaccuracy or failure (x) prior to delivery of such written notice to the Seller or during the ten (10) day period commencing on the date of delivery of such notice or (y) following such ten (10) day period, if such inaccuracy or failure shall have been fully cured during such ten (10) day period;

(iii)     the Bankruptcy Court approves an Alternative Transaction;

(iv)     any Selling Entity (A) withdraws the Bidding Procedures and Sale Motion, or publicly announces its intention to withdraw the Bidding Procedures and Sale Motion, (B) moves to voluntarily dismiss any of the Bankruptcy Cases, (C) moves for conversion of any of the Bankruptcy Cases to Chapter 7 of the Bankruptcy Code or (D) moves for appointment of an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code or a trustee in any of the Bankruptcy Cases;

(v)     (A) a trustee or an examiner with expanded powers is appointed in any of the Bankruptcy Cases or (B) any of the Bankruptcy Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(vi)     an order of the Bankruptcy Court is entered denying approval of the Bidding Procedures Order or Sale Order;

(vii)   any court of competent jurisdiction shall enter a final, non-appealable judgment or order declaring this Agreement to be unenforceable;

(viii)   the Bankruptcy Court grants relief from the automatic stay with respect to any Purchased Asset with a value of more than $250,000;

(ix)   the Bankruptcy Court shall not have entered the Bidding Procedures Order, in form and substance acceptable to the Buyer in its sole discretion, on or prior to December 31, 2015, or such order shall have been stayed, vacated, reversed, modified or amended at any time in any respect without the prior written consent of Buyer given in its sole discretion;

(x)   the Auction shall not have commenced on or prior to January 25, 2016;

(xi)   the Bankruptcy Court shall not have entered the Sale Order, in form and substance acceptable to Buyer in its sole discretion, on or prior to January 29, 2016, or such order shall have been stayed, vacated, reversed, modified or amended at any time in any respect without the prior written consent of Buyer given in its sole discretion;

(xii)   the Closing Date shall not have occurred on or prior to February 15, 2016, *provided* that such date shall be extended to and including February 29, 2016 to the extent reasonably necessary to obtain the Consents from Governmental Authorities pursuant to Section 7.6 or to effectuate any transactions or modifications permitted under Section 10.1;

(xiii)   (A) the Selling Entities are not authorized to use cash collateral on terms reasonably acceptable to the Buyer through and including the Closing Date; or (B) the occurrence of either an event of default or acceleration or maturity of the Buyer DIP Facility (if any such facility is in effect); or

(xiv)   except to the extent paid by the Selling Entities (or deducted from the Purchase Price), the Cure Payments necessary to cure defaults under the Assumed Agreements and the Assumed Real Property Leases exceed the Buyer Cure Amount Cap.

Section 9.2   Procedure and Effect of Termination.   In the event of termination of this Agreement by either Seller or Buyer pursuant to Section 9.1, written notice thereof shall forthwith be given by the terminating Party to the other Party (and may be given by Buyer without application to or order of the Bankruptcy Court), specifying the provision hereof pursuant to which such termination is made, and this Agreement shall thereupon terminate and become void and of no further force and effect, and the transactions contemplated hereby shall be abandoned without further action by any of the Parties; *provided, however*, that (a) no Party shall be relieved of or released from any Liability arising from any willful, knowing or intentional breach by such Party of any provision of this Agreement, (b) this Section 9.2, Section 7.3 and Section 7.11, and ARTICLE X shall remain in full force and effect and survive any termination of this Agreement, and (c) the Selling Entities shall remain liable for payment of

the Buyer Expense Reimbursement, the Termination Fee and the Pre-Filing Loans Reimbursement to the extent set forth herein and in the Bidding Procedures Order.

Section 9.3    Extension; Waiver.  At any time prior to the Closing, the Selling Entities, on the one hand, or the Buyer, on the other hand, may, without application to or order of the Bankruptcy Court (a) extend the time for the performance of any of the obligations or other acts of the Buyer (in the case of an agreed extension by the Selling Entities) or the Selling Entities (in the case of an agreed extension by the Buyer), (b) waive any inaccuracies in the representations and warranties of the Buyer (in the case of a wavier by the Selling Entities) or the Selling Entities (in the case of a waiver by the Buyer) contained herein or in any document delivered pursuant hereto, (c) waive compliance with any of the agreements of the Buyer (in the case of a wavier by the Selling Entities) or the Selling Entities (in the case of a waiver by the Buyer) contained herein, or (d) waive any condition to its obligations hereunder.  Any agreement on the part of the Selling Entities, on the one hand, or the Buyer, on the other hand, to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of the Selling Entities or the Buyer, as applicable, without the need for any application to or order of the Bankruptcy Court.  The failure or delay of any Party to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of those rights, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any rights hereunder.

Section 9.4    Liabilities Upon Termination; Return of Deposit.  If Closing has not occurred because the Buyer wrongfully fails to tender performance at Closing, or because the Seller terminates this Agreement pursuant to Section 9.1(c)(i) or Section 9.1(c)(ii) based upon a material breach by the Buyer of its obligations under this Agreement prior to Closing, and all of the conditions to closing under Section 8.1 and Section 8.2 have been satisfied or waived and the Seller is ready to close, then the Seller shall be entitled, in its sole discretion, either to (a) retain the Deposit (and any interest accrued thereon) and deem the Pre-Filing Loans waived as the Selling Entities' sole and exclusive remedy and as full and final settlement of all liabilities associated with the Buyer's breach of this Agreement or (b) seek to enforce any other remedy against the Buyer.  The Buyer's failure to close shall not be considered wrongful if (x) the conditions under Section 8.1 and Section 8.2 are not satisfied through no fault of Buyer and are not waived, or (y) Buyer has the right to terminate or has terminated this Agreement pursuant to Section 9.1.  The only circumstances in which Seller may make a claim for retention of the Deposit and waiver of the Pre-Filing Loans are set forth in Section 9.4(a) hereof; the Buyer shall be entitled to receive the Deposit (and any accrued interest thereon) immediately after the determination that the Closing will not occur for any other reason or upon Seller seeking to enforce its remedy pursuant to Section 9.4(a).  For avoidance of doubt, if Closing has not occurred and this Agreement has been terminated for any reason, then, unless the provisions of Section 9.4(a) apply, the Deposit shall promptly, but in no event later than one (1) Business Day after the receipt by the Seller of notice of termination, be returned to the Buyer.

## ARTICLE X.
## MISCELLANEOUS PROVISIONS

Section 10.1    Amendment and Modification.  This Agreement may be amended, modified or supplemented only by a written instrument signed on behalf of each of the Selling

69

Entities and Buyer; *provided* that Buyer reserves the right to make one or more unilateral modifications to the structure of the transactions contemplated hereby, and the Selling Entities will cooperate with the Buyer, including by amending this Agreement to provide for Buyer purchasing certain assets and assuming certain related liabilities of one or more of the Acquired Subsidiaries (without additional consideration), rather than purchasing the Equity Interests of any such Acquired Subsidiaries, and making any other modifications to the structure as may be reasonably necessary or advisable to implement the foregoing; *provided, further,* that, with the consent of the Buyer, which may be withheld in its sole discretion, such transactions may be effectuated after the Closing Date.

Section 10.2    <u>Survival</u>.   None of the representations and warranties of the Parties in this Agreement, in any instrument delivered pursuant to this Agreement, or in the Schedules or Exhibits attached hereto shall survive the Closing, and no Party hereto shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such representation or warranty from or after the Closing.   None of the covenants or agreements of the Parties in this Agreement shall survive the Closing, and no Party hereto shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such covenant or agreement from or after the Closing, other than (a) the covenants and agreements of the Parties contained in this <u>ARTICLE X</u> and in <u>ARTICLE III</u> and <u>ARTICLE IV</u> and (b) those other covenants and agreements contained herein that by their terms apply, or that are to be performed in whole or in part, after the Closing, which shall survive the consummation of the transaction contemplated by this Agreement until fully performed.

Section 10.3    <u>Notices</u>.  All notices or other communications required or permitted under, or otherwise made in connection with, this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when delivered in person, (b) upon confirmation of receipt when transmitted by electronic mail, (c) upon receipt after dispatch by registered or certified mail, postage prepaid, or (d) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery), in each case, addressed as follows:

(a)    If to the Seller or the Selling Entities, to:

Fuhu, Inc.
909 N. Sepulveda Blvd., 5th Fl.
El Segundo, CA 90245
Attention:  Jim Mitchell
Email:  jim.mitchell@fuhu.com

with a copy (which shall not constitute notice) to:

Bryan Cave LLP
Two North Central Avenue, Suite 2200
Phoenix, AZ  85004-
Attention:  Robert J. Miller   rmiller@bryancave.com
            Brian C. Walsh   brian.walsh@bryancave.com

If to the Buyer, to:

Mattel, Inc.
Attention: Treasurer
333 Continental Blvd. El Segundo, CA 90245
Email: Mandana.sadigh@mattel.com

With a copy to:

Mattel, Inc.
Attention: Vice President and Asst. General Counsel-Corporate/Securities
333 Continental Blvd.
El Segundo, CA 90245
Email: Tiffani.magri@mattel.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, California 90071
Attention: James P. Beaubien james.beaubien@lw.com
          Peter M. Gilhuly    peter.gilhuly@lw.com
          Ted A. Dillman      ted.dillman@lw.com

Section 10.4    Assignment.   Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties, and any such assignment shall be null and void; *provided* that the rights of the Buyer under this Agreement may be assigned by the Buyer, without the prior written consent of any Selling Entity, to one or more Buyer Designees, so long as the Buyer shall continue to remain obligated in full hereunder.  No assignment by any Party (including an assignment by Buyer to any Buyer Designee) shall relieve such Party of any of its obligations hereunder.  Subject to the foregoing, this Agreement and all of the provisions hereof shall be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns, including, in the case of the Selling Entities, any trustee in the Bankruptcy Case or in any subsequent Chapter 7 case.

Section 10.5    Severability.   If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon a determination that any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 10.6    Governing Law.   Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and all claims and causes of action arising out of, based

upon, or related to this Agreement or the negotiation, execution or performance hereof, shall be governed by, and construed, interpreted and enforced in accordance with, the Laws of the State of Delaware, without regard to choice or conflict of law principles that would result in the application of any Laws other than the Laws of the State of Delaware.

Section 10.7  <u>SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL</u>.

(a)  Any action, claim, suit or Legal Proceeding arising out of, based upon or relating to this Agreement or the transactions contemplated hereby and the proceedings related thereto shall be brought solely in the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court).  Each Party hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) in respect of any action, claim, suit or Legal Proceeding arising out of, based upon or relating to this Agreement or any of the rights and obligations arising hereunder, and agrees that it will not bring any action arising out of, based upon or related thereto in any other court; *provided, however*, that, if the Bankruptcy Case is dismissed, any action, claim, suit or Legal Proceeding arising out of, based upon or relating to this Agreement or the transactions contemplated hereby shall be heard and determined solely in the Chancery Court of the State of Delaware and any state appellate court therefrom within the State of Delaware (or, if the Chancery Court of the State of Delaware declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware and any direct appellate court therefrom).  Each Party hereby irrevocably waives, and agrees not to assert as a defense, counterclaim or otherwise, in any such action, claim, suit or Legal Proceeding, (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve process in accordance with <u>Section 10.3</u>, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by applicable Law, any claim that (i) the suit, action or Legal Proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, action or Legal Proceeding is improper or (iii) this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith, or the subject matter hereof or thereof, may not be enforced in or by such courts.  Each Party agrees that notice or the service of process in any action, claim, suit or Legal Proceeding arising out of, based upon or relating to this Agreement or any of the rights and obligations arising hereunder or thereunder, shall be properly served or delivered if delivered in the manner contemplated by <u>Section 10.3</u>.

(b)  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY AND ALL RIGHT SUCH PARTY MAY HAVE TO TRIAL BY JURY IN ANY ACTION, CLAIM, SUIT OR LEGAL PROCEEDING BETWEEN THE PARTIES HERETO ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE HEREOF.

Section 10.8  <u>Counterparts</u>.  This Agreement may be executed by facsimile or pdf format and in one or more counterparts, and by the different Parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together

LA\4340501.10

shall constitute one and the same agreement, and which shall become effective when one or more counterparts have been signed by each of the Parties and delivered (by facsimile, pdf format or otherwise) to the other Parties.

Section 10.9 <u>Incorporation of Schedules and Exhibits</u>. All Schedules (including the Seller Disclosure Schedule) and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

Section 10.10 <u>Entire Agreement</u>. This Agreement, including all Schedules (including the Seller Disclosure Schedule, and all Exhibits), and the Transaction Documents constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the Parties with respect thereto.

Section 10.11 <u>Remedies</u>. The Parties agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or was otherwise breached and that monetary damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement. It is accordingly agreed that, prior to any valid termination of this Agreement as provided in <u>Section 9.1</u>, the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, and any such injunction shall be in addition to any other remedy to which any Party is entitled, at law or in equity.

Section 10.12 <u>Mutual Drafting; Headings; Information Made Available</u>. The Parties participated jointly in the negotiation and drafting of this Agreement and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent. If an ambiguity or question of intent or interpretation arises, then this Agreement will accordingly be construed as drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. The descriptive headings and table of contents contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement. To the extent this Agreement refers to information or documents to be made available (or delivered or provided) to Buyer or its Representatives, the Selling Entities shall be deemed to have satisfied such obligation if the Seller or any of its Representatives has made such information or document available (or delivered or provided such information or document) to Buyer or any of its Representatives in an electronic data room or via electronic mail prior to the date of this Agreement.

Section 10.13 <u>Seller Disclosure Schedule</u>.

(a) The Schedules and the Seller Disclosure Schedule are incorporated herein and expressly made part of this Agreement as though completely set forth herein. It is expressly understood and agreed that (a) the disclosure of any fact or item in any section of the Seller Disclosure Schedule shall be deemed disclosure with respect to any other section or subsection to the extent the applicability of such disclosure to such other section or subsection is readily apparent on the face of such disclosure, (b) the disclosure of any matter or item in the Seller Disclosure Schedule shall not be deemed to constitute an acknowledgement that such matter or

item is required to be disclosed therein, and (c) the mere inclusion of an item in the Seller Disclosure Schedule as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has had or would be reasonably likely to have a Material Adverse Effect.

(b)      From the date of this Agreement until the earlier of the Closing or termination of this Agreement in accordance with its terms, the Buyer shall give prompt notice to the Seller, and the Seller shall give prompt notice to the Buyer, upon the Buyer or the Seller (as applicable) obtaining actual knowledge of the occurrence, or failure to occur, of any event, the occurrence or failure to occur of which would, to such Party's actual knowledge, be reasonably likely to cause any of the conditions set forth in ARTICLE VIII not to be satisfied.

(c)      The Seller shall amend, update and supplement the Seller Disclosure Schedule prior to the Closing if any facts or circumstances are discovered that should be identified on the Seller Disclosure Schedule; *provided* that no such amendment, update or supplement shall be deemed to prevent or cure any misrepresentation or breach of warranty or covenant.

Section 10.14 <u>No Third Party Beneficiaries</u>. Except as expressly provided in <u>Section 7.20</u>, this Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment at all or for any specified period.

Section 10.15 <u>Bulk Sales Law</u>.  The Buyer hereby waives compliance by the Selling Entities with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to the Buyer.  The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any security interests in the Purchased Assets, including any liens or claims arising out of the bulk transfer laws, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

* * * * *

74

IN WITNESS WHEREOF, the Parties hereto have caused this Asset Purchase Agreement to be executed as of the date first written above.

**SELLER:**

**FUHU, INC.**

By: _____
Name: Jim Mitchell
Title: CEO

**OTHER SELLING ENTITIES:**

**FUHU HOLDINGS, INC.**

By: _____
Name: Jim Mitchell
Title: CEO

**FUHU DIRECT, INC.**

By: _____
Name: Jim Mitchell
Title: President

**NABI, INC.**

By: _____
Name: Jim Mitchell
Title: President

**BUYER:**

**MATTEL, INC.**

By: _____
Name:  Chris Sinclair
Title:   Chief Executive Officer

## SCHEDULES

The Schedules to the Asset Purchase Agreement, dated as of December 15, 2015 (the "**Agreement**"), between Fuhu, Inc., a Delaware corporation (the "**Seller**"), each of the subsidiaries of the Seller listed on the signature pages hereto (together with the Seller, the "**Selling Entities**"), and Mattel, Inc., a Delaware corporation or its designee (the "**Buyer**") follow. All capitalized terms used but not defined herein shall have the meanings as defined in the Agreement, unless otherwise provided. Inclusion of any item in any Schedule shall not constitute, or be deemed to be, an admission to any third party concerning such item.

## SCHEDULE 1.1(a)

### Excluded Insurance Policies

None.

## SCHEDULE 2.2

### Other Excluded Assets

None.

## SCHEDULE 2.5(a)

### Assumed Agreements and Assumed Real Property Leases

To come.

## SCHEDULE 7.1

### Conduct of Business

None.

## SCHEDULE 8.2(i)

Accrued but unpaid operating expenses incurred in the Ordinary Course of Business not to exceed $500,000, *provided* that all such operating expenses shall be paid prior to Closing in the Ordinary Course of Business.

## SELLER DISCLOSURE SCHEDULE

This Seller Disclosure Schedule is made and given pursuant to Section 5 of the Asset Purchase Agreement, dated as of December 15, 2015 (the "**Agreement**"), between Fuhu, Inc., a Delaware corporation (the "**Seller**"), each of the subsidiaries of the Seller listed on the signature pages hereto (together with the Seller, the "**Selling Entities**"), and Mattel, Inc., a Delaware corporation or its designee (the "**Buyer**"). All capitalized terms used but not defined herein shall have the meanings as defined in the Agreement, unless otherwise provided. The section numbers below correspond to the section numbers of the representations and warranties in the Agreement; *provided, however*, that (a) the disclosure of any fact or item in any section of this Seller Disclosure Schedule shall be deemed disclosure with respect to any other section or subsection to the extent the applicability of such disclosure to such other section or subsection is readily apparent on the face of such disclosure, (b) the disclosure of any matter or item in this Seller Disclosure Schedule shall not be deemed to constitute an acknowledgement that such matter or item is required to be disclosed therein, and (c) the mere inclusion of an item in the Seller Disclosure Schedule as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has had or would be reasonably likely to have a Material Adverse Effect. Nothing in this Schedule is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant. Inclusion of any item in this Schedule shall not constitute, or be deemed to be, an admission to any third party concerning such item.

## SELLER DISCLOSURE SCHEDULE SECTION 5.2(a)

### Subsidiaries

| Subsidiary Name | Jurisdiction of Formation | Equity Owners | % Ownership | Equity Interests in Others |
|---|---|---|---|---|
| Fuhu Holdings, Inc. | California | Fuhu, Inc. | 100% | None |
| Fuhu Limited | Hong Kong | Fuhu, Inc. | 100% | None |
| Fuhu Taiwan, Inc. | Taiwan | Fuhu, Inc. | 100% | None |
| Fuhu Japan, Inc. | Japan | Fuhu, Inc. | 100% | None |
| Fuhu Direct, Inc. | Delaware | Fuhu, Inc. | 100% | None |
| Nabi, Inc. | Delaware | Fuhu, Inc. | 100% | None |
| Atala Enterprises, Ltd. | Canada | Fuhu, Inc. | 100% | None |

## SELLER DISCLOSURE SCHEDULE SECTION 5.2(d)

### Permanent Establishments

| Entity | Address |
|---|---|
| Fuhu, Inc. | 909 N. Sepulveda Boulevard, 5th Floor, El Segundo, CA 90245 |
| Fuhu, Inc. | 1700 E. Walnut Avenue, 5th Floor, El Segundo, CA 90245 |
| Fuhu, Inc. | 691 S. Milpitas Boulevard, Milpitas, CA 95035 |
| Fuhu Taiwan, Inc. | 8Fl., No. 1, Songgao Road, Xinyi District, Taipei 11073, Taiwan |

## SELLER DISCLOSURE SCHEDULE SECTION 5.2(e)

## Assets and Liabilities of Acquired Subsidiaries

**Assets or Liabilities**

Fuhu Holdings, Inc.: Assets and Liabilities of Fuhu Holdings, Inc., are reflected in the consolidated financial statements of Fuhu, Inc.

**No Assets or Liabilities:**

Fuhu Limited
Fuhu Japan, Inc.
Fuhu Direct, Inc.
Nabi, Inc.
Atala Enterprises, Ltd.

**Assets and Liabilities:**

Fuhu Taiwan, Inc.

"Farglory Financial Center" Lease
Agreement, dated May 8, 2014, between
Fuhu Taiwan, Inc. and Farglory Life
Insurance Co., Ltd.; "Farglory Financial
Center" Lease Agreement, dated March 4,
2015.

**Fuhu Taiwan, Inc.**
**Balance Sheet[1]**
**As of November 30, 2015**

| Assets | | | Liabilities & Net Assets | |
|---|---|---|---|---|
| **Current Assets:** | | | **Current Liabilities:** | |
| Cash (Petty cash) | | | Notes payable | |

---

[1] The Taiwan lease has a security deposit under its lease that is listed under "Other Assets" on Fuhu Taiwan's Balance Sheet. If there is an outstanding amount owed to the landlord, it would be listed as a Liability on their Balance Sheet as well.

| | | | | |
|---|---|---|---|---|
| | 1,611 | | Accrued expenses-other | - |
| Cash (Petty cash)-US | 269 | | | 34,446 |
| Cash (Petty cash)-HKD | - | | Accrued payroll | 230,400 |
| Cash (Petty cash)-CNY | 285 | | Accrued expenses-Staff | 769 |
| Cash in banks | 519,116 | | Taxes payable | - |
| Cash in banks-checking Account | 191 | | Other payables | - |
| Accounts receivable | 519,319 | | Temporary receipts | 5,562 |
| Other receivables | - | | Intercompany payables | 705,874 |
| Prepaid expenses-insurance | 93 | | Receipts under custody-insurance | 7,789 |
| Prepaid expenses-other | 16,861 | | Receipts under custody-income tax employees | 10,190 |
| Temporary payments | 3,256 | | Receipts under custody-2% health insurance | - |
| Prepaid sales tax(VAT-input) | 4,268 | | Receipts under custody-other | - |
| Tax refund receivable | 6,376 | | **Liabilities** | **995,032** |
| | **1,071,642** | | | |
| | | | | |
| **Property** | | | | |
| Facilities | 55,743 | | Capital (Registered) | 182,407 |
| Accumulated depreciation | (28,766) | | | |
| | **26,977** | | Legal reserve | 222 |
| | | | Accumulated profit or loss | 27,732 |
| | | | Net income or loss for current period | 403,731 |
| **Other assets** | | | | |
| Refundable deposits | 267,054 | | | |
| Unamortized expenses | 243,436 | | **Equity Capital** | **614,093** |
| Payment on behalf of others | 15 | | | |
| | **510,505** | | | |
| | | | | |
| Total Assets | | | **Total Liabilities & Net** | |

| | 1,609,124 | Assets | 1,609,124 |
|---|---|---|---|

**SELLER DISCLOSURE SCHEDULE SECTION 5.4(a)(iii)**

**Consents and Conflicts – Material Contracts**

See Section 5.10(c)

**SELLER DISCLOSURE SCHEDULE SECTION 5.4(b)(i)**

**Governmental Authority Consents**

None.

**SELLER DISCLOSURE SCHEDULE SECTION 5.4(b)(iii)**

**Governmental Authority Consents - Permits**


None.

**SELLER DISCLOSURE SCHEDULE SECTION 5.5**

**Legal Proceedings**


**[see attached]**

| Matter | Date Filed | Fuhu Counsel |
|---|---|---|
| **Memory Integrity LLC v. Fuhu, Inc.**<br>USDC DE Case No. 1:13-cv-01799-GMS | Nov 2013 | Akin Gump Strauss Hauer & Feld LLP |
| **Alprica, Inc. v. Fuhu Holdings, Inc.**<br>Los Angeles Superior Court Case No. BC 532024 | Dec 2013 | Akin Gump Strauss Hauer & Feld LLP |
| **Miller et al. v. Fuhu, Inc. et al.**<br>CDCA Case No. 14-cv-6119 CAS (ASx) | July 2014 | O'Melveny & Myers LLP |
| **D&H Distributing Co. v. Fuhu, Inc.**<br>Los Angeles Superior Court Case No. YC070375 | January 2015 | Latham & Watkins LLP |
| **Magnacross LLC v. Fuhu, Inc.**<br>EDTX Case No. 2:15-cv-845 | May 2015 | Akin Gump Strauss Hauer & Feld LLP |
| **Morpho Komodo LLC v. Fuhu, Inc.**<br>EDTX Case No. 2:15-cv-01104 | June 2015 | Akin Gump Strauss Hauer & Feld LLP |
| **Tymphany HK Limited v. Fuhu, Inc.**<br>Los Angeles Superior Court Case No. BC584266 | June 2015 | Bryan Cave LLP |
| **Fuhu, Inc. v. Wistron Corporation et al.**<br>CDCA Case No. 2:15-cv-4447-DDP-JC | June 2015 | Dentons US LLP |
| **Fuhu, Inc. v. Datapipe, Inc. et al.**<br>Los Angeles Superior Court Case No. BC591615 | August 2015 | Jassy Vick Carolan LLP |
| **WMBE Payrolling, Inc. v. Fuhu, Inc.**<br>San Diego Superior Court Case No. 37-2015-00026525-CU-CL-CTL | August 2015 | Tesser Ruttenberg & Grossman LLP |
| **Wistron Corporation et al. v. Fuhu, Inc.**<br>Los Angeles Superior Court Case No. YC070375 | Sept 2015 | Dentons US LLP |
| **Career Group Inc. v Fuhu, Inc.**<br>Los Angeles Superior Court Case No. BC594118 | Sept 2015 | Bryan Cave LLP |
| **Proven Solutions, LLC v. Fuhu, Inc.**<br>Los Angeles Superior Court Case No. YC070885 | October 2015 | Bryan Cave LLP |
| **PR Logistics, LLC v. Fuhu, Inc. et al.**<br>Los Angeles Superior Court Case No. YC070940 | Nov 2015 | N/A |
| **Symbology Innovations, LLC v. Fuhu, Inc.**<br>EDTX Case No. | Nov 2015 | Akin Gump Strauss Hauer & Feld LLP |
| **Van Etten Sipprelle LLP v Fuhu, Inc. et al.**<br>Los Angeles Superior Court Case No. 15K14438 | Nov 2015 | N/A |
| **The Animation Guild, IATSE Local 839 and Fuhu, Inc.**<br>NLRB Case No. 31-CA-153710 | October 2015 | Dentons US LLP |
| **Nokia Technologies LTD. adv. Fuhu Holdings, Inc.** | N/A | N/A |
| **Tanner Stuhaug adv. Fuhu, Inc.** | N/A | N/A |

| | | |
|---|---|---|
| **KT Dunphy adv Fuhu, Inc.** | N/A | N/A |
| | | |
| **Chengcheng Yu v. Fuhu, Inc.**<br>Cal DLSE Case No. 05-64978 EE | N/A | N/A |
| | | |
| **Stephanie Arculli v. Fuhu, Inc.**<br>Cal DLSE Case No. 05-65594 EE | N/A | N/A |
| | | |
| **SAFRAN v. Fuhu Holdings, Inc.**<br>TTAB Opposition Nos. 91218120 and 91218121 | N/A | Bryan Cave LLP |
| | | |
| In addition to the foregoing matters, (i) the company has received various demands for payment and threats of the institution of legal proceedings against the Selling Entities with respect to the failure of any such entity to make payments as and when due, and (ii) Fuhu Inc. and/or Fuhu Holdings, Inc. may be involved in trademark opposition matters in non-U.S. jurisdictions where the outcome of any such matter would not result in a Material Adverse Effect. | | |

## SELLER DISCLOSURE SCHEDULE SECTION 5.7(c)

## Indebtedness of Selling Entities

| Party | Nature of Debt | Amount |
|---|---|---|
| LG Display Co., Ltd.(See Schedule 5.10(a)(i), #19 (Contracts for Indebtedness)) | Put Option for Common Stock and Series D Preferred Stock | $26,000,000 |
| Morgan Stanley | Convertible Note | $11,571,717 |
| Intel Capital Corporation (See Schedule 5.10(a)(i), #18 (Contracts for Indebtedness)) | Put Option for Series D Preferred Stock | $10,000,000 |
| Tennenbaum Capital Partners, LLC | Loan | $5,120,789 |
| Fusing International, Inc. | Purchase Money Security Interest | $2,000,067 |
| LSQ Funding Group L.C. | Factored Invoices | $1,279,000 |
| Power-All Networks Ltd. | Note Payable | $900,000 |
| Mattel, Inc. | Note Payable | $300,000 |
| Wells Fargo Equipment Finance, Inc. | Shuttle Bus Lease | $88,422 |
| Wells Fargo Bank, NA | Company Credit Cards | $30,314 |
| Wells Fargo Financial Leasing | Computer Equipment Leases | $4,514 |
| Canon Financial Services | Copier Leases | $7,603 |
| | | |

## SELLER DISCLOSURE SCHEDULE SECTION 5.8

### Seller Benefit Plans

1. Fuhu, Inc. 401(k) -- Allied Consultants Inc. Volume Submitter Defined Contribution Plan; Basic Plan 12.

2. Kaiser Permanente Medical, HMO.

3. Anthem Medical, HMO 20 or 40; Anthem Solution PPO 2500/25/20; Anthem Classic PPO 500/30/20.

4. Anthem Dental, Blue Vision.

5. Anthem Basic Life and AD&D Insurance.

**SELLER DISCLOSURE SCHEDULE SECTION 5.8(b)**

**Compliance with Seller Benefit Plans**

None.

## SELLER DISCLOSURE SCHEDULE SECTION 5.8(f))

### Foreign Plans

| Benefit | Description |
|---|---|
| **Insurance/Pension by Government Law** | Labor Insurance |
| | Health Insurance |
| | Labor Pension |
| **Group Insurance** | Term Life |
| | Personal Accident |
| | Accident: Aircrafts |
| | Accidental Injury |
| | Intensive Care Unit Treatment Insurance Rider |
| | Hospital & Surgical |
| | Occupational Hazard Insure |
| **Travel insurance** | AD&D: Accidental Death and Dismemberment |
| | MR: Medical Insurance |
| | OHS: Occupational Health and Safety |
| **Leave-Taking of Workers** | Annual Leave: 7, 10, 15    days according to employee's work period |
| | Marital Leave: 8 days |
| | Maternity Leave: 56 days |
| | |
| | Paternity Leave: 5 days |
| | Funeral Leave: 3, 6 or 8 days according to three kinds kinship relationship |
| **General Affairs** | Annual Bonus |
| | Year-end Party |
| | Cookies |
| | Coffee & Drinks |
| | Fresh Fruit ( on Wed.) |
| | Department Outing /Monthly |
| | Meal allowance for overtime |
| | Training course |
| | Allowance NTD1000/P for Chinese Traditional holiday (Dragon Boat Festival, Moon Festival and Chinese New Year |
| | Red Envelopes for congratulate employee's wedding |
| | White Envelope for grieve over death their family |
| | Sent Fruit  or flower basket to Hospital for |

|  | Sick Employee. |
|  | Car parking space for executive |
|  | Motorcycle parking space for employees |

## SELLER DISCLOSURE SCHEDULE SECTION 5.9(c)

### Employment Compliance

None.

## SELLER DISCLOSURE SCHEDULE SECTION 5.9(f)

### COBRA Liabilities

None.

## SELLER DISCLOSURE SCHEDULE SECTION 5.9(h)

## Independent Contractors

None.

**SELLER DISCLOSURE SCHEDULE SECTION 5.10(a)(i)**

**Material Contracts**


**[See attached]**

# Schedule 5.10(a)(i)

## Material Contracts

**Contracts for Indebtedness**

1. Credit Agreement, dated May 27, 2015, among Fuhu Inc., Obsidian Agency Services, Inc., and Tennenbaum Special Situations Fund IX, LLC; Borrowing Base Certificate, dated May 27, 2015; Form of Notice of Borrowing, dated May 27, 2015; Copyright Security Agreement, dated May 27, 2015; Guarantee and Collateral Agreement, dated May 27, 2015; First Amendment to Credit Agreement, dated July 9, 2015; Officer's Certificate, dated May 27, 2015.

2. Note, dated May 27, 2015, between Fuhu Inc. and Tennenbaum Special Situations Fund IX, LLC; Warrant, dated May 27, 2015; Form of Perfection Certificate, undated; Officer's Certificate, dated May 27, 2015; Warrant Purchase Agreement, dated May 27, 2015; Secretary's Certificate, dated May 27, 2015; Officer's Closing and Solvency Certificate, dated May 27, 2015.

3. United States Patent and Trademark Office Notice of Recordation of Assignment Document, Assignment of Patents, dated May 28, 2015, from Fuhu, Inc. to Obsidian Agency Services c/o Tennenbaum Capital Partners; United States Patent and Trademark Office Notice of Recordation of Assignment Document, dated June 1, 2014.

4. Deposit Account Control Agreement, dated July 23, 2015, among Fuhu, Inc., Obsidian Agency Services, Inc., and Wells Fargo Bank, NA.

5. Bailee Agreement, dated May 27, 2015, among Obsidian Agency Services, Inc. (as collateral agent for Tennenbaum), Fuhu, Inc., and Rakuten Super Logistics (fka Webgistix Corp.); Acknowledgment of Administrative Agent, dated July 20, 2015.

6. Bailee Agreement, dated May 27, 2015, among Obsidian Agency Services, Inc., (as collateral agent for Tennenbaum), Fuhu, Inc., and AFC Worldwide Express, Inc. dba R+L Global Logistics.

7. Factoring and Security Agreement, dated April 21, 2015, between Fuhu, Inc. and LSQ Funding Group, L.C.; Validity Agreement, dated April 21, 2015; Consent to Credit Agreement with Obsidian Agency Services, dated May 27, 2015.

8. Convertible Promissory Note, dated December 31, 2013, among Fuhu, Inc., Fuhu Holdings, Inc., and Morgan Stanley Expansion Capital LP.

9. Convertible Promissory Note, dated December 31, 2013, among Fuhu, Inc., Fuhu Holdings, Inc., and MS Expansion Capital Co-Investment Vehicle LP.

10. Letter Agreement, dated December 31, 2013, among Fuhu Inc., Fuhu Holdings, Inc., Morgan Stanley Expansion Capital LP, and MS Expansion Capital Co-Investment Vehicle LP; Note and Warrant Purchase Agreement, dated December 31, 2013; Consent

with respect to Note and Warrant Purchase Agreement, dated May 27, 2015; Waiver with respect to Note and Warrant Purchase Agreement, dated July 8, 2015; Debt Subordination Agreement, dated May 27, 2015.

11. Waiver with respect to Note and Warrant Purchase Agreement, dated July 8, 2015, among Fuhu Inc., Fuhu Holdings, Inc., North Haven Expansion Capital LP (fka Morgan Stanley Expansion Capital LP), and North Haven Expansion Capital Co-Investment Vehicle LP (fka MS Expansion Capital Co-Investment Vehicle LP).

12. Unified Lease Agreement, dated December 9, 2014, between Fuhu Inc. and Canon Solutions America, Inc.

13. Memorandum of Understanding, dated April 2, 2014, between Fuhu, Inc. and Hon Hai Precision Industries, Ltd. (Foxconn); Memorandum of Understanding, dated July 1, 2014.

14. Equipment Lease, dated March 6, 2015, between Fuhu, Inc., and Creative Bus Sales, Inc.; Acknowledgment and Agreement between Fuhu, Inc., assigning the Equipment Lease from Creative Bus Sales Inc., to Wells Fargo Equipment Finance, Inc., dated March 6, 2015; Invoice, dated March 6, 2015; Titled Equipment Agreement and Acknowledgement, undated; Insurance, dated March 6, 2015; Authorization for Automatic Payment Plan, undated.

15. Capital Lease, dated August, 31, 2012, between Fuhu Holdings, Inc. and VAR Resources, Inc.; Addendum to Purchase Order and Conditions of Credit Approval, dated August 17, 2012; Purchase Order Agreement, dated September 5, 2012; Master Lease Agreement, dated August 20, 2012.

16. Secured Promissory Note, dated December 3, 2015, among Fuhu, Inc., Fuhu Holdings, Inc., and Mattel, Inc.

17. Purchase-Money Security Agreement, dated October 12, 2015, between Fuhu, Inc., and Fusing International Inc.

18. Put Agreement, dated April 2, 2014, between Fuhu, Inc. and Intel Capital Corporation, a Delaware corporation.

19. Put Option Agreement, dated July 31, 2015, between Fuhu, Inc. and LG Display Co., Ltd., a company organized under the laws of the Republic of Korea.

20. Verbal, undated Agreement between Fuhu, Inc. and Power-All Networks Ltd.

**Real Property Leases**

See Schedule 5.10(a)(ii).

## Information Technology

1. Service Order Number One to Master Service Agreement, dated April 9, 2015, between Fuhu, Inc. and BCM One, Inc., a New York corporation.

2. Authorization and Service Engagement, dated November 18, 2014, between Fuhu (the Authorization and Service Engagement does not specify which Fuhu entity) and P-1 Technologies; Statement of Work: EMC Isilon Implementation, dated November 14, 2014; Service Brief: Network Remediation, dated February 12, 2015, prepared by P-1 Technologies for Fuhu, Inc.

3. Cloud Sherpas Amendment to the Google Apps Service Agreement, dated December 19, 2014, between Fuhu, Inc., and Cloud Sherpas.

4. Service Order Form, from Fuhu, Inc. to Zayo Group, dated June 4, 2014.

5. Proposed Statement of Work, from Independent Technology Group to Fuhu (the Statement of Work does not specify which Fuhu entity), dated February 13, 2015.

6. Gigabit Data Center Services Agreement, dated September 1, 2011, between Fuhu, Inc., and Alchemy Communications, Inc.

7. Master Agreement for Velocity Services, dated May 11, 2015, between Fuhu Inc., and Velocity Technology Solutions, Inc.; Service Description for Velocity Services, dated May 22, 2015.

8. Straightline Communications; there are no agreements directly between a Fuhu entity and Straightline Communications, as Straightline is a reseller/broker.

9. Master Agreement, dated as of February 28, 2014, between Oracle America, Inc. and Fuhu, Inc.

10. Reliam Sales Order Form for AWS Re-Sale and cost optimization services, dated October 1, 2015; Reliam's Sales Order Form for PCI Compliance Environment on AWS, dated September 30, 2015.


## Tablet Manufacturing

1. Master Purchase Agreement, dated January 1, 2013, between Fuhu, Inc. and Hon Hai Precision Industry, Co., Ltd., a corporation organized under the laws of the Republic of China; Amendment to the Master Purchase Agreement, dated July 1, 2014. *(Note: Hon Hai has given notice of termination).*

2. Product Supply Agreement, dated April 22, 2015, between Fuhu, Inc. and Arima Communications Corporation, a Taiwan corporation. *(Note: Fuhu has not executed Arima Agreement, but has issued PO's and purchased product from Arima in anticipation thereof).*

**Accessories and Other Suppliers**

1. Product Supply Agreement, dated May 10, 2013, between Fuhu, Inc. and dreamGear, LLC, a corporation organized under the laws of California.

2. Product Supply Agreement, dated March 22, 2013, between Fuhu Holdings, Inc. and Hip Sing China Industrial Ltd., a corporation organized under the laws of Hong Kong.

3. Supply Agreement, dated July 31, 2015, between Fuhu, Inc. and LG Display Co., Ltd., a company organized under the laws of the Republic of Korea.

4. Product Supply Agreement, dated June 3, 2013, between Fuhu Holdings, Inc. and Grandsun Electronics Co. Ltd., a corporation organized under the laws of People Republic of China.

5. Product Supply Agreement, dated April 26, 2013, between Fuhu Holdings, Inc. and Shenzhen AEE Technology Co., Ltd., a corporation organized under the laws of the People's Republic of China.

6. Product Supply Agreement, dated April 14, 2012, between Fuhu, Inc. and Wictle International Co., Ltd., a corporation organized under the laws of Hong Kong.

**Tablet Technology Licenses**

1. License Agreement, dated December 6, 2013, between Fuhu, Inc. and Pen Generations, Inc., a South Korean corporation.

2. High-Definition Multimedia Interface Specification Adopter Agreement, dated March 21, 2012, between Fuhu, Inc. and HDMI Licensing, LLC.

3. Playready Device Development and Intermediate Project Distribution License, dated October 1, 2012, between Fuhu Holdings, Inc. and Microsoft Corporation, a Washington corporation; Playready Server Application Development and Distribution License, dated October 1, 2012.

4. Playready Master Agreement, dated October 1, 2012, between Fuhu Holdings, Inc. and Microsoft Licensing, GP, a Nevada general partnership; Playready Service Deployment License, dated October 1, 2012; Playready Device Final Product Distribution License,

dated October 1, 2012; Windows Media Components Final Product Agreement, dated June 1, 2012; Microsoft PlayReady Server Agreement, dated April 24, 2015.

5. AVC Patent Portfolio License, dated May 16, 2012, between Fuhu, Inc. and MPEG LA, L.L.C., a Delaware limited liability company; MPEG-4 Visual Patent Portfolio License, dated May 16, 2012; MPEG-2 Patent Portfolio License, dated May 16, 2012; Automatic Renewal Addendum, dated January 1, 2016.

6. License and Distribution Agreement, dated October 11, 2012, between Fuhu Holdings, Inc. and AuthenTec, Inc., a Delaware corporation.

7. Technology Partner Program Agreement, dated May 12, 2014, between Fuhu, Inc. and Vision Objects, a French "Societe Anonyme."

8. SD Card Association Membership Application, between Fuhu Holdings, Inc. and SD Card Association, dated October 12, 2012.

9. AAC Patent License Agreement, dated May 25, 2012, between Fuhu, Inc. and Via Licensing Corporation, a Delaware Corporation.

10. Wi-Fi Alliance Membership Agreement, dated June 27, 2012, between Fuhu Holdings, Inc. and Wi-Fi Alliance, a California nonprofit mutual benefit corporation; Wi-Fi Alliance Intellectual Property Rights Policy Acknowledgment, dated June 27, 2012.

11. License Agreement, dated November 15, 2013, among Fuhu Inc., Audio MPEG, Inc., a Virginia corporation and Societa' Italiana Per Lo Sviluppo Dell'elettronica, S.I.SV.EL S.p.A., a corporation organized under the laws of Italy.

12. License Agreement, dated October 11, 2014, between Fuhu and MLR, LLC, a Virginia limited liability company.

**Warehouse, Fulfillment, Logistics and Customer Service**

1. Fuhu, Inc. Distribution Agreement, dated May 10, 2012, between Fuhu, Inc. and D & H Distributing Co., a Pennsylvania company.

2. Warranty Service Provider Agreement, dated March 27, 2015, between Ozark Electronics Repair and Mazarine Enterprises, Inc.; Amendment No. One to the Warranty Service Provider Agreement, dated March 27, 2015; Statement of Work Phase 1 In Warranty Nabi Replacement Program, dated March 27, 2015; Statement of Work Phase 2 Out of Warranty Nabi Repair Program, dated April 29, 2015.

3. Warehousing Agreement, dated June 5, 2014, between Fuhu, Inc. and AFC Worldwide Express, Inc. dba R+L Global Logisitics; Addendum to Master Agreement Schedule B, dated August 4, 2014.
4. Fulfillment Services Agreement, dated October 23, 2013, between Fuhu, Inc. and Webgistix Corporation.

5. Master Services Agreement, dated September 4, 2013, between Fuhu, Inc. and 24-7 Intouch, Inc.; Statement of Work Change, dated October 21, 2013.

6. Scope and Proposal Prepared for Fuhu, Inc., dated June 15, 2015 (pricing valid until June 27, 2015), by SPS Commerce.

7. FedEx Pricing Agreement, dated October 29, 2013, between Fuhu (the agreement does not specify which Fuhu entity) and Federal Express Corporation, FedEx Ground Package System, Inc. and FedEx Smartpost Inc.

**Sales Representatives**

1. Sales Representative Agreement, dated September 1, 2014, between Fuhu, Inc. and Griffin International Companies, Inc., a Minnesota corporation.

2. Sales Representative Agreement, dated March 5, 2015, between Fuhu, Inc. and Watt/Spohn Universal, a Texas corporation.

3. Sales Representative Agreement, dated March 5, 2015, between Fuhu, Inc., and Berberian & Associates, Inc.

**Customers**

1. Vendor Master Agreement, dated July 26, 2013, between Fuhu Holdings, Inc. and Best Buy Purchasing LLC, a Minnesota corporation; Vendor Master Agreement, dated February 1, 2014; Vendor Master Agreement, dated September 10, 2014; Vendor Master Agreement, dated September 10, 2015.

2. Vendor Program Agreement, dated September 22, 2014, between Fuhu, Inc. and Best Buy Purchasing LLC, a Minnesota corporation; Vender Program Agreement, dated March 21, 2015.

3. Partners Online Agreement, dated July 24, 2014, between Fuhu, Inc. and Target Canada Co.

4. Master Purchase Order Agreement, dated September 11, 2014, between Fuhu, Inc. and Toys R Us - Delaware, Inc.

5. Walmart General Merchandise Supplier Agreement, dated August 6, 2013, between Fuhu, Inc. and Wal-Mart Stores, Inc.

6. Distribution Agreement, dated March 31, 2015, between Fuhu, Inc. and WYNIT Distribution, LLC; Amendment No. 1 to the Distribution Agreement, dated August 24, 2015; Amendment No. 2 to the Distribution Agreement, dated November 18, 2015.

7. Vendor Program Agreement, dated April 21, 2015, between Fuhu, Inc., and BrandsMart USA.

8. New Account Application, dated March 20, 2015, between Fuhu and Electronic Express, Inc.; Non-Disclosure and Information Assignment Agreement, dated March 20, 2015; New Vendor Maintenance Sheet, undated,

9. Standard Vendor Agreement, dated January 2015, between Fuhu, Inc. and The Kroger Co.; Amendment to Standard Vendor Agreement between Kroger Co. and Fuhu, Inc., undated.

## Merchandising Licenses

1. License Agreement, dated July 1, 2013, between Fuhu, Inc. and Disney Consumer Products, Inc.; Extension of License Agreement Term, dated July 1, 2013; First Amendment to the Standard Terms and Conditions, dated July 1, 2013.; Consumer Products License, dated July, 1, 2013; Schedule to License Agreement, dated July 1, 2013; Schedule to License Agreement, dated September 1, 2013; Schedule to License Agreement, dated October 24, 2014; First Amendment to License Agreement, dated May 1, 2014; Extension of License Agreement Term, dated January 30, 2015; Extension of License Agreement Term, dated March 3, 2015; Extension of License Agreement Term, dated March 30, 2015.

2. Master License Agreement with Schedule I, dated April 1, 2012, between Fuhu Holdings, Inc. and Dreamworks Animation LLC, a Delaware limited liability company; Schedule II to Master License Agreement, dated June 17, 2013; Schedule III to Master License Agreement, dated September 1, 2013; Amended and Restated Schedule III to Master License Agreement, dated February 1, 2014; Schedule IV to the Master License Agreement, dated February 1, 2014.

3. License Agreement and Schedule, dated October 3, 2014, between Fuhu, Inc. and Marvel Characters B.V.

4. Product License Agreement, dated September 4, 2012, between Fuhu Holdings, Inc. and Warner Bros. Consumer Products, Inc.

5. Merchandising License Agreement, dated February 13, 2015, between Fuhu Inc., and MGA Entertainment, Inc.

## Software Licenses

1. Software License Agreement, dated February 27, 2014, between Fuhu, Inc. and ArcSoft, Inc., a California corporation; Amendment One to the Software License Agreement, dated February 27, 2014.

2. Software Development and License Agreement, dated August 7, 2014, between Fuhu, Inc. and Hyweb Technology Co., Ltd., a Taiwanese corporation.

3. Android PDK License Agreement for OEMs, dated October 3, 2014, between Fuhu, Inc. and Google, Inc., a Delaware corporation.

4. Mobile Application Distribution Agreement, dated December 1, 2014, between Fuhu, Inc. and Google, Inc., a Delaware corporation.

5. Anti-Fragmentation Agreement, dated December 4, 2014, between Fuhu, Inc. and Google, Inc., a Delaware corporation.

6. Mobile Application Distribution Agreement, dated June 1, 2013, between Fuhu, Inc. and Google, Inc.

7. Annex One, MediaMaker Software and Service Level Agreement, undated, between Fuhu, Inc. and XStream A/S; Xstream Software Purchase Order, dated March 15, 2013, between Fuhu, Inc. and Xstream A/S; Xstream Hosting Service Level Agreement, undated.

8. Mediago Master License and Professional Services Agreement, dated March 31, 2015, between Fuhu, Inc. and Kaltura, Inc.

9. BrightCove Master Service Agreement, dated December 11, 2013, between Fuhu, Inc. and Brightcove, Inc.

10. Master Services Agreement, dated May 23, 2012, between EdgeCast Networks, Inc., and Fuhu, Inc.; Service Level Agreement, undated; Service Order, dated May 23, 2012.

11. Agreement, dated May 24, 2011, between 7Digital, Limited, a company incorporated under the laws of England and Wales.

**EST/VOD Distribution Agreements**

1. Electronic Home Video License Agreement, dated July 29, 2013, between Fuhu Holdings, Inc. and ABC Cable Networks Group, a California corporation.

2. Video on Demand and Electronic Sell-Through Content License Agreement, dated November 25, 2013, between Fuhu, Inc. and Anderson Digital, LLC; Amendment No. 1 to Content License Agreement, dated December 1, 2014.

3. Video on Demand and Electronic Sell-Through Content License Agreement, dated September 8, 2014, between Fuhu, Inc. and The Baby School Company, Inc. d.b.a. So Smart! Productions.

4. Video on Demand and Electronic Sell-Through Content License Agreement, dated May, 15, 2014, between Fuhu, Inc. and Eat Right, LLC.

5. Video-on-Demand and Electronic Sell Through License Agreement, dated July 17, 2014, between Fuhu, Inc. and Fanlala, Inc.

6.  Video-on-Demand and Electronic Sell Through License Agreement, dated March 17, 2014, between Fuhu, Inc. and 20th Century Fox Film Corporation.

7.  Electronic Sell–Through Enforceable Term Sheet, dated January 31, 2014 between Fuhu, Inc. and Hasbro Studios LLC, a Delaware limited liability company.

8.  Video on Demand and Electronic Sell-Through Content License Agreement, dated September 9, 2014, between Fuhu, Inc. and The Mother Company, LLC, a California limited liability company.

9.  Video on Demand and Electronic Sell-Through Content License Agreement, dated October 29, 2014, between Fuhu, Inc. and Redrover Co., Ltd., a South Korean corporation.

10. Digital Distribution License Agreement, dated April 23, 2014, between Fuhu, Inc. and Paramount Pictures Corporation; First Amendment to Digital Distribution License Agreement, dated June 4, 2014.

11. Video-on-Demand and Electronic Sell Through License Agreement, dated March 23, 2015, between Fuhu, Inc. and Nelvana International Limited, an Irish incorporated company.

12. Video-on-Demand and Electronic Sell Through License Agreement, dated October 23, 2015, between Fuhu, Inc. and NCircle Entertainment, a division of Alliance Entertainment, LLC, a Delaware limited liability company.

**Software (Application Pre-Loads) Distribution Agreements**

1.  Software Distribution Agreement, dated October 27, 2011, between Fuhu, Inc. and A&R Entertainment, a French institution.

2.  Software Distribution Agreement, dated July 10, 2014, between Fuhu Holdings, Inc. and Agile Fusion Corporation, a California corporation.

3.  Software Distribution Agreement, dated October 20, 2014, between Fuhu, Inc. and Allrecipes.com, Inc., a Washington corporation.

4.  Software Distribution Agreement, dated May 31, 2012, between Fuhu, Inc. and Atomicom Limited, a UK Limited corporation.

5.  Software Distribution Agreement, dated July 24, 2014, between Fuhu Holdings, Inc. and Ayopa Games LLC, a California Limited Liability Company.

6.  Software Distribution Agreement, dated July 31, 2014, between Fuhu Holdings, Inc. and Fingerprint Play, Inc., a California corporation at Fingerprint Digital, Inc. a Delaware corporation; First Amendment to Software Distribution Agreement, dated August 6, 2014.

7.  Software Distribution Agreement, dated May 22, 2012, between Fuhu, Inc. and The Cartoon Network, Inc., a Delaware corporation.

8.  Software Distribution Agreement, dated December 22, 2013, between Fuhu Holdings, Inc. and Crescent Moon Games.

9.  Mobile Licensing Agreement, dated October 27, 2013, between Fuhu, Inc. and Halfbrick Studios Pty, Ltd., an Australian corporation. *(Halfbrick has provided notice of termination).*

10. Software Distribution Agreement, dated March 4, 2014, between Fuhu Holdings, Inc. and Hidden Variable Studios, LLC, a California limited liability company.

11. Software Distribution Agreement, dated March 4, 2014, between Fuhu Holdings, Inc. and Hitcents, Inc., a Kentucky corporation.

12. Software Distribution Agreement, dated April 18, 2014, between Fuhu Holdings, Inc. and iStory Time, Inc., a Delaware corporation.

13. Software Distribution Agreement, dated April 18, 2014, between Fuhu Holdings, Inc. and Knowledge Adventure, Inc., a Delaware corporation.

14. Software Distribution Agreement, dated February 18, 2013, between Mediocre AB, a Swedish corporation.

15. Software Distribution Agreement, dated April 3, 2014, between Fuhu Holdings, Inc. and Murtha Design, Inc., an Ontario, Canada corporation.

16. Software Distribution Agreement, dated July 10, 2014, between Oooweeooo Inc., an Ontario Canada corporation.

17. Software Distribution Agreement, dated January 21, 2014, between Fuhu Holdings, Inc. and Silver Creek Entertainment, an Oregon corporation.

18. Software Distribution Agreement, dated March 12, 2014, between Fuhu Holdings, Inc. and StoryToys, Inc., and Irish corporation.

19. Software Distribution Agreement, dated January 23, 2014, between Fuhu Holdings, Inc. and TinyTap, Ltd., and Israel corporation.

20. Software Distribution Agreement, dated March 10, 2014, between Fuhu Holdings, Inc. and Visual Blasters, LLC, a Florida limited liability company.

21. YouTube APK and Marketing Agreement, dated November 21, 2014, between Fuhu, Inc. and Google, Inc., a Delaware corporation.

22. Open Screen Project Agreement and Software Distribution License, dated September 21, 2011, between Fuhu, Inc. and Adobe Systems Incorporated, a Delaware corporation; Adobe Systems Incorporated's Letter Amendment to OSP License Agreement, dated March 23, 2012.

23. Software Distribution Agreement, dated April 3, 2015, between Fuhu Holdings, Inc. and Toca Boca AB, a Swedish corporation.

**Nabi Pass Content Distribution Agreements**

1. Digital Content Distribution Agreement, dated July 29, 2013, between Fuhu Holdings, Inc. and ABC Cable Networks Group, a California corporation.

2. Master License Agreement, dated April 23, 2012, between Fuhu, Inc. and Cookie Jar Entertainment, Inc., a corporation incorporated in Canada; First Amendment to Agreement Between Fuhu, Inc. and Cookie Jar Entertainment Inc., dated August 24, 2012.

3. Content License Agreement, dated July 21, 2014, between Fuhu, Inc. and Nelvana International Limited, an Irish incorporated company; Amendment to Content License Agreement, dated September 16, 2014;

4. Content License Agreement, dated August 31, 2014, between Fuhu, Inc. and Auryn, Inc., a California corporation.

5. Content License Agreement, dated October 31, 2014, between Fuhu, Inc. and Cupcake Digital, Inc., a Delaware corporation.

6. Content License Agreement, dated May 16, 2014, between Fuhu, Inc. and Curtis Licensing, a division of The Saturday Evening Post Society, Inc., an Indiana corporation.

7. Content License Agreement, dated June 27, 2014, between Fuhu, Inc. and National Geographic Society, a District of Columbia corporation.

8. Content License Agreement, dated November 3, 2011, between Fuhu, Inc. and Two Tomatoes, LLC, a New York limited liability company; Addendum Number One to Content License Agreement, dated December 8, 2011; Addendum Number Two to Content License Agreement, dated April 17, 2012; Addendum Number Three to Content License Agreement, dated April 17, 2014; Addendum Number Four to Content License Agreement, dated June 2, 2014.

9. Content License Agreement, dated November 13, 2014, between Fuhu, Inc. and Discovery Communications, LLC, a Delaware limited liability company.

13. Content License Agreement, dated August 12, 2014, between Fuhu, Inc. and Paws, Incorporated, an Indiana corporation.

14. Content License Agreement, dated May 27, 2015, between Fuhu, Inc. and Cinedigm Entertainment Corp., a New York corporation.

10. Nabi Karaoke Device Download Code Agreement, dated August 15, 2014, between Fuhu, Inc. and Walt Disney Records, a division of ABC, Inc.

11. Nabi Pass Application License Agreement, undated, between Fuhu, Inc. and Agile Fusion Corporation.

12. Nabi Pass Application License Agreement, undated, between Fuhu, Inc. and Laura Tallardy, an individual.

13. Nabi Pass Application License Agreement, undated, between Fuhu, Inc. and Loud Crow.

14. Content License Agreement, dated October 22, 2015, between Fuhu, Inc. and NCircle Entertainment, a division of Alliance Entertainment, LLC, a Delaware limited liability company.

**Miscellaneous**

1. ABC Promotion Agreement, dated August 1, 2013, between Fuhu Holdings, Inc. and ABC Cable Networks Group, Radio Disney, a division of ABC Radio Networks Assets, LLC and Radio Disney Group, LLC.

2. DKC Public Relations, Marketing & Government Affairs Agreement, dated October 29, 2013, between Fuhu, Inc. and Dan Klores Communications, LLC; DKC Public Relations, Marketing & Government Affairs Agreement, dated March 13, 2014.

3. Shopify Plus Agreement, dated March 28, 2014, between Fuhu, Inc. and Shopify, Inc. a Canadian corporation; Shopify Service Level Agreement, dated March 28, 2014.

4. Merchant Agreement, dated October 30, 2014, between Fuhu, Inc. and Affirm, Inc. a Delaware corporation.

5. Viacom Media Networks Letter Agreement, dated April 30, 2012, between Fuhu, Inc. and Viacom Media Networks, a division of Viacom International, Inc., a division of Viacom International, Inc.

6. NVIDIA Upstream Technology License Agreement, dated May 9, 2013, between Fuhu Holdings, Inc. and NVIDIA Corporation, a Delaware Corporation.

7. kidSAFE+ Membership Agreement, dated January 1, 2014, between Fuhu, Inc. and Samet Privacy, LLC.

8. Consulting Agreement, dated October 1, 2011, between Fuhu, Inc., and OSG Taiwan Limited Company; Amendment No. 1 to Consulting and Service Agreement, dated September 15, 2012.

9. Equipment Finance Agreement, Dated December 10, 2012 between U.S. Bank Equipment Finance and Fuhu Holdings, Inc.; Revised Agreements thereof dated February 11, 2013 and February 26, 2013.

10. PayPal; Agreements between PayPal and a Fuhu entity are in place; however, agreements are utilized through standard terms and conditions of PayPal's online form.

11. Amazon Marketplace; Agreements between Amazon Marketplace and a Fuhu entity are in place; however, agreements are utilized through standard terms and conditions of Amazon's online form.

12. Services Agreement for Hosted Service Bureau Intelligent Call Routing and Interactive Call Processing Services, dated October 3, 2013, between Fuhu, Inc. and XO Communications Services, LLC, a Delaware limited liability company.

13. Confidential Mutual Release and Settlement Agreement, dated as of May 26, 2015, between GoPro, Inc. and Fuhu, Inc.

14. Capital Lease, dated September 30, 2012, between Fuhu Holdings. Inc. and VAR Resources, Inc.

15. Proposed Statement of Work, dated February 13, 2015, between Independent Technology Group, LLC and Fuhu. (Note: Fuhu entity is not referenced).

16. Purchase Order, dated November 8, 2014, between RFX and Fuhu, Inc.

## SELLER DISCLOSURE SCHEDULE SECTION 5.10(a)(ii)

### Real Property Leases

1. Office Lease, dated April 17, 2014, between Fuhu, Inc. and USAF 1700 Walnut, LLC, a California limited liability company; as amended by documents dated May 5, 2014, August 8, 2014, September 22, 2014, December 18, 2014, February 24, 2015, April 14, 2015, July 28, 2015, and September 11, 2015.

2. Lease Agreement, dated March 27, 2014, between Fuhu, Inc. and 691 Milpitas Investors, LLC, a Delaware limited liability company.

3. Office Lease, dated November 13, 2012, between Fuhu, Inc. and Kilroy Realty, LP, a Delaware limited partnership; First Amendment to Lease, dated July 8, 2013.

4. Lease Agreement, dated November 29, 2010, between Fuhu, Inc. and Westpark IV, LLC.; First Lease Amendment, dated February 27, 2014; Waiver and Consent by Real Property Owners, dated June 24, 2015.

5. "Farglory Financial Center" Lease Agreement, dated May 8, 2014, between Fuhu Taiwan, Inc. and Farglory Life Insurance Co., Ltd.; "Farglory Financial Center" Lease Agreement, dated March 4, 2015.

## SELLER DISCLOSURE SCHEDULE SECTION 5.10(d)

### Credit Support

1. Wells Fargo Bank, N. A. Irrevocable Standby Letter of Credit (in the amount of $183,200), dated July 12, 2013, in favor of Kilroy Realty, LP.

2. Wells Fargo Bank, N. A. Irrevocable Standby Letter of Credit, Debit Advice (in the amount of $100,000), dated June 4, 2014, in favor of USAF 1700 Walnut, LLC.

3. Wells Fargo Bank, N. A. Irrevocable Standby Letter of Credit, Debit Advice (in the amount of $100,000), dated June 4, 2014, in favor of 691 Milpitas Investors, LLC.

4. Wells Fargo Bank, N. A. Irrevocable Standby Letter of Credit (in the amount of $38,000), dated April 30 2015, in favor of Disney Consumer Products, Inc.

5. Amendment to WellsOne Commercial Card Agreement (in the amount of $50,000), dated November 16, 2015,  by and between Wells Fargo Bank, NA and Fuhu Inc.

**SELLER DISCLOSURE SCHEDULE SECTION 5.11(a)**

**Intellectual Property**

**[see attached]**

# U.S. COPYRIGHTS

## *U.S. Copyright Registrations*

| Claimant | Full Title | Copyright Reg. Number | Year |
|----------|-----------|----------------------|------|
| Fuhu Holdings, Inc. | BUTTERFLY DESIGN. | VA000187121 I | 2011 |
| Fuhu Holdings, Inc. | Chinese Character Artwork- Dragon, et al. | VAu001138965 | 2013 |
| Fuhu Holdings, Inc. | Fuhu Logo. | VA0001875038 | 2013 |
| Fuhu Holdings, Inc. | GOOD MORNING RED BIRD. | SR0000731919 | 2013 |
| Fuhu Holdings, Inc. | GOOD MORNING RED BIRD. | PA0001869037 | 2013 |
| Fuhu Holdings, Inc. | NABI 2 TABLET IMAGES. | VA0001871356 | 2012 |
| Fuhu Holdings, Inc. | Nabi - AngleView, et al. | VA0001879471 | 2011 |
| Fuhu Holdings, Inc. | Nabi Jr 16GB_RightSide, et al. | VA0001879468 | 2012 |
| Fuhu Holdings, Inc. | NABI LOGO. | VA0001869314 | 2011 |
| Fuhu Holdings, Inc. | NABI LOGO - nabi red. | VA0001871213 | 2011 |
| Fuhu Holdings, Inc. | NabiXD Back, et al. | VA0001879454 | 2012 |
| Fuhu Holdings, Inc. | PINQ LEMONADE LOGO. | VAu001138963 | 2013 |
| Fuhu Holdings, Inc. | PINQ LEMONADE LOGO-color. | VAu001138964 | 2013 |
| Fuhu Holdings, Inc. | WINGS Logo. | VA0001875036 | 2012 |
| Fuhu Holdings, Inc. | WINGS W Logo. | VA0001875037 | 2012 |

III-2

# FUHU PATENT PORTFOLIO

## FUHU ISSUED UTILITY PATENTS (US)

| Country | Appl No. | Title | Filing Date | Patent No. | Issue Date | Owner |
|---------|----------|-------|-------------|------------|------------|-------|
| US | 12/383,301 | Security and Remote Support Apparatus, System and Method | 03/23/09 | 8,234,235 | 07/31/12 | FUHU HOLDINGS, INC. |
| US | 12/592,207 | Apparatus, System and Method for an Icon Driven Tile Bar in a Graphical User Interface | 11/20/09 | 8,533,610 | 09/10/13 | FUHU HOLDINGS, INC. |
| US | 12/872,372 | Apparatus, System, and Method for a User Profile-Based OS for Mobile Devices | 08/31/10 | 8,239,772 | 08/07/12 | FUHU HOLDINGS, INC. |
| US | 14/046,893 | Systems and Methods for Device Configuration and Activation with Automated Privacy Law Compliance | 10/04/13 | 9,015,796 | 04/9/15 | FUHU, INC. |
| US | 12/381,905 | Social Based Search Engine, System and Method | 06/11/13 | 8,463,764 | 03/17/09 | FUHU HOLDINGS, INC. |
| US | 12/709,839 | System and Method for Defined Searching and Web Crawling | 02/22/10 | 8,489,577 | 07/16/13 | FUHU HOLDINGS, INC. |
| US | 12/730,500 | Apparatus, System and Method for an Icon Driven Tile Bar in a Graphical User Interface | 03/24/10 | 8,479,113 | 07/02/13 | FUHU HOLDINGS, INC. |
| US | 12/722,058 | System And Method For Providing User Access | 03/11/10 | 9,141,261 | 09/22/15 | FUHU, INC. |

1

8338340ZIV-5

CONFIDENTIAL INFORMATION – FUHU, INC. AND FUHU HOLDINGS, INC.

# FUHU PENDING UTILITY APPLICATIONS (US)

| Appl No. | Title | Filing Date | Status | Owner |
|---|---|---|---|---|
| 14/454,624 | A Mobile Computer with a Detachable Frame | 08/07/14 | Pending | FUHU, INC |
| 14/453,561 | Corner Button to Protect a Touch Screen | 08/06/14 | Pending | FUHU, INC. |
| 14/453,570 | Tablet Bumper Assembly | 08/06/14 | Pending | FUHU, INC. |
| 13/841,461 | Tablet Computer | 03/15/13 | Pending | FUHU, INC. |
| 13/852,840 | Tablet Computer | 03/28/13 | Pending | FUHU, INC. |
| 12/383,456 | Webtop and Monetization Engine, System and Method | 03/24/09 | Pending | FUHU HOLDINGS, INC. |
| 14/335,844 | Time and Sleep Control System and Method | 07/18/14 | Pending | FUHU, INC. |
| 14/522,529 | Baby Monitoring Camera | 10/23/14 | Pending | FUHU, INC. |
| 14/523,396 | Mobile Virtual Environment | 10/24/14 | Pending | FUHU, INC. |
| 14/210,647 | Tablet Transition Screens | 3/14/2014 | Pending | FUHU, INC. |
| 14/621,223 | Apparatus for Recognizing Handwritten Notes | 02/12/15 | Pending | FUHU, INC. |
| 14/606,965 | Keyboard Cover for a Tablet Computer | 01/27/15 | Pending | FUHU, INC. |
| 14/684,140 | Wireless Modular Speaker | 04/10/15 | Pending | FUHU, INC. |
| 14/669,698 | Interface for Virtual Devices, Systems, and Methods | 03/26/15 | Pending | FUHU, INC. |
| 13/834,986 | Multi-Mode Audio Device and Monitoring System | 03/15/13 | Pending | FUHU, INC. |
| 13/910,083 | Access Control Systems | 06/04/13 | Pending | FUHU, INC. |
| 14/629,407 | Systems and Methods for Device Configuration and Activation with Automated Privacy Law Compliance | 02/23/15 | Pending | FUHU, INC. |
| 14/052,897 | Widgetized Avatar And A Method And System Of Creating And Using Same | 10/14/13 | Pending | FUHU HOLDINGS, INC. |
| 12/755,818 | Device and Method for Creating, Distributing, Managing and Monetizing Widgets Using Templates | 04/07/10 | Pending | FUHU HOLDINGS, INC. |

2

8338340ZV.5

CONFIDENTIAL INFORMATION -- FUHU, INC. AND FUHU HOLDINGS, INC.

| App. No. | Title | Filing Date | Status | Owner |
|---|---|---|---|---|
| 12/494,940 | Widgetized Avatar And A Method And System Of Creating And Using Same | 06/30/09 | Pending | FUHU HOLDINGS, INC. |
| 12/848,276 | Virtual Marketplace Accessible To Widgetized Avatars | 08/02/10 | Pending | FUHU HOLDINGS, INC. |
| 13/891,147 | Virtual Marketplace Accessible To Widgetized Avatars | 05/09/13 | Pending | FUHU HOLDINGS, INC. |
| 12/707,203 | System and Method For Providing Expert Search In A Modular Computing System | 02/17/10 | Pending | FUHU HOLDINGS, INC. |
| 13/323,719 | Electronic Device Case with Removable Attachments | 12/12/11 | Pending | FUHU HOLDINGS, INC. |
| 12/544,129 | Modular Application Computing Apparatus, System and Method | 08/19/09 | Pending | FUHU HOLDINGS, INC. |
| 12/383,456 | Webtop and Monetization Engine, System and Method | 03/24/09 | Pending | FUHU HOLDINGS, INC |
| 14/193,488 | Customized User Interface for Mobile computers | 02/28/14 | Pending | FUHU, INC |
| 14/859,907 | System And Method For Providing User Access | 09/21/15 | Pending | FUHU, INC |

3

# FUHU PENDING UTILITY APPLICATIONS (PCT)

| Appl No. | Title | Filing Date | Owner |
|---|---|---|---|
| PCT/US14/50018 | Corner Button to Protect a Touch Screen | 8/6/2014 | FUHU, INC. |
| PCT/US14/50015 | Tablet Bumper Assembly | 8/6/2014 | FUHU, INC. |
| PCT/US14/47329 | Time and Sleep Control System and Method | 7/18/2014 | FUHU, INC. |
| PCT/US14/62259 | Mobile Virtual Environment | 10/24/2014 | FUHU, INC. |
| PCT/US15/15703 | Apparatus for Recognizing Handwritten Notes | 2/12/2015 | FUHU, INC. |
| PCT/US15/13143 | Keyboard Cover for a Tablet Computer | 1/27/2015 | FUHU, INC. |
| PCT/US15/25458 | Wireless Modular Speaker | 4/10/2015 | FUHU, INC. |
| PCT/US15/22735 | Interface for Virtual Devices, Systems, and Methods | 3/26/2015 | FUHU, INC. |
| PCT/US14/59115 | Systems and Methods for Device Configuration and Activation with Automated Privacy Law Compliance | 10/3/2014 | FUHU, INC. |
| PCT/US14/60522 | Widgetized Avatar and a System Method and System of Creating and Using Same | 10/14/2014 | FUHU HOLDINGS, INC. |
| PCT/US15/18353 | Customized User Interface for Mobile Computers | 3/2/2015 | FUHU, INC. |

4

## FUHU PENDING UTILITY APPLICATIONS (FOREIGN)

| Country | Appl No. | Title | Filing Date | Corresponding US Appln | Owner |
|---|---|---|---|---|---|
| Taiwan | 103126871 | Corner Button to Protect a Touch Screen | 8/6/2014 | 14/453,561 | FUHU, INC. |
| Taiwan | 103126872 | Tablet Bumper Assembly | 8/6/2014 | 14/453,570 | FUHU, INC. |
| Canada | 2,818,341 | Tablet Computer | 6/11/2013 | 13/841,461 | FUHU, INC. |
| China | 201380061509.0 | Tablet Computer | 9/27/2013 | 13/852,840, 13/852,461 | FUHU, INC. |
| Europe | 13840396.9 | Tablet Computer | 9/27/2013 | 13/852,840, 13/852,461 | FUHU, INC |
| Japan | TBD By JPO | Tablet Computer | 9/27/2013 | 13/852,840, 13/852,461 | FUHU, INC |
| Korea | 10-2015-7010805 | Tablet Computer | 9/27/2013 | 13/852,840, 13/852,461 | FUHU, INC. |
| Canada | 2,907,274 | Tablet Computer | 3/14/2014 | 13/841,461 | FUHU, INC |
| China | 201480023591.2 | Tablet Computer | 3/14/2014 | 13/841,461 | FUHU, INC |
| Europe | 14764143.5 | Tablet Computer | 3/14/2014 | 13/841,461 | FUHU, INC |
| Japan | TBD By JPO | Tablet Computer | 3/14/2014 | 13/841,461 | FUHU, INC |
| Korea | 10-2015-7029482 | Tablet Computer | 3/14/2014 | 13/841,461 | FUHU, INC |
| Taiwan | 103136578 | Mobile Virtual Environment | 10/24/2014 | 14/523,396 | FUHU, INC |
| Taiwan | 104104689 | Optical Recognition of a Writing Implement | 2/12/2015 | 14/621,223 | FUHU, INC. |
| Taiwan | 104102656 | Keyboard Cover for a Tablet Computer | 1/27/2015 | 14/606,965 | FUHU, INC. |
| Taiwan | 104111577 | Wireless Modular Speaker | 4/10/2015 | 14/684,140 | FUHU, INC. |
| Taiwan | 104109702 | Interface for Virtual Devices, Systems and Methods | 3/26/2015 | 14/669,698 | FUHU, INC. |
| China | 201380071850.4 | Multi - Mode Headphones | 11/29/2013 | 13/834,986 | FUHU, INC. |
| Europe | 13858891.8 | Multi - Mode Headphones | 11/29/2013 | 13/834,986 | FUHU, INC. |
| Japan | TBD By JPO | Multi - Mode Headphones | 11/29/2013 | 13/834,986 | FUHU, INC. |
| Korea | 10-2015-7017246 | Multi - Mode Headphones | 11/29/2013 | 13/834,986 | FUHU, INC. |

83383402\V-5

| Taiwan | 102143938 | Multi-Mode Audio Device and Monitoring System | 11/29/2013 | 13/834,986 | FUHU, INC. |
| China | 201410264184.2 | Access Control Systems | 6/4/2014 | 13/910,083 | FUHU, INC. |
| Europe | 141771206.7 | Access Control Systems | 6/4/2014 | 13/910,083 | FUHU, INC. |
| Japan | 2014-114869 | Access Control Systems | 6/3/2014 | 13/910,083 | FUHU, INC. |
| Korea | 10-2014-0068599 | Access Control Systems | 6/5/2014 | 13/910,083 | FUHU, INC. |
| Taiwan | 103134531 | Systems and Methods for Device Configuration and Activation with Automated Privacy Law Compliance | 10/3/2014 | 14/046,893 | FUHU, INC. |
| Taiwan | 103135470 | Widgetized Avatar and a Method and System of Creating and Using Same | 10/14/2014 | 14/052,897 | FUHU HOLDINGS, INC. |
| Taiwan | 104106456 | Customized User Interface for Mobile Computers | 3/2/2015 | 14/193,488 | FUHU, INC. |

6

CONFIDENTIAL INFORMATION -- FUHU, INC. AND FUHU HOLDINGS, INC.

## Issued US Design Patents

| Country | Appl No. | Title | Filing Date | Patent No. | Issue Date | Owner |
|---------|----------|-------|-------------|------------|------------|-------|
| US | 29/443,683 | Display Screen or a Portion Thereof with Graphical User Interface (Treasure Box - Coins) | 1/21/2013 | D707,695 | 5/24/2014 | FUHU, INC |
| US | 29/454,425 | Corner Button | 5/9/2013 | D733,717 | 7/7/2015 | FUHU, INC |
| US | 29/454,426 | Corner Button | 5/9/2013 | D733,718 | 7/7/2015 | FUHU, INC |
| US | 29/457,567 | Tablet Stand | 06/11/13 | D697,920 | 01/21/14 | FUHU, INC |
| US | 29/483,042 | Wire Management | 02/25/14 | D714,620 | 10/07/14 | FUHU, INC |
| US | 29/466,386 | Tablet Bumper Assembly | 09/06/13 | D714,295 | 09/30/14 | FUHU, INC |
| US | 29/447,119 | Graphical User Interface for a Display Screen or Portion Thereof | 02/28/13 | D712,427 | 09/02/14 | FUHU, INC |
| US | 29/446,135 | Case For An Electronic Device | 02/20/13 | D692,006 | 10/22/13 | FUHU, INC |
| US | 29/469,238 | Wireless Charger Stand | 10/08/13 | D721,033 | 01/13/15 | FUHU, INC |
| US | 29/481,881 | Paper Stand | 02/11/14 | D714,302 | 09/30/14 | FUHU, INC |
| US | 29/482,087 | Paper Stand | 02/13/14 | D714,303 | 09/30/14 | FUHU, INC |

7

| | | | | | | |
|---|---|---|---|---|---|---|
| US | 29/481,867 | Paper Stand | 02/11/14 | D714,301 | 09/30/14 | FUHU, INC |
| US | 29/481,862 | Paper Stand | 02/11/14 | D714,300 | 9/30/2014 | FUHU, INC |
| US | 29/481,788 | Paper Stand | 02/10/14 | D714,299 | 09/30/14 | FUHU, INC |
| US | 29/481,783 | Paper Stand | 02/10/14 | D714,298 | 09/30/14 | FUHU, INC |
| US | 29/483,118 | Paper Stand | 02/25/14 | D714,309 | 09/30/14 | FUHU, INC |
| US | 29/483,116 | Paper Stand | 02/25/14 | D714,308 | 09/30/14 | FUHU, INC |
| US | 29/483,040 | Paper Stand | 02/25/14 | D714,304 | 09/30/14 | FUHU, INC |
| US | 29/483,111 | Paper Stand | 02/25/14 | D714,306 | 09/30/14 | FUHU, INC |
| US | 29/483,114 | Paper Stand | 02/25/14 | D714,307 | 09/30/14 | FUHU, INC |
| US | 29/483,107 | Paper Stand | 02/25/14 | D714,305 | 09/30/14 | FUHU, INC |
| US | 29/484,057 | Paper Stand | 03/05/14 | D715,303 | 10/14/14 | FUHU, INC |
| US | 29/484,061 | Paper Stand | 03/05/14 | D714,797 | 10/07/14 | FUHU, INC |
| US | 29/484,065 | Paper Stand | 03/05/14 | D715,304 | 10/14/14 | FUHU, INC |
| US | 29/484,122 | Paper Stand | 03/06/14 | D714,798 | 10/14/14 | FUHU, INC |
| US | 29/484,119 | Paper Stand | 03/06/14 | D715,305 | 10/14/14 | FUHU, INC |
| US | 29/483,612 | Paper Stand | 02/28/14 | D714,310 | 09/30/14 | FUHU, INC |
| US | 29/483,917 | Paper Stand | 03/04/14 | D715,302 | 10/14/14 | FUHU, INC |
| US | 29/483,877 | Paper Stand | 03/04/14 | D714,312 | 09/30/14 | FUHU, INC |
| US | 29/483,873 | Paper Stand | 03/04/14 | D714,796 | 10/07/14 | FUHU, INC |

85383402\V-5

CONFIDENTIAL INFORMATION – FUHU, INC. AND FUHU HOLDINGS, INC.

| US | 29/483,647 | Paper Stand | 02/28/14 | D714,311 | 09/30/14 | FUHU, INC |
|----|------------|-------------|----------|----------|----------|-----------|
| US | 29/483,650 | Paper Stand | 02/28/14 | D714,795 | 10/07/14 | FUHU, INC |
| US | 29/486,056 | Tablet Stand | 03/26/14 | D715,308 | 10/14/14 | FUHU, INC |
| US | 29/484,126 | Paper Stand | 03/06/14 | D714,799 | 10/07/14 | FUHU, INC |
| US | 29/486,054 | Paper Stand | 03/26/14 | D715,307 | 10/14/14 | FUHU, INC |
| US | 29/484,702 | Paper Stand | 03/12/14 | D714,800 | 10/07/14 | FUHU, INC |
| US | 29/484,714 | Paper Stand | 03/12/14 | D714,801 | 10/07/14 | FUHU, INC |
| US | 29/484,715 | Paper Stand | 03/12/14 | D715,306 | 10/14/14 | FUHU, INC |
| US | 29/486,062 | Tablet Stand | 03/25/14 | D714,805 | 10/07/14 | FUHU, INC |
| US | 29/486,064 | Tablet Stand | 03/26/14 | D714,806 | 10/07/14 | FUHU, INC |
| US | 29/486,053 | Tablet Stand | 03/26/14 | D714,802 | 10/07/04 | FUHU, INC |
| US | 29/486,061 | Tablet Stand | 03/26/14 | D714,804 | 10/07/14 | FUHU, INC |
| US | 29/486,058 | Tablet Stand | 03/26/14 | D714,803 | 10/07/14 | FUHU, INC |
| US | 29/469,243 | Tablet Skinit | 10/08/13 | D721,079 | 01/13/15 | FUHU, INC |
| US | 29/484,740 | Portable Speaker | 03/12/14 | D734,300 | 07/14/15 | FUHU, INC |
| US | 29/484,539 | Sound System Tower | 03/11/14 | D732,004 | 06/16/15 | FUHU, INC |
| US | 29/484,537 | Sound System Tower | 03/11/14 | D732,506 | 06/23/15 | FUHU, INC |
| US | 29/484,542 | Sound System Tower | 03/11/14 | D732,507 | 06/23/15 | FUHU, INC |
| US | 29/484,534 | Sound System Tower | 03/11/14 | D732,505 | 06/23/15 | FUHU, INC |

9

83383402EV-5

| | | | | | | |
|---|---|---|---|---|---|---|
| US | 29/487,690 | Speaker Strap Accessory | 04/10/14 | D734,742 | 07/21/15 | FUHU, INC |
| US | 29/488,476 | Silicone Smart Cover | 04/18/14 | D714,296 | 09/30/14 | FUHU, INC |
| US | 29/465,153 | Baby Monitor | 08/23/13 | D727,277 | 04/21/15 | FUHU, INC |
| US | 29/439,704 | Headphones | 12/13/12 | D698,334 | 01/28/14 | FUHU, INC |
| US | 29/476,847 | Headphones | 12/17/13 | D721,053 | 01/13/15 | FUHU, INC |
| US | 29/443,680 | Graphical User Interface for a Display Screen or a Portion Thereof (Homescreen) | 01/21/13 | D729,827 | 05/19/15 | FUHU, INC |
| US | 29/443,681 | Graphical User Interface for a Display Screen or a Portion Thereof | 01/21/13 | D715,319 | 10/14/14 | FUHU, INC |
| US | 29/443,691 | Graphical User Interface for a Display Screen or a Portion Thereof (Desktop) | | D743,979 | 11/24/2015 | FUHU, INC |
| US | 29/443,692 | Graphical User Interface for a Display Screen or a Portion Thereof (Cloud) | 01/16/13 | D708,202 | 07/01/14 | FUHU HOLDINGS, INC. |
| US | 29/426,642 | Case for an Electronic Device | 07/09/12 | D691,094 | 10/08/13 | FUHU, INC |
| US | 29/453,839 | Mount for a Tablet Computer | 05/03/13 | D700,185 | 02/25/14 | FUHU, INC |
| US | 29/457,249 | Tranformable and Interconnected Toy "Pill" Shape (Dragon Toy - | 06/07/13 | D721,408 | 01/20/15 | FUHU, INC |

| | | Manual) | | | | |
|---|---|---|---|---|---|---|
| US | 29/457,253 | Transformable and Interconnectable Toy | 06/07/13 | D721,409 | 01/20/15 | FUHU, INC |
| US | 29/443,686 | Display Screen or a Portion thereof with a Graphical User Interface | 01/16/13 | D717,821 | 11/18/14 | FUHU, INC |
| US | 29/426,458 | Protective Bumper for an Electronic Device | 07/05/12 | D716,312 | 10/28/14 | FUHU, INC |
| US | 29/315,038 | Graphical User Interface for a Computer Display | 05/20/09 | D619,593 | 07/13/10 | FUHU, INC |
| US | 29/422,339 | Connector Socket | 5/18/2012 | D686,579 | 7/23/2013 | FUHU, INC. |
| US | 29/422,345 | Connector Bit | 05/18/12 | D695,600 | 12/17/13 | FUHU, INC. |
| US | 29/453,735 | Graphical User Interface for a Display Screen or a Portion Thereof | 05/02/13 | D736,806 | 08/18/15 | FUHU, INC. |
| US | 29/443,689 | Display Screen or Portion Thereof with Graphical User Interface | 01/16/2013 | D744,507 | 12/01/2015 | FUHU, INC. |
| US | 29/487,696 | Curved Speakers Mounting Accessory | 04/10/14 | D739,387 | 09/22/15 | FUHU, INC |
| US | 29/459,731 | Graphical User Interface for a Display Screen or a Portion Thereof | 07/02/13 | D739,865 | 09/29/15 | FUHU, INC |
| US | 29/487,688 | Speaker Strap Accessory | 04/10/14 | D740,259 | 10/6/2015 | FUHU, INC |
| US | 29/446,123 | Electronic Device | 02/20/13 | D740,280 | 10/6/2015 | FUHU, INC |

85383402\V-5

CONFIDENTIAL INFORMATION – FUHU, INC. AND FUHU HOLDINGS, INC.

| US | 29/488,474 | Silicone Speaker Mounting Accessory | 04/18/14 | D740,791 | 10/13/2015 | FUHU, INC |
| US | 29/487,686 | T-Stand Speaker Mounting Accessory | 04/10/14 | D741,291 | 10/20/2015 | FUHU, INC |
| US | 29/487,692 | Sound System Tower | 04/10/14 | D741,837 | 10/27/2015 | FUHU, INC |

12

CONFIDENTIAL INFORMATION -- FUHU, INC. AND FUHU HOLDINGS, INC.

## US PENDING DESIGN APPLICATIONS

| Appl No. | Title | Filing Date | Owner |
|---|---|---|---|
| 29/457,750 | Tablet Stand | 06/12/13 | FUHU, INC |
| 29/496,871 | Display Screen or Portion Thereof with Graphical User Interface | 7/17/2014 | FUHU, INC |
| 29/496,872 | Display Screen or Portion Thereof With Graphical User Interface | 7/17/2014 | FUHU, INC |
| 29/496,873 | Display Screen or Portion Thereof With Graphical User Interface | 7/17/2014 | FUHU, INC |
| 29/496,874 | Display Screen or Portion Thereof With Graphical User Interface | 7/17/2014 | FUHU, INC |
| 29/496,875 | Display Screen or Portion Thereof With Graphical User Interface | 7/17/2014 | FUHU, INC |
| 29/524,556 | Curved Speakers Mounting Accessory | 4/21/2015 | FUHU, INC |
| 29/524,571 | Curved Speakers Mounting Accessory | 4/21/2015 | FUHU, INC |
| 29/529,101 | Silicone Speaker Mounting Accessory | 6/3/2015 | FUHU, INC |
| 29/488,477 | Speaker Mounting Clamp | 4/18/2014 | FUHU, INC |
| 29/443,687 | Graphical User Interface for a Display Screen or a Portion Thereof (App Zone) | 01/21/13 | FUHU, INC |
| 29/451,544 | Graphical User Interface for a Display Screen or a Portion Thereof | 04/03/13 | FUHU, INC |
| 29/451,545 | Graphical User Interface for a Display Screen or a Portion Thereof | 04/03/13 | FUHU, INC |
| 29/458,077 | Writing Implement (Stylus) | 06/14/13 | FUHU, INC |
| 29/476,391 | Interlocking Divert Joint (Battle Kinabis) | 12/12/13 | FUHU, INC |
| 29/476,392 | Interlocking Swivel Joint (Battle Kinabis) | 12/12/13 | FUHU, INC |

13

83383402(V.5

CONFIDENTIAL INFORMATION -- FUHU, INC. AND FUHU HOLDINGS, INC.

| 29/516,171 | Cube Speaker | 01/29/15 | FUHU, INC |
| 29/527,033 | Tablet Computer | 05/14/15 | FUHU, INC |
| 29/532,121 | Case for an Electronic Device | 07/01/15 | FUHU, INC |

14

CONFIDENTIAL INFORMATION -- FUHU, INC. AND FUHU HOLDINGS, INC.

## FOREIGN ISSUED DESIGN PATENTS

| Country | Appl No. | Title | Filing Date | Patent No. | Issue Date | Owner |
|---|---|---|---|---|---|---|
| China | 201330533651.3 | Corner Button | 11/08/13 | ZL201330533651.3 | 10/22/14 | FUHU, INC. |
| China | 201330611085.3 | Tablet Stand | 12/10/13 | ZL201330611085.3 | 07/30/14 | FUHU, INC. |
| Europe | 1394571 | Tablet Stand | 12/11/13 | 1394571 | 12/11/13 | FUHU, INC. |
| Hong Kong | 1302203.70 | Tablet Stand | 12/11/13 | 1302203.7 | 12/11/13 | FUHU, INC. |
| China | 201330533642.4 | Corner Button | 11/8/2013 | ZL201330533642.4 | 8/20/2014 | FUHU, INC. |
| China | 201430304618.8 | Wire Management | 08/25/14 | ZL201430304618.8 | 7/15/2015 | FUHU, INC. |
| Canada | 158348 | Wire Management | 8/22/2014 | 158348 | 6/1/2015 | FUHU, INC |
| Europe | 002524082 | Wire Management | 08/23/14 | 002524082-0001 | 8/23/2014 | FUHU, INC |
| Hong Kong | 1401579.4 | Wire Management | 08/22/14 | 1401579.4 | 01/09/15 | FUHU, INC |
| Japan | 2014-018416 | Wire Management | 08/25/14 | 1534085 | 08/21/2015 | FUHU, INC. |
| Korea | 30-2014-41367 | Wire Management | 08/25/2014 | 30-807509 | 07/20/2015 | FUHU, INC. |
| China | 201430041658.8 | Tablet Bumper Assembly | 3/5/2014 | ZL201430041658.8 | 12/24/2014 | FUHU, INC. |
| Hong Kong | 1400386.3 | Tablet Bumper Assembly | 3/4/2014 | 1400386.3 | 3/4/2014 | FUHU, INC. |
| Korea | 30-2013-0029318 | Display Screen with A Graphical User Interface Being Expressed | 06/05/13 | 3007283950000 | 02/03/14 | FUHU, INC. |
| Korea | 30-2013-0029319 | Display Screen with A Graphical User Interface Being Expressed | 06/05/13 | 3007284340000 | 02/03/14 | FUHU, INC. |
| Korea | 30-2013-0029320 | Display Screen with A Graphical User Interface Being Expressed | 6/5/2013 | 3007283970000 | 02/03/14 | FUHU, INC. |

15

83383402LV-5

CONFIDENTIAL INFORMATION – FUHU, INC. AND FUHU HOLDINGS, INC.

| | | | | | |
|---|---|---|---|---|---|
| Korea | 30-2013-0029321 | Display Screen with A Graphical User Interface Being Expressed | 06/05/13 | 3007283970001 | 02/03/14 | FUHU, INC. |
| Korea | 30-2013-0029322 | Display Screen with A Graphical User Interface Being Expressed | 06/05/13 | 3007284080000 | 02/03/14 | FUHU, INC.. |
| Europe | 002297861 | Graphical User Interface for a Display Screen or a Portion Thereof (nabi jr. - nabi mode user interface screens) | 08/27/13 | 002297861-0001 through 002297861-0011 | 08/27/13 | FUHU, INC. |
| Japan | 2013-13052 | Display Screen Or A Portion Thereof With Graphical User Interface | 06/10/2013 | 1532856 | 08/07/2015 | FUHU, INC. |
| Korea | 30-2013-0029317 | Display Screen with A Graphical User Interface Being Expressed | 06/05/13 | 3007388540000 | 04/08/14 | FUHU, INC. |
| Korea | 30-2013-0029323 | Display Screen with A Graphical User Interface Being Expressed | 06/05/13 | 3007284320000 | 02/03/14 | FUHU, INC. |
| Korea | 30-2013-30219 | Display Screen with A Graphical User Interface Being Expressed | 06/11/13 | 30-0728417 | 02/03/14 | FUHU, INC. |
| Europe | 002223941 | Case for an Electronic Device | 04/19/13 | 002223941-0001 | 06/21/13 | FUHU, INC. |
| Japan | 2013-012148 | Case for an Electronic Device | 05/31/13 | 1513706 | 12/15/14 | FUHU, INC. |

16

83383-4001V-5

| | | | | | | |
|---|---|---|---|---|---|---|
| Europe | 002223768 | Electronic Device | 04/19/13 | 002223768-0001 | 04/19/13 | FUHU, INC. |
| Japan | 2013-012146 | Electronic Device | 05/31/13 | 1495240 | 3/20/2014 | FUHU, INC. |
| Korea | 30-2013-0029027 | Electronic Device | 06/04/13 | 30-0745027 | 05/20/14 | FUHU, INC. |
| Europe | 002223768 | Electronic Device | 04/19/13 | 002223768-0002 | 04/19/13 | FUHU, INC. |
| Japan | 2013-012147 | Handheld Terminal (Nabi Jr.) | 05/31/13 | 1495241 | 03/20/14 | FUHU, INC. |
| Korea | 30-2013-0029028 | Electronic Device | 06/04/13 | 30-0745013 | 05/20/14 | FUHU, INC. |
| Europe | 002442103-0001 | Wireless Charger Stand | 04/07/14 | 002442103-0001 | 4/7/2014 | FUHU, INC. |
| Hong Kong | 1400611.2 | Wireless Charger Stand | 04/04/14 | 1400611.2 | 4/4/2014 | FUHU, INC. |
| Canada | 158117 | Paper Stand | 08/11/14 | 158117 | 6/15/2015 | FUHU, INC. |
| China | 201430281433.X | Paper Stand | 08/11/14 | ZL201430281433.X | 6/24/2015 | FUHU, INC. |
| Europe | 2517847 | Paper Stand | 08/11/14 | 002517847-0001 | 8/11/2014 | FUHU, INC. |
| Hong Kong | 1401478.9 | Paper Stand | 08/12/14 | 1401478.9 | 8/12/2015 | FUHU, INC. |
| Canada | 158182 | Paper Stand | 08/12/14 | 158182 | 6/15/2015 | FUHU, INC. |
| Europe | 002518696 | Paper Stand | 08/12/14 | 002518696-0001 | 8/12/2014 | FUHU, INC. |

8593402\V-5

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Hong Kong | 1401485.4 | | Paper Stand | 08/12/14 | 1401485.4 | 8/12/2014 | FUHU, INC. |
| Canada | 158118 | | Paper Stand | 08/11/14 | 158118 | 6/15/2015 | FUHU, INC. |
| China | 2.0143E+11 | | Paper Stand | 08/11/14 | ZL201430281435.9 | 6/24/2015 | FUHU, INC. |
| Europe | 002517862 | | Paper Stand | 08/11/14 | 002517862-0001 | 8/11/2014 | FUHU, INC. |
| Hong Kong | 1401479.1 | | Paper Stand | 08/12/14 | 1401479.1 | 08/12/14 | FUHU, INC. |
| Canada | 158119 | | Paper Stand | 08/11/14 | 158119 | 06/15/15 | FUHU, INC. |
| China | 2.0143E+11 | | Paper Stand | 08/11/14 | ZL201430281423.6 | 06/24/15 | FUHU, INC. |
| Europe | 002517789 | | Paper Stand | 08/11/14 | 002517789-0001 | 8/11/2014 | |
| Hong Kong | 1401480.3 | | Paper Stand | 08/12/14 | 1401480.3 | 08/12/14 | FUHU, INC. |
| Canada | 158121 | | Paper Stand | 06/15/15 | 158121 | 06/15/15 | FUHU, INC. |
| China | 2.0143E+11 | | Paper Stand | 08/11/14 | ZL201430281448.6 | 06/24/15 | FUHU, INC. |
| Europe | 002517730 | | Paper Stand | 08/11/14 | 002517730-0001 | 8/11/2014 | FUHU, INC. |
| Hong Kong | 1401477.7 | | Paper Stand | 08/12/14 | 1401477.7 | 08/12/14 | FUHU, INC. |
| Canada | 158120 | | Paper Stand | 08/11/14 | 158120 | 06/15/15 | FUHU, INC. |
| China | 2.0143E+11 | | Paper Stand | 08/11/14 | ZL201430281323.3 | 06/24/15 | FUHU, INC. |

83383402\V-5

| | | | | | | |
|---|---|---|---|---|---|---|
| Europe | 002517888 | Paper Stand | 08/11/14 | 002517888-0001 | 8/11/2014 | FUHU, INC. |
| China | 201430304663.3 | Paper Stand | 08/25/14 | ZL201430304663.3 | 07/15/2015 | FUHU, INC. |
| Hong Kong | 1401476.5 | Paper Stand | 08/12/14 | 1401476.5 | 08/12/14 | FUHU, INC. |
| Canada | 158353 | Paper Stand | 08/22/14 | 158353 | 06/15/15 | FUHU, INC. |
| Canada | 158349 | Paper Stand | 08/22/14 | 158349 | 06/15/15 | FUHU, INC. |
| Europe | 002524090 | Paper Stand | 08/23/14 | 002524090-0001 | 8/23/14 | FUHU, INC. |
| Canada | 158351 | Paper Stand | 08/22/15 | 158351 | 6/15/15 | FUHU, INC. |
| Canada | 158352 | Paper Stand | 08/22/14 | 158352 | 6/15/15 | FUHU HOLDINGS, INC. |
| China | 2.0143E+11 | Paper Stand | 08/25/14 | ZL201430304877.0 | 7/1/15 | FUHU HOLDINGS, INC. |
| Canada | 158350 | Paper Stand | 08/22/14 | 158350 | 6/15/15 | FUHU HOLDINGS, INC. |
| China | 2.0143E+11 | Paper Stand | 08/25/14 | ZL201430304596.5 | 7/1/15 | FUHU HOLDINGS, INC |
| Europe | 002524116 | Paper Stand | 08/23/14 | 002524116-0001 | 8/23/14 | FUHU HOLDINGS, INC |

| Canada | 158354 | Paper Stand | 08/22/14 | 158354 | 6/15/15 | FUHU, INC. |
|---|---|---|---|---|---|---|
| China | 2.0143E+11 | Paper Stand | 08/25/14 | ZL20143030466 2.9 | 7/1/15 | FUHU, INC. |
| Europe | 2524157 | Paper Stand | 08/23/14 | 2524157 | 8/23/14 | FUHU, INC. |
| Canada | 158413 | Paper Stand | 08/27/14 | 158413 | 6/15/15 | FUHU, INC. |
| China | 2.0143E+11 | Paper Stand | 08/25/14 | ZL201430313299.7 | 7/1/15 | FUHU, INC. |
| Europe | 002526459 | Paper Stand | 08/27/14 | 002526459-0001 | 8/27/2014 | FUHU, INC. |
| Canada | 158414 | Paper Stand | 08/27/14 | 158414 | 6/15/2015 | FUHU, INC. |
| China | 2.0143E+11 | Paper Stand | 08/28/14 | ZL201430312964.0 | 7/1/2015 | FUHU, INC. |
| Europe | 002526442 | Paper Stand | 08/27/14 | 002526442-0001 | 8/27/2014 | FUHU, INC. |
| Canada | 158412 | Paper Stand | 08/27/14 | 158412 | 8/27/2014 | FUHU, INC. |
| China | 2.0143E+11 | Paper Stand | 08/28/14 | ZL201430313209.4 | 7/8/2015 | FUHU, INC. |
| Europe | 002526426 | Paper Stand | 08/27/14 | 002526426-0001 | 8/27/2014 | FUHU, INC. |
| China | 201430304605.0 | Paper Stand | 08/27/2014 | ZL201430304605.0 | 07/15/2015 | FUHU, INC. |
| Hong Kong | 1401584.4M005 | Paper Stand | 08/25/2014 | 1401584.4M005 | 08/07/2015 | FUHU HOLDINGS, INC. |
| Hong Kong | 1401584.4M006 | Paper Stand | 08/25/2014 | 1401584.4M006 | 08/07/2015 | FUHU, INC. |
| Hong Kong | 1401602.4M002 | Paper Stand | 08/27/2014 | 1401602.4M002 | 08/07/2015 | FUHU, INC. |
| Hong Kong | 1401602.4M003 | Paper Stand | 08/27/2014 | 1401602.4M003 | 08/07/2015 | FUHU, INC. |

8358340ZV-5

| | | | | | | |
|---|---|---|---|---|---|---|
| Hong Kong | 1401602.4M001 | Paper Stand | 08/27/2014 | 1401602.4M001 | 08/07/2015 | FUHU, INC. |
| Hong Kong | 1401584.4M001 | Paper Stand | 08/24/2014 | 1401584.4M001 | 08/07/2015 | FUHU, INC. |
| Hong Kong | 1401584.4M002 | Paper Stand | 08/24/2014 | 1401584.4M001 | 08/07/2015 | FUHU, INC. |
| Hong Kong | 1401584.4M003 | Paper Stand | 08/25/2014 | 1401584.4M002 | 08/07/2015 | FUHU, INC. |
| Hong Kong | 1401584.4M004 | Paper Stand | 08/25/2014 | 1401584.4M003 | 08/07/2015 | FUHU, INC. |
| Hong Kong | 30-2014-41370 | Paper Stand | 08/25/2014 | 1401584.4M004 | 09/21/2015 | FUHU HOLDINGS, INC |
| Korea | 30-2014-41368 | Paper Stand | 08/25/2014 | 30-817336 | 07/22/2015 | FUHU, INC. |
| Korea | 30-2014-41858 | Paper Stand | 08/27/14 | 30-807910 | 07/22/2015 | FUHU, INC. |
| Korea | 30-2014-41859 | Paper Stand | 08/27/14 | 30-807913 | 07/22/2015 | FUHU, INC. |
| Korea | 30-2014-41857 | Paper Stand | 08/27/14 | 30-807914 | 07/22/2015 | FUHU, INC. |
| Korea | 30-2014-39086 | Paper Stand | 08/11/14 | 30-807914 | 09/07/2015 | FUHU, INC. |
| Korea | 30-2014-39084 | Paper Stand | 08/11/14 | 30-814916 | 08/26/2015 | FUHU, INC. |
| Korea | 30-2014-39085 | Paper Stand | 08/11/14 | 30-813030 | 07/22/2015 | FUHU, INC. |
| Korea | 30-2014-41373 | Paper Stand | 08/25/14 | 30-807909 | 07/22/2015 | FUHU, INC. |
| Korea | 30-2014-41369 | Paper Stand | 08/25/14 | 30-807912 | 09/07/2015 | FUHU, INC. |
| Korea | 30-2014-41371 | Paper Stand | 08/25/14 | 30-814918 | 07/22/2015 | FUHU, INC. |
| | | | | 30-807911 | | |
| Taiwan | 103304907 | Headphones | 6/13/2013 | D169468 | 08/01/2015 | FUHU, INC. |
| Korea | 30-2014-41372 | Paper Stand | 08/25/14 | 30-814919 | 09/07/2015 | FUHU HOLDINGS, |

21

CONFIDENTIAL INFORMATION -- FUHU, INC. AND FUHU HOLDINGS, INC.

| | | | | | | INC. |
|---|---|---|---|---|---|---|
| China | 201430077116.2 | Tablet Skinit | 04/04/14 | ZL201430077116.2 | 12/17/2014 | FUHU, INC. |
| Europe | 002441980-0001 | Tablet Skinit | 04/07/14 | 002441980-0001 | 04/07/14 | FUHU, INC. |
| Hong Kong | 1400610.0 | Tablet Skinit | 04/04/14 | 1400610.0 | 04/04/14 | FUHU, INC. |
| China | 201430031382.5 | Baby Monitor | 02/21/14 | ZL201430031382.5 | 04/01/15 | FUHU, INC. |
| Europe | 2404921 | Baby Monitor | 02/14/14 | 002404921-0001 | 04/08/14 | FUHU, INC. |
| Hong Kong | 1400257.0 | Baby Monitor | 02/14/14 | 1400257.0 | 02/14/14 | FUHU, INC. |
| Japan | 2014-2981 | Baby Monitor Camera | 02/14/14 | 1507677 | 08/22/14 | FUHU, INC. |
| Korea | 30-2014-8375 | Baby Monitor | 2/19/2014 | 30-781972 | 1/23/2015 | FUHU, INC. |
| China | 201330248154.9 | Headphones | 06/13/13 | 302716154 S. | 01/15/14 | FUHU, INC. |
| Taiwan | 102304121 | Headphones | 06/13/13 | D169463 | 08/01/2015 | FUHU, INC. |
| Taiwan | 102304121D01 | Headphones | 06/13/2013 | D169464 | 08/01/2015 | |
| Korea | 30-2013-0030631 | Multi-mode Headphones | 06/13/13 | 30-0750395-01 | 06/26/14 | FUHU, INC. |
| Korea | 30-2013-0030632 | Multi-mode Headphones | 06/13/13 | 30-0767945 | 10/21/2014 | FUHU, INC. |
| Europe | 002255232-0001 | Multi-mode Headphones | 06/13/13 | 002255232-0001 | 06/13/13 | FUHU, INC. |
| Europe | 002255232-0002 | Multi-mode Headphones | 06/13/13 | 002255232-0002 | 06/13/13 | FUHU, INC.. |

22

| | | | | | | |
|---|---|---|---|---|---|---|
| Europe | 002255232-0003 | Multi-mode Headphones | 06/13/13 | 002255232-0003 | 06/13/13 | FUHU, INC. |
| Hong Kong | 1300972.5 | Multi-mode Headphones | 06/13/13 | 1300972.5 | 11/22/13 | FUHU, INC. |
| Japan | 2013-013359 | Multi-mode Headphones | 06/13/13 | 1489117 | 12/27/13 | FUHU, INC. |
| Japan | 2013-013360 | Multi-mode Headphones | 06/13/13 | 1489417 | 12/27/13 | FUHU, INC. |
| Japan | 2013-013361 | Multi-mode Headphones | 06/13/13 | 1489118 | 12/27/13 | FUHU, INC. |
| Korea | 30-2013-0030630 | Headphones | 06/13/13 | 30-0750395 | 06/26/14 | FUHU, INC. |
| Europe | 2277657 | Treasure Box | 07/19/13 | 002277657-0001 | 07/19/13 | FUHU, INC. |
| Europe | 2277657 | Treasure Box | 07/19/13 | 002277657-0002 | 07/19/13 | FUHU, INC. |
| Europe | 2277657 | Treasure Box | 07/19/13 | 002277657-0003 | 07/09/13 | FUHU, INC. |
| Europe | 2277657 | Treasure Box | 07/19/13 | 002277657-0004 | 07/09/13 | FUHU, INC. |
| Europe | 2277657 | Treasure Box | 07/19/13 | 002277657-0005 | 07/19/13 | FUHU, INC. |
| Europe | 2277657 | Chore List | 07/19/13 | 002277657-0006 | 07/19/13 | FUHU, INC. |
| Europe | 2277657 | Chore List | 07/19/13 | 002277657-0007 | 07/19/13 | FUHU, INC. |
| Europe | 2277657 | Chore List | 07/19/13 | 002277657-0008 | 07/19/13 | FUHU, INC. |
| Europe | 2277657 | Settings - nabi mode | 07/19/13 | 002277657-0009 | 07/19/13 | FUHU, INC. |
| Europe | 2277657 | Settings - nabi mode | 07/19/13 | 002277657-0010 | 07/19/13 | FUHU, INC. |
| Europe | 2277657 | Settings - nabi mode | 07/19/13 | 002277657-0011 | 07/19/13 | FUHU, INC. |
| Europe | 2277657 | Sync/Desktop | 07/19/13 | 002277657-0012 | 07/19/13 | FUHU, INC. |
| Europe | 2277657 | Sync/Desktop | 07/19/13 | 002277657-0013 | 07/19/13 | FUHU, INC. |

83383402\V-5

CONFIDENTIAL INFORMATION -- FUHU, INC. AND FUHU HOLDINGS, INC.

| Europe | 2277657 | Sync/Desktop | 07/19/13 | 002277657-0014 | 07/19/13 | FUHU, INC. |
|---|---|---|---|---|---|---|
| Europe | 2277657 | Sync/Desktop | 07/19/13 | 002277657-0015 | 07/19/13 | FUHU, INC. |
| Europe | 2277657 | Sync/Desktop | 07/19/13 | 002277657-0016 | 07/19/13 | FUHU, INC. |
| Europe | 2277657 | Sync/Desktop | 07/19/13 | 002277657-0017 | 07/19/13 | FUHU, INC. |
| Europe | 2277657 | Sync/Desktop | 07/19/13 | 002277657-0018 | 07/19/13 | FUHU, INC. |
| Europe | 2277657 | Sync/Desktop | 07/19/13 | 002277657-0019 | 07/19/13 | FUHU, INC. |
| Europe | 2277657 | Cloud | 07/19/13 | 002277657-0020 | 07/19/13 | FUHU, INC. |
| Korea | 30-2014-17148 | Wireless Charger Stand for Tablet PC | 04/07/14 | 30-786544 | 02/26/15 | FUHU, INC. |
| Korea | 30-2014-17149 | Protective Cover for a Tablet PC | 04/07/14 | 30-786545 | 02/26/15 | FUHU, INC. |
| China | 201330003321.3 | Case for Electronic Device | 01/07/13 | 3027210032 S. | 01/07/13 | FUHU, INC. |
| Europe | 2163121 | nabi 2 Case | 01/08/13 | 002163121-0001 | 01/08/13 | FUHU, INC. |
| Japan | 2013-000135 | Electronic Device Case (nabi 2 Case) | 01/08/13 | 1479619 | 01/08/13 | FUHU, INC. |
| Korea | 30-2013-0001198 | A Case for the Portable Electronic Device (nabi 2 Case) | 01/08/13 | 30-0710955-0000 | 09/27/13 | FUHU, INC. |
| Taiwan | 102300136 | Portion of a Case for a Portable Electronic Device (nabi 2 Case) | 01/07/13 | D161232 | 01/07/13 | FUHU, INC. |
| Canada | 153332 | Graphical User Interface for a Display Screen or a Portion Thereof (Wings UI) | 10/02/13 | 153332 | 04/27/15 | FUHU, INC. |
| Europe | 002319723-0001 | Wings User Interface | 10/03/13 | 002319723-0001 | 10/3/2013 | FUHU, INC. |

24

| Europe | 002319723-0002 | Wings User Interface | 10/03/13 | 002319723-0002 | 10/3/2013 | . FUHU, INC. |
| Europe | 002319723-0003 | Wings User Interface | 10/03/13 | 002319723-0003 | 10/3/2013 | FUHU, INC. |
| Europe | 002319723-0004 | Wings User Interface | 10/03/13 | 002319723-0004 | 10/3/2013 | FUHU, INC. |
| Europe | 002319723-0005 | Wings User Interface | 10/03/13 | 002319723-0005 | 10/3/2013 | FUHU, INC. |
| Europe | 002319723-0006 | Wings User Interface | 10/03/13 | 002319723-0006 | 10/3/2013 | FUHU, INC.. |
| Europe | 002319723-0007 | Wings User Interface | 10/03/13 | 002319723-0007 | 10/3/2013 | FUHU, INC.. |
| Europe | 002319723-0008 | Wings User Interface | 10/03/13 | 002319723-0008 | 10/3/2013 | FUHU, INC. |
| Europe | 002319723-0009 | Wings User Interface | 10/03/13 | 002319723-0009 | 10/3/2013 | FUHU, INC. |
| Europe | 002319723-0010 | Wings User Interface | 10/03/13 | 002319723-0010 | 10/3/2013 | FUHU, INC. |
| Europe | 002319723-0011 | Wings User Interface | 10/03/13 | 002319723-0011 | 10/3/2013 | FUHU, INC. |
| Europe | 002319723-0012 | Wings User Interface | 10/03/13 | 002319723-0012 | 10/3/2013 | . FUHU, INC. |
| Europe | 002319723-0013 | Wings User Interface | 10/03/13 | 002319723-0013 | 10/3/2013 | FUHU, INC.. |
| Europe | 002319723-0014 | Wings User Interface | 10/03/13 | 002319723-0014 | 10/3/2013 | FUHU, INC. |
| Europe | 002319723-0015 | Wings User Interface | 10/03/13 | 002319723-0015 | 10/3/2013 | FUHU, INC.. |
| Europe | 002319723-0016 | Wings User Interface | 10/03/13 | 002319723-0016 | 10/3/2013 | FUHU, INC.. |
| Europe | 002319723-0017 | Wings User Interface | 10/03/13 | 002319723-0017 | 10/3/2013 | FUHU, INC. |
| Europe | 002319723-0018 | Wings User Interface | 10/03/13 | 002319723-0018 | 10/3/2013 | FUHU, INC. |
| Europe | 002319723-0019 | Wings User Interface | 10/03/13 | 002319723-0019 | 10/3/2013 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M001 | 12/27/13 | FUHU, INC. |

CONFIDENTIAL INFORMATION -- FUHU, INC. AND FUHU HOLDINGS, INC.

| | | | | | | |
|---|---|---|---|---|---|---|
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M002 | 12/27/13 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M003 | 12/27/13 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M004 | 12/27/13 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M005 | 12/27/13 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M006 | 12/27/13 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M007 | 12/27/13 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M008 | 12/27/13 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M009 | 12/27/13 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M010 | 12/27/13 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M011 | 12/27/13 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M012 | 12/27/13 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M013 | 12/27/13 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M014 | 12/27/13 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M015 | 12/27/13 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M016 | 12/27/13 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M017 | 12/27/13 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M018 | 12/27/13 | FUHU, INC. |
| Hong Kong | 1301716 | Wings User Interface | 10/02/13 | 1301716.5M019 | 12/27/13 | FUHU, INC. |
| Canada | 153333 | Graphical User Interface for a Display Screen or a Portion | 10/02/13 | 153333 | 04/07/15 | FUHU, INC. |

26

| | | Thereof (Wings UI) | | | | |
|---|---|---|---|---|---|---|
| China | 20133062178.0 | Writing Implement | 12/13/13 | ZL20133062178.0 | 01/07/15 | FUHU, INC. |
| Canada | 154285 | Transformable and Interconnectable Toy | 12/06/13 | 154285 | 03/19/15 | FUHU, INC. |
| Europe | 002365379-0001 | Tranformable and Interconnected Toy "Pill" Shape (Dragon Toy - Manual) | 12/06/13 | 002365379-0001 | 12/06/13 | FUHU, INC. |
| Europe | 002365379-0002 | Tranformable and Interconnected Toy "Pill" Shape (Dragon Toy - Manual) | 12/06/13 | 002365379-0002 | 12/6/2013 | FUHU, INC. |
| Europe | 002365379-0003 | Tranformable and Interconnected Toy "Pill" Shape (Dragon Toy - Manual) | 12/06/13 | 002365379-0003 | 12/06/13 | FUHU, INC. |
| Europe | 002365379-0004 | Tranformable and Interconnected Toy "Pill" Shape (Dragon Toy - Manual) | 12/06/13 | 002365379-0004 | 12/06/13 | FUHU, INC.. |
| Hong Kong | 1302143.9 | Transformable and Interconnected Toy "Pill" Shape (Dragon Toy - Manual) | 12/03/13 | 1302143.9 | 03/21/14 | FUHU, INC. |
| Japan | 2013-028448 | Tranformable and Interconnected Toy "Pill" Shape (Dragon Toy - Manual) | 12/04/13 | 1513300 | 12/8/2014 | FUHU, INC. |
| Korea | 30-2013-0061714 | Tranformable and Interconnected Toy "Pill" Shape (Dragon Toy - Manual) | 12/06/13 | 30-0790703 | 03/27/15 | FUHU, INC.. |

83383400\V-5

| | | | | | | |
|---|---|---|---|---|---|---|
| Taiwan | 102307883 | Tranformable and Interconnected Toy "Pill" Shape (Dragon Toy - Manual) | 12/06/13 | D166957 | 04/01/15 | FUHU, INC. |
| Canada | 154286 | Transformable and Interconnectable Toy | 12/06/13 | 154286 | 03/19/15 | FUHU, INC. |
| Europe | 002365379-0005 | Tranformable and Interconnected Toy "Pill" Shape (Dragon Toy - Automatic) | 12/06/13 | 002365379-0005 | 12/06/13 | FUHU, INC. |
| Europe | 002365379-0006 | Tranformable and Interconnected Toy "Pill" Shape (Dragon Toy - Automatic) | 12/06/13 | 002365379-0006 | 12/06/13 | FUHU, INC. |
| Europe | 002365379-0007 | Tranformable and Interconnected Toy"Pill" Shape (Dragon Toy - Automatic) | 12/06/13 | 002365379-0007 | 12/06/13 | FUHU, INC.. |
| Europe | 002365379-0008 | Tranformable and Interconnected Toy "Pill" Shape (Dragon Toy - Automatic) | 12/06/13 | 002365379-0008 | 12/06/13 | FUHU, INC. |
| Hong Kong | 1302145.4 | Transformable and Interconnectable Toy | 12/03/13 | 1302145.4 | 03/21/14 | FUHU, INC. |
| Japan | 2013-028449 | Transformable and Interconnectable Toy | 12/04/13 | 1513712 | 12/15/14 | FUHU, INC. |
| Korea | 30-2013-0061716 | Transformable and Interconnectable Toy | 12/06/13 | 30-0790704 | 03/27/15 | FUHU, INC. |
| Korea | 30-2013-0029029 | Electronic Device | 06/04/13 | 30-0745011 | 05/20/14 | FUHU, INC. |
| Taiwan | 102307884 | TRANSFORMABLE AND INTERCONNECTABLE TOY | 06-Dec-2013 | D171561 | 01-Nov-2015 | FUHU, INC. |

83383402/V-5

## Foreign Pending Design

| Country | Application Number | Title | Filing Date | Corresponding U.S. Appln | Owner |
|---|---|---|---|---|---|
| Korea | 30-2014-41367 | Wire Management | 08/25/14 | 29/483,042 | FUHU, INC. |
| Taiwan | 103304974 | Wire Management | 08/25/14 | 29/483,042 | FUHU, INC. |
| Canada | 153589 | Graphical User interface for a Display Screen or a Portion Thereof | 10/25/13 | 29/447,119 | FUHU, INC. |
| Japan | 2013-13051 | Mobile Information Terminal | 06/10/13 | 29/447,119 | FUHU, INC. |
| Korea | 30-2013-29317 | Display Screen with A Graphical User Interface Being Expressed | 06/11/13 | 29/447,119 | FUHU, INC. |
| Canada | 153679 | Graphical User Interface for a Display Screen or a Portion Thereof | 10/31/13 | 29/453,735 | FUHU, INC. |
| Korea | 30-2013-30226 | Display Screen with A Graphical User Interface Being Expressed | 06/11/13 | 29/453,735 | FUHU, INC. |
| Korea | 30-2013-30227 | Display Screen with A Graphical User Interface Being Expressed | 06/11/13 | 29/453,735 | FUHU, INC. |
| Japan | 2013-13052 | Graphical User Interface for a Display Screen or a Portion Thereof - Title was changed to Graphical user interface for a display screen | 06/10/13 | 29/453,735 | FUHU, INC. |
| Canada | 150429 | Case for an Electronic Device | 04/19/13 | 29/446,135 | FUHU, INC. |
| Canada | 150428 | Nabi Jr. Hardware Device | 03/26/13 | 29/446,132 | FUHU, INC. |
| Korea | 30-2013-0029028 | Nabi Jr. Hardware Device | 06/04/13 | 29/446,132 | FUHU, INC. |
| China | 201430077717.7 | Wireless Charger Stand | 04/04/14 | 29/469,238 | FUHU, INC. |
| Korea | 30-2014-0017148 | Wireless Charger Stand | 04/07/14 | 29/469,238 | FUHU, INC. |

29

| | | | | | |
|---|---|---|---|---|---|
| China | 201430284863.7 | Paper Stand | 08/13/14 | 29/482,087 | FUHU, INC. |
| Japan | 2014-017607 | Paper Stand | 08/12/14 | 29/482,087 | FUHU, INC. |
| Korea | 30-2014-39206 | Paper Stand | 08/12/14 | 29/482,087 | FUHU, INC. |
| Taiwan | 103304727 | Paper Stand | 08/11/14 | 29/482,087 | FUHU, INC. |
| Japan | 2014-017519 | Paper Stand | 08/11/14 | 29/481,867 | FUHU, INC. |
| Korea | 30-2014-39087 | Paper Stand | 08/11/14 | 29/481,867 | FUHU, INC. |
| Taiwan | .103304721 | Paper Stand | 08/11/14 | 29/481,867 | FUHU, INC. |
| Canada | 158119 | Paper Stand | 08/11/14 | 29/481,862 | FUHU, INC. |
| Japan | 2014-017545 | Paper Stand | 08/11/14 | 29/481,862 | FUHU, INC. |
| Taiwan | 103304725 | Paper Stand | 08/11/14 | 29/481,862 | FUHU, INC. |
| Taiwan | 103304726 | Paper Stand | 08/11/14 | 29/481,788 | FUHU, INC. |
| Japan | 2014-017510 | Paper Stand | 08/11/14 | 29/481,783 | FUHU, INC. |
| Taiwan | 103304724 | Paper Stand | 08/11/14 | 29/481,783 | FUHU, INC. |
| Europe | 002524140 | Paper Stand | 08/23/14 | 29/483,118 | FUHU, INC. |
| Japan | 2014-018448 | Paper Stand | 08/25/14 | 29/483,118 | FUHU, INC. |
| Taiwan | 103304978 | Paper Stand | 08/25/14 | 29/483,118 | FUHU, INC. |
| Japan | 2014-018421 | Paper Stand | 08/25/14 | 29/483,116 | FUHU, INC. |
| Taiwan | 103304975 | Paper Stand | 08/25/14 | 29/483,116 | FUHU, INC. |
| China | 201430304604.6 | Paper Stand | 08/25/14 | 29/483,040 | FUHU, INC. |

83383402\V-5

CONFIDENTIAL INFORMATION -- FUHU, INC. AND FUHU HOLDINGS, INC.

| Europe | 002524124 | Paper Stand | 08/23/14 | 29/483,040 | FUHU, INC. |
|--------|-----------|-------------|----------|------------|------------|
| Japan | 2014-018434 | Paper Stand | 08/25/14 | 29/483,040 | FUHU, INC. |
| Taiwan | 103304980 | Paper Stand | 08/25/14 | 29/483,040 | FUHU, INC. |
| Canada | 158352 | Paper Stand | 08/22/14 | 29/483,111 | FUHU HOLDINGS, INC. |
| Europe | 002524132 | Paper Stand | 08/23/14 | 29/483,111 | FUHU HOLDINGS, INC |
| Japan | 2014-018440 | Paper Stand | 08/25/14 | 29/483,111 | FUHU HOLDINGS, INC |
| Taiwan | 103304977 | Paper Stand | 08/25/14 | 29/483,111 | FUHU HOLDINGS, INC |
| Japan | 2014-018426 | Paper Stand | 08/25/14 | 29/483,114 | FUHU HOLDINGS, INC |
| Taiwan | 103304976 | Paper Stand | 08/25/14 | 29/483,114 | FUHU HOLDINGS, INC |
| Japan | 2014-018429 | Paper Stand | 08/25/14 | 29/483,107 | FUHU, INC. |
| Taiwan | 103304979 | Paper Stand | 08/25/14 | 29/483,107 | FUHU, INC. |
| Japan | 2014-018825 | Paper Stand | 08/28/14 | 29/483,612 | FUHU, INC. |

83383402\V-5

| Taiwan | 103305046 | Paper Stand | 08/28/14 | 29/483,612 | FUHU, INC. |
|---|---|---|---|---|---|
| Canada | 158414 | Paper Stand | 08/27/14 | 29/483,647 | FUHU, INC. |
| Japan | 2014-018809 | Paper Stand | 08/28/14 | 29/483,647 | FUHU, INC. |
| Taiwan | 103305047 | Paper Stand | 08/28/14 | 29/483,647 | FUHU, INC. |
| Japan | 2014-018821 | Paper Stand | 08/28/14 | 29/483,650 | FUHU, INC. |
| Taiwan | 103305048 | Paper Stand | 08/28/14 | 29/483,650 | FUHU, INC. |
| Japan | 2014-017521 | Paper Stand | 08/11/14 | 29/481,881 | FUHU, INC. |
| Japan | 2014-017515 | Paper Stand | 08/11/14 | 29/481,788 | FUHU, INC. |
| Korea | 30-2014-39088 | Paper Stand | 08/11/14 | 29/481,881 | FUHU, INC. |
| Taiwan | 103304723 | Paper Stand | 08/11/14 | 29/481,881 | FUHU, INC. |
| Europe | 002441980 | Tablet Skinit | 04/07/14 | 29/469,243 | FUHU, INC. |
| Hong Kong | 1400610.0 | Tablet Skinit | 04/04/14 | 29/469,243 | FUHU, INC. |
| Canada | 151817 | Headphones | 6/13/2013 | 29/439,704 | FUHU, INC. |
| Canada | 150718 | Chore list | 04/16/13 | 29/443/686 | FUHU HOLDINGS, INC. |
| Canada | 150717 | Graphical User Interface for a Display Screen or a Portion Thereof (Treasure Box) | 04/16/13 | 29/443,681 | FUHU, INC. |
| Canada | 150719 | Graphical User Interface for a Display Screen or a Portion Thereof (Settings) | 04/16/13 | 29/443,689 | FUHU, INC. |
| Canada | 150721 | Graphical User Interface for a Display Screen or a Portion Thereof (Desktop) | 04/16/13 | 29/443,691 | FUHU, INC. |

32

83383402IV-5

CONFIDENTIAL INFORMATION – FUHU, INC. AND FUHU HOLDINGS, INC.

| Canada | 150720 | Graphical User Interface for a Display Screen or a Portion Thereof (Cloud) | 04/16/13 | 29/443,692 | FUHU HOLDINGS, INC. |
|--------|--------|-----------------------------------------------------------------------------|----------|------------|---------------------|
| Canada | 149299 | Electronic Device Case (nabi 2 Case) | 01/08/13 | 29/426,642 | FUHU INC. |
| China | 201330522058.9 | Mount for Tablet Computer | 11/01/13 | 29/453,839 | FUHU HOLDINGS, INC. |
| Canada | 150430 | Electronic Device | 03/26/13 | 29/446,123 | FUHU, INC. |
| Taiwan | 102307884 | Pill Shape (Dragon Toy - Automatic) | 12/06/13 | 29/457,253 | FUHU, INC. |
| Korea | 30 - 2013 - 0029029 | Case for an Electronic Device | 06/04/13 | 29/446,135 | FUHU, INC. |

33

**Trademark Report By Title**
**Search Criteria**

| Country ID | US |
| Client ID | FUHUINC |
| Status | ACTIVE |

**Display Options**

| Exclude Actions | SC,5Y,9Y |
| Images | All |
| Owner | All |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|

### :)NSPIRE Logo

:)nspire

| UNITED STATES | 82150/384576-1 | 7/19/2012 | 85/682,098 | 9/8/2015 | 4,806,263 | REGISTERED | 035 |
|---|---|---|---|---|---|---|---|

OWNER:  *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 9/8/2021 | AFFIDVT OF USE 8 &15 |
| 9/8/2025 | US RENEWAL/DEC USE |

### ALL YOU CAN PLAY

| UNITED STATES | 82150/384576-4 | 11/22/2013 | 86/127,139 | | | ALLOWED | 009, 041 |
|---|---|---|---|---|---|---|---|

OWNER:  *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 12/17/2015 | FILE ITU EXTENSION-3 |
| 12/17/2015 | STATEMENT OF USE |

### ANYTHING YOU CAN DO

| UNITED STATES | 82150/384576-7 | 7/22/2014 | 86/344,972 | | | ALLOWED | 009 |
|---|---|---|---|---|---|---|---|

OWNER:  *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 1/13/2016 | STATEMENT OF USE |
| 1/13/2016 | FILE ITU EXTENSION-2 |

### ART OF GENIUS

| UNITED STATES | 82150/384576-8 | 11/29/2012 | 85/791,073 | | | ALLOWED | 009 |
|---|---|---|---|---|---|---|---|

OWNER:  *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 12/11/2015 | STATEMENT OF USE |
| 12/11/2015 | FILE ITU EXTENSION-5 |

### BIG TAB

| UNITED STATES | 82150/384576-11 | 5/30/2014 | 86/296,570 | | | ALLOWED | 009 |
|---|---|---|---|---|---|---|---|

OWNER:  *FUHU HOLDINGS, INC.*

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

| CURRENT DUE | ACTION |
|-------------|--------|
| 6/9/2016 | STATEMENT OF USE |
| 6/9/2016 | FILE ITU EXTENSION-2 |

## BIG TAB HD Logo



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-12 | 7/11/2014 | 86/335,298 | | | ALLOWED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/15/2016 | STATEMENT OF USE |
| 3/15/2016 | FILE ITU EXTENSION-1 |

## BIG TAB HD Logo (Tablet Shape)



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-13 | 7/11/2014 | 86/335,304 | | | ALLOWED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/15/2016 | STATEMENT OF USE |
| 3/15/2016 | FILE ITU EXTENSION-1 |

## BLUE MORPHO (Opp #91218120, SAFRAN v. Fuhu Holdings)

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-14 | 9/24/2013 | 86/073,529 | | | PENDING | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 1/5/2016 | INITIAL DISCLSRS DUE |
| 5/4/2016 | EXPERT DISCLSRS DUE |
| 6/3/2016 | DISCOVERY CLOSES |
| 7/18/2016 | PLF PRETRIAL DSCLSRS |
| 9/1/2016 | PLF TRIAL PERD ENDS |
| 9/16/2016 | DFT PRETRIAL DSCLSRS |
| 10/31/2016 | DFT TRIAL PERD ENDS |
| 11/15/2016 | PLF REBUTTAL DSCLSRS |
| 12/15/2016 | PLF REBUTL PERD ENDS |

## BLUEMORPHO (Opp #91218121, SAFRAN v. Fuhu Holdings)

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-15 | 9/24/2013 | 86/073,558 | | | PENDING | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|

| CURRENT DUE | ACTION |
|---|---|
| 1/5/2016 | INITIAL DISCLSRS DUE |
| 5/4/2016 | EXPERT DSCLSRS DUE |
| 6/3/2016 | DISCOVERY CLOSES |
| 7/18/2016 | PLF PRETRIAL DSCLSRS |
| 9/1/2016 | PLF TRIAL PERD ENDS |
| 9/16/2016 | DFT PRETRIAL DSCLSRS |
| 10/31/2016 | DFT TRIAL PERD ENDS |
| 11/15/2016 | PLF REBUTTAL DSCLSRS |
| 12/15/2016 | PLF REBUTL PERD ENDS |

## Butterfly Logo



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-136 | 12/21/2012 | 85/808,674 | 1/21/2014 | 4,468,987 | REGISTERED | 009 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 1/21/2020 | AFFIDVT OF USE 8 &15 |
| 1/21/2024 | US RENEWAL/DEC USE |

## CHARMED BY NABI

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-16 | 7/8/2013 | 86/004,763 | | | ALLOWED | 009, 014, 026, 028 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 1/22/2016 | STATEMENT OF USE |
| 1/22/2016 | FILE ITU EXTENSION-3 |

## CHARMS: 18

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-17 | 10/2/2013 | 86/081,138 | | | ALLOWED | 009, 014, 026, 028, 041 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 5/4/2016 | STATEMENT OF USE |
| 5/4/2016 | FILE ITU EXTENSION-3 |

## CHORE LIST

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-18 | 5/30/2013 | 85/946,310 | 6/3/2014 | 4,545,372 | REGISTERED | 009, 042 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 6/3/2020 | AFFIDVT OF USE 8 &15 |
| 6/3/2024 | US RENEWAL/DEC USE |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|

## CLASS MODE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-19 | 5/22/2013 | 85/939,354 | | | ALLOWED | 009, 041 |

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|---|---|
| 12/24/2015 | STATEMENT OF USE |
| 12/24/2015 | FILE ITU EXTENSION-3 |

## CLASSROOM MODE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-20 | 5/11/2013 | 85/929,403 | | | ALLOWED | 041 |

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|---|---|
| 12/24/2015 | STATEMENT OF USE |
| 12/24/2015 | FILE ITU EXTENSION-3 |

## CLOUD STYLE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-21 | 6/6/2013 | 85/952,462 | | | ALLOWED | 009 |

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|---|---|
| 12/23/2015 | STATEMENT OF USE |
| 12/23/2015 | FILE ITU EXTENSION-2 |

## CLUB NABI

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-22 | 8/18/2014 | 86/369,594 | | | ALLOWED | 035 |

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|---|---|
| 2/3/2016 | STATEMENT OF USE |
| 2/3/2016 | FILE ITU EXTENSION-2 |

## CONVERTABLET

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-23 | 1/4/2013 | 85/815,625 | | | ALLOWED | 009, 028 |

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|---|---|
| 3/23/2016 | FILE ITU EXTENSION-3 |
| 3/23/2016 | STATEMENT OF USE |

## DAVR

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-24 | 12/11/2012 | 85/799,623 | 9/16/2014 | 4,606,218 | REGISTERED | 009 |

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|---|---|
| 9/16/2020 | AFFIDVT OF USE 8 &15 |
| 9/16/2024 | US RENEWAL/DEC USE |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

## Design (Airplane On the Go Color Logo)



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-3 | 2/17/2014 | 86/195,841 | | | ALLOWED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/16/2016 | FILE ITU EXTENSION-3 |
| 3/16/2016 | STATEMENT OF USE |

## DJ QUALITY VOLUME LIMITING HEADPHONES FOR KIDS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-25 | 3/22/2013 | 85/883,866 | 4/1/2014 | 4,508,337 | REGISTERED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 4/1/2020 | AFFIDVT OF USE SEC 8 |
| 4/1/2024 | US RENEWAL/DEC USE |

## DREAM PEN

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-27 | 3/26/2014 | 86/233,288 | | | ALLOWED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/23/2016 | FILE ITU EXTENSION-3 |
| 3/23/2016 | STATEMENT OF USE |

## DREAM PRO STUDIO

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-28 | 2/13/2014 | 86/193,517 | | | ALLOWED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 2/26/2016 | FILE ITU EXTENSION-3 |
| 2/26/2016 | STATEMENT OF USE |

## DREAMTAB

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-29 | 1/6/2014 | 86/158,516 | | | ALLOWED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 12/17/2015 | FILE ITU EXTENSION-3 |
| 12/17/2015 | STATEMENT OF USE |

## DREAMTAB FX

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-32 | 3/17/2014 | 86/222,980 | | | ALLOWED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|

| CURRENT DUE | ACTION |
|---|---|
| 1/8/2016 | FILE ITU EXTENSION-3 |
| 1/8/2016 | STATEMENT OF USE |

## DREAMTAB Logo

**dreamtab**

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-30 | 1/6/2014 | 86/158,577 | | | ALLOWED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 1/8/2016 | FILE ITU EXTENSION-3 |
| 1/8/2016 | STATEMENT OF USE |

## DREAMTAB Logo (2)

**dreamtab**

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-31 | 1/6/2014 | 86/158,562 | | | ALLOWED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 1/8/2016 | FILE ITU EXTENSION-3 |
| 1/8/2016 | STATEMENT OF USE |

## DROP-SAFE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-33 | 9/11/2012 | 85/726,263 | 8/13/2013 | 4,385,520 | REGISTERED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 8/13/2019 | AFFIDVT OF USE 8 &15 |
| 8/13/2023 | US RENEWAL/DEC USE |

## FAMILY TAB

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-35 | 5/30/2014 | 86/296,307 | | | ALLOWED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 5/17/2016 | STATEMENT OF USE |
| 5/17/2016 | FILE ITU EXTENSION-1 |

## FAN-A-TECH

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-36 | 1/20/2012 | 85/521,257 | 6/19/2012 | 4,161,454 | REGISTERED | 042 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|

| CURRENT DUE | ACTION |
|---|---|
| 6/19/2018 | AFFIDVT OF USE 8 &15 |
| 6/19/2022 | US RENEWAL/DEC USE |

## FOOZ

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-39 | 3/2/2009 | 77/681,499 | 4/26/2011 | 3,951,375 | REGISTERED | 045 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 4/26/2017 | AFFIDVT OF USE 8 &15 |
| 4/26/2021 | US RENEWAL/DEC USE |

## FOOZ KIDS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-41 | 12/22/2009 | 77/899,424 | 3/13/2012 | 4,112,299 | REGISTERED | 042 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 3/13/2018 | AFFIDVT OF USE 8 &15 |
| 3/13/2022 | US RENEWAL/DEC USE |

## FOOZ KIDS Logo



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-42 | 2/28/2010 | 77/946,721 | 3/13/2012 | 4,112,338 | REGISTERED | 041, 042 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 3/13/2018 | AFFIDVT OF USE 8 &15 |
| 3/13/2022 | US RENEWAL/DEC USE |

## FOOZ KIDS Logo (Color)



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-43 | 2/28/2010 | 77/946,723 | 3/20/2012 | 4,115,480 | REGISTERED | 041, 042 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 3/20/2018 | AFFIDVT OF USE 8 &15 |
| 3/20/2022 | US RENEWAL/DEC USE |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

## FOOZ Logo (Color)



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-40 | 2/21/2008 | 77/402,938 | 12/7/2010 | 3,886,686 | REGISTERED | 042 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 12/7/2016 | AFFIDVT OF USE 8 &15 |
| 12/7/2020 | US RENEWAL/DEC USE |

## FOOZ MALL

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-44 | 7/3/2008 | 77/514,227 | 3/9/2010 | 3,758,480 | REGISTERED | 042 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/9/2016 | AFFIDVT OF USE 8 &15 |
| 3/9/2020 | US RENEWAL/DEC USE |

## FOOZ NATION

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-45 | 2/11/2010 | 77/934,132 | 8/9/2011 | 4,010,096 | REGISTERED | 042 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 8/9/2017 | AFFIDVT OF USE 8 &15 |
| 8/9/2021 | US RENEWAL/DEC USE |

## FOOZ POINTS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-46 | 3/2/2009 | 77/681,460 | 4/12/2011 | 3,944,945 | REGISTERED | 036 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 4/12/2017 | AFFIDVT OF USE 8 &15 |
| 4/12/2021 | US RENEWAL/DEC USE |

## FOOZ WORLD

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-47 | 7/3/2008 | 77/514,233 | 2/9/2010 | 3,747,474 | REGISTERED | 042 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 2/9/2016 | AFFIDVT OF USE 8 &15 |
| 2/9/2020 | US RENEWAL/DEC USE |

## FOR KIDS. BY MOMS.

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-54 | 5/25/2010 | 85/047,297 | 4/17/2012 | 4,127,550 | REGISTERED | 038, 041, 042 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|

| CURRENT DUE | ACTION |
|---|---|
| 4/17/2018 | AFFIDVT OF USE 8 &15 |
| 4/17/2022 | US RENEWAL/DEC USE |

## FOR KIDS. BY PARENTS.

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-55 | 7/27/2012 | 85/689,343 | | | ALLOWED | 009 |
| | *OWNER: FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 3/5/2016 | STATEMENT OF USE |

## FOR PARENTS. BY PARENTS.

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-60 | 7/27/2012 | 85/689,332 | 8/27/2013 | 4,393,780 | REGISTERED | 009 |
| | *OWNER: FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 8/27/2019 | AFFIDVT OF USE 8 &15 |
| 8/27/2023 | US RENEWAL/DEC USE |

## FUHU

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-67 | 2/21/2008 | 77/402,328 | 8/16/2011 | 4,012,785 | REGISTERED | 042 |
| | *OWNER: FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 8/16/2017 | AFFIDVT OF USE 8 &15 |
| 8/16/2021 | US RENEWAL/DEC USE |

## FUHU Logo (Color)



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-68 | 2/21/2008 | 77/402,829 | 8/16/2011 | 4,012,786 | REGISTERED | 042 |
| | *OWNER: FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 8/16/2017 | AFFIDVT OF USE 8 &15 |
| 8/16/2021 | US RENEWAL/DEC USE |

## FUHU Logo (Script with Tomato)



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-70 | 8/20/2013 | 86/043,427 | 4/22/2014 | 4,517,616 | REGISTERED | 035, 042 |
| | *OWNER: FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 4/22/2020 | AFFIDVT OF USE 8 &15 |
| 4/22/2024 | US RENEWAL/DEC USE |

## FUHU Logo (Script)



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-69 | 8/20/2013 | 86/043,436 | 4/22/2014 | 4,517,618 | REGISTERED | 035, 042 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 4/22/2020 | AFFIDVT OF USE 8 &15 |
| 4/22/2024 | US RENEWAL/DEC USE |

## FX Logo (Color)

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-72 | 2/17/2014 | 86/195,828 | | | ALLOWED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 1/8/2016 | FILE ITU EXTENSION-3 |
| 1/8/2016 | STATEMENT OF USE |

## GAMUCATION

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-73 | 12/5/2012 | 85/795,789 | | | ALLOWED | 041 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 12/11/2015 | STATEMENT OF USE |
| 12/11/2015 | FILE ITU EXTENSION-5 |

## GO BIG

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-74 | 7/22/2014 | 86/344,952 | | | ALLOWED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 1/13/2016 | FILE ITU EXTENSION-2 |
| 1/13/2016 | STATEMENT OF USE |

## GO BIG. GO HOME.

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-75 | 7/22/2014 | 86/344,936 | | | ALLOWED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 1/13/2016 | FILE ITU EXTENSION-2 |
| 1/13/2016 | STATEMENT OF USE |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|

## HAPPY KIDS ARE FOOZ KIDS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-78 | 6/24/2013 | 85/968,584 | 2/18/2014 | 4,484,415 | REGISTERED | 041, 042 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 2/18/2020 | AFFIDVT OF USE 8 &15 |
| 2/18/2024 | US RENEWAL/DEC USE |

## HOMEWORK REINVENTED.

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-79 | 3/26/2013 | 85/886,842 | 11/5/2013 | 4,428,749 | REGISTERED | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 11/5/2019 | AFFIDVT OF USE 8 &15 |
| 11/5/2023 | US RENEWAL/DEC USE |

## INSPIRE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-84 | 7/19/2012 | 85/682,066 | 9/8/2015 | 4,806,262 | REGISTERED | 035 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 9/8/2021 | AFFIDVT OF USE 8 &15 |
| 9/8/2025 | US RENEWAL/DEC USE |

## IT'S MORE THAN A TABLET. IT'S A FRIEND.

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-85 | 12/16/2013 | 86/144,766 | | | ALLOWED | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 12/17/2015 | FILE ITU EXTENSION-3 |
| 12/17/2015 | STATEMENT OF USE |

## IT'S NOT A TABLET, IT'S A FRIEND

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-89 | 5/12/2014 | 86/279,152 | | | ALLOWED | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 4/28/2016 | STATEMENT OF USE |
| 4/28/2016 | FILE ITU EXTENSION-3 |

## IT'S THE EVERYTHING TABLET THAT GROWS WITH YOU

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-90 | 5/31/2013 | 85/947,540 | 1/14/2014 | 4,465,657 | REGISTERED | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 1/14/2020 | AFFIDVT OF USE 8 &15 |
| 1/14/2024 | US RENEWAL/DEC USE |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

## KIDDIFIED

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-95 | 7/26/2012 | 85/687,862 | | | ALLOWED | 009, 041, 045 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 4/30/2016 | STATEMENT OF USE |

## KIDSVISION

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-97 | 8/26/2013 | 86/048,427 | | | ALLOWED | 009 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 5/19/2016 | FILE ITU EXTENSION-2 |
| 5/19/2016 | STATEMENT OF USE |

## KINABI

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-98 | 8/2/2013 | 86/027,718 | | | ALLOWED | 009, 018 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 2/18/2016 | FILE ITU EXTENSION-4 |
| 2/18/2016 | STATEMENT OF USE |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-99 | 3/20/2012 | 85/575,049 | 8/27/2013 | 4,393,280 | REGISTERED | 009 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 8/27/2019 | AFFIDVT OF USE 8 &15 |
| 8/27/2023 | US RENEWAL/DEC USE |

## KINABIS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-100 | 3/21/2013 | 85/883,169 | | | ALLOWED | 009, 028 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 5/13/2016 | FILE ITU EXTENSION-4 |
| 5/13/2016 | STATEMENT OF USE |

## KINABIS Logo

**KINABIs**

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-101 | 9/6/2013 | 86/058,309 | | | ALLOWED | 009, 026 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/30/2016 | FILE ITU EXTENSION-3 |
| 3/30/2016 | STATEMENT OF USE |

## KINABIS Logo (Color)



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-102 | 9/6/2013 | 86/058,319 | | | ALLOWED | 009, 026 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/30/2016 | FILE ITU EXTENSION-3 |
| 3/30/2016 | STATEMENT OF USE |

## KINABIS Logo (New Colors)



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-103 | 2/17/2014 | 86/195,832 | | | ALLOWED | 009, 026 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 6/9/2016 | STATEMENT OF USE |
| 6/9/2016 | FILE ITU EXTENSION-2 |

## KUNGFOOZ

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-104 | 5/20/2011 | 85/326,568 | 12/27/2011 | 4,077,129 | REGISTERED | 009, 042 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 12/27/2017 | AFFIDVT OF USE 8 &15 |
| 12/27/2021 | US RENEWAL/DEC USE |

## KUNGFOOZ Logo (Color)



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-105 | 7/15/2011 | 85/372,870 | 2/28/2012 | 4,105,423 | REGISTERED | 042 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 2/28/2018 | AFFIDVT OF USE 8 &15 |
| 2/28/2022 | US RENEWAL/DEC USE |

## LEARN FIRST, PLAY LATER.

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-108 | 12/11/2013 | 86/141,371 | | | ALLOWED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

| | CURRENT DUE | ACTION | | | | | |
|---|---|---|---|---|---|---|---|
| | 12/17/2015 | FILE ITU EXTENSION-3 | | | | | |
| | 12/17/2015 | STATEMENT OF USE | | | | | |

## LEARN. DISCOVER. GROW.

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-109 | 5/30/2013 | 85/946,892 | 5/13/2014 | 4,528,276 | REGISTERED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| | CURRENT DUE | ACTION | | | | | |
|---|---|---|---|---|---|---|---|
| | 5/13/2020 | AFFIDVT OF USE 8 &15 | | | | | |
| | 5/13/2024 | US RENEWAL/DEC USE | | | | | |

## LEARN. PLAY. DO.

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-110 | 5/30/2013 | 85/946,915 | 1/7/2014 | 4,462,767 | REGISTERED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| | CURRENT DUE | ACTION | | | | | |
|---|---|---|---|---|---|---|---|
| | 1/7/2020 | AFFIDVT OF USE 8 &15 | | | | | |
| | 1/7/2024 | US RENEWAL/DEC USE | | | | | |

## LEARN. PLAY. GROW.

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-111 | 5/30/2013 | 85/946,907 | 5/13/2014 | 4,528,277 | REGISTERED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| | CURRENT DUE | ACTION | | | | | |
|---|---|---|---|---|---|---|---|
| | 5/13/2020 | AFFIDVT OF USE 8 &15 | | | | | |
| | 5/13/2024 | US RENEWAL/DEC USE | | | | | |

## LEARN. PLAY. GROW. EXPERIENCES FOR LIFE.

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-112 | 8/21/2013 | 86/044,617 | 5/27/2014 | 4,536,541 | REGISTERED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| | CURRENT DUE | ACTION | | | | | |
|---|---|---|---|---|---|---|---|
| | 5/27/2020 | AFFIDVT OF USE 8 &15 | | | | | |
| | 5/27/2024 | US RENEWAL/DEC USE | | | | | |

## LEARN. PLAY. GROW. FOR LIFE.

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-113 | 7/27/2012 | 85/689,310 | 9/3/2013 | 4,397,561 | REGISTERED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| | CURRENT DUE | ACTION | | | | | |
|---|---|---|---|---|---|---|---|
| | 9/3/2019 | AFFIDVT OF USE 8 &15 | | | | | |
| | 9/3/2023 | US RENEWAL/DEC USE | | | | | |

## LITTLE GENIUS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-114 | 5/30/2013 | 85/946,234 | | | ALLOWED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

| CURRENT DUE | ACTION |
|-------------|--------|
| 1/1/2016 | FILE ITU EXTENSION-3 |
| 1/1/2016 | STATEMENT OF USE |

## MINI MOGUL

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-116 | 7/9/2013 | 86/005,746 | | | PENDING | 009, 041, 042 |

OWNER: FUHU HOLDINGS, INC.

## MOM AND ME

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-117 | 10/21/2013 | 86/096,814 | | | ALLOWED | 042, 045 |

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|-------------|--------|
| 2/24/2016 | STATEMENT OF USE |
| 2/24/2016 | FILE ITU EXTENSION-2 |

## MOM MODE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-118 | 10/4/2011 | 85/439,215 | | | PUBLISHED | 009, 041 |

OWNER: FUHU HOLDINGS, INC.

## MOMMY MODE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-119 | 10/4/2011 | 85/439,203 | | | PENDING | 009, 041, 045 |

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/2/2016 | RESPONSE TO OA |

## MOM-SELECTED, KID-APPROVED APPS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-120 | 7/27/2012 | 85/689,292 | 7/30/2013 | 4,377,641 | REGISTERED | 009 |

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|-------------|--------|
| 7/30/2019 | AFFIDVT OF USE 8 &15 |
| 7/30/2023 | US RENEWAL/DEC USE |

## MONARCH

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-121 | 9/19/2013 | 86/069,873 | | | ALLOWED | 009 |

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|-------------|--------|
| 4/29/2016 | FILE ITU EXTENSION-4 |
| 4/29/2016 | STATEMENT OF USE |

## MONARCH OS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-122 | 9/19/2013 | 86/069,875 | | | ALLOWED | 009 |

OWNER: FUHU HOLDINGS, INC.

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

| CURRENT DUE | ACTION |
|-------------|--------|
| 4/29/2016 | FILE ITU EXTENSION-4 |
| 4/29/2016 | STATEMENT OF USE |

## MORE POWER. MORE EXPERIENCE.

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-123 | 3/21/2013 | 85/883,102 | 8/13/2013 | 4,384,081 | REGISTERED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 8/13/2019 | AFFIDVT OF USE 8 &15 |
| 8/13/2023 | US RENEWAL/DEC USE |

## MORE TABLET. LESS TOY.

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-124 | 3/21/2013 | 85/883,124 | 10/22/2013 | 4,421,938 | REGISTERED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 10/22/2019 | AFFIDVT OF USE 8 &15 |
| 10/22/2023 | US RENEWAL/DEC USE |

## MORPHO PODS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-125 | 4/15/2014 | 86/253,001 | | | ALLOWED | 009, 028 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 5/26/2016 | STATEMENT OF USE |
| 5/26/2016 | FILE ITU EXTENSION-2 |

## MORPHOPODS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-126 | 4/15/2014 | 86/252,961 | | | ALLOWED | 009, 028 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 6/9/2016 | FILE ITU EXTENSION-2 |
| 6/9/2016 | STATEMENT OF USE |

## NABI

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-130 | 9/19/2011 | 85/426,283 | 10/30/2012 | 4,232,559 | REGISTERED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 10/30/2018 | AFFIDVT OF USE 8 &15 |
| 10/30/2022 | US RENEWAL/DEC USE |

## NABI ACTION

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384581-333 | 7/31/2015 | 86/711,873 | | | PENDING | 009, 014 |

| CURRENT DUE | ACTION |
|-------------|--------|
| 1/31/2016 | FOR. FILING DEADLINE |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

## NABI and Design (Bumper Trade Dress Design)



| UNITED STATES | 82150/384576-135 | 2/20/2013 | 85/855,234 | 9/16/2014 | 4,604,015 | REGISTERED | 009 |
|---------------|------------------|-----------|------------|-----------|-----------|------------|-----|

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|-------------|--------|
| 9/16/2020 | AFFIDVT OF USE 8 &15 |
| 9/16/2024 | US RENEWAL/DEC USE |

## NABI and Design (Product Packaging/Box Design)



| UNITED STATES | 82150/384576-134 | 2/20/2013 | 85/855,044 | 10/8/2013 | 4,414,217 | REGISTERED | 009 |
|---------------|------------------|-----------|------------|-----------|-----------|------------|-----|

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|-------------|--------|
| 10/8/2019 | AFFIDVT OF USE 8 &15 |
| 10/8/2023 | US RENEWAL/DEC USE |

## NABI and Design (Tablet Composite Outline)



| UNITED STATES | 82150/384576-167 | 2/20/2013 | 85/855,068 | 10/8/2013 | 4,414,218 | REGISTERED | 009 |
|---------------|------------------|-----------|------------|-----------|-----------|------------|-----|

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|-------------|--------|
| 10/8/2019 | AFFIDVT OF USE 8 &15 |
| 10/8/2023 | US RENEWAL/DEC USE |

## NABI ANYWHERE

| UNITED STATES | 82150/384576-133 | 10/10/2013 | 86/088,304 | | | ALLOWED | 009, 038 |
|---------------|------------------|------------|------------|--|--|---------|----------|

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/25/2016 | STATEMENT OF USE |
| 3/25/2016 | FILE ITU EXTENSION-4 |

## NABI CARES

| UNITED STATES | 82150/384576-137 | 6/21/2013 | 85/966,908 | 1/21/2014 | 4,470,852 | REGISTERED | 035 |
|---------------|------------------|-----------|------------|-----------|-----------|------------|-----|

OWNER: FUHU HOLDINGS, INC.

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|

| CURRENT DUE | ACTION |
|---|---|
| 1/21/2020 | AFFIDVT OF USE 8 &15 |
| 1/21/2024 | US RENEWAL/DEC USE |

## NABI CERTIFIED

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-138 | 10/21/2013 | 86/097,355 | | | ALLOWED | 045 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 3/16/2016 | STATEMENT OF USE |
| 3/16/2016 | FILE ITU EXTENSION-3 |

## NABI CLOUD

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-139 | 5/30/2013 | 85/946,435 | 6/17/2014 | 4,550,399 | REGISTERED | 009, 042 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 6/17/2020 | AFFIDVT OF USE 8 &15 |
| 6/17/2024 | US RENEWAL/DEC USE |

## NABI COINS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-140 | 5/30/2013 | 85/946,866 | 7/29/2014 | 4,574,540 | REGISTERED | 035, 036 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 7/29/2020 | AFFIDVT OF USE 8 &15 |
| 7/29/2024 | US RENEWAL/DEC USE |

## NABI COMPETE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384581-334 | 7/31/2015 | 86/711,877 | | | PENDING | 009, 014 |

| CURRENT DUE | ACTION |
|---|---|
| 1/31/2016 | FOR. FILING DEADLINE |

## NABI DREAMTAB

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-141 | 4/17/2014 | 86/255,079 | | | ALLOWED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 3/9/2016 | FILE ITU EXTENSION-3 |
| 3/9/2016 | STATEMENT OF USE |

## NABI ELEV-8

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-143 | 1/5/2015 | 86/495,163 | | | PUBLISHED | 009, 041, 042 |

OWNER: *FUHU HOLDINGS, INC.*

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

## NABI EVERYWHERE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-144 | 10/10/2013 | 86/088,549 | | | ALLOWED | 009, 038 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/25/2016 | FILE ITU EXTENSION-4 |
| 3/25/2016 | STATEMENT OF USE |

## NABI FACE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-145 | 3/26/2014 | 86/233,310 | | | ALLOWED | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/30/2016 | FILE ITU EXTENSION-3 |
| 3/30/2016 | STATEMENT OF USE |

## NABI FX

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-146 | 7/23/2013 | 86/018,049 | 5/27/2014 | 4,540,508 | REGISTERED | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 5/27/2020 | AFFIDVT OF USE 8 &15 |
| 5/27/2024 | US RENEWAL/DEC USE |

## NABI GO

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-147 | 7/2/2014 | 86/327,249 | | | ALLOWED | 009, 014, 041, 042 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 2/3/2016 | FILE ITU EXTENSION-2 |
| 2/3/2016 | STATEMENT OF USE |

## NABI GRID

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-149 | 5/12/2014 | 86/279,136 | | | ALLOWED | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/30/2016 | FILE ITU EXTENSION-3 |
| 3/30/2016 | STATEMENT OF USE |

## NABI JR. Logo



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-150 | 5/28/2013 | 85/944,422 | 1/14/2014 | 4,465,606 | REGISTERED | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|

| CURRENT DUE | ACTION |
|---|---|
| 1/14/2020 | AFFIDVT OF USE 8 &15 |
| 1/14/2024 | US RENEWAL/DEC USE |

## NABI KONNECT

| UNITED STATES | 82150/384576-151 | 1/22/2014 | 86/172,630 | | | ALLOWED | 009, 038, 042 |
|---|---|---|---|---|---|---|---|

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 2/5/2016 | FILE ITU EXTENSION-3 |
| 2/5/2016 | STATEMENT OF USE |

## NABI LABS Logo



| UNITED STATES | 82150/384576-152 | 6/6/2013 | 85/952,828 | 7/22/2014 | 4,570,925 | REGISTERED | 041 |
|---|---|---|---|---|---|---|---|

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 7/22/2020 | AFFIDVT OF USE 8 &15 |
| 7/22/2024 | US RENEWAL/DEC USE |

## NABI Logo



| UNITED STATES | 82150/384576-131 | 3/8/2012 | 85/564,634 | 10/30/2012 | 4,233,424 | REGISTERED | 009 |
|---|---|---|---|---|---|---|---|

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 10/30/2018 | AFFIDVT OF USE 8 &15 |
| 10/30/2022 | US RENEWAL/DEC USE |

## NABI LUMU TAB

| UNITED STATES | 82150/384576-153 | 5/5/2014 | 86/272,360 | | | ALLOWED | 009 |
|---|---|---|---|---|---|---|---|

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 4/7/2016 | STATEMENT OF USE |
| 4/7/2016 | FILE ITU EXTENSION-3 |

## NABI MD

| UNITED STATES | 82150/384576-155 | 5/30/2013 | 85/946,884 | 7/29/2014 | 4,574,541 | REGISTERED | 042 |
|---|---|---|---|---|---|---|---|

OWNER: *FUHU HOLDINGS, INC.*

| | CURRENT DUE | ACTION | | | | | |
|---|---|---|---|---|---|---|---|
| | 7/29/2020 | AFFIDVT OF USE 8 &15 | | | | | |
| | 7/29/2024 | US RENEWAL/DEC USE | | | | | |

## NABI MODE

| UNITED STATES | 82150/384576-156 | 12/6/2013 | 86/137,606 | 6/24/2014 | 4,557,594 | REGISTERED | 009 |
|---|---|---|---|---|---|---|---|

OWNER: *FUHU HOLDINGS, INC.*

| | CURRENT DUE | ACTION |
|---|---|---|
| | 6/24/2020 | AFFIDVT OF USE 8 &15 |
| | 6/24/2024 | US RENEWAL/DEC USE |

## NABI MORPHO PODS Logo



| UNITED STATES | 82150/384576-157 | 4/17/2014 | 86/255,518 | | | PUBLISHED | 009 |
|---|---|---|---|---|---|---|---|

OWNER: *FUHU HOLDINGS, INC.*

## NABI ON THE GO

| UNITED STATES | 82150/384576-159 | 7/12/2013 | 86/008,891 | | | ALLOWED | 009 |
|---|---|---|---|---|---|---|---|

OWNER: *FUHU HOLDINGS, INC.*

| | CURRENT DUE | ACTION |
|---|---|---|
| | 3/10/2016 | FILE ITU EXTENSION-2 |
| | 3/10/2016 | STATEMENT OF USE |

## NABI PASS

| UNITED STATES | 82150/384576-160 | 12/9/2013 | 86/138,944 | | | ALLOWED | 009, 014, 038 |
|---|---|---|---|---|---|---|---|

OWNER: *FUHU HOLDINGS, INC.*

| | CURRENT DUE | ACTION |
|---|---|---|
| | 3/25/2016 | FILE ITU EXTENSION-4 |
| | 3/25/2016 | STATEMENT OF USE |

## NABI PLAY

| UNITED STATES | 82150/384576-162 | 3/26/2014 | 86/233,324 | | | ALLOWED | 009 |
|---|---|---|---|---|---|---|---|

OWNER: *FUHU HOLDINGS, INC.*

| | CURRENT DUE | ACTION |
|---|---|---|
| | 1/15/2016 | FILE ITU EXTENSION-3 |
| | 1/15/2016 | STATEMENT OF USE |

## NABI PODS

| UNITED STATES | 82150/384576-163 | 4/15/2014 | 86/252,682 | | | ALLOWED | 009, 028 |
|---|---|---|---|---|---|---|---|

OWNER: *FUHU HOLDINGS, INC.*

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

| CURRENT DUE | ACTION |
|-------------|--------|
| 5/5/2016 | STATEMENT OF USE |
| 5/5/2016 | FILE ITU EXTENSION-2 |

## NABI SYNC

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-166 | 5/31/2013 | 85/948,108 | 1/28/2014 | 4,474,411 | REGISTERED | 009, 038 |
| OWNER: *FUHU HOLDINGS, INC.* | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 1/28/2020 | AFFIDVT OF USE 8 &15 |
| 1/28/2024 | US RENEWAL/DEC USE |

## NABI WISHLIST

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-168 | 8/15/2014 | 86/368,541 | | | ALLOWED | 009 |
| OWNER: *FUHU HOLDINGS, INC.* | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 2/3/2016 | FILE ITU EXTENSION-2 |
| 2/3/2016 | STATEMENT OF USE |

## NABI XD Logo



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-169 | 5/29/2013 | 85/945,328 | 5/13/2014 | 4,528,273 | REGISTERED | 009 |
| OWNER: *FUHU HOLDINGS, INC.* | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 5/13/2020 | AFFIDVT OF USE 8 &15 |
| 5/13/2024 | US RENEWAL/DEC USE |

## NABIE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-176 | 9/19/2013 | 86/069,882 | | | ALLOWED | 009 |
| OWNER: *FUHU HOLDINGS, INC.* | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 2/11/2016 | STATEMENT OF USE |
| 2/11/2016 | FILE ITU EXTENSION-1 |

## NABIGATOR

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-179 | 2/6/2014 | 86/186,955 | | | ALLOWED | 009 |
| OWNER: *FUHU HOLDINGS, INC.* | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/16/2016 | STATEMENT OF USE |
| 3/16/2016 | FILE ITU EXTENSION-3 |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

## N-SITE

| UNITED STATES | 82150/384576-127 | 4/12/2012 | 85/596,107 | 11/5/2013 | 4,429,486 | REGISTERED | 041 |
|---------------|------------------|-----------|------------|-----------|-----------|------------|-----|

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|-------------|--------|
| 11/5/2019 | AFFIDVT OF USE 8 &15 |
| 11/5/2023 | US RENEWAL/DEC USE |

| UNITED STATES | 82150/384576-128 | 7/13/2012 | 85/676,886 | 5/27/2014 | 4,538,482 | REGISTERED | 042 |
|---------------|------------------|-----------|------------|-----------|-----------|------------|-----|

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|-------------|--------|
| 5/27/2020 | AFFIDVT OF USE 8 &15 |
| 5/27/2024 | US RENEWAL/DEC USE |

| UNITED STATES | 82150/384576-129 | 3/22/2013 | 85/884,351 | 6/24/2014 | 4,557,032 | REGISTERED | 042 |
|---------------|------------------|-----------|------------|-----------|-----------|------------|-----|

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|-------------|--------|
| 6/24/2020 | AFFIDVT OF USE 8 &15 |
| 6/24/2024 | US RENEWAL/DEC USE |

## ON THE GO Logo



| UNITED STATES | 82150/384576-195 | 6/6/2013 | 85/952,876 | 8/26/2014 | 4,591,252 | REGISTERED | 009 |
|---------------|------------------|----------|------------|-----------|-----------|------------|-----|

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|-------------|--------|
| 8/26/2020 | AFFIDVT OF USE 8 &15 |
| 8/26/2024 | US RENEWAL/DEC USE |

## ON THE GO Logo (Color)



| UNITED STATES | 82150/384576-189 | 2/17/2014 | 86/195,844 | | | ALLOWED | 009 |
|---------------|------------------|-----------|------------|--|--|---------|-----|

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/30/2016 | STATEMENT OF USE |
| 3/30/2016 | FILE ITU EXTENSION-3 |

## PAPER FX

| UNITED STATES | 82150/384576-209 | 5/19/2014 | 86/285,710 | | | ALLOWED | 009 |
|---------------|------------------|-----------|------------|--|--|---------|-----|

OWNER: FUHU HOLDINGS, INC.

| CURRENT DUE | ACTION |
|-------------|--------|
| 4/28/2016 | STATEMENT OF USE |
| 4/28/2016 | FILE ITU EXTENSION-3 |

## PARENTS THINK DIFFERENTLY

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-211 | 7/27/2012 | 85/689,270 | 9/10/2013 | 4,401,463 | REGISTERED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 9/10/2019 | AFFIDVT OF USE 8 &15 |
| 9/10/2023 | US RENEWAL/DEC USE |

## PINQ LEMONADE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-213 | 12/21/2012 | 85/809,198 | | | ALLOWED | 009, 014, 018 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 2/6/2016 | STATEMENT OF USE |
| 2/6/2016 | FILE ITU EXTENSION-5 |

## PINQ LEMONADE Logo



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-214 | 12/21/2012 | 85/809,202 | | | ALLOWED | 009, 014, 018 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 2/6/2016 | STATEMENT OF USE |
| 2/6/2016 | FILE ITU EXTENSION-5 |

## PLAY RATED

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-218 | 12/6/2012 | 85/796,725 | | | ALLOWED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 2/20/2016 | FILE ITU EXTENSION-5 |
| 2/20/2016 | STATEMENT OF USE |

## PLAY VALUE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-220 | 2/11/2014 | 86/191,018 | | | ALLOWED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 2/12/2016 | STATEMENT OF USE |
| 2/12/2016 | FILE ITU EXTENSION-3 |

## PLAYABILITY

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-222 | 12/6/2012 | 85/796,682 | | | ALLOWED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

| CURRENT DUE | ACTION |
|-------------|--------|
| 2/20/2016 | STATEMENT OF USE |
| 2/20/2016 | FILE ITU EXTENSION-5 |

## PLAYVALUE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-232 | 2/11/2014 | 86/191,001 | | | ALLOWED | 009 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 2/12/2016 | STATEMENT OF USE |
| 2/12/2016 | FILE ITU EXTENSION-3 |

## POMEGRANATE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-233 | 8/13/2013 | 86/037,000 | | | ALLOWED | 014 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 4/21/2016 | STATEMENT OF USE |
| 4/21/2016 | FILE ITU EXTENSION-2 |

## PROJECT HAPPY KIDS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-235 | 6/24/2013 | 85/968,543 | 1/28/2014 | 4,475,147 | REGISTERED | 041 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 1/28/2020 | AFFIDVT OF USE 8 &15 |
| 1/28/2024 | US RENEWAL/DEC USE |

## PURPOSEFUL PLAY

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-237 | 8/9/2013 | 86/034,138 | | | ALLOWED | 009 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/4/2016 | FILE ITU EXTENSION-4 |
| 3/4/2016 | STATEMENT OF USE |

## RED BIRD

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-244 | 3/26/2014 | 86/233,315 | | | ALLOWED | 009 |

*OWNER: FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/30/2016 | STATEMENT OF USE |
| 3/30/2016 | FILE ITU EXTENSION-3 |

## S Logo (Color)



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-251 | 2/21/2008 | 77/402,923 | 6/7/2011 | 3,974,878 | REGISTERED | 042 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 6/7/2017 | AFFIDVT OF USE 8 &15 |
| 6/7/2021 | US RENEWAL/DEC USE |

## SHARE IT

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-256 | 2/11/2010 | 77/933,508 | 8/9/2011 | 4,010,093 | REGISTERED | 042 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 8/9/2017 | AFFIDVT OF USE 8 &15 |
| 8/9/2021 | US RENEWAL/DEC USE |

## SHOW THE WORLD WHAT YOU CAN DO

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-257 | 10/16/2014 | 86/426,015 | | | ALLOWED | 009, 041, 042 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 6/1/2016 | STATEMENT OF USE |
| 6/1/2016 | FILE ITU EXTENSION-1 |

## SOLUTIONS Logo (Color)



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-269 | 2/17/2014 | 86/195,839 | | | ALLOWED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/30/2016 | FILE ITU EXTENSION-3 |
| 3/30/2016 | STATEMENT OF USE |

## SOUND SIGNATURE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-270 | 6/4/2013 | 85/950,283 | | | ALLOWED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 1/21/2016 | STATEMENT OF USE |
| 1/21/2016 | FILE ITU EXTENSION-1 |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

## SPINLETS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-273 | 3/13/2007 | 77/129,654 | 11/9/2010 | 3,873,711 | REGISTERED | 042 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 11/9/2016 | AFFIDVT OF USE 8 &15 |
| 11/9/2020 | US RENEWAL/DEC USE |

## SPINLETSLAB

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-274 | 9/24/2008 | 77/577,780 | 5/10/2011 | 3,958,240 | REGISTERED | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 5/10/2017 | AFFIDVT OF USE 8 &15 |
| 5/10/2021 | US RENEWAL/DEC USE |

## SPINLETSLAB Logo (Color)


SpinletsLab

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-275 | 12/4/2008 | 77/626,216 | 6/22/2010 | 3,807,888 | REGISTERED | 042 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 6/22/2016 | AFFIDVT OF USE 8 &15 |
| 6/22/2020 | US RENEWAL/DEC USE |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-276 | 9/24/2008 | 77/577,838 | 5/10/2011 | 3,958,241 | REGISTERED | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 5/10/2017 | AFFIDVT OF USE 8 &15 |
| 5/10/2021 | US RENEWAL/DEC USE |

## SQUARE HD

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-279 | 3/27/2013 | 85/887,853 | 11/19/2013 | 4,435,839 | REGISTERED | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 11/19/2019 | AFFIDVT OF USE 8 &15 |
| 11/19/2023 | US RENEWAL/DEC USE |

## SUGAR TAB

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-281 | 4/30/2014 | 86/268,150 | | | ALLOWED | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/2/2016 | STATEMENT OF USE |
| 3/2/2016 | FILE ITU EXTENSION-3 |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|

## TEACHER MODE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-291 | 5/22/2013 | 85/939,354 | | | ALLOWED | 009, 041 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 12/24/2015 | STATEMENT OF USE |
| 12/24/2015 | FILE ITU EXTENSION-3 |

## THE WORLD THROUGH THE EYES OF A CHILD IN HIGH DEFINITION

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-293 | 3/26/2013 | 85/887,167 | 11/19/2013 | 4,435,810 | REGISTERED | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 11/19/2019 | AFFIDVT OF USE 8 &15 |
| 11/19/2023 | US RENEWAL/DEC USE |

## TIME CONTROLS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-294 | 7/16/2013 | 86/011,871 | 6/10/2014 | 4,549,225 | REGISTERED | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 6/10/2020 | AFFIDVT OF USE 8 &15 |
| 6/10/2024 | US RENEWAL/DEC USE |

## Tomato Logo



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-295 | 8/20/2013 | 86/043,431 | 4/22/2014 | 4,517,617 | REGISTERED | 035, 042 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 4/22/2020 | AFFIDVT OF USE 8 &15 |
| 4/22/2024 | US RENEWAL/DEC USE |

## TOUCH CHARMS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-296 | 7/8/2013 | 86/004,779 | | | ALLOWED | 009, 014, 026, 028 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 3/3/2016 | STATEMENT OF USE |
| 3/3/2016 | FILE ITU EXTENSION-2 |

## TOYCESSORY

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| UNITED STATES | 82150/384576-297 | 12/5/2012 | 85/795,797 | | | ALLOWED | 009, 028 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

| | CURRENT DUE | ACTION | | | | | |
|---|---|---|---|---|---|---|---|
| | 3/24/2016 | STATEMENT OF USE | | | | | |
| | 3/24/2016 | FILE ITU EXTENSION-5 | | | | | |

## TREASURE BOX

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-300 | 5/30/2013 | 85/946,394 | 7/29/2014 | 4,574,535 | REGISTERED | 009, 035 |
| OWNER: *FUHU HOLDINGS, INC.* | | | | | | | |

| | CURRENT DUE | ACTION | | | | | |
|---|---|---|---|---|---|---|---|
| | 7/29/2020 | AFFIDVT OF USE 8 &15 | | | | | |
| | 7/29/2024 | US RENEWAL/DEC USE | | | | | |

## UNSTOPPABLE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-302 | 10/21/2013 | 86/097,315 | | | PENDING | 009 |
| OWNER: *FUHU HOLDINGS, INC.* | | | | | | | |

## URDRIVE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-303 | 2/8/2010 | 77/930,790 | 8/9/2011 | 4,010,090 | REGISTERED | 009 |
| OWNER: *FUHU HOLDINGS, INC.* | | | | | | | |

| | CURRENT DUE | ACTION | | | | | |
|---|---|---|---|---|---|---|---|
| | 8/9/2017 | AFFIDVT OF USE 8 &15 | | | | | |
| | 8/9/2021 | US RENEWAL/DEC USE | | | | | |

## URFOOZ

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-304 | 2/20/2008 | 77/401,650 | 12/7/2010 | 3,886,685 | REGISTERED | 042 |
| OWNER: *FUHU HOLDINGS, INC.* | | | | | | | |

| | CURRENT DUE | ACTION | | | | | |
|---|---|---|---|---|---|---|---|
| | 12/7/2016 | AFFIDVT OF USE 8 &15 | | | | | |
| | 12/7/2020 | US RENEWAL/DEC USE | | | | | |

## URFOOZ Logo (Color)



| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-305 | 2/20/2008 | 77/401,611 | 12/21/2010 | 3,894,257 | REGISTERED | 042 |
| OWNER: *FUHU HOLDINGS, INC.* | | | | | | | |

| | CURRENT DUE | ACTION | | | | | |
|---|---|---|---|---|---|---|---|
| | 12/21/2016 | AFFIDVT OF USE 8 &15 | | | | | |
| | 12/21/2020 | US RENEWAL/DEC USE | | | | | |

## WINGS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| UNITED STATES | 82150/384576-307 | 11/29/2012 | 85/791,090 | 6/24/2014 | 4,556,749 | REGISTERED | 041 |
| OWNER: *FUHU HOLDINGS, INC.* | | | | | | | |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

| CURRENT DUE | ACTION |
|-------------|--------|
| 6/24/2020 | AFFIDVT OF USE 8 &15 |
| 6/24/2024 | US RENEWAL/DEC USE |

## WINGS ADAPTIVE LEARNING SYSTEM

| UNITED STATES | 82150/384576-310 | 4/26/2013 | 85/916,107 | | | PUBLISHED | 041 |
|---------------|------------------|-----------|------------|--|--|-----------|-----|
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 1/14/2016 | 3RD PARTY OPP DEADLINE |

## WINGS LANGUAGE IMMERSION

| UNITED STATES | 82150/384576-311 | 1/2/2014 | 86/156,589 | | | ALLOWED | 009, 041 |
|---------------|------------------|----------|------------|--|--|---------|----------|
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 2/19/2016 | STATEMENT OF USE |
| 2/19/2016 | FILE ITU EXTENSION-3 |

## WINGS LEARNING SYSTEM

| UNITED STATES | 82150/384576-312 | 1/7/2013 | 85/817,303 | | | ALLOWED | 041 |
|---------------|------------------|----------|------------|--|--|---------|-----|
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 1/14/2016 | STATEMENT OF USE |
| 1/14/2016 | FILE ITU EXTENSION-4 |

## WINGS Logo



| UNITED STATES | 82150/384576-308 | 11/29/2012 | 85/791,097 | 6/24/2014 | 4,556,750 | REGISTERED | 041 |
|---------------|------------------|------------|------------|-----------|-----------|------------|-----|
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 6/24/2020 | AFFIDVT OF USE 8 &15 |
| 6/24/2024 | US RENEWAL/DEC USE |

## WINGS W Logo



| UNITED STATES | 82150/384576-314 | 11/30/2012 | 85/792,254 | | | ALLOWED | 041 |
|---------------|------------------|------------|------------|--|--|---------|-----|
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| CURRENT DUE | ACTION |
|-------------|--------|
| 12/24/2015 | FILE ITU EXTENSION-4 |
| 12/24/2015 | STATEMENT OF USE |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

END OF REPORT                                        TOTAL ITEMS SELECTED =        164

**Trademark Report By Title**
**Search Criteria**

| Country ID | [NOT] US |
| Client ID | FUHUINC |
| Status | ACTIVE |

**Display Options**

| Exclude Actions | SC,RR,PU |
| Images | All |
| Owner | All |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|

## BUTTERFLY (CHINESE CHARACTERS)

| CHINA | 82150/384581-CN8 | 3/14/2013 | 12265451 | | | PENDING | 042 |

| CURRENT DUE | ACTION |
|---|---|
| 12/18/2015 | DEADLINE TO FILE APPEAL |
| 1/19/2016 | DEADLINE TO FILE LAWSUIT |

| CHINA | 82150/384581-CN19 | 4/11/2013 | 12407950 | | | PENDING | 038 |

## BUTTERFLY (in Chinese characters)

| CHINA | 82150/384581-CN4 | 3/14/2013 | 12264795 | | | PENDING | 009 |

| CURRENT DUE | ACTION |
|---|---|
| 12/18/2015 | DEADLINE TO FILE APPEAL |
| 1/19/2016 | DEADLINE TO FILE LAWSUIT |

| CHINA | 82150/384581-CN11 | 3/14/2013 | 12265198 | 4/7/2015 | 12265198 | REGISTERED | 016 |

| CURRENT DUE | ACTION |
|---|---|
| 4/6/2025 | RENEWAL |

## Butterfly Logo



| AUSTRALIA | 82150/384581-AU2 | 4/4/2013 | 1549920 | 4/4/2013 | 1549920 | REGISTERED | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 4/4/2023 | RENEWAL |

| BRAZIL | 82150/384581-BR2 | 4/4/2013 | 840473192 | | | PENDING | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CANADA | 82150/384581-CA2 | 4/4/2013 | 1621101 | 4/8/2015 | TMA900554 | REGISTERED | WRS |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

| CURRENT DUE | ACTION |
|---|---|
| 4/8/2030 | RENEWAL |

| CHINA | 82150/384581-CN5 | 3/14/2013 | 12265331 | | | PENDING | 042 |

| CHINA | 82150/384581-CN6 | 3/14/2013 | 12264695 | | | PENDING | 009 |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| | **CURRENT DUE** | **ACTION** | | | | | |
| | 12/18/2015 | DEADLINE TO FILE APPEAL | | | | | |
| | 1/19/2016 | DEADLINE TO FILE LAWSUIT | | | | | |
| CHINA | 82150/384581-CN12 | 3/14/2013 | 12265087 | | | PENDING | 016 |
| | **CURRENT DUE** | **ACTION** | | | | | |
| | 12/18/2015 | DEADLINE TO FILE APPEAL | | | | | |
| | 1/19/2016 | DEADLINE TO FILE LAWSUIT | | | | | |
| CHINA | 82150/384581-CN22 | 4/11/2013 | 12407858 | | | PENDING | 038 |
| | **CURRENT DUE** | **ACTION** | | | | | |
| | 12/18/2015 | DEADLINE TO FILE APPEAL | | | | | |
| | 1/19/2016 | DEADLINE TO FILE LAWSUIT | | | | | |
| CHINA | 82150/384581-CN25 | 4/12/2013 | 12415324 | 1/14/2015 | 12415324 | REGISTERED | 009 |
| | **CURRENT DUE** | **ACTION** | | | | | |
| | 1/13/2025 | RENEWAL | | | | | |
| EUROPEAN UNION (CTI | 82150/384581-EU2 | 4/2/2013 | 11706207 | 8/29/2013 | 11706207 | REGISTERED | 009 |
| | **CURRENT DUE** | **ACTION** | | | | | |
| | 4/2/2023 | RENEWAL | | | | | |
| HONG KONG | 82150/384581-HK2 | 4/2/2013 | 302564767 | 12/17/2013 | 302564767 | REGISTERED | 009 |
| *OWNER: FUHU HOLDINGS, INC.* | | | | | | | |
| | **CURRENT DUE** | **ACTION** | | | | | |
| | 4/2/2023 | RENEWAL | | | | | |
| INDIA | 82150/384581-IN2 | 4/4/2013 | 2507026 | | | PENDING | 009 |
| *OWNER: FUHU HOLDINGS, INC.* | | | | | | | |
| | **CURRENT DUE** | **ACTION** | | | | | |
| | 12/31/2015 | RESPONSE TO OA | | | | | |
| | 4/4/2023 | RENEWAL | | | | | |
| JAPAN | 82150/384581-JP2 | 4/3/2013 | 2013-24462 | 2/14/2014 | 5649042 | REGISTERED | 009 |
| *OWNER: FUHU HOLDINGS, INC.* | | | | | | | |
| | **CURRENT DUE** | **ACTION** | | | | | |
| | 2/14/2024 | RENEWAL | | | | | |
| MALAYSIA | 82150/384581-MY2 | 4/24/2013 | 2013053936 | 12/21/2012 | 2013053936 | REGISTERED | 009 |
| *OWNER: FUHU HOLDINGS, INC.* | | | | | | | |
| | **CURRENT DUE** | **ACTION** | | | | | |
| | 12/21/2022 | RENEWAL | | | | | |
| MEXICO | 82150/384581-MX2 | 4/10/2013 | 1363948 | 2/19/2014 | 1435378 | REGISTERED | 009 |
| *OWNER: FUHU HOLDINGS, INC.* | | | | | | | |
| | **CURRENT DUE** | **ACTION** | | | | | |
| | 4/10/2023 | RENEWAL | | | | | |
| NEW ZEALAND | 82150/384581-NZ1 | 4/4/2013 | 975228 | 10/8/2013 | 975228 | REGISTERED | 009 |
| *OWNER: FUHU HOLDINGS, INC.* | | | | | | | |
| | **CURRENT DUE** | **ACTION** | | | | | |
| | 12/21/2022 | RENEWAL | | | | | |
| NORWAY | 82150/384581-NO1 | 4/4/2013 | 201304207 | 10/4/2013 | 272565 | REGISTERED | 009 |
| *OWNER: FUHU HOLDINGS, INC.* | | | | | | | |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| | CURRENT DUE — ACTION | | | | | | |
| | 4/4/2023 — RENEWAL | | | | | | |
| SINGAPORE | 82150/384581-SG2 | 4/4/2013 | T1305358G | 4/4/2013 | T1305358G | REGISTERED | 009 |
| | OWNER: FUHU HOLDINGS, INC. | | | | | | |
| | CURRENT DUE — ACTION | | | | | | |
| | 4/4/2023 — RENEWAL | | | | | | |
| SOUTH KOREA | 82150/384581-KR2 | 4/2/2013 | 40-2013-0020648 | 7/14/2014 | 40-1048154-0000 | REGISTERED | 009 |
| | OWNER: FUHU HOLDINGS, INC. | | | | | | |
| | CURRENT DUE — ACTION | | | | | | |
| | 7/14/2024 — RENEWAL | | | | | | |
| SWITZERLAND | 82150/384581-CH2 | 4/3/2013 | 54030/2013 | 4/3/2013 | 645344 | REGISTERED | 009 |
| | OWNER: FUHU HOLDINGS, INC. | | | | | | |
| | CURRENT DUE — ACTION | | | | | | |
| | 4/3/2023 — RENEWAL | | | | | | |
| TAIWAN | 82150/384581-TW2 | 4/22/2013 | 102020905 | | | PENDING | 009 |
| | OWNER: FUHU HOLDINGS, INC. | | | | | | |
| UNITED ARAB EMR | 82150/384581-AE2 | 4/10/2013 | 189859 | 3/17/2014 | 189859 | REGISTERED | 009 |
| | OWNER: FUHU HOLDINGS, INC. | | | | | | |
| | CURRENT DUE — ACTION | | | | | | |
| | 4/10/2023 — RENEWAL | | | | | | |

## KINABI

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| CHINA | 82150/384581-CN41 | 9/24/2013 | 13279998 | | | PENDING | 009 |
| CHINA | 82150/384581-CN42 | 9/24/2013 | 13279997 | | | PENDING | 018 |
| CHINA | 82150/384581-CN43 | 9/24/2013 | 13279996 | | | PENDING | 026 |
| HONG KONG | 82150/384581-HK10 | 9/13/2013 | 302737486 | 9/13/2013 | 302737486 | REGISTERED | 009, 018 |
| | OWNER: FUHU HOLDINGS, INC. | | | | | | |
| | CURRENT DUE — ACTION | | | | | | |
| | 9/13/2023 — RENEWAL | | | | | | |
| TAIWAN | 82150/384581-TW10 | 9/14/2013 | 102051684 | | | PENDING | 009, 018 |
| | OWNER: FUHU HOLDINGS, INC. | | | | | | |

## KINABIS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| CHINA | 82150/384581-CN44 | 9/24/2013 | 13279994 | | | PENDING | 009 |
| CHINA | 82150/384581-CN45 | 9/24/2013 | 13279993 | | | PENDING | 018 |
| CHINA | 82150/384581-CN46 | 9/24/2013 | 13279995 | | | PENDING | 026 |
| HONG KONG | 82150/384581-HK11 | 9/13/2013 | 302737495 | 9/13/2013 | 302737495 | REGISTERED | 009, 018 |
| | OWNER: FUHU HOLDINGS, INC. | | | | | | |
| | CURRENT DUE — ACTION | | | | | | |
| | 9/13/2023 — RENEWAL | | | | | | |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| TAIWAN | 82150/384581-TW11 | 9/14/2013 | 102051685 | | | PENDING | 009, 018 |

OWNER: *FUHU HOLDINGS, INC.*

## LITTLE GENIUS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| HONG KONG | 82150/384581-HK8 | 8/12/2013 | 302702943 | | | PENDING | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 8/12/2023 | RENEWAL |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| TAIWAN | 82150/384581-TW6 | 8/7/2013 | 102043340 | | | PENDING | 009 |

OWNER: *FUHU HOLDINGS, INC.*

## LITTLE GENIUS (Chinese characters)

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| CHINA | 82150/384581-CN32 | 8/13/2013 | 13073016 | | | PENDING | 009 |

## NABI

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| AUSTRALIA | 82150/384581-AU1 | 4/4/2013 | 1549919 | 7/25/2013 | 1549919 | REGISTERED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 4/4/2023 | RENEWAL |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| BRAZIL | 82150/384581-BR1 | 4/4/2013 | 840473206 | | | PENDING | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| CANADA | 82150/384581-CA1 | 4/4/2013 | 1621102 | | | ALLOWED | 1 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 4/30/2016 | REGISTRATION FEE DUE |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| CHINA | 82150/384581-CN1 | 7/6/2012 | 11175510 | 1/2/2014 | 11175510 | REGISTERED | 009 |

| CURRENT DUE | ACTION |
|---|---|
| 1/2/2024 | RENEWAL |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| CHINA | 82150/384581-CN2 | 3/14/2013 | 12265380 | | | PENDING | 042 |

OWNER: *FUHU HOLDINGS, INC.*

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| CHINA | 82150/384581-CN3 | 4/14/2013 | 12265127 | | | PENDING | 016 |

| CURRENT DUE | ACTION |
|---|---|
| 12/18/2015 | DEADLINE TO FILE APPEAL |
| 1/19/2016 | DEADLINE TO FILE LAWSUIT |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| CHINA | 82150/384581-CN10 | 3/14/2013 | 12264735 | | | PENDING | 009 |
| CHINA | 82150/384581-CN20 | 4/11/2013 | 12407927 | | | PENDING | 038 |
| EUROPEAN UNION (CTI | 82150/384581-EU1 | 4/2/2013 | 11706132 | 8/29/2013 | 11706132 | REGISTERED | 009 |

| CURRENT DUE | ACTION |
|---|---|
| 4/2/2023 | RENEWAL |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| HONG KONG | 82150/384581-HK1 | 4/2/2013 | 302564721 | | | PENDING | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| | CURRENT DUE 4/2/2023 | ACTION RENEWAL | | | | | |
| INDIA | 82150/384581-IN1 | 4/4/2013 | 2507027 | | | PENDING | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |
| | CURRENT DUE 4/4/2023 | ACTION RENEWAL | | | | | |
| JAPAN | 82150/384581-JP1 | 4/3/2013 | 2013-24461 | 4/17/2015 | 5758829 | REGISTERED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |
| | CURRENT DUE 4/17/2025 | ACTION RENEWAL | | | | | |
| MEXICO | 82150/384581-MX1 | 4/10/2013 | 1363939 | | | PENDING | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |
| | CURRENT DUE 4/10/2023 | ACTION RENEWAL | | | | | |
| NEW ZEALAND | 82150/384581-NZ3 | 4/4/2013 | 975227 | 10/8/2013 | 975227 | REGISTERED | 009 |
| | CURRENT DUE 4/4/2023 | ACTION RENEWAL | | | | | |
| SINGAPORE | 82150/384581-SG1 | 4/4/2013 | T1305356J | 4/4/2013 | T1305356J | REGISTERED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |
| | CURRENT DUE 4/4/2023 | ACTION RENEWAL | | | | | |
| SOUTH KOREA | 82150/384581-KR1 | 4/2/2013 | 40-2013-0020647 | | | PENDING | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |
| SWITZERLAND | 82150/384581-CH1 | 4/3/2013 | 54029/2013 | 4/3/2013 | 645363 | REGISTERED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |
| | CURRENT DUE 4/3/2023 | ACTION RENEWAL | | | | | |
| UNITED ARAB EMR | 82150/384581-AE1 | 4/10/2013 | 189858 | 3/17/2014 | 189858 | REGISTERED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |
| | CURRENT DUE 4/10/2023 | ACTION RENEWAL | | | | | |

## NABI and Design

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| TAIWAN | 82150/384581-TW1 | 7/17/2012 | 101040123 | 2/1/2013 | 01562833 | REGISTERED | 009 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |
| | CURRENT DUE 2/1/2023 | ACTION RENEWAL | | | | | |

## NABI CLOUD

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| AUSTRALIA | 82150/384581-AU3 | 2/7/2014 | 1604759 | | | PENDING | 009, 035, 042 |
| OWNER: FUHU HOLDINGS, INC. | | | | | | | |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|

| | CURRENT DUE | ACTION | | | | | |
|---|---|---|---|---|---|---|---|
| | 2/7/2024 | RENEWAL | | | | | |
| NEW ZEALAND | 82150/384581-NZ2 | 2/7/2014 | 992229 | | | PENDING | 009, 035 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 2/7/2024 | RENEWAL |

## NABI JR. Logo



| CHINA | 82150/384581-CN13 | 3/29/2013 | 12346643 | 3/21/2015 | 12346643 | REGISTERED | 009 |
|---|---|---|---|---|---|---|---|

| CURRENT DUE | ACTION |
|---|---|
| 3/20/2025 | RENEWAL |

| CHINA | 82150/384581-CN14 | 3/29/2013 | 12346686 | | | PENDING | 016 |
|---|---|---|---|---|---|---|---|
| CHINA | 82150/384581-CN17 | 3/29/2013 | 12346715 | | | PENDING | 042 |
| CHINA | 82150/384581-CN23 | 4/11/2013 | 12407980 | | | PENDING | 038 |
| CHINA | 82150/384581-CN48 | 10/11/2013 | 13342068 | | | PENDING | 009 |
| HONG KONG | 82150/384581-HK13 | 9/24/2013 | 302745946 | 9/24/2013 | 302745946 | REGISTERED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|---|---|
| 9/24/2023 | RENEWAL |

| TAIWAN | 82150/384581-TW12 | 10/7/2013 | 102055768 | | | PENDING | 009 |
|---|---|---|---|---|---|---|---|

OWNER: *FUHU HOLDINGS, INC.*

## NABI Logo



| CHINA | 82150/384581-CN7 | 3/14/2013 | 12265155 | | | PENDING | 016 |
|---|---|---|---|---|---|---|---|

| CURRENT DUE | ACTION |
|---|---|
| 12/18/2015 | DEADLINE TO FILE APPEAL |
| 1/19/2016 | DEADLINE TO FILE LAWSUIT |

| CHINA | 82150/384581-CN9 | 3/14/2013 | 12265405 | | | PENDING | 042 |
|---|---|---|---|---|---|---|---|
| CHINA | 82150/384581-CN21 | 4/11/2013 | 12407898 | | | PENDING | 038 |

| CURRENT DUE | ACTION |
|---|---|
| 12/18/2015 | DEADLINE TO FILE APPEAL |
| 1/19/2016 | DEADLINE TO FILE LAWSUIT |

| CHINA | 82150/384581-CN39 | 8/13/2013 | 13073023 | | | PENDING | 009 |
|---|---|---|---|---|---|---|---|

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

## NABI ON THE GO

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| CHINA | 82150/384581-CN51 | 10/11/2013 | 13342065 | | | PENDING | 009 |
| HONG KONG | 82150/384581-HK16 | 9/24/2013 | 302745973 | 9/24/2013 | 302745973 | REGISTERED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 9/24/2023 | RENEWAL |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| TAIWAN | 82150/384581-TW15 | 10/7/2013 | 10255774 | | | PENDING | 009 |

OWNER: *FUHU HOLDINGS, INC.*

## NABI XD Logo

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| CHINA | 82150/384581-CN15 | 3/29/2013 | 12346651 | 3/21/2015 | 12346651 | REGISTERED | 009 |

| CURRENT DUE | ACTION |
|-------------|--------|
| 3/20/2025 | RENEWAL |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| CHINA | 82150/384581-CN16 | 3/29/2013 | 12346693 | | | PENDING | 016 |
| CHINA | 82150/384581-CN18 | 3/29/2013 | 1236723 | | | PENDING | 042 |
| CHINA | 82150/384581-CN24 | 4/12/2013 | 12415442 | | | PENDING | 038 |
| CHINA | 82150/384581-CN49 | 10/11/2013 | 13342067 | | | PENDING | 009 |
| HONG KONG | 82150/384581-HK14 | 9/24/2013 | 302745955 | 9/24/2013 | 302745955 | REGISTERED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 9/24/2023 | RENEWAL |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| TAIWAN | 82150/384581-TW13 | 10/7/2013 | 102055772 | | | PENDING | 009 |

OWNER: *FUHU HOLDINGS, INC.*

## ON THE GO Logo

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| CHINA | 82150/384581-CN50 | 10/11/2013 | 13342066 | | | PENDING | 009 |
| HONG KONG | 82150/384581-HK15 | 9/24/2013 | 302745964 | 9/24/2013 | 302745964 | REGISTERED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 9/24/2023 | RENEWAL |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| TAIWAN | 82150/384581-TW14 | 10/7/2013 | 102055773 | | | PENDING | 009 |

OWNER: *FUHU HOLDINGS, INC.*

## PINQ LEMONADE

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| CHINA | 82150/384581-CN33 | 8/13/2013 | 13073022 | 1/14/2015 | 13073002 | REGISTERED | 009 |

| CURRENT DUE | ACTION |
|-------------|--------|
| 1/14/2025 | RENEWAL |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| CHINA | 82150/384581-CN34 | 8/13/2013 | 13073021 | 1/7/2015 | 13073021 | REGISTERED | 014 |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| | CURRENT DUE<br>1/7/2025 | ACTION<br>RENEWAL | | | | | |
| CHINA | 82150/384581-CN35 | 7/13/2013 | 13073020 | 4/14/2015 | 13073020 | REGISTERED | 018 |
| | CURRENT DUE<br>4/14/2025 | ACTION<br>RENEWAL | | | | | |
| CHINA | 82150/384581-CN38 | 8/13/2013 | 13073017 | 4/14/2015 | 13073017 | REGISTERED | 018 |
| | CURRENT DUE<br>4/14/2025 | ACTION<br>RENEWAL | | | | | |
| HONG KONG | 82150/384581-HK6 | 8/9/2013 | 302701061 | 8/9/2013 | 302701061 | REGISTERED | 009, 014, 018 |
| *OWNER: FUHU HOLDINGS, INC.* | | | | | | | |
| | CURRENT DUE<br>8/9/2023 | ACTION<br>RENEWAL | | | | | |
| JAPAN | 82150/384581-JP3 | 8/8/2013 | 2013-62086 | 11/17/2014 | 5685796 | REGISTERED | 009, 014, 018 |
| *OWNER: FUHU HOLDINGS, INC.* | | | | | | | |
| | CURRENT DUE<br>11/17/2024 | ACTION<br>RENEWAL | | | | | |
| TAIWAN | 82150/384581-TW7 | 8/9/2013 | 102043895 | 5/16/2014 | 01644712 | REGISTERED | 009, 014, 018 |
| *OWNER: FUHU HOLDINGS, INC.* | | | | | | | |
| | CURRENT DUE<br>5/16/2024 | ACTION<br>RENEWAL | | | | | |

## PINQ LEMONADE Logo

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| CHINA | 82150/384581-CN36 | 8/13/2013 | 13073019 | 1/14/2015 | 13073019 | REGISTERED | 009 |
| | CURRENT DUE<br>1/14/2025 | ACTION<br>RENEWAL | | | | | |
| CHINA | 82150/384581-CN37 | 8/13/2013 | 13073018 | 12/21/2014 | 13073018 | REGISTERED | 014 |
| | CURRENT DUE<br>12/21/2024 | ACTION<br>RENEWAL | | | | | |
| HONG KONG | 82150/384581-HK7 | 8/9/2013 | 302701070 | 8/9/2013 | 302701070 | REGISTERED | 009, 014, 018 |
| *OWNER: FUHU HOLDINGS, INC.* | | | | | | | |
| | CURRENT DUE<br>8/9/2023 | ACTION<br>RENEWAL | | | | | |
| JAPAN | 82150/384581-JP4 | 8/8/2013 | 2013-62087 | 7/11/2014 | 5685797 | REGISTERED | 009, 014, 018 |
| *OWNER: FUHU HOLDINGS, INC.* | | | | | | | |
| | CURRENT DUE<br>7/11/2024 | ACTION<br>RENEWAL | | | | | |
| TAIWAN | 82150/384581-TW8 | 8/9/2013 | 102043897 | 5/16/2014 | 01644713 | REGISTERED | 009, 014, 018 |
| *OWNER: FUHU HOLDINGS, INC.* | | | | | | | |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| | CURRENT DUE / 5/16/2024 | ACTION / RENEWAL | | | | | |

## SQUARE HD

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| CHINA | 82150/384581-CN47 | 10/11/2013 | 13342064 | | | PENDING | 009 |
| HONG KONG | 82150/384581-HK12 | 9/24/2013 | 302745937 | 9/24/2013 | 302745937 | REGISTERED | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |
| | CURRENT DUE / 9/24/2023 | ACTION / RENEWAL | | | | | |
| TAIWAN | 82150/384581-TW16 | 10/7/2013 | 10255775 | 5/1/2014 | 01639752 | REGISTERED | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |
| | CURRENT DUE / 5/1/2024 | ACTION / RENEWAL | | | | | |

## W WINGS Logo

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| CHINA | 82150/384581-CN30 | 7/8/2013 | 12878729 | | | PENDING | 009 |
| CHINA | 82150/384581-CN31 | 7/8/2013 | 12878728 | | | PENDING | 041 |
| HONG KONG | 82150/384581-HK5 | 7/8/2013 | 302663712 | | | PENDING | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |
| | CURRENT DUE / 7/8/2023 | ACTION / RENEWAL | | | | | |
| TAIWAN | 82150/384581-TW5 | 7/9/2013 | 102037068 | | | PENDING | 009, 041 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

## WINGS

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| CHINA | 82150/384581-CN26 | 7/8/2013 | 12878733 | | | PENDING | 009 |
| CHINA | 82150/384581-CN27 | 7/8/2013 | 12878732 | | | PENDING | 041 |
| TAIWAN | 82150/384581-TW3 | 7/9/2013 | 102037064 | | | PENDING | 009, 041 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |

## WINGS (w/butterfly) Logo



wings

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---|---|---|---|---|---|---|---|
| HONG KONG | 82150/384581-HK4 | 7/8/2013 | 302663703 | | | PENDING | 009 |
| | OWNER: *FUHU HOLDINGS, INC.* | | | | | | |
| | CURRENT DUE / 7/8/2023 | ACTION / RENEWAL | | | | | |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|

### WINGS Logo

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| CHINA | 82150/384581-CN28 | 7/8/2013 | 12878731 | | | PENDING | 009 |
| CHINA | 82150/384581-CN29 | 7/8/2013 | 12878730 | | | PENDING | 041 |
| HONG KONG | 82150/384581-HK3 | 7/8/2013 | 302663695 | | | PENDING | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 7/8/2023 | RENEWAL |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| TAIWAN | 82150/384581-TW4 | 7/9/2013 | 102037066 | | | PENDING | 009, 041 |

OWNER: *FUHU HOLDINGS, INC.*

### 小神童 (LITTLE GENIUS in Chinese characters)

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| HONG KONG | 82150/384581-HK9 | 8/12/2013 | 302702952 | 8/12/2013 | 302702952 | REGISTERED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 8/12/2023 | RENEWAL |

| COUNTRY | REFERENCE # | FILED | APP # | REG DT | REG # | STATUS | CLASSES |
|---------|-------------|-------|-------|--------|-------|--------|---------|
| TAIWAN | 82150/384581-TW9 | 8/9/2013 | 102043892 | 7/1/2014 | 01651281 | REGISTERED | 009 |

OWNER: *FUHU HOLDINGS, INC.*

| CURRENT DUE | ACTION |
|-------------|--------|
| 7/1/2024 | RENEWAL |

END OF REPORT                    TOTAL ITEMS SELECTED =        112

**SELLER DISCLOSURE SCHEDULE SECTION 5.11(b)**

See Section 5.11(d).

## SELLER DISCLOSURE SCHEDULE SECTION 5.11(c)

See also Section 5.11(d).

Five former employees of the Company, James Menke, Brendan Cosgrove, Aya Matsunaga, Krista Shue and Joe Zhou, did not execute confidential information and invention assignment agreements. Each of these former employees left the Company approximately two or more years ago, and only worked on (and only had access to information regarding) the design and development of legacy products that are no longer relevant to the Company's business or are bound by professional obligations of confidentiality.

**SELLER DISCLOSURE SCHEDULE SECTION 5.11(d)**

**[see attached]**

# FUHU DOMESTIC OPPOSITIONS

∞ Beats Electronic v. Fuhu Holdings, Inc.
TTAB Opposition No.: 91214802
Marks Opposed: (1) BEAT PROFILE, App. No. 85/944,151; (2) BEAT PERSONALITY, App.
No. 85/944,209; and (3) BEAT STYLE, App. No. 85/944,239.
Status: Fuhu filed notices of abandonment for all opposed marks as part of settlement agreement.
(Judgment entered notwithstanding settlement because opposer's written consent to abandonment
were not of record.)
Termination Date: 08-26-2014

∞ Leapfrog Enterprises, Inc. v. Fuhu Holdings, Inc.
TTAB Opposition No: 91214816
Mark Opposed: JUMP PAD, App. No. 85/957,169
Status: Opposition dismissed without prejudice after Fuhu expressly abandoned the opposed mark
with prejudice.
Termination Date: 07-25-14

∞ Fuhu Holdings, Inc. v. Nubi Technologies, Inc.
TTAB Opposition No.: 91216874
Mark Opposed: NUBI, App. No. 86/030,366
Status: Opposed mark abandoned after default judgment entered against defendant.
Termination Date: 09-30-2014

∞ The San Antonio Children's Museum v. Fuhu Holdings, Inc.
TTAB Opposition No.: 91217477
Mark Opposed: DOSEUM, App. No. 86/205,486
Status: Opposition dismissed without prejudice after Opposer withdrew Notice of Opposition and
Fuhu expressly abandoned the application without prejudice.
Termination Date: 11-05-2014

∞ Safran v. Fuhu Holdings, Inc.
TTAB Opposition No.: 91218121
Mark Opposed: BLUEMORPHO, App. No. 86/073,558
Status: Suspended pending settlement negotiations. Opposition resumes 01-05-2016.

∞ Safran v. Fuhu Holdings, Inc.
TTAB Opposition No.: 91218120
Mark Opposed: BLUE MORPHO, App. No. 86/073529
Status: Suspended pending settlement negotiations. Opposition resumes 01-05-2016.

∞ Fuhu Holdings, Inc. v. Razer (Asia-Pacific) Pte.Ltd
TTAB Opposition No.: 91219933
Mark Opposed: NABU, App. No. 86/158,817
Status: Opposition dismissed with prejudice after notice of opposition withdrawn with prejudice,
and counterclaims withdrawn with prejudice, all pursuant to settlement agreement.
Termination Date: 10-07-2015

# FUHU DOMESTIC OPPOSITIONS

∞ Trace TV v. Fuhu Holdings, Inc.
TTAB Opposition No.: 91220763
Mark Opposed: TRACER, App. No. 86/975,221
Status: Fuhu made a business decision not to defend in the opposition. Fuhu application abandoned after default judgment entered.
Termination Date: 06-02-2015

## DOMESTIC OFFICE ACTION REJECTIONS

∞ Mark: MOMMY MODE, App. No. 85/439,203
Grounds of Rejection: (1) Likelihood of confusion with MOMSMODE A MOMS APPROACH (stylized), Reg. No. 3,917,569 (rejection as to Class 45 only); (2) Likelihood of confusion with KID MODE, Reg. No. 4,116,312.
Response Deadline: 03-02-2016
Note: Fuhu overcame rejections regarding same registrations for Fuhu's MOM MODE, App. No. 85/439,215.

# FOREIGN APPLICATIONS/OPPOSITIONS/INFRINGEMENTS

## CHINA:

∞ **Trademark Opposition against "FUHU & DEVICE" (stylized), App. No. 14760262.**
Filed: September 6, 2015
Opposer: Fuhu Holdings, Inc.
Applicant: Shantou Mu Kai Knitwear Industrial Corporation
Status: Opposition is pending, however, Fuhu has elected not to proceed, and will take no further action in opposition.

∞ **Trademark Opposition against "NABI & DEVICE" (stylized), App. No. 13194906**
Filed: October 20, 2015
Opposer: Fuhu Holdings, Inc.
Applicant: Shenzhen City Zhongyou International Technology Co., Ltd. (KDG)
Status: Client is negotiating with applicant (client's former distributor) to assign opposed application (and additional applications – see below) to Fuhu.
Note: Supplementary evidence deadline: January 19, 2016.

∞ **Assignment of "NABI" marks from Shenzhen City Zhongyou International Technology Co., Ltd. (KDG) to Fuhu Holdings, Inc.**
Fuhu is negotiating with KDG to assign eight variants of "NABI" marks from KDG to Fuhu.
Marks: (1) No. 13194906 (opposed mark in opposition against KDG); (2) No. 13526444 (Registered); (3) No. 13533502 (Registered); (4) No. 13533372 (Registered); (5) No. 13533433 (Registered); (6) No. 13533628 (Registered); (7) No. 13533719 (Registered); (8) No. 13533818 (Registered).

∞ **Rejections of Trademark Assignment Applications**
The CTO rejected Fuhu's applications for assignment of eight variants of "NABI" marks from Shen Zhen Yun Lian Shi Xun Science and Technology Co., Ltd. to Fuhu Holdings, Inc. The applications were rejected because the CTO rejected the underlying trademark applications.

Assignment applications rejected for: (1) No. 12265127; (2) No. 12264795; (3) No. 12264695 (trademark rejection appealed, status unknown); (4) No. 12265155; (5) No. 12265451; (6) No. 12265087 (trademark rejection appealed, status unknown); (7) No. 12407898 (trademark rejection appealed, status unknown); and (8) No. 12407858 (trademark rejection appealed, status unknown).

Note: (1) Deadline to appeal rejections is December 18, 2015; (2) Deadline to file lawsuit is January 19, 2016.

## INDIA

∞ **Office Action Response**
Mark: "Butterfly Logo," (stylized), App. No. 2507026
Grounds for Rejection: Lack of distinctiveness. According to local counsel, this objection is routine and issued in 99% of cases. Local counsel confident that it can overcome the objection.
Deadline to Respond: Deadline triggered by mailing of hard copy of examination report. This has not yet occurred.

# FOREIGN APPLICATIONS/OPPOSITIONS/INFRINGEMENTS

## MEXICO

∞ **Appeal before Mexican Trademark Office**
Mark: "NABI," App. No. 1363939
Status: Final arguments submitted by local counsel on 11-23-15 and pending with Mexican Trademark Office

## AUSTRALIA

∞ **Aoan International Pty Ltd Australia App. No. 1641500 (NABI) (Cl. 9, 28, 41)**
Fuhu discovered the filing of the above junior application and sent Applicant a cease and desist letter in March 2015. After commencement, Fuhu determined that the Australia market was low priority and the matter is not resolved to date.

∞ **Trademark Opposition Against NABI, Australia App. No. 1549919 and NABI CLOUD, Australia App. No. 1604759**
Opposer: National Australia Bank Ltd.
Applicant: Fuhu Holdings, Inc.
Status: After commencement, Fuhu determined that the Australia market was low priority. Opposition status is unknown.

**SELLER DISCLOSURE SCHEDULE SECTION 5.11(f)**

**Technology Licenses**

1. Service Order Number One to Master Service Agreement, dated April 9, 2015, between Fuhu, Inc. and BCM One, Inc., a New York corporation.

2. Authorization and Service Engagement, dated November 18, 2014, between Fuhu (the Authorization and Service Engagement does not specify which Fuhu entity) and P-1 Technologies; Statement of Work: EMC Isilon Implementation, dated November 14, 2014; Service Brief: Network Remediation, dated February 12, 2015, prepared by P-1 Technologies for Fuhu, Inc.

3. Cloud Sherpas Amendment to the Google Apps Service Agreement, dated December 19, 2014, between Fuhu, Inc., and Cloud Sherpas.

4. Service Order Form, from Fuhu, Inc. to Zayo Group, dated June 4, 2014.

5. Proposed Statement of Work, from Independent Technology Group to Fuhu (the Statement of Work does not specify which Fuhu entity), dated February 13, 2015.

6. Gigabit Data Center Services Agreement, dated September 1, 2011, between Fuhu, Inc., and Alchemy Communications, Inc.

7. Master Agreement for Velocity Services, dated May 11, 2015, between Fuhu Inc., and Velocity Technology Solutions, Inc.; Service Description for Velocity Services, dated May 22, 2015.

8. Master Agreement, dated as of February 28, 2014, between Oracle America, Inc. and Fuhu, Inc.

9. Software Development and License Agreement, dated August 7, 2014, between Fuhu, Inc. and Hyweb Technology Co., Ltd., a Taiwanese corporation.

10. Android PDK License Agreement for OEMs, dated October 3, 2014, between Fuhu, Inc. and Google, Inc., a Delaware corporation.

11. Mobile Application Distribution Agreement, dated December 1, 2014, between Fuhu, Inc. and Google, Inc., a Delaware corporation.

12. Anti-Fragmentation Agreement, dated December 4, 2014, between Fuhu, Inc. and Google, Inc., a Delaware corporation.

13. Mobile Application Distribution Agreement, dated June 1, 2013, between Fuhu, Inc. and Google, Inc.

14. Annex One, MediaMaker Software and Service Level Agreement, undated, between Fuhu, Inc. and XStream A/S; Xstream Software Purchase Order, dated March 15, 2013, between Fuhu, Inc. and Xstream A/S; Xstream Hosting Service Level Agreement, undated.

15. Mediago Master License and Professional Services Agreement, dated March 31, 2015, between Fuhu, Inc. and Kaltura, Inc.

16. BrightCove Master Service Agreement, dated December 11, 2013, between Fuhu, Inc. and Brightcove, Inc.

17. Master Services Agreement, dated May 23, 2012, between EdgeCast Networks, Inc., and Fuhu, Inc.; Service Level Agreement, undated; Service Order, dated May 23, 2012.

18. Reliam Sales Order Form for AWS Re-Sale and cost optimization services, dated October 1, 2015; Reliam's Sales Order Form for PCI Compliance Environment on AWS, dated September 30, 2015.

## SELLER DISCLOSURE SCHEDULE SECTION 5.11(j)

## Intellectual Property Standard Setting Organizations

None.

**SELLER DISCLOSURE SCHEDULE SECTION 5.13**

**Insurance Policies**


**[See attached]**

**Schedule 5.13. Fuhu Insurance Summary**

| Policy Number | Policy Type | Coverage | Insurance Company |
|---|---|---|---|
| 6309S12B767 | Commercial General Liability | $1,000,000 | Travelers Property Casualty Company of America |
| CUP9512B676 | Commercial Excess Liability Umbrella | $5,000,000 | Travelers Property Casualty Company of America |
| BA4F164806 | Commercial Automobile | $1,000,000 | Travelers Property Casualty Company of America |
| ZPP21N34405 | Foreign Package | $2,000,000 | Travelers Property Casualty Company of America |
| HJUB1C81319715 | Workers Compensation | $1,000,000 | Travelers Property Casualty Company of America |
| 7901240 | Cargo | $2,500,000 | Chubb Group of Insurance Companies |
| 03096296 | Excess Directors & Officers Liability | $5,000,000 | Allied World Assurance Company |
| CNC6602067 | Excess Umbrella | $5,000,000 | Topa Insurance Company |
| SISIFNL20207615 | Directors & Officers | $5,000,000 | Starr Indemnity & Liability Company |
| | Employment Practices | $5,000,000 | |
| | Fiduciary | $1,000,000 | |
| ESD01108868 | Errors & Omissions | $1,000,000 | Lloyd's |

## Fuhu Insurance Summary

| Policy Number | Policy Type | Coverage NTD | Policy Period | Insurance Company |
|---|---|---|---|---|
| 0621D101907 | Public Liability Insurance | $100,000,000 | 12/18/14-12/18/15 | Taian Insurance Co., Ltd. |
| 0592O4B00185 | Fire Insurance | $41,000,000 | 09/30/15-09/30/16 | Taian Insurance Co., Ltd. |
| 0592O3B00132 | Fire Insurance | $41,000,000 | 12/18/14-12/18/15 | Taian Insurance Co., Ltd. |
| | | | | |
| | | | | |

**SELLER DISCLOSURE SCHEDULE SECTION 5.16**

**Permits**

None.

**SELLER DISCLOSURE SCHEDULE SECTION 5.21**

**Banks**

**[see attached]**

## List of Fuhu Bank Accounts

### *Fuhu Inc./Fuhu Holdings*

Wells Fargo Bank, 309 N. Sepulveda Boulevard, Unit A, El Segundo, CA 90245

Fuhu, Inc. Savings Account – XXXXX9961     Jim Mitchell (President) and Ming Cheung (Director of Finance)
Fuhu, Inc. Savings Account – XXXXX1852     Jim Mitchell (President) and Ming Cheung (Director of Finance)
Fuhu, Inc. Checking Account – XXXXX3134     Jim Mitchell (President) and Ming Cheung (Director of Finance)
Fuhu, Inc. Checking Account – XXXXX8478     Jim Mitchell (President) and Ming Cheung (Director of Finance)
Fuhu, Inc. Checking Account – XXXXX4969     Jim Mitchell (President) and Ming Cheung (Director of Finance)
Fuhu Holdings, Inc. Checking Account – XXXXX3614     Jim Mitchell (President) and Ming Cheung (Director of Finance)
Fuhu Holdings, Inc. Checking Account – XXXXX5944     Jim Mitchell (President) and Ming Cheung (Director of Finance)

HSBC Bank, 660 S. Figueroa Street, Suite 800, Los Angeles, CA 90017

Fuhu, Inc. Checking Account – XXX-XXX03-2     Jim Mitchell (President) and Ming Cheung (Director of Finance)

PayPal, 2211 North First Street, San Jose, CA 95131

Fuhu, Inc. Business Account – Account Number N/A     Ming Cheung (Director of Finance)

## Subsidiaries

### *Nabi Inc.*

Wells Fargo Bank, 309 N. Sepulveda Boulevard, Unit A, El Segundo, CA 90245

Nabi Inc. Checking Account #XXXXXX5033     Jim Mitchell (President) and Jessica Chen (Corporate Secretary)
Nabi Inc. Checking Account #XXXXXX75025     Jim Mitchell (President) and Jessica Chen (Corporate Secretary)

### *Fuhu Taiwan, Inc.*

Cathay United Bank, 1st Fl., No. 7, Song Ren Rd., Taipei, Taiwan

**Signatories**

Fuhu Taiwan Checking Account #XXX-XX-XXX2818     Justin Nishiki (Director)

*Fuhu Limited*

HSBC Bank, 660 South Figueroa Street, Suite 800, Los Angeles, CA 90017

Fuhu Limited Checking Account #XXX-XX6390–001     Ming Cheung (Director of Finance) and Peter Coleman (Former CFO)

*Fuhu Japan, Inc.*

Sumitomo Mitsui Banking Corporation, Tokyo-chuo Branch 2-1-10 Nihonbashi chuo-ku Tokyo Japan 103-0027

Fuhu Japan, Inc. Checking Account #XXX-XXX1793     Kazuhiro Ohshima (CEO of Fuhu Japan)

**List of Fuhu Safety Deposit Boxes:**

Wells Fargo Bank, 1501 Pacific Coast Highway, Hermosa Beach, CA. 90254

Safety Deposit Box # 45     Jim Mitchell (Chief Executive Officer), Daryl Okimoto (Creative Director of Operations), Dan Miyahara (Chief Creative Officer)

**<u>SELLER DISCLOSURE SCHEDULE SECTION 5.22</u>**

**Brokers**


Krys Global USA, Inc., a subsidiary of Krys & Associates Cayman Ltd.